## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CAPITOL PAVING OF D.C., INC.** | : | |
| **Plaintiff** | : | |
| **v.** | : | **Civil Case No. 07cv113 (RJL)** |
| **DISTRICT OF COLUMBIA et al.** | : | |
| **Defendants** | : | |


### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Capitol Paving of D.C., Inc. ("Capitol Paving"), by its attorneys, Gavett and Datt, P.C., and Douglas A. Datt, Esquire respectfully moves this Court for entry of a Preliminary Injunction pursuant to Fed. R. Civ. P. Rule 65 and Local Civil Rule 65.1. Plaintiff respectfully refers the Court to the accompanying Memorandum of Points and Authorities in Support of its Motion for Preliminary Injunction.

WHEREFORE, Plaintiff respectfully requests that this Court grant its Motion for Preliminary Injunction in the above-captioned matter.

Respectfully submitted,

GAVETT AND DATT, P.C.

/s/ *Douglas A. Datt*
Douglas A. Datt, Bar No. 410354
Rhoda S. Barish, Bar No. 366658
15850 Crabbs Branch Way, Suite 180
Rockville, MD 20855-2622
ddatt@gavettdatt.com
Telephone: (301) 948-1177
Facsimile: (301) 948-4334
**Counsel for Plaintiff**
**Capitol Paving of D.C., Inc.**

## REQUEST FOR EXPEDITED HEARING

Plaintiff respectfully requests an expedited hearing on its Motion for Preliminary Injunction.

### Statement of Why Expedition of Hearing is Essential

Capitol Paving adopts and incorporates by reference the arguments set forth in its Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction. As noted in its Memorandum, on January 17, 2007, Capitol Paving filed a lawsuit seeking to have this Court declare invalid and enjoin the implementation of a provision in the District of Columbia Small, Local and Disadvantaged Business Enterprise Development and Assistance Act of 2005 ("the 2005 SLDBEDA Act"), D.C. Code Sections 2-218.01, *et seq.*, which gives an unprecedented and disproportionate preference (Longtime Resident Business or LRB) to entities who have been in business in the District of Columbia for twenty consecutive years or longer. As explained more fully in Capitol Paving's Memorandum, this preference violates, among other things, the Equal Protection clause and conflicts with the stated purpose of the 2005 SLDBEDA Act itself and years of established District of Columbia Procurement law. In addition, although the Act explicitly required that the Mayor issue proposed rules to implement the legislation, the District of Columbia and its officials have began to implement this Act by applying this preference in evaluating bids and awarding contracts, without any rules and in violation of the law.

Capitol Paving is in danger of immediate and irreparable harm if a preliminary injunction is not issued to set aside this provision. Of most immediate concern is the District of Columbia's indication that it is about to award a contract ("the Alley Contract"), in which it has evaluated bids whereby the application of this LRB preference resulted in another contractor being deemed the low

bidder although Capitol Paving was the apparent low bidder before the application of the LRB preference.

As explained in the attached Memorandum, Capitol Paving protested the determination of the District of Columbia Department of Public Works contract officer that after application of the recently enacted LRB preference, another contractor, Fort Myer Construction Corporation was deemed to be the low bidder. The Contract Appeals Board denied the protest on October 12, 2006, and on November 13, 2006, Capitol Paving filed a Petition for Review of the CAB's decision with the Superior Court of the District of Columbia, along with a Motion to Stay Agency Decision and the award of the contract pending review of the issues by the Superior Court.

The constitutional and other issues raised in the present lawsuit are not before the Superior Court, as the CAB is without authority to declare invalid and enjoin the implementation of the LRB provision.

Capitol Paving's Motion to Stay was denied by the Superior Court on March 15, 2007.  The District is moving forward with the award of the Alley Contract.  In the most recent pleadings filed on March 14, 2007 in the  Superior Court, the District advised that the proposed contract was undergoing administrative review at the D.C. Office of Contracting and Procurement and that once the internal review was concluded, OCP intended to submit the contract to the Mayor within the next two to three weeks. Once the contract is awarded, the contractor will mobilize its forces and move forward rapidly to perform the work.  Due to the increased cost of a second mobilization, the likelihood of the District terminating the contract and either re-submitting it for bid or awarding it to a new contractor  once work has begun is slim.

In addition,  the District continues to issue Solicitations that contain the LRB preference. Capitol Paving has protested one such Solicitation (Slurry Seal Contract), the appeal of  which is

presently pending in the Superior Court for the District of Columbia.  Other Solicitations will be

issued and Capitol Paving, as well as other contractors in the District, simply cannot effectively

compete in the face of the 10% reduction in bid price accorded a LRB.  Capitol Paving requests an

expedited hearing so that the ongoing prejudice it sustains will be held in abeyance pending review

of the issues by this Court.

GAVETT AND DATT, P.C.


/s/ *Douglas A. Datt*
Douglas A. Datt


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, this 20th day of March, 2007,  a copy of the foregoing Plaintiff's
Motion for Preliminary Injunction, Supporting Memorandum of Points and Authorities, with
attached Exhibit List, exhibits, and proposed Order were served by filing with the Court's electronic
filing service, with instructions to serve on the following:

Carl J. Schifferle, Esquire
Assistant Attorney General
441 Fourth Street, N. WE., Suite 6008
Washington, D. C.   20001
Telephone: (202) 724-6624
Facsimile: (202) 727-3625
E-mail: carl.schifferle@dc.gov
**Counsel for Defendants District of Columbia
and Mayor Adrian Fenty**

/s/ *Douglas A. Datt*


F:\Data\GD\Corporate\104.000\104-35\Pleadings\MOTION-PRELIM-INJUNCTION.wpd

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAPITOL PAVING OF D.C., INC.          :

      Plaintiff          :

v.          :          Civil Action No. 07cv113 (RJL)

DISTRICT OF COLUMBIA, et al.          :

      Defendants          :

## ORDER

UPON CONSIDERATION of Plaintiff's Motion for Preliminary Injunction, the opposition thereto, and the oral argument of counsel:

A.      This Court finds that plaintiff has a likelihood of success on the merits of this action in showing that application of the LRB preference category as set forth in the District of Columbia Small, Local and Disadvantaged Business Enterprise Development and Assistance Act of 2005: (1) violates the Equal Protection Clause of the United States Constitution as well as Plaintiff's civil rights under 42 U.S.C. §1981 and 42 U.S.C. §1983 in that it denies minority businesses, who, for the most part, have not had the advantage of being in business for twenty or more years, equal opportunity to participate in the District of Columbia's contracting and procurement process; (2) violates the Equal Protection Clause in that it is an economic provision not rationally related to a legitimate state interest, and is arbitrary, capricious, and unreasonable in that there is no reasonable basis for affording such a large and unprecedented preference to companies that have been in business for twenty years or longer when the application of this enormous preference in fact, has a severe adverse economic impact on the District; (3) conflicts with the stated purpose of the Act to stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's contracting and procurement process; (4) conflicts with the District

of Columbia Procurement Practices Act; (5) is unconstitutionally vague; and (6) the public officials who have attempted to apply the Act have failed to comply with the 2005 SLDBEDA Act and the District of Columbia Administrative Procedures Act;

B.     This Court further finds that plaintiff will suffer irreparable harm if the Court does not grant injunctive relief, the balance of harms weighs in favor of the injunctive relief plaintiff seeks, and the injunctive relief plaintiff seeks is in the public interest.

It is therefore this _____ day of _____, 20___,

ORDERED, that defendants and their officers, agents, and employees, are preliminarily enjoined from implementing and applying the LRB category and preferences as set forth in the District of Columbia Small, Local and Disadvantaged Business Enterprise Development and Assistance Act of 2005.

_____
Judge
United States District Court for the
District of Columbia

cc:     Douglas A. Datt, Esquire
        Gavett and Datt, P.C.
        15850 Crabbs Branch Way
        Suite 180
        Rockville, MD 20855-2622

        Carl J. Schifferle, Esquire
        Assistant Attorney General
        441 Fourth Street, N. WE., Suite 6008
        Washington, D. C.   20001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAPITOL PAVING OF D.C., INC.**　　　　　:

　　　**Plaintiff**　　　　　　　　　　　　:

**v.**　　　　　　　　　　　　　　　　　　:　　　**Civil Case No. 07cv113 (RJL)**

**DISTRICT OF COLUMBIA, et al.**　　　　　:

　　　**Defendants**　　　　　　　　　　　:

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

GAVETT AND DATT, P.C.

Douglas A. Datt, Bar No. 410354
Rhoda S. Barish, Bar No. 366658
15850 Crabbs Branch Way
Suite 180
Rockville, MD 20855-2622
ddatt@gavettdatt.com
Telephone:  (301) 948-1177
Facsimile:  (301) 948-4334
**Counsel for Plaintiff**
**Capitol Paving of D.C., Inc.**

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.  Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.  History of the District of Columbia Contracting Program . . . . . . . . . . . . . . . . . . . . . 3

      C.  The District of Columbia Small, Local, and Disadvantaged Business Enterprise
          Development and Assistance Act of 2005 ("2005 SLDBEDA Act") . . . . . . . . . . . . 4

      D.  Classifications of Certified Business Enterprises Set Forth in the
          2005 SLDBEDA Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      E.  Departments and Commissions Established By the 2005 SLDBEDA Act . . . . . . . . . 7

      F.  Implementation of the 2005 SLDBEDA Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      G.  Amendments to the LRB Classification Definition Introduced After
          the Passage of the 2005 SLDBEDA Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      H.  The Effect of the 2005 SLDBEDA Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

              1.    The First Citywide Alley Solicitation . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              2.    The Citywide Slurry Seal Solicitation . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  THE GOVERNING STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF . . . . 16

IV.   LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.    PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE
            MERITS OF ITS CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

              1.    The LRB Classification and Preference Violates the Equal Protection
                    Clause in That it Is An Economic Provision Not Rationally Related to a
                    Legitimate State Interest, is Arbitrary, Capricious, and Unreasonable,
                    and Conflicts with the Stated Purpose of the Act . . . . . . . . . . . . . . . . . 18

a.    The LRB Classification and Preference Violates the Equal Protection Clause Because It Has No Rational Basis . . . . 19

    i.  Supreme Court and Federal Court Precedent Make It Clear that the LRB Classification is Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    ii.  The Legislative History of the 2005 SLDBEDA Act Makes It Clear That There is No Rational Basis for the LRB Classification and Preference . . . . . . . . . . . . . . . . 22

b.    The LRB Classification and Preference Conflicts With The Stated Purposes of the Act . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.    The LRB Classification and Preference Conflicts with the District of Columbia Procurement Practices Act . . . . . . . . . . . . . . . . . . 26

3.    The LRB Classification and Preference Violates the Equal Protection Clause of the United States Constitution as Well as Plaintiff's Civil Rights Under 42 U.S.C. §1981 and 42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

4.    The 2005 SLDBEDA Act is Void for Vagueness . . . . . . . . . . . . . . . . . 31

5.    The Public Officials Who Have Attempted to Apply the Act Have Failed to Comply With the  2005 SLDBEDA Act and the District of Columbia Administrative Procedures Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

C.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF THE INJUNCTIVE RELIEF PLAINTIFF SEEKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

D.    THE INJUNCTIVE RELIEF PLAINTIFF SEEKS IS IN THE PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

SECURITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Pages**

*Abel Converting, Inc. v. United States,* 679 F. Supp. 1133 (D.D.C. 1988) . . . . . . . . . . . . . 17, 35

*AFGE v. United States,* 195 F. Supp. 2d 4 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*American Council of Life Insurance v. District of Columbia,* 645 F. Supp. 84
    (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Bradshaw v. Veneman,* 338 F. Supp. 2d 139 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . 16, 38

*Buckeye Industries, Inc. v. Secretary of Labor,* 587 F.2d 231 (5th Cir. 1979) . . . . . . . . . . . . 14

*Bunyan v. Camacho,* 770 F.2d 773 (9th Cir. 1985), *cert. denied,* 477 U.S. 903 (1986) . . . . . . . 21

*City of Richmond v. Croson,* 488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738
    (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 35

*\*CSX Transportation, Inc. v. Williams,* 365 U.S. App. D.C. 331, 406 F.3d 667
    (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17, 35

*Danielson v. Local 275,* 479 F.2d 1033, 1037 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*District of Columbia v. Eastern Trans-Waste of Maryland, Inc.,* 758 A.2d 1
    (D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Dynalectron Corp. v. United States,* 659 F. Supp. 64, 69 (D.D.C. 1987) . . . . . . . . . . . . . . . . . 27

*Francis v. Recycling Solutions, Inc.,* 695 A.2d 63 (D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*General Electric Co. v. Seamans,* 340 F. Supp. 636 (D.D.C. 1972) . . . . . . . . . . . . . . . . . . . . . 36

*Gray Panthers v. Administrator, Health Care Financing Administration,*
    556 F.Supp. 889 (D.D.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*\*Hooper v. Bernalillo County Assessor,* 472 U. S. 612 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Jones & Artis v. District of Columbia Contract Appeals Board,* 549 A.2d 315
    (D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Maldonado v. Houstoun,* 177 F.R.D. 311 (E.D. Pa. 1997), *aff'd,* 157 F.3d 179
    (3d Cir. 1998), *cert. denied,* 526 U.S. 1130 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O'Donnell Construction Co. v. District of Columbia, 295 U.S. App. D.C. 317,
    963 F.2d 420 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 17, 28, 35

Oestereich v. Selective Service Board No. 11, 393 U.S. 233 (1968) . . . . . . . . . . . . . . . . . . . . . . 14

Protest of Capitol Paving of D. C., Inc., CAB No. P-0736 (Oct. 12, 2006) . . . . . . . . . . . . . . . 12

Protest of Capitol Paving of D. C., Inc., CAB No. P-0741 (Nov. 9, 2006) . . . . . . . . . . . . . . . 15

Protest of O'Donnell Construction Co., CAB No. P-158,
    1992 DCBCA LEXIS 228, 39 D.C. Reg. 4479 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Shapiro v. Thompson, 394 U. S. 618 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Soto-Lopez v. New York City Civil Service Commission, 755 F.2d 266
    (2d Cir. 1985), aff'd, 476 U.S. 898 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Williams v. Vermont, 472 U. S. 14 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wisconsin Gas Co. v. FERC, 244 U.S. App. D.C. 349,  758 F.2d 669
    (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Zobel v. Williams, 457 U.S. 55 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S. Const.  Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

U.S. Const. Fourteenth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Statutes**

42 U.S.C. § 1981  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

42 U.S.C. § 1983  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

District of Columbia Code § 2-215.03, *et seq.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

District of Columbia Code § 2-217.01, *et seq.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

District of Columbia Code § 2-218.01, *et seq.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

District of Columbia Code § 2-301.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

District of Columbia Code § 2-309.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Rules**

27 DCMR § 304.1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

27 DCMR § 312.2  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Other Authorities**

Council of the District of Columbia, Committee on Economic
      Development Report on Bill 16-506 (November 6, 2006)  . . . . . . . . . . . . . . . . . . 9-10, 24

Local, Small and Disadvantaged Business Opportunity Development Report,
Volume I, Prepared by the Mayor's Task Force on Local, Small and
Disadvantaged Business Opportunity Development ("Mayor's LSDBE Report")
      (October 16, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40

# I.  <u>INTRODUCTION</u>

Plaintiff, Capitol Paving of D.C., Inc. ("Capitol Paving"), by its attorneys, Gavett and Datt, P.C., and Douglas A. Datt, Esquire,  respectfully submits this Memorandum of Points and Authorities in support of its Motion for Preliminary Injunction.

On January 17, 2007, Plaintiff filed a lawsuit seeking to have this Court declare invalid and enjoin the implementation of a provision in the District of Columbia Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005 ("the 2005 SLDBEDA Act"), D.C. Code § 2-218.01 *et seq.*, which gives an unprecedented and disproportionate preference to businesses who compete in the District of Columbia's contracting and procurement process who have been  in  business in the District of Columbia for twenty consecutive years or longer.  In its lawsuit, plaintiff alleges that this provision: (1) violates the Equal Protection clause as well as Plaintiff's civil rights in that it denies minority businesses, who, for the most part, have not had the advantage of being in business for twenty or more years, equal opportunity to participate in the District of Columbia's contracting and procurement process; (2) violates Equal Protection in that it sets forth a classification and preference that are not rationally related to a legitimate state interest, are arbitrary, capricious, and unreasonable, and conflict with the stated purpose of the 2005 SLDBEDA Act to stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's contracting and procurement process; (3) conflicts with the District of Columbia Procurement Practices Act because it has the effect of reducing competition; and (4) is unconstitutionally vague.

Plaintiff further alleged that the 2005 SLDBEDA Act explicitly required that the Mayor issue proposed rules to implement the legislation and required that the Director of the District of Columbia Department of Small and Local Business Development establish procedures and guidelines for the implementation of the programs established pursuant to the Act.  Since the Mayor never issued  any

proposed rules or implementing rules, and the Director of the District of Columbia Department of

Small and Local Business Development has never established procedures and guidelines for the

implementation of the programs, plaintiff alleged that the actions taken by the District of Columbia

Department of Small and Local Business Development and/or District of Columbia Small and Local

Business Opportunity Commission in certifying companies for this preference, and the actions taken

by District agencies, in particular the District of Columbia Department of Public Works, District

Division of Transportation, in applying this preference in evaluating bids and awarding contracts,

are in violation of the 2005 SLDBEDA Act as well as the District of Columbia Administrative

Procedures Act.

## II.  **FACTUAL BACKGROUND**

### A.     **Parties**

Plaintiff, Capitol Paving, is a District of Columbia minority-owned and operated corporation

authorized to conduct business in the District of Columbia, which has performed work in the District

of Columbia since November 1987.  The work of Capitol Paving includes paving and rehabilitation

work.  Capitol Paving is eligible as a small business enterprise pursuant to the United States Small

Business Act, 15 U.S.C. § 631 et seq., and therefore qualifies as a Small Business Enterprise

pursuant to § 2332 of the Small, Local and Disadvantaged Business Enterprise Development and

Assistance Act of 2005.[1]

The District of Columbia Department of Small and Local Business Development ("DSLBD")

is a department of the District of Columbia which the 2005 SLDBEDA Act authorizes as responsible

for, among other things, stimulating and fostering greater opportunities for local, small, and

---

[1]  Capitol Paving has applied for such certification before the District of Columbia
Department of Small and Local Business Development.

disadvantaged business enterprises to participate in the District's Contracting and procurement process. The 2005 SLDBEDA Act further requires the Director to establish procedures and guidelines for the implementation of the programs established by the Act.

The District of Columbia Small and Local Business Opportunity Commission ("SLBOC") is a District of Columbia commission appointed by the Mayor responsible for, among other things, reviewing applications for certain business certifications including certification as a Local Business Enterprise, Small Business Enterprise, Disadvantaged Business Enterprise, and Longtime Resident Business.

The District of Columbia Department of Public Works, District Division of Transportation ("DDOT") is a department of the District of Columbia that has applied these certifications in soliciting and awarding contracts.

The Act charges the Mayor with responsibility for issuing rules to implement the Act.

**B.    History of the District of Columbia Contracting Program**

Since the 1970's, the District of Columbia has had a contracting program regarding contracts for competitively-bid goods and services entered into with the District of Columbia. Under this program, local, small and economically disadvantaged businesses, which have been certified as such by a District of Columbia agency, have been able to receive preference points on responses to Requests for Proposals ("RFP's") or percent reductions on responses to Invitations or Requests for Bids ("IFB"). Thus, although a business may submit a bid with a bid price that is higher than a competitor's bid, after the application of these preference points or percent reductions, the bid may be considered the lower bid resulting in the contract being awarded to that bidder. Although a contractor's bid may be given a discount for purposes of award consideration, the actual contract award  to be paid to the contractor will be the actual bid amount.

- 3 -

The original legislation setting forth certain such categories and preferences was the Minority Contracting Act of 1976, effective March 29, 1977, D.C. Law 1-95; D.C. Code §2-215.03 *et seq.* The Sheltered Market Program, established under the Minority Contracting Act of 1976, which set forth certain preferences to local minority business enterprises, was declared unconstitutional by the United States Court of Appeals for the District of Columbia Circuit in *O'Donnell Construction Co. v. District of Columbia*, 295 U.S. App. D.C. 317, 963 F.2d 420 (D.C. Cir. 1992). As a result thereof, the Sheltered Market Program for minority businesses was discontinued and the District of Columbia City Council enacted a new program in 1992, allowing businesses to be certified in the Program in a variety of categories. The Local, Small, and Disadvantaged Business Enterprise ("LSDBE") Program was established in 1992 as the Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act. The 1992 Act was amended by the Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act of 1998, effective April 27, 1999, D.C. Law 12-628, D.C. Code § 2-217.01 *et seq.*

Throughout the years, pursuant to this legislation, the number of preference points or percent reductions for particular categories has varied somewhat, ranging from 2 points or 2 percentage point reductions to 5 points or 5 percentage point reductions for any one category. There had never been a category, under any versions of the Act, that had a preference assigned to it in excess of 5 points.

C.    **The District of Columbia Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005 ("2005 SLDBEDA Act")**

On March 24, 2005, the Chairperson of the Council of the District of Columbia, Linda W. Cropp, at the request of the Mayor, introduced before the Council the Fiscal Year 2006 Budget Support Act of 2005 (Bill 16-200). Title II of that Act, Subtitle A, was the District of Columbia Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005 ("the 2005 SLDBEDA Act"). That proposed legislation provided that each District agency shall exercise

- 4 -

its contracting and procurement authority in such a way as to meet on an annual basis the goal of procuring and contracting 50% of the dollar volume of its goods and services to Small Business Enterprises ("SBE"). The proposed legislation also has a mandatory set-aside of small contracts for small business enterprises and a set-aside program for local, small or disadvantaged business enterprises for the District of Columbia supply schedules. The proposed legislation, as originally introduced by Chairperson Cropp, further set forth four categories of preferences in evaluating bids and proposal preferences as follows:

| | | |
|---|---|---|
| a. | Local Business Enterprise (LBE) | 4 points or 4% |
| b. | Disadvantaged Business Enterprise (DBE) | 3 points or 3% |
| c. | Resident Business Ownership (RBO) | 3 points or 3% |
| d. | LBE with principal office located in an enterprise zone (DZE) | 2 points or 2% |

The final version of the 2005 SLDBEDA Act, was signed by the Mayor on July 26, 2005, and transmitted to Congress for review. The law became effective on October 20, 2005. D.C. Code § 2-218.01. A copy of the relevant sections of the 2005 SLDBEDA Act are attached hereto as Exhibit 1.

The final version of the Act set forth many of the same preference categories that had been provided for in previous legislation, and in Chairperson Cropp's original proposal, with preference points or percent reductions of either 2 or 3 points or percent reductions for each category. Inexplicably, however, the newly enacted Act provided for a category that had not appeared in the original version introduced by Council Chairperson Cropp on March 24, 2005 nor in any predecessor legislation. The legislative history, as to the extent it exists, is unclear as to how this category suddenly appeared in the final version of the Act. This new category, entitled "Longtime Resident Business" ("LRB"), is defined in the Act as "a business which has been ***continuously eligible*** for

certification as a Local Business Enterprise... *for twenty consecutive years*." § 2-218.02(13)(emphasis added). This new category was accorded the unprecedented and disproportionate preference of ten points or ten percent (10%) reduction in bid price. § 2-218.43.

### D. Classifications of Certified Business Enterprises Set Forth in the 2005 SLDBEDA Act

Subsection D of the 2005 SLDBEDA Act set forth programs for Certified Business Enterprises. This subsection establishes the following seven classifications of Certified Business Enterprises: Local Business Enterprises ("LBE")(§ 2-218.31); Small Business Enterprises ("SBE") (§ 2-218.32); Disadvantaged Business Enterprises ("DBE") (§ 2-218.33); Qualified Metropolitan Area Business Enterprises ("QMABE") (§ 2-218.34); Resident-owned Businesses ("ROB") (§ 2-218.35); Longtime Resident Businesses ("LRB")(§ 2-218.36); and Local Business Enterprises with Principal Offices located in an Enterprise Zone ("DZE") (§ 2-218.37).

Section 218.41 of the Act sets forth a goal for District agencies with respect to contracting and procurement. This section provides that each agency shall exercise its contracting and procurement authority so as to meet, on an annual basis, the goal of procuring and contracting 50% of the dollar volume of its goods and services, including construction goods and services, to Small Business Enterprises. § 2-218.41(a).

In order to achieve the contracting and procurement goals, the final version of the Act provides for certain bid and proposal preferences to be granted to the following six categories of Certified Business Categories as follows:

| | | |
|---|---|---|
| a. | Small business enterprise (SBE) | 3 points or 3% |
| b. | Resident-owned business enterprise (ROB) | 3 points or 3% |
| **c.** | **Longtime Resident Business (LRB)** | **10 points or 10%** |
| d. | Local Business Enterprise (LBE) | 2 points or 2% |

- 6 -

   e.      LBE with principal office located in an
          enterprise zone ( DZE)               2 points or 2%

   f.      Disadvantaged business enterprise (DBE)     2 points or 2%
          § 2-218.43(a).

(emphasis added).  The Act further provides that a certified business enterprise shall be entitled to any or all of the preferences provided in section 218.43, but in no case shall a certified business enterprise be entitled to a preference of more than 12 points, or reduction in price of more than 12%.  § 2-218.43(b).

Section 2-218.61 sets forth that enterprises seeking to be certified in the following categories must file written applications with the Commission:  LBE, SBE, DBE, ROB, and DZE.  There is no mention of the filing of applications for certification in the category of LRB.

## E.    Departments and Commissions Established By the 2005 SLDBEDA Act

The 2005 SLDBEDA Act established the Department of Small and Local Business Development ("the Department" or "DSLBD").  § 2-218.11.  The Act also established the District of Columbia Small and Local Business Opportunity Commission ("SLBOC" or "Commission"), which was to replace the previously established Local Business Opportunity Commission ("LBOC"). § 2-218.21.

The 2005 SLDBEDA Act states that "[i]t shall be the goal and responsibility of the Department to stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's Contracting and procurement process."  § 2-218.13(a).  The 2005 SLDBEDA Act further states that, "The Director shall establish procedures and guidelines for the implementation of the programs established pursuant to part D of this subtitle."  § 2-218.13(b).

The 2005 SLDBEDA Act further provides that the Department shall establish, among other divisions, the Office of Certification, Compliance, and Enforcement, which shall be responsible for,

among other things, reviewing applications for certification as a local, small, or disadvantaged business enterprise, or as a resident-owned or resident business or as a local business enterprise with its principal office located in an enterprise zone. § 2-218.13(c)(1).

The 2005 SLDBEDA Act described the functions of the Commission and provided that the Commission shall, among other things, "Determine a business enterprise's or joint venture's eligibility for certification under part D and review and determine the continued eligibility of business enterprises and joint ventures certified by the Commission." § 2-218.22.

The 2005 SLDBEDA Act further stated that the Commission "shall educate the public, including District residents and businesses, about the District's programs for local, small, and disadvantaged business enterprises" and "stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's contracting and procurement process and provide recommendations  to the Council and the Mayor on ways to increase the participation." § 2-218.23.

> ### F.    Implementation of the 2005 SLDBEDA Act

The 2005 SLDBEDA Act explicitly requires that the "Mayor shall... issue proposed rules to implement this subtitle." § 2-218.72.  No such implementing rules have ever been issued.

Despite the fact that no implementing rules have been issued, the DSLBD and/or SLBOC have started to certify companies in the LRB category and that certification and its associated preferences are being relied upon and applied by District of Columbia agencies in evaluating bids and awarding contracts.

> ### G.    Amendments to the LRB Classification Definition Introduced After the Passage of the 2005 SLDBEDA Act

After apparent discontent by those small businesses adversely affected by the newly created LRB category, less than one month after the effective date of the 2005 SLDBEDA Act, on

November 2, 2005, an amendment was introduced by Council-member Brown, the "Longtime Resident Business Definition Amendment Act of 2005," Bill 16-506, which would amend the 2005 SLDBEDA Act to provide that a business enterprise seeking to meet the definition of a Longtime Resident Business, is bound by the size standard of a ***small business enterprise*** and must have been continuously certified as such for ***ten (10)*** consecutive years. (emphasis added). That version of the proposed amendment was never acted on by the Council.

On October 20, 2006, however, a public hearing was held on the Bill with testimony from the public, the Department of Small and Local Business Development, and the Small and Local Business Opportunity Commission. Several witnesses representing individual businesses and public interest organizations representing minority business owners testified in support of the proposed amendment because the reduction in number of years to be eligible for the LRB preference would allow a number of businesses to qualify for LRB certification and would level the playing field for the small business owner. In addition, Ronnie Edwards, the Acting Director of the District of Columbia DSLBD, testified in support of the legislation and proposed additional changes, noting that "this change will reduce the significant advantage currently being enjoyed by larger longtime resident businesses when competing for city contracts against smaller companies." Alberto Gomez, a representative of the District of Columbia SLBOC, also testified in support of the amended legislation and stated that the Commission viewed a fifteen year residency requirement as the most equitable and best suited for identifying longtime resident businesses. *See* Council of the District of Columbia, Committee on Economic Development Report on Bill 16-506 (November 6, 2006), attached as Exhibit 2.

As a result of the public testimony and further review of the legislation, on November 5, 2006, The Committee on Economic Development met to mark-up Bill 16-506. Legislation was then proposed that amended the existing law defining resident businesses and small businesses and

reduced the residency requirement for Longtime Resident Businesses from twenty to fifteen years. *See* Exhibit 2, Draft Committee Print.

On December 5, 2006, a favorable First Vote/Reading of the Amended Bill was undertaken by the Council. *See* Exhibit 3, Council of the District of Columbia Legislative Information Management System. On December 19, 2006, a Second Vote/Final Reading of the Amended Bill was scheduled to be completed. On that date, however, Council Chairperson Linda Cropp introduced an entirely new marked-up bill, Bill 16-506, the "Longtime Resident Business Definition Amendment Act of 2006," which was passed by the Council that day. The amendment amends the definition of Longtime Resident Business under the 2005 SLDBEDA Act by lowering the threshold for Small Business Enterprises to fifteen consecutive years. Thus, pursuant to the Amendment, a Longtime Resident Business would include either a business which has been continuously eligible for certification as a Local Business Enterprise for twenty consecutive years or a Small Business Enterprise which has been continuously eligible for certification as a Local Business Enterprise for fifteen consecutive years. The amendment was signed by the Mayor on December 28, 2006 and is pending approval by Congress. A copy of the Amendment is attached hereto as Exhibit 4.

At this time, however, the 2005 SLDBEDA Act remains in force, and even if the December 19, 2006 Amendment becomes law, the 2005 SLDBEDA Act would apply to bids that have taken place and continue to take place prior to the effective date of the Amendment.

**H.      The Effect of the 2005 SLDBEDA Act**

The preferences accorded to an LRB pursuant to the 2005 SLDBEDA Act effectively preclude plaintiff and other local, small, and/or disadvantaged enterprises from competing in the District of Columbia contracting and procurement process. Without enjoinment of this provision of the Act, plaintiff will suffer imminent harm as a result of the application of the LRB preference. As shown below, Capitol Paving is in danger of suffering imminent harm as a result of the

application of this provision with respect to two recently-bid solicitations.  These are just two examples of many solicitations to come whereby Capitol Paving is effectively precluded from competitively bidding in the District of Columbia contracting and procurement program.

### 1.    The First Citywide Alley Solicitation

Although Capitol Paving was the low-bidder in response to a March 3, 2006, Solicitation from the District of Columbia, Department of Public Works, District Division of Transportation ("DDOT") for citywide rehabilitation of alleys at various locations in the District of Columbia (FYO5 First Citywide Alley Contract, D. C. Solicitation No. POKA-2005-B-0015-LS), the District of Columbia Department of Transportation advised Capitol Paving on June 7, 2006, that after the application of the recently enacted preference points, another contractor, Fort Myer Construction Corporation ("Fort Myer"), was deemed to be the low bidder.  Capitol Paving's bid was $576,068.20 lower than Fort Myer's bid.  In analyzing the bids, the Department assigned a 2 percent reduction in the bid price to Capitol Paving for its certification as a Local Business Enterprise (LBE).  Capitol Paving has been a District of Columbia business enterprise for nineteen years.  Fort Myer, who was considered the low-bidder, who has been in business for twenty years, received a total of a 12% reduction in the bid price:  2 percent for a Local Business Enterprise (LBE) and 10 percent based on its recent certification as a Longtime Resident Business (LRB).  Although Capitol Paving's bid was almost $600,000 lower than its competitor's bid, after application of the preferences, Fort Myer's bid was considered lower than Capitol Paving's bid by in excess of $ 2 million dollars.  Thus, if and when this contract is finally awarded, the District will be paying almost $600,000 dollars more to Fort Myer than it would have had the contract been awarded to the low bidder, Capitol Paving, based solely on the fact that Capitol Paving has been in business just short of the twenty year period required to receive ten preference points as an LRB.  In addition, of the four(4) contractors who bid

on that project, Fort Myer was the only contractor certified as LRB, and was deemed the low bidder solely due to the application of the LRB preference.

Capitol Paving filed a Protest of this Solicitation before the District of Columbia Contract Appeals Board ("CAB").  In its Protest, Capitol Paving objected to the disproportionate preference given to Fort Myer and objected to many procedural inconsistencies in the bid materials, noting inconsistencies in different parts of the Solicitation regarding the application of preferences.  In addition, Capitol Paving made several other objections, including arguments  that the Agency was unable to award any preferences based on LRB certification since no proposed rules were ever issued implementing the 2005 SLDBEDA Act, the Act failed to specify the certification process required for the LRB preference, the Act did not explain whether any Waiver provisions, which had previously been in effect,  would apply to this category, that there was no mechanism in place by which a company could currently be certified as LRB, and that Fort Myer should not qualify as a LRB because it had not been "continuously" eligible for certification based on its earlier debarment arising out of a March 14, 2003, "guilty" plea to the charge of Conspiracy to Commit Bribery in connection with the Company's role in distributing cash bribes to District Department of Public Works' officials in exchange for the DPW officials agreeing to accept inflated job tickets for asphalt materials that were never provided to the District.[2]

Pursuant to District of Columbia law, during the pendency of Capitol Paving's Protest, the award of the contract was automatically stayed  pursuant to 27 DCMR § 304.1.  On October 12, 2006, Capitol Paving's Protest of this Solicitation was denied by the Contract Appeals Board.  CAB No. P-0736 (October 12, 2006) (Exhibit 5).  The CAB rejected some of Capitol Paving's arguments

---

[2]  Fort Myer was debarred from performing contracts involving Federal funds for a period of eighteen months. In the District of Columbia, Fort Myer was suspended and ultimately debarred for a period of three years.  Subsequent to the imposition of the debarment, the D. C. Council approved an emergency resolution to lift the debarment.

and simply failed to address others.[3]  On November 13, 2006, Capitol Paving filed a Petition for

Review of the Contract Appeals Board decision with the Superior Court of the District of Columbia.[4]

 *Capitol Paving of D.C., Inc. v. District of Columbia Contract Appeals Board,* D.C. Superior Court

C. A. No. 06-0008266 P(MPA).  Along with its Petition for Review, Capitol Paving filed a Motion

to Stay, seeking to have the Superior Court stay the award of the contract (since the automatic stay

provision of 27 DCMR § 304.1 applied only during the pendency of the Protest proceeding before

the CAB).  The District  opposed the Motion to Stay along with Intervenor Fort Myer Construction

Corporation. On March 15, 2007, the Honorable Melvin R. Wright denied Capitol Paving's Motion

to Stay.  Judge Wright noted  that the constitutional arguments before this Court were specifically

not before him for decision.  The District is moving forward with the award of the contract.  In a

filing in the Superior Court dated March 14, 2007, the District indicates that the proposed contract

is undergoing administrative review at the D.C. Office of Contracting and Procurement, and that

---

[3]  In its decision denying Capitol Paving's Protest, the Contract Appeals Board indicated that with respect to Capitol Paving's Protest objecting to Fort Myer's certification as a Longtime Resident Business, any challenges to such certification should be  properly addressed to the Department of Small and Local Business Development (DSLBD).  Capitol Paving filed a Complaint before the DSLBD on November 13, 2006, objecting to Fort Myer's certification as a LRB.  The DSLBD remained silent after receiving Capitol Paving's Complaint, yet on December 19, 2006, temporarily re-certified Fort Myer as a LRB.  By letter dated January 17, 2007, to the Interim Director of the DSLBD, Capitol Paving objected to such re-certification, especially in light of Capitol Paving's pending Complaint.  Having received no response to its correspondence, by letter dated February 16, 2007, Capitol Paving again objected, and notified the DSLBD that under Section 2363 of the 2005 SLDBEDA Act, the Commission, if it does not determine that a Complaint is frivolous or otherwise without merit, is required to hold a hearing on the Complaint within three months of the filing of the Complaint.  On March 5, 2007, the General Counsel for DSLBD advised that Capitol Paving's Complaint had recently been sent to the Commission and DSLBD was awaiting a response from the Commission as to how to proceed.

[4]  Although many decisions of the CAB may be appealed directly to the District of Columbia Court of Appeals, because bid protests are not contested cases, they may not be appealed directly to the Court of Appeals under D.C. Code § 2-309.05 (2006).  *Francis v. Recycling Solutions, Inc.,* 695 A.2d 63 (D.C. 1997); *Jones & Artis v. District of Columbia Contract Appeals Board,* 549 A.2d 315 (D.C. 1988).  District of Columbia Municipal Regulation Section 312.2 governs judicial review of Board decisions on Protests.

once the review is concluded, OCP intends to submit the contract to the Mayor within the next two to three weeks.

The issues before the CAB, and the appeal of those issues currently before the Superior Court, do not include the issues Capitol Paving presented to this Court seeking to have this Court declare invalid and enjoin the implementation of the LRB provision in the 2005 SLDBEDA Act, since the CAB is without authority to take such action. *See, e.g., Protest of O'Donnell Construction Co.,* CAB No. P-158, 1992 DCBCA LEXIS 228, 39 D.C. Reg. 4479 (1992), *citing Oestereich v. Selective Service Board No. 11,* 393 U.S. 233 (1968) and *Buckeye Industries, Inc. v. Secretary of Labor,* 587 F.2d 231 (5th Cir. 1979).

### 2.    The Citywide Slurry Seal Solicitation

In a second Solicitation, again by the Office of Contracting and Procurement ("OCP") on behalf of the DDOT, the District issued an Invitation to Bid for joint seal, slurry seal, and bituminous surface treatment for various roadways in the District of Columbia, Solicitation No. POKA-2006-B-0090-LJ (FYO6 Citywide Slurry Seal and Chip Seal Contract). The Solicitation and ensuing contract provide for the citywide rehabilitation of streets and road surfaces which have developed cracks. The term of the Contract is for a period of one(1) year and the one year price range is approximately $1,500,000.

Prior to bid opening, Capitol Paving, as a prospective bidder whose direct economic interest would be affected by the award of the contract, filed a Protest to the Solicitation. In its Protest, Capitol Paving set forth two major areas of objection. First, Capitol Paving argued that the Solicitation contained inconsistencies regarding how bids will be evaluated in that there was a conflict between Section M, which set forth the Evaluation factors and preferences the District would apply in evaluating bids, and Attachment J.7, the LSDBE Certification Package issued by the Office of Local Business Development, which set forth different preferences and evaluation factors.

Second, Capitol Paving objected to the evaluation factors set forth in the Solicitation, including the identification of a ten point or ten percent reduction for the LRB preference, for largely the same reasons as set forth in its Protest of the First Citywide Alley Contract, as described above.

After the filing of Capitol Paving's Protest, and prior to bid opening,  the District issued an Amendment to the Solicitation deleting in its entirety Attachment J.7 LSDBE Certification Package. On November 9, 2006, Capitol Paving's Protest of this Solicitation was denied by the Contract Appeals Board.  CAB No. P-0741 (November 9, 2006) (Exhibit 6).  The Board took the position that the District's removal of Attachment J.7 mooted any issue of inconsistency regarding the applicable preferences.  Further, the Board essentially adopted the reasoning it had previously employed to deny Capitol Paving's Protest in connection with the Alley Contract Protest, and again failed to address some of Capitol Paving's other arguments.

On December 11, 2006, Capitol Paving filed a Petition for Review of the CAB  decision with the Superior Court of the District of Columbia.  *Capitol Paving of D.C., Inc. v. District of Columbia Contract Appeals Board,* D.C. Superior Court Civil No. 2006 CA 00817 P(MPA).  Along with its Petition for Review, Capitol Paving filed a Motion to Stay, seeking to have the Superior Court stay the award of the contract (again, since the automatic stay provision of 27 DCMR § 304.1 applied only during the pendency of the Protest proceeding before the CAB).

On January 26, 2007, the Superior Court, *sua sponte* , issued a Show Cause Order why the Motion for Stay of Agency Decision should not be granted and requested that the District file a response by February 8, 2007.  The District failed to file a response by that date.  On  February 15, 2007, the Superior Court issued an Order granting Capitol Paving's Motion to Stay.  The District filed a Motion for Reconsideration based on its failure to respond, which has been granted by the Honorable Lynn Leibovitz.  The case has also been transferred to Judge Wright for decision on  the merits of the Motion to Stay, briefing schedule and consolidation of the two cases.

As with the appeal of the Protest regarding the Alley Contract Solicitation, the issues before the CAB, and the appeal of those issues currently before the Superior Court, do not include the issues Capitol Paving presented to this Court seeking to have this Court declare invalid and enjoin the implementation of the LRB provision in the 2005 SLDBEDA Act, since, as noted above, the CAB is without authority to take such action.

### III.  THE GOVERNING STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

In evaluating whether to grant a motion for preliminary injunction, this Court must consider four factors: (1) whether there is a substantial likelihood that plaintiff will prevail on the merits of its claim; (2) whether plaintiff will suffer irreparable injury absent an injunction; (3) whether the harm to plaintiff if the injunction is denied outweighs the harm to defendants if it is granted; and (4) whether an injunction would be in the public interest or at least not be adverse to the public interest. *O'Donnell Const. Co. v. District of Columbia*, 295 U.S. App. D.C. 317, 963 F.2d 420, 428-29 (D.C. Cir. 1992); *Bradshaw v. Veneman,* 338 F. Supp. 2d 139, 141 (D.D.C. 2004).

These factors are viewed as a continuum, "with more of one factor compensating for a less of another." Thus, injunctive relief may be granted "with either a high probability of success and some injury, or vice versa." *Bradshaw,* 338 F. Supp. 2d at 141.  "Where there is a particularly strong likelihood of success on the merits even if there is relatively slight showing of irreparable injury," injunctive relief may be justified.  *CSX Transportation, Inc. v. Williams,* 365 U.S. App. D.C. 331, 406 F.3d 667, 670 (D.C. Cir. 2005);  *CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995).  In addition, where there is a challenge to a District of Columbia statute, if the Court finds that there is substantial likelihood of success on the merits with respect to

- 16 -

one of plaintiff's challenges, this would satisfy the requirement that plaintiff is likely to succeed on the merits without regard to the other challenges to the D.C. Act. *See, e.g., CSX,* 406 F.3d at 669 n.3.

In addition, in cases involving government procurement, "[c]ourts find irreparable harm and grant injunctive relief to a disappointed bidder more readily where the government has violated statutory or regulatory requirements." *Id.* at 22 n.18, *citing O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 428-29 (D.C. Cir. 1992) and *Abel Converting, Inc. v. United States,* 679 F. Supp. 1133, 1142 (D.D.C. 1988).

## IV. <u>LEGAL ARGUMENT</u>

As shown below, there is a substantial likelihood that plaintiff will succeed on the merits of this action. There is absolutely no rational basis for the LRB preference in the 2005 SLDBEDA Act and as shown below, it clearly violates established law.

Plaintiff has no adequate remedy at law for the burdens imposed on it by the 2005 SLDBEDA Act. If the defendants are not enjoined from enforcing application of the LRB preference, plaintiff will suffer immediate and irreparable harm. Although the amendment to the Act which was recently passed by the District of Columbia Council, which changes the definition of LRB to include not only big businesses which have been in existence for twenty years, but small businesses that have been in existence for fifteen years, the passage of the amendment does not relieve the unfair effects of the 2005 SLDBEDA Act. If the amendment becomes law, it would only be effective when it finally becomes law, and would not afford relief to local, small, and/or disadvantaged enterprises that are being unfairly precluded from competing for contracts that are being awarded as of now pursuant to the 2005 SLDBEDA Act and the current definition of LRB.

Injunctive relief will serve the public interest in that the application of the LRB preference points pursuant to the 2005 SLDBEDA Act causes substantial harm to the District because after application of the unprecedented and disproportionate ten point preference to LRB's, the District will be awarding contracts to bidders who, prior to the award of these points, in fact, were not the lowest bidders and therefore the District and its residents are entering into contracts which are not the lowest bids for the work.  Injunctive relief will further serve the public interest in that it will preserve the status quo and foster equitable and  broad-based competition in the District through support of the free enterprise system, ensuring support of the local, small and disadvantaged business opportunity program, full and open competition by providing that contractors are given adequate opportunities to bid and that the government receives sufficient bids to ensure that it obtains the lowest possible price for goods and services that meet specifications and standards for quality; provide for increased public confidence in the procedures followed in public procurement; provide increased economy in procurement activities, and would ensure the fair and equitable treatment of all persons who deal with the procurement system of the District government.

As further demonstrated below, denial of injunctive relief will cause greater injury to plaintiff than granting injunctive relief will cause to defendants.

## A. PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIM

There are five Counts in the Complaint.  As shown below, there is a substantial likelihood that plaintiff will succeed on the merits of this action.

### 1. The LRB Classification and Preference Violates the Equal Protection Clause in That it Is An Economic Provision Not Rationally Related to a Legitimate State Interest, is Arbitrary, Capricious, and Unreasonable, and Conflicts with the Stated Purpose of the Act

In Count II, plaintiff alleges that the Act violates the Equal Protection clause because it is an economic provision not rationally related to a legitimate state interest, is arbitrary, capricious, and

unreasonable, and conflicts with the stated purpose of the Act. As shown below, it is not even necessary to examine whether the LRB preference impacts a suspect class, because it has no rational basis whatsoever under well-established law.

### a. The LRB Classification and Preference Violates the Equal Protection Clause Because It Has No Rational Basis

To pass constitutional muster, the District of Columbia Act must be rationally related to a legitimate government purpose. *American Council of Life Insurer. v. District of Columbia,* 645 F. Supp. 84, 86 (D.D.C. 1986), *citing Gray Panthers v. Administrator, Health Care Financing Administration,* 566 F. Supp. 889, 892 (D.D.C. 1983). Although the District of Columbia Council may have a legitimate interest in its promoting economic opportunities in the District, and may arguably have an interest in promoting local businesses, the question here is whether the District of Columbia Council acted "in an irrational and arbitrary fashion," *id.,* in enacting legislation which gives an unprecedented and disproportionate preference to businesses who have been in business in the District of Columbia for **twenty consecutive years** or longer. It is clear from well-established law that such a provision has no rational basis and is clearly unconstitutional.

### i. Supreme Court and Federal Court Precedent Make It Clear that the LRB Classification is Unconstitutional

Judicial inquiry into equal protection claims necessarily requires a determination of whether the statutory classifications drawn are reasonable in light of the statute's purpose. *AFGE v. United States,* 195 F. Supp. 2d 4 (D.D.C. 2002).

The United States Supreme Court has consistently struck down statutes that set forth classifications favoring longtime residents. Beginning with the case of *Zobel v. Williams,* 457 U.S. 55 (1982), the Supreme Court ruled that when a state makes distinctions between residents based on how long they have lived in the State, such classifications are subject to scrutiny under the

equal protection clause, and generally survive that scrutiny only if the distinctions rationally further a legitimate state purpose. In *Zobel*, the State of Alaska had given long-term residents larger cash dividends than newer residents as an alleged reward for contributions of various kinds which the longer-term residents made during their years of residency. The United States Supreme Court made it clear that such classifications were not based on a legitimate state purpose, and there was no valid state interest to be served by making a distinction between citizens who established residency before 1959 and those who became resident since then. The Court took the position that the equal protection clause prohibited an apportionment based on contributions state residents had made to the community in the past through the payment of taxes. *See also Shapiro v. Thompson,* 394 U.S. 618 (1969) (a State may not apportion welfare benefits according to the past tax contributions of applicants).

Similarly, in *Williams v. Vermont,* 472 U. S. 14 (1985), the Supreme Court struck down a Vermont statute which gave credits for sales taxes paid to a reciprocating state on cars purchased by present Vermont residents, but denied the credit to Vermont residents who purchased and registered their cars outside of the State before becoming Vermont residents. The Court held that no legitimate purpose was furthered by these classifications, and that residence at the time of purchase was a wholly arbitrary basis on which to distinguish among present Vermont registrants.

Again, in *Hooper v. Bernalillo County Assessor,* 472 U. S. 612 (1985), the Supreme Court struck down a statute that granted longtime state resident Vietnam veterans a partial property tax exemption. The Court noted that the statute created "fixed permanent distinctions between... classes of concededly bona fide residents" based on how long they resided in the State and that such classification did not bear a rational relationship to a legitimate state purpose.

- 20 -

Many federal courts have similarly found statutes which make distinctions between longtime residents and newer residents to be repugnant to Equal Protection principles. In *Soto-Lopez v. New York City Civil Service Commission,* 755 F.2d 266 (2d Cir. 1985), *aff'd,* 476 U.S. 898 (1986), the United States Court of Appeals for the Second Circuit examined a law which gave veterans who were New York residents at the time of their induction into the military extra preference points on their civil service examinations. The Court concluded that rewarding only prior state residents for performing military service was not a legitimate state purpose and that distinguishing between longtime residents and those veterans who were not residents at the time of their induction was not rationally related to a legitimate state purpose.

Similarly, in *Bunyan v. Camacho,* 770 F.2d 773 (9th Cir. 1985), *cert. denied,* 477 U.S. 903 (1986), the United States Court of Appeals for the Ninth Circuit was faced with the constitutionality of a Guam statute that granted retroactive retirement credit to local government employees who were Guam residents before they started college. The Court found that the statute violated the Equal Protection Clause because its distinction between different classes of resident civil servants by rewarding only "established" residents for past conduct was not a legitimate purpose.

The United States Court of Appeals for the Third Circuit was faced with a similar issue in *Maldonado v. Houstoun,*177 F.R.D. 311 (E.D. Pa. 1997), *aff'd,* 157 F.3d 179 (3d Cir. 1998), *cert. denied,* 526 U.S. 1130 (1999). In that case, the Court examined a Pennsylvania statute which made a distinction between two classes of indigent residents in determining welfare benefits: one class was comprised of residents who had resided in the state a year or more, and the other of residents who resided in the state less than one year. The Commonwealth of Pennsylvania contended that the statute was rationally related to furthering its legitimate interest in fostering the self-sufficiency and

- 21 -

work ethic of its citizens.  The Court disagreed, finding that the Constitution required that the State

not discriminate on the basis of time of residence.[5]

It is clear from these cases that the District's classification and preference to longtime

resident businesses is in violation of the Equal Protection Clause.  The District's distinction between

different classes of businesses by so overwhelmingly rewarding those "established" businesses who

have resided in the District for twenty or more years serves no legitimate purpose and has no rational

basis whatsoever.  As such, it is clear that plaintiff is likely to succeed on the merits of its challenge

to the 2005 SLDBEDA Act.

### ii. The Legislative History of the 2005 SLDBEDA Act Makes It Clear That There is No Rational Basis for the LRB Classification and Preference

There is no evidence that the District of Columbia Council considered  any justification

whatsoever for the adoption of the LRB preference as defined in the final Act.  Indeed, the very

appearance of the LRB category in the final legislation, when it had not appeared in any previous

versions of the bill, is suspect.  There is no indication in the legislative history how this category

suddenly appeared.  In fact, on March 24, 2005, when the legislation was first introduced before the

Council, there was no reference whatsoever to an LRB preference.  The final version of the 2005

SLDBEDA Act, signed by the Mayor on July 26, 2005, inexplicably provided for this new LRB

preference.

Unlike the situation in the *American Council of Life Insurance* case, where the Court found

that the District of Columbia enacted the statute at issue "after extensive hearings on its advisability

and consequences," 645 F. Supp. at 88, in this case, there is no legislative history prior to the

---

[5]  The Court further found in that case that the statue was subject to strict scrutiny because the residency requirement discriminated against newly arrived residents and penalized their fundamental right to travel and migrate.

adoption of the legislation indicating any justification for the LRB preference.  As a result, it does not look like this issue was debated whatsoever, but was somehow inserted into the final version of the Bill.

Interestingly, less than one month after the effective date of the 2005 SLDBEDA Act, on November 2, 2005, an amendment was introduced by Council-member Brown, the "Longtime Resident Business Definition Amendment Act of 2005," which sought to change the definition of Longtime Resident Business to require that such a business have been continuously certified as a **small business enterprise** for **ten (10)** consecutive years. (emphasis added).  That proposed amendment was not acted on by the Council.

Several months later, on October 20, 2006, a public hearing was held regarding the Amendment of the LRB definition,  with testimony from the public, the Department of Small and Local Business Development, and the Small and Local Business Opportunity Commission.  Several witnesses representing individual businesses and public interest organizations representing minority business owners testified in support of the proposed legislation because the reduction in number of years to be eligible for the LRB preference would allow a number of businesses to qualify for LRB certification and would level the playing field for the small business owner.  In addition, Ronnie Edwards, the Acting Director of the District's own agency, the District of Columbia DSLBD, testified in support of the amendment and proposed additional changes, noting that "***this change will reduce the significant advantage currently being enjoyed by larger longtime resident businesses when competing for city contracts against smaller companies***."  Alberto Gomez, another representative of the District of Columbia government, the SLBOC, also testified in support of the amendment and stated that the Commission viewed a ***fifteen*** year residency requirement as the most equitable and best suited for identifying longtime resident businesses.  *See* Council of the District

of Columbia, Committee on Economic Development Report on Bill 16-506 (November 6, 2006), attached as Exhibit 2 (emphasis added).

Incredibly, then, the **ONLY** testimony that is available regarding the intent of this legislation reflects that the experts who are involved with administering the District of Columbia Small and Local Business Opportunity Program not only saw no rational basis for the LRB definition of twenty years as enacted, but advocated a change in the definition in order to meet the goals of the program.

As a result of the public testimony and further review of the legislation, on November 5, 2006, The Committee on Economic Development met to mark -up Bill 16-506. As a result of that meeting, legislation was proposed that amended the existing law defining resident businesses and small businesses and *reduced* the residency requirement for longtime resident businesses **from 20 to 15 years**. *See* Exhibit 2, Draft Committee Print.

On December 5, 2006, a favorable First Vote/Reading of the Amended Bill was undertaken by the Council. *See* Exhibit 3, Council of the District of Columbia Legislative Information Management System. On December 19, 2006, a Final Vote/Second Reading of the Amended Bill was scheduled to occur. Without explanation, on that date Council Chairperson Linda Cropp introduced an entirely new marked-up bill, Bill 16-506, the "Longtime Resident Business Definition Amendment Act of 2006," which was passed by the Council that day. *The amendment amends the definition of Longtime Resident Business under the 2005 SLDBEDA Act by lowering the threshold for Small Business Enterprises to fifteen consecutive years*.

Thus, a Longtime Resident Business would include either a business which has been continuously eligible for certification as a Local Business Enterprise for twenty consecutive years or a Small Business Enterprise which has been continuously eligible for certification as a Local Business Enterprise for fifteen consecutive years. The amendment was signed by the Mayor on

- 24 -

December 28, 2006 and is pending approval by Congress.  A copy of the Amendment is attached hereto as Exhibit 4.  At this time, however, the 2005 SLDBEDA Act remains in force, and even if the 12/19/2006 Amendment becomes law, the 2005 SLDBEDA Act would only apply prospectively if and when it is signed into law.

With respect to the 2005 SLDBEDA Act that is now in force, there is obviously no rational basis for a provision that grants such an enormous  preference to a business that has been certified as LBE for twenty or more years.  There is no evidence that this would result in any benefit to the District, and, indeed, as shown above,  reveals that the application of such a deep discount in evaluating a bid that is, in fact, much higher than others, and that would obligate the District to the original bid price if the contract is awarded, in fact, hurts the District as well as the entity that was the low-bidder prior to the application of the LRB preference.  In addition, as shown herein, the application of this preference is in contradiction to  other legislation and District of Columbia policy to encourage and foster equitably broad-based competition.

Given the suspicious way in which the LRB preference came into being to begin with, the complete lack of any record or even a scintilla of evidence in support of the provision as originally defined, the subsequent testimony by District officials against the original definition and in support of the amendment, and the abrupt departure by the Council in almost immediately amending its definition, there is a likelihood that plaintiff will succeed on the merits in showing that there was no rational basis for this provision to begin with as set forth in the 2005 SLDBEDA Act.

### b. The LRB Classification and Preference Conflicts With the Stated Purposes of the Act

Because of the realities of the marketplace and the nature of companies who have been in business in the District continuously for twenty years or more, the application of the LRB preference

category will result in significant preferences awarded to large, established businesses. Application of the LRB preference will therefore have the effect of counteracting the stated goal of the District that each agency shall exercise its contracting and procurement authority in such a way as to meet on an annual basis the goal of procuring and contracting 50% of the dollar volume of its goods and services to Small Business Enterprises ("SBE").

Application of the LRB preference further conflicts with the purpose and goal of the 2005 SLDBEDA Act itself, and its predecessor acts, to stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's Contracting and procurement process.

As the Mayor's Task force noted, "[s]mall business is critical to the growth and maintenance of the economy. Small businesses produce half of the gross domestic product and employed half of all employees in the United States. More than 75 percent of new jobs are created by small businesses, and 90 percent of new businesses are categorized by the U.S. Census Bureau as small businesses." Census data from 1998 reflects that small businesses employed nearly 48% of the District's employment base. Mayor's LSDBE Report, Exhibit 13 at 14.

This provision of the District Act, therefore, violates the Equal Protection clause of the United States Constitution.

    **2.    The LRB Classification and Preference Conflicts with District of Columbia Procurement Practices Act**

In Count III of the Complaint, plaintiff alleges that the LRB classification and preference conflicts with the District of Columbia Procurement Practices Act. The District of Columbia Code regarding Procurement Practices, § 2-301.01 provides, in relevant part, that the purpose of the District's procurement practices are: to foster effective and equitably broad-based competition in the

District through support of the free enterprise system, ensuring support of the local, small and disadvantaged business opportunity program; to obtain full and open competition by providing that contractors are given adequate opportunities to bid and that the government receives sufficient bids to ensure that it obtains the lowest possible price for goods and services that meet specifications and standards for quality; to provide increased procurement opportunities for District-based, women-owned businesses; to provide for increased public confidence in the procedures followed in public procurement; to provide increased economy in procurement activities and to maximize, to the fullest extent allowed by law, the purchasing power of the District government; and to insure the fair and equitable treatment of all persons who deal with the procurement system of the District government.

The effects of applying the LRB category and its associated disproportionate preference conflicts with all of these stated goals in that it impedes effective and equitably broad-based competition in the District, contradicts the policy to promote local, small and disadvantaged businesses; hinders full and open competition, limits the government's ability to receive sufficient bids to ensure that it obtains the lowest possible price for goods and services that meet specifications and standards for quality; decreases, instead of increases procurement opportunities for District-based, women-owned businesses; decreases public confidence in the procedures followed in public procurement; decreases economy in procurement activities; minimizes, instead of maximizes, the purchasing power of the District government; and infringes on the fair and equitable treatment of all persons who deal with the procurement system of the District government.

By analogy, this Court has found that with respect to contracting with the United States government, a bidder for a government contract has the right to be treated fairly in the contracting process. *Dynalectron Corp. v. United States,* 659 F. Supp. 64, 69 (D.D.C. 1987).

Because application of the LRB classification and preference conflicts with long-established District procurement law, this aspect of the law should be enjoined from enforcement.

> **3.      The LRB Classification and Preference Violates the Equal Protection Clause of the United States Constitution as Well as Plaintiff's Civil Rights Under 42 U.S.C. §1981 and 42 U.S.C. §1983**

As noted above, and as many federal courts have reasoned in similar cases, since it is so clear that the 2005 Act has no rational basis, it is not necessary to even address the argument as to whether the Act, under a strict scrutiny standard, violates the Equal Protection clause.  As shown below, under such a standard, the legislation also fails.

In Count I, Plaintiffs have alleged that application of the LRB preference violates the Equal Protection Clause of the United States Constitution, as well as  42 U.S.C. §1981 and 42 U.S.C. §1983.  In *O'Donnell Const. Co. v. District of Columbia*, 295 U.S. App. D.C. 317,  963 F.2d 420, 428-29 (D.C. Cir. 1992), the United States Court of Appeals for the District of Columbia Circuit was faced with a constitutional challenge by O'Donnell Construction Company to the District's use of racial classifications in awarding road construction contracts under the District of Columbia Minority Contracting Act.  O'Donnell was owned by two men, both of whom were white.  The Minority Contracting Act required, among other things, that each District agency  allocate its construction contracts to reach the goal of 35% of the dollar value of all construction contracts to local minority business enterprises.  Under the "sheltered market" program that was established for assisting minority contractors, agencies were required to set aside contracts and subcontracts for limited competition in bidding among minority business enterprises.  Although non-minority firms were ineligible to compete in the sheltered market, minority business enterprises were eligible to bid for both sheltered and non-sheltered contracts.  963 F.3d at 422.

- 28 -

O'Donnell maintained that by virtue of the operation of this program, O'Donnell was excluded from bidding.  The Court first found that the strict scrutiny standard of review applied with respect to the Court's review of the Act, as was the case in the Supreme Court's decision in *City of Richmond v. Croson,* 488 U.S. 469 (1989).  963 F. Supp. at 423.

The Court, citing *Croson*, noted that under the Equal Protection Clause, "a local government may not use racial classifications to remedy past racial discrimination unless it can demonstrate a compelling interest for doing so."  *Id.* at 424.  The Court stated:

> Those principles demand, at a minimum, that the District have a "strong basis in evidence" to support its racially based program .... The District cannot simply rely on broad expressions of purpose or general allegations of historical or societal racism. Rather, its legislation must rest on evidence at least approaching a *prima facie* case of racial discrimination in the relevant industry. The District's response to the problems of the past – if these have been satisfactorily demonstrated – must also be narrowly tailored to achieve its end.

*Id.* (citations omitted).

The Court found that the Council had increased the 25 percent figure in the 1977 Act from 25% to 35% although the District conceded that no findings were made when the Council increased the percentage, and that raising the goal without any attempt to link the new racial preference to any identified discrimination was simply arbitrary.  *Id.* at 427.

The Court concluded that the District was violating O'Donnell's right to equal protection of the laws and enjoined the District from enforcing the Act in a manner that deprived O'Donnell of the equal opportunity to compete for city road construction contracts.

In what is now somewhat of a "reverse O'Donnell" situation, the District of Columbia Council has promulgated legislation which provides an uneven preference to established  white-owned businesses to the extreme disadvantage to minority-owned firms.  Although the legislation does not explicitly define the categories by racial classification, it is clear that the categories set forth

in the legislation are drawn along racial lines.  In order to receive an LRB preference, which amounts to a discount of ten percentage points (twelve points when combined with the LBE category, which a business must have as a prerequisite), a business must have been eligible as an LBE for twenty or more consecutive years.

Census data demonstrate that minority-owned businesses in the District of Columbia  have shown significant increases since 1992, just fifteen years ago.  For example, between 1992 and 1997, minority-owned businesses in the United States grew more than four times as fast as U.S. firms overall.  Exhibit 7, United States Department of Commerce Press Release, July 12, 2001.  In the District of Columbia, in 1992, there were 1,452 Hispanic-owned firms.  Exhibit 8.  In 1997, that number increased to 2,153, and in 2002, to 2,169.  Exhibit 9.  In 1992, there were 10,111 Black-owned firms in the District of Columbia.  Exhibit 10.  In 1997, that number increased to 10,909,  and in 2002, to 12,198.  Exhibit 11.

Thus, there are a significant number of minority-owned businesses who are not eligible for LRB certification under the current legislation because they have not been in existence for twenty years and will not be eligible for such preference  for quite some time.  Capitol Paving has been in existence since November 1997 and is therefore not currently eligible as an LRB.  Moreover, even if a minority-owned business were to receive for example, three certifications as a Small Business Enterprise, Local Business Enterprise, and Disadvantaged Business Enterprise, the combination of the preference points for these categories (7 total:  3 for SBE, 2 for LBE, and 2 for DBE) still would not come close to the disproportionate preference that an LRB receives pursuant to the 2005 SLDBEDA Act (10 for LRB plus 2 for LBE).

The application of the LRB preference has the effect of violating the equal protection principles embodied in the Due Process Clause of the Fifth Amendment to the Constitution, violates

plaintiff's rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment, and violates plaintiff's rights under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 because it does not give minority-owned businesses the same opportunity to compete in the District of Columbia contracting and procurement process, as non-minority owned businesses. As the Mayor's Task force noted, discrimination studies that were performed in the 1980's provided statistical and anecdotal evidence that supported a finding of contracting discrimination against Black and Hispanic businesses in the District of Columbia geographic market area. Local, Small and Disadvantaged Business Opportunity Development Report, Volume I, Prepared by the Mayor's Task Force on Local, Small and Disadvantaged Business Opportunity Development (October 16, 2002) ("Mayor's LSDBE Report"), Exhibit 13 at 13. The District of Columbia's minority contracting set-aside program, which was created to expand ethnic group participation, was found to be unconstitutional, thereby resulting in the Equal Opportunity for Local, Small, and Disadvantaged Business Enterprise Act. Although the District of Columbia made the decision not to continue with a revised race-based program to replace the original Minority Contracting Act, and instead to develop a race-neutral program, *see* Mayor's LSDBE Report, Exhibit 13 at 140, in fact, the recent adoption of the LRB preference accomplishes the exact opposite effect and promotes new and blatant discrimination against minority-owned businesses by precluding many of them, who have not been in business for twenty years, from competing for District of Columbia procurement opportunities.

As such, the LRB preference set forth in the 2005 SLDBEDA Act should be enjoined.

### 4.     The 2005 SLDBEDA Act is Void for Vagueness

In Count IV of the Complaint, plaintiff has alleged that the 2005 SLDBEDA Act is void for vagueness.

The 2005 SLDBEDA Act defines "Longtime resident business" as "a business which has been continuously eligible for certification as a Local Business Enterprise... for twenty consecutive years." § 2-218.02(13). Section 2-218.61(a) states that no business enterprise shall be permitted to participate in a program established under this part unless the business enterprise has been issued a certificate of registration or provisional certification. Section 2-218.61(b)(1) then describes the certification process for several categories including local, small or disadvantaged business enterprise, resident-owned business, resident business, and Local Business Enterprise with its principal office located in an enterprise zone. Notably absent is any description of certification as a LRB. Thus, the legislation is ambiguous and void for vagueness since it does not even mention in any way whatsoever the certification process for the category of LRB.

Even assuming, *arguendo*, that the legislation is not vague with respect to its failure to include the LRB category in the description of the certification process, it is clear that an entity that receives LRB certification, by definition, must, as a prerequisite, be an LBE. The legislation is further vague, however, because it fails to explain whether being designated as LRB allows you to "double dip" and add-on LBE certification as well. Thus, it is ambiguous whether an entity that is eligible for a 10 point LRB preference in essence is automatically entitled to a 12 point preference, claiming under both LBE and LRB, or whether the LRB category subsumes the LBE category and entities are limited to the LRB category alone and cannot also claim additional preference points under the LBE category. The legislation is therefore void for vagueness and should be set aside.

Further, the legislation is also vague because it fails to describe how a company may be "eligible" for certification as an LRB. Under the previous Acts, in order to apply for LBE certification, a company was required to submit an application accompanied by a sworn Affidavit that the statements made in the application were true and correct along with a Certificate of Good

Standing.  The 2005 SLDBEDA Act does not state that an LRB is a business which has been certified as a Local Business Enterprise for twenty years, but rather, that an LRB is a business which has been continuously ***eligible*** for certification as a Local Business Enterprise... for twenty consecutive years. Thus, a business may not have been ***certified*** as an LBE for twenty years, yet the legislation provides that if it was eligible, it can still obtain LRB certification.  This is completely vague and ambiguous.  What does it mean to be "eligible" for certification?  Must the company receive retroactive certification as an LBE for the years that it was not certified as such?  Does "eligibility" for certification as an LRB for the years prior to actually being certified as LBE for those years require the company to submit an Application for LRB certification accompanied by a sworn Affidavit that the statements  made in the application are true and correct, as it would have to have done to have received LBE certification?  Is the company required to submit a Certificate of Good Standing for all twenty years as it was required to do when applying for LBE certification?  In addition, the 2005 SLDBEDA Act requires a company applying for certification in these other categories to submit evidence of ability and character.  § 2-218.61(b)(2).  Does a company applying for LRB certification  have to submit  evidence of ability and character for a twenty-year period? The legislation is, on its face, void for vagueness with respect to the certification under the new LRB category and should therefore be set aside.

Because people of common intelligence must guess at the meaning of the statue and can differ as to its application, the statute is unconstitutionally vague.

### 5. The Public Officials Who Have Attempted to Apply the Act Have Failed to Comply With the  2005 SLDBEDA Act and the District of Columbia Administrative Procedures Act

In Count V of the Complaint, plaintiff alleges that since no implementing rules have ever been proposed or issued by the Mayor, and no procedures and guidelines have ever been established

by the Director, the actions taken by the DSLBD and/or SLBOC in certifying companies for the LRB preference, and the actions taken by District agencies, specifically the DDOT, in applying this preference in evaluating bids and awarding contracts, are in violation of plaintiff's constitutional rights, the 2005 Act, as well as the District of Columbia Administrative Procedures Act.

Although the 2005 SLDBEDA Act explicitly requires that the "Mayor shall... issue proposed rules to implement this subtitle" (Section 2-218.72), no such implementing rules have ever been issued. The 2005 SLDBEDA Act further requires that "The Director shall establish procedures and guidelines for the implementation of the programs established pursuant to part D of this subtitle." § 2-218.13(b).

The District of Columbia Administrative Procedures Act requires notice of proposed rules and an opportunity to comment upon proposed rules, prior to such rules being enforced by an agency of the District of Columbia government (except in the case of emergency rules). D.C. Code § 2-505 (2006).

The public officials administering this Act have (1) certified companies as LRB's in the absence of any rules setting forth how such certification shall be granted and in the absence of any public comment; (2) begun to apply the LRB classification in determining which bidders should be awarded contracts with the District in the absence of any rules and opportunity for public comment; and (3) in the absence of rules and public comment, have failed to act on Complaints, as allowed by the 2005 Act, by District of Columbia businesses, who object to certain companies being classified as LRB's. (*See* note 3, *supra*)

Since no implementing rules have ever been proposed or issued by the Mayor, and no procedures and guidelines have ever been established by the Director, the actions taken by the DSLBD and/or SLBOC in certifying companies for the LRB preference, and the actions taken by

District agencies, specifically the DDOT, in applying this preference in evaluating bids and awarding contracts, are in violation of plaintiff's constitutional rights, the 2005 SLDBEDA Act, as well as the District of Columbia Administrative Procedures Act.

## B.   PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT INJUNCTIVE RELIEF

As noted above, "Where there is a particularly strong likelihood of success on the merits even if there is relatively slight showing of irreparable injury," injunctive relief may be justified. *CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995).

In addition, in cases involving government procurement, "[c]ourts find irreparable harm and grant injunctive relief to a disappointed bidder more readily where the government has violated statutory or regulatory requirements." *Id.* at 22 n.18 (*citing O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 428-29 (D.C. Cir. 1992 ) and *Abel Converting, Inc. v. United States,* 679 F. Supp. 1133, 1142 (D.D.C. 1988)).

In addition, courts have found that irreparable injury is suffered when monetary damages are difficult to ascertain or inadequate. *CSX,* 406 F.3d at 673, *citing Danielson v. Local 275,* 479 F.2d 1033, 1037 (2d Cir. 1973). In *O'Donnell*, the United States Court of Appeals for the District of Columbia Circuit stated:

> As to irreparable injury, O'Donnell has little hope of obtaining "adequate compensatory or other corrective relief at a later date" if the injunction does not issue. In order to recoup its losses, O'Donnell would have to show which prime contracts and subcontracts it would have received in the absence of the sheltered market and 50 percent set-aside provisions and how much profit it would have made on each of those contracts. The difficulty of such an inherently speculative showing weigh heavily in favor of granting the injunction, especially since O'Donnell's likelihood of success is so high.

963 F.2d at 428 (citations omitted).

Also, while economic loss may not, in and of itself, constitute irreparable harm, such harm

will be found if economic "loss threatens the very existence of the movant's business." *Wisconsin*

*Gas Co. v. FERC,* 244 U.S. App. D.C. 349, 354, 758 F.2d 669, 674 (D.C. Cir. 1985).  *See also*

*District of Columbia v. Eastern Trans-Waste of Maryland, Inc.,* 758 A.2d 1 (D.C. 2000)(finding of

irreparable harm where 80% of the contractor's business came from Government contracts, and its

continued existence was at risk).

By analogy, in the area of government contracts concerning contracts with the United States

government, this Court has recognized that an action for money damages in the United States Court

of Claims, which would be recovery of bid preparation costs, is insufficient to compensate an

unsuccessful bidder for the wrongful award of a government procurement contract, because it does

not fully compensate the loss sustained by the frustrated bidder.  *General Electric Co. v. Seamans,*

340 F. Supp. 636 (D.D.C. 1972).

As set forth in the Affidavit of Francisco R. Neto, President of Capitol Paving, the

application of the LRB preference has caused and will continue to cause irreparable injury to Capitol

Paving.  *See* Affidavit of Francisco R. Neto, attached hereto as Exhibit 14.  As noted in the attached

Affidavit of Mr. Neto, Capitol Paving is a minority-owned and operated business which does a

substantial portion of its work pursuant to contracts with the District of Columbia government for

paving and rehabilitation work.  *Id.* at ¶ 5.  As further noted in Mr. Neto's Affidavit, since March

of 2006, the District of Columbia has issued three Solicitations containing the Longtime Resident

Business (LRB) preference for work that is within the realm of expertise and scope of services

performed by Capitol Paving.   In connection with the FY05 First Citywide Alley Contract, Capitol

Paving was the apparent low bidder by an amount of $576,068.20.  However, upon application of

the LRB preference, Fort Myer was deemed to be the low bidder, although it would perform the

- 36 -

work at its bid price which results in a higher price to the District for the work in the amount of $576,068.20. As a result of the application of the LRB preference, if the First Citywide Alley Contract is awarded to Fort Myer, Capitol Paving would lose a contract potentially generating $25 million over five years. In addition, over the term of the contract, the District will pay $576,068.20 more to Fort Myer than if the contract was awarded to Capitol Paving as the true low bidder. *Id.* at ¶¶ 6-7.

The second Solicitation is for FY06 City Slurry Seal and Chip Seal Contract, which also contains the LRB preference. The contract is for a period of one year, and the one year price range is approximately $1.5 million. The District has also issued POKA-206-R-0087-VH (D. C. Streetcar Anacostia Initial Line Segment). This is a roughly $30 million contract, which also includes the LRB preference. *Id.* at ¶¶ 8-9.

Mr. Neto describes in his Affidavit that at the very minimum, the application of the LRB preference would cost Capitol Paving a contract worth potentially $25 million as well as effectively preventing Capitol Paving from bidding on other Solicitations that contain the LRB preference. Mr. Neto explains that while the District continues to generate contracts which contain the LRB preference, Capitol Paving will not be eligible to apply for the LRB certification until November 9, 2007, and in the interim, the LRB preference has created a monopoly in bidding on contracts for work in the District of Columbia. It is the understanding of Capitol Paving that in the field of paving and rehabilitation work, at the time of the solicitation of the 2006 Alley Contract, only one contractor, Fort Myer Construction Corporation, was eligible and had received the LRB preference. *Id.* at ¶¶ 10-11.

Mr. Neto indicates that if Capitol Paving cannot effectively compete for paving work in the District, Capitol Paving would be required to lay off employees, reduce the size of its operations and

ultimately, it would be forced out of the paving business in the District. *Id.* at ¶ 13. The application

of the LRB preference threatens the very existence of Capitol Paving. *Id.* at ¶ 12. *See also* the

Affidavit of Phuong D. Tran, Vice President and Chief Estimator for Capitol Paving, setting forth

that the LRB preference has the practical effect of reducing and ultimately eliminating competition

in the paving industry in the District. Further, the inability of Capitol Paving to competitively bid

for paving work will result in it being forced out of the paving business in the District. *See* Affidavit

of Phuong Tran, Exhibit 15.

In this case, Plaintiff has no adequate remedy at law for the burdens imposed on it by the

2005 SLDBEDA Act. If the defendants are not enjoined from enforcing application of the LRB

preference, plaintiff will suffer immediate and irreparable harm.

## C.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF THE INJUNCTIVE RELIEF PLAINTIFF SEEKS

In considering a motion for injunction, a court must balance the harm that the plaintiff would

suffer in the absence of the injunction against the harm that the defendants would suffer if the Court

grants the relief. *Bradshaw,* 338 F. Supp. 2d at 141.

In this case, denial of injunctive relief will cause greater injury to plaintiff than granting

injunctive relief will cause to the District. Capitol Paving and other similarly situated contractors

will suffer irreparable harm if they are effectively precluded from competing in the procurement

process. By contrast, if the LRB preference is enjoined, the District may continue to evaluate bids

pursuant to the legislation without giving effect to the LRB category, similar to what it had been

doing for years before this new legislation was passed.

Plaintiff is simply trying to preserve the status quo and have the established preferences that

have been applied in the District contracting and procurement program for many years remain in

effect, without giving effect to the unfair and discriminatory LRB preference which was recently enacted, until this Court can finally rule on its validity.

Any claim by the District that granting injunctive relief will substantially harm it and the public is unsupported by the facts of the case. The Solicitation in question was issued on March 3, 2006, with a bid opening of May 26, 2006. In excess of a year has expired since the Solicitation was issued. Despite the automatic Stay before the Contract Appeals Board, the District could have moved to vacate the Stay, but chose not to do so.

While the District may contend that the lack of funding delayed challenging the Stay, in reality, any lack of funding further corroborates Capitol Paving's argument that this particular contract is not a priority for the District and further review of the constitutionality of the legislation in question will not substantially harm the District.

Even at the present date, the Contract is undergoing administrative review at the D.C. Office of Contracting and Procurement. Any claim by the District of alleged harm when viewed in comparison to the continued implementation of an unconstitutional act weighs in favor of granting the relief sought by Capitol Paving.

It should also be noted that in 2002, Capitol Paving was awarded the same work as specified in the Alley Contract pursuant to a different Solicitation. Capitol Paving had one year left on the original contract. Capitol Paving had performed the prior three option years of the contract successfully, and was prepared to complete the fourth option year.

For reasons unknown, the final year of the contract was cancelled. No explanation for the cancellation was provided. *See* Exhibit 14, Affidavit of Francisco Neto.

The District's decision to cancel the 2002 contract option year resulted in higher prices for the work, as any work performed by Fort Myer under the 2005 Alley Contract will be completed at

a premium based on the application fo the LRB preference. Thus, any argument by the District that the work must move forward immediately or it will sustain higher prices for the repair work and\or that it will incur indirect costs is undermined by its own action to terminate the prior contract and its own inaction in moving the contract forward at a more rapid pace.

After weighing the competing harms in this case, the balance of harms weigh in favor of granting the relief sought by Capitol Paving.

**D.      THE INJUNCTIVE RELIEF PLAINTIFF SEEKS IS IN THE PUBLIC INTEREST**

There are several reasons why the requested injunctive relief is in the public interest.

First, injunctive relief in this case will serve the public interest in that the application of the LRB preference points pursuant to the 2005 SLDBEDA Act causes substantial economic harm to the District because after application of the unprecedented and disproportionate ten point preference to LRB's, the District will be awarding contracts to bidders who, in fact, were not the lowest bidders. By enjoining application of the LRB preference, therefore, the District will be able to continue to enter into contracts which will more likely award the work to the lowest bidder and restore the status quo.

Second, the District of Columbia has emphasized "the importance of small businesses to the economic base of the District and to its Renaissance in real estate and neighborhood development." Local, Small and Disadvantaged Business Opportunity Development Report, Volume I at 2, Prepared by the Mayor's Task Force on Local, Small and Disadvantaged Business Opportunity Development (October 16, 2002), attached as Exhibit13.  Yet, as shown above, the application of the LRB preference category in the 2005 SLDBEDA Act discriminates against small businesses and denies them equal opportunity to participate in the District of Columbia's contracting and procurement

process. Thus, injunctive relief will serve the public interest in that it will restore the status quo to small businesses, as existed before the LRB category and preferences were enacted, providing equal opportunity to compete in the District of Columbia's contracting and procurement process.

Third, as shown above, the LRB preference discriminates against minority-owned businesses, who, for the most part, have not had the advantage of being in business for twenty or more years, and equal opportunity to participate in the District of Columbia's contracting and procurement process. Thus, injunctive relief will serve the public interest in that it will restore the status quo to minority-owned businesses, as existed before the LRB category and preferences were enacted, and provide support and a continuing equal opportunity to compete in the District of Columbia's contracting and procurement process. (*See* Exhibits 14 and 15, Affidavits of Francisco Neto and Phuong Tran)

Fourth, in addition to the fact that the LRB preference category in the 2005 SLDBEDA Act discriminates against minority and small businesses, the preference has a further discriminatory effect in that it denies women-owned businesses, who, for the most part, have not had the advantage of being in business for twenty or more years, equal opportunity to participate in the District of Columbia's contracting and procurement process. Census data demonstrates that women-owned businesses in the District of Columbia have shown significant increases. For example, in 1997, there were 13,979 minority-owned firms in the District of Columbia. Exhibit 12. In 2002, that number increased to 15,675, a 12% increase in that 5-year period alone. *Id.*

Thus, in addition to minority-owned businesses, there are a significant number of women-owned businesses who are not eligible for the LRB preference because they have not been in existence for twenty years and will not be eligible for such preference for quite some time. Moreover, even if a women-owned business were to receive for example, three certifications as a

Small Business Enterprise, Local Business Enterprise, and Disadvantaged Business Enterprise, the combination of the preference points for these categories (7 total: 3 for SBE, 2 for LBE, and 2 for DBE) still would not come close to the disproportionate preference that an LRB receives pursuant to the 2005 SLDBEDA Act (10 for LRB plus 2 for LBE). The District of Columbia Code section regarding Procurement Practices, § 2-301.01 provides, in part, that one of the purposes of the District's procurement practices is to provide increased procurement opportunities for District-based, women-owned businesses. The effects of applying the LRB category and its associated disproportionate preference conflicts with this stated goal.

Thus, injunctive relief will serve the public interest in that it will restore the status quo to women-owned businesses, as existed before the LRB category and preferences were enacted, providing equal opportunity to compete in the District of Columbia's contracting and procurement process.

Fifth, the LRB preference in the 2005 SLDBEDA Act imposes an unreasonable burden on interstate commerce, in violation of the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, and. The LRB preference imposes an unreasonable burden on out-of-state businesses who have strong economic ties to the District and who have conducted business with the District of Columbia. Prior to the 2005 SLDBEDA Act, solicitations conducted under the earlier acts contained a "Waiver Provision" which explained that applicants whose principal offices were not physically located within the District of Columbia were able to qualify for certification as SBE and DBE if they met certain waiver provisions based on an applicant's ability to demonstrate strong economic ties to the District of Columbia. Under the 2005 SLDBEDA Act, a non-District based-business may apply for certification as a Qualified Metropolitan Area Business Enterprise, and may receive certification as a SBE or DBE. There is no provision, however, that affords a QMABE the

- 42 -

opportunity to be certified as a LRB. The Act therefore imposes an unreasonable burden on interstate commerce, in violation of the Commerce Clause of the United States Constitution, as it has a severe economic impact on out-of-state businesses who have previously qualified for certification as SBE and DBE, even if they have had significant economic ties to the District for over twenty years, and puts them at a severe disadvantage to compete with businesses who have conducted business with the District for the same period of time but who are located in the District of Columbia.

Thus, injunctive relief will serve the public interest in that it will restore the status quo to out-of-state metropolitan area businesses, as existed before the LRB category and preferences were enacted, providing equal opportunity to compete in the District of Columbia's contracting and procurement process.

Finally, to the extent the District argues that it is in the public interest for the District to proceed to solicit bids and award contracts to attend to its needs, Capitol Paving is simply asking that the District issue its solicitations and make its awards without the application of the LRB preference category. In that case, the District will be able to award its contracts to the lowest bidder pursuant to categories that existed prior to the enactment of the 2005 SLDBEDA Act which have a rational basis, are non-discriminatory, and promote the District of Columbia's true goals of promoting competition and to stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's contracting and procurement process.

Although obviously arguments can be made on both sides with respect to the public interest argument, maintaining the integrity of the procurement process and ensuring fair and open competition in the solicitation of District of Columbia contracts outweighs the public interest in avoiding a temporary disruption of the procurement process.

## SECURITY

Federal Rule of Civil Procedure 65(c) and Local Civil Rule 65.1.1 provide for the giving of security by the applicant for a preliminary injunction, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. Plaintiff submits that no security is required pursuant to these rules. As discussed above, defendants would suffer little, if any, injury from the issuance of emergency injunctive relief that is later overturned. Plaintiff therefore respectfully requests that the Court require no security or, in the event it deems security necessary, only a modest security in this case.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court grant its Motion for Preliminary Injunction in the above-captioned matter, preliminarily enjoining defendants, and their officers, agents, and employees, from implementing and applying the LRB classification and preferences as set forth in the District of Columbia Small, Local and Disadvantaged Business Enterprise Development and Assistance Act of 2005.

Respectfully submitted,

GAVETT AND DATT, P.C.

/s/ *Douglas A. Datt*
Douglas A. Datt, Bar No. 410354
Rhoda S. Barish, Bar No. 366658
15850 Crabbs Branch Way, Suite 180
Rockville, MD 20855-2622
ddatt@gavettdatt.com
Telephone: (301) 948-1177
Facsimile: (301) 948-4334
**Counsel for Plaintiff**
**Capitol Paving of D.C., Inc.**

F:\Data\GD\Corporate\104.000\104-35\Pleadings\Memo-Motion-Prelim-Injunc.wpd

# EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1 | District of Columbia Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005 |
| 2 | Report on Bill 16-506, the Longtime Resident Business Definition Amendment Act of 2006 (November 6, 2006) |
| 3 | December 5, 2006 Council of the District of Columbia Legislative Information Management System re: favorable First Vote/Reading of Amended Bill 16-506 |
| 4 | Bill 16-506, the "Longtime Resident Business Definition Amendment Act of 2006" (December 19, 2006, signed by the Mayor on December 28, 2006, (D. C. Act 16-22), pending approval by Congress |
| 5 | Contract Appeals Board Opinion, CAB No. P-0736 (October 12, 2006) (First Citywide Alley Solicitation) |
| 6 | Contract Appeals Board Opinion, CAB No. P-0741 (November 9, 2006) (Slurry Seal Solicitation) |
| 7 | United States Department of Commerce Press Release, July 12, 2001 |
| 8 | Census Data, , Statistics for Hispanic-Owned Firms, 1992 |
| 9 | Summary Statistics for Changes in the Number of Hispanic-Owned Businesses and their Receipts: 1997 to 2002 |
| 10 | Census Data, , Statistics for Black-Owned Firms, 1992 |
| 11 | Summary Statistics for Changes in the Number of Black-Owned Businesses and their Receipts: 1997 to 2002 |
| 12 | Summary Statistics for Changes in the Number of Women-Owned Businesses and their Receipts: 1997 to 2002 |
| 13 | Local, Small and Disadvantaged Business Opportunity Development Report, Volume I, Prepared by the Mayor's Task Force on Local, Small and Disadvantaged Business Opportunity Development ("The Mayor's LSDBE Report") (October 16, 2002) |
| 14 | Affidavit of Francisco R. Neto |
| 15 | Affidavit of Phuong D. Tran |

AN ACT

D.C. ACT 16-166

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

JULY 26, 2005

FISCAL YEAR 2006 BUDGET SUPPORT ACT OF 2005

TABLE OF CONTENTS

TITLE I.    GOVERNMENT DIRECTION AND SUPPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
SUBTITLE A.  FISCAL YEAR 2006 BUDGET SUBMISSION
            AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
SUBTITLE B.  PERFORMANCE BASED BUDGETING AMENDMENT . . . . 9
SUBTITLE C.  CRITERIA FOR SPENDING CONTINGENCY FUNDING . . 11
SUBTITLE D.  APPROPRIATION OF ADDITIONAL REVENUE . . . . . . . . 12
SUBTITLE E.  COLLECTIVE BARGAINING AMENDMENT . . . . . . . . . . . 14
SUBTITLE F.  SUPPORT FOR VOTING RIGHTS EDUCATIONAL AND
            INFORMATIONAL ACTIVITIES . . . . . . . . . . . . . . . . . . . . . . . . 14
SUBTITLE G.  LEASING FEES WORKING FUND AMENDMENT . . . . . . . 15
SUBTITLE H.  TOBACCO SETTLEMENT TRUST FUND BOARD
            MEETINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SUBTITLE I.   SURPLUS PERSONAL PROPERTY SALES OPERATING
            FUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SUBTITLE J.  REVENUE AND ALLOCATION PRIORITY
            CLARIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
SUBTITLE K.  STANDARD DEDUCTION AND PERSONAL EXEMPTION
            INCREASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
SUBTITLE L.  EXPANSION OF THE EARNED INCOME TAX CREDIT . . . 19
SUBTITLE M.  ASSESSMENT OF COLLECTION FEES ACT OF 2005 . . . . 20
SUBTITLE N.  ESTABLISHMENT OF COMPLIANCE AND REAL
            PROPERTY TAX ADMINISTRATION FUND ACT OF 2005 . . . . . . 20
SUBTITLE O.  HOMESTEAD DEDUCTION INCREASE . . . . . . . . . . . . . . . 21
SUBTITLE P.  ESTABLISHMENT OF THE COMMODITIES COST
            RESERVE FUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

Exhibit 1, Part 1

**ENROLLED ORIGINAL**

SUBTITLE Q. DISHONORED CHECK FEE COLLECTION . . . . . . . . . . . . 24
SUBTITLE R. REPROGRAMMING AMENDMENT . . . . . . . . . . . . . . . . . . . 25
SUBTITLE S. TAX DEFERRAL FOR LOW-INCOME PROPERTY
    OWNERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SUBTITLE T. FEE COLLECTION INCENTIVE . . . . . . . . . . . . . . . . . . . . . . 30
SUBTITLE U. THE CATHOLIC UNIVERSITY OF AMERICA TAX
    EXEMPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SUBTITLE V. CARVER 2000 LOW-INCOME AND SENIOR HOUSING
    TAX EXEMPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SUBTITLE W. DUPONT COMMONS LOW-INCOME HOUSING TAX
    EXEMPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SUBTITLE X. THE WAY OF THE CROSS CHURCH OF CHRIST TAX
    EXEMPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
SUBTITLE Y. APPALACHIAN STATE UNIVERSITY TAX EXEMPTION  35
SUBTITLE Z. FAMILY PROPERTY RECORDATION AND TRANSFER
    TAX EXEMPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
SUBTITLE AA. AMERICAN PSYCHOLOGICAL ASSOCIATION TAX
    EXEMPTION CONTINUATION . . . . . . . . . . . . . . . . . . . . . . . . . 36
SUBTITLE BB. RECYCLABLE MATERIAL SALES TAX
    CLARIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
SUBTITLE CC. NURSING HOME PROVIDER TAX TECHNICAL
    AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
SUBTITLE DD. WASHINGTON CONVENTION CENTER MARKETING
    FUND AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
SUBTITLE EE. RESIDENTIAL PROPERTY TAX RATE AND CAP
    REDUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
SUBTITLE FF. CALCULATED RESIDENTIAL PROPERTY TAX RATE
    ESTABLISHMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
SUBTITLE GG. LIMITED-EQUITY COOPERATIVE TAX FAIRNESS . . . . 43
SUBTITLE HH. AFFORDABLE HOUSING PRESERVATION TAX
    ASSESSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
SUBTITLE II. TRIENNIAL GROUP DISPARITY CORRECTION . . . . . . . . 46
SUBTITLE JJ. INCOME EXCLUSION FOR DISABLED PERSONS . . . . . . . 47
SUBTITLE KK. REDUCED TAX LIABILITY FOR DISABLED
    PROPERTY OWNERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

TITLE II.   ECONOMIC DEVELOPMENT AND REGULATION . . . . . . . . . . . . . . . . . . 52
SUBTITLE A. OFFICE OF PEOPLE'S COUNSEL AMENDMENT . . . . . . . 52
SUBTITLE B. T.I.F. RE-AUTHORIZATION . . . . . . . . . . . . . . . . . . . . . . . . 52

ii

ENROLLED ORIGINAL

SUBTITLE C.  DISTRICT OF COLUMBIA SUPPORT FOR PUBLIC
    HOUSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
SUBTITLE D.  DEPARTMENT OF CONSUMER AND REGULATORY
    AFFAIRS CONSUMER PROTECTION REVITALIZATION ACT..  . 53
SUBTITLE E. UNEMPLOYMENT COMPENSATION ADMINISTRATIVE
    FUNDING ASSESSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
SUBTITLE F. YOUTH EMPLOYMENT SERVICE INITIATIVE . . . . . . . . . . 56
SUBTITLE G.  OFFICE OF THE CHIEF TENANT ADVOCATE
    ESTABLISHMENT ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
SUBTITLE H.  TRANSITIONAL EMPLOYMENT PROGRAM AND
    APPRENTICESHIP INITIATIVE . . . . . . . . . . . . . . . . . . . . . . . . . . 60
SUBTITLE I.  GREAT STREETS DEVELOPMENT . . . . . . . . . . . . . . . . . . 62
SUBTITLE J.  HOUSING PRODUCTION TRUST FUND AND NEW
    COMMUNITIES FINANCING . . . . . . . . . . . . . . . . . . . . . . . . . . 63
SUBTITLE K.  NATURAL GAS FUND . . . . . . . . . . . . . . . . . . . . . . . . . . 71
SUBTITLE L.  INSURANCE REGULATORY TRUST FUND
    ENHANCEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
SUBTITLE M.  TARGETED HISTORIC HOUSING TAX CREDIT ACT . . . 72
SUBTITLE N.   SMALL, LOCAL, AND DISADVANTAGED BUSINESS
    ENTERPRISE DEVELOPMENT AND ASSISTANCE . . . . . . . . . . . . . 73

TITLE III.    PUBLIC SAFETY AND JUSTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
SUBTITLE A. ESTABLISHMENT OF THE OFFICE OF THE CHIEF
    MEDICAL  EXAMINER MANAGEMENT FUND . . . . . . . . . . . . . . 98
SUBTITLE B. LEGAL SERVICE AMENDMENT . . . . . . . . . . . . . . . . . . . . . 99
SUBTITLE C. THE DEPARTMENT OF CORRECTIONS REIMBURSEMENT
    FUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

TITLE IV.    PUBLIC EDUCATION SYSTEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
SUBTITLE A.   EDUCATION LICENSURE COMMISSION . . . . . . . . . . . . 105
SUBTITLE B.  UNIFORM PER STUDENT FUNDING FORMULA FOR
    PUBLIC SCHOOLS AND PUBLIC CHARTER SCHOOLS . . . . . . . 106
SUBTITLE C.  PRESERVATION OF SCHOOL-BASED STAFF
    POSITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
SUBTITLE D.  FISCAL YEAR 2006 EDUCATIONAL INVESTMENTS
    FUND FOR DISTRICT OF COLUMBIA PUBLIC SCHOOLS AND
    PUBLIC CHARTER SCHOOLS SPENDING PLAN
    REQUIREMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
SUBTITLE E. SCHOOLS MODERNIZATION FUND . . . . . . . . . . . . . . . . 112
SUBTITLE F.  POLICIES FOR 3RD AND 8TH GRADE STUDENTS . . . . . . . 114

TITLE V.     HUMAN SUPPORT SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
             SUBTITLE A.  HEALTH CARE AND CHILD DEVELOPMENT FACILITIES
                 LICENSOR FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
             SUBTITLE B. CLINICAL LABORATORY . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
             SUBTITLE C.  BOARD OF MEDICINE AMENDMENT . . . . . . . . . . . . . . . . 119
             SUBTITLE D.  CHILD SUPPORT PASS-THROUGH ESTABLISHMENT . 120
             SUBTITLE E.  CHOICE IN DRUG TREATMENT SERVICES . . . . . . . . . . . 120
             SUBTITLE F.  HEALTH REGULATION AND OCCUPATIONS FEES . . . . 121
             SUBTITLE G.  SCHOOL BASED HEALTH  . . . . . . . . . . . . . . . . . . . . . . . . 122
             SUBTITLE H. ACCESS RX AMENDMENT ACT . . . . . . . . . . . . . . . . . . . . 122
             SUBTITLE I.  HEALTH REPORTING REQUIREMENTS . . . . . . . . . . . . . . 123
             SUBTITLE J.  RESIDENTIAL PLACEMENT OF CHILDREN
                 AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
             SUBTITLE K.  DEPARTMENT OF MENTAL HEALTH RETIREMENT
                 INCENTIVE PROGRAM ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
             SUBTITLE L.  DEPARTMENT OF MENTAL HEALTH ACUTE CARE
                 INITIATIVE ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
             SUBTITLE M.  HIV/AIDS CRISIS AREA CAPACITY BUILDING FUND . 129
             SUBTITLE N.  DESIGNATED APPROPRIATION ALLOCATIONS . . . . . . 130
             SUBTITLE O.  FUNDING SAFEGUARDS FOR THE CHILD AND FAMILY
                 SERVICES AGENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

TITLE VI.    PUBLIC WORKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
             SUBTITLE A. TRAFFIC AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
             SUBTITLE B. PARKING FINES INCREASE . . . . . . . . . . . . . . . . . . . . . . . 138
             SUBTITLE C. LOCAL ROADS CONSTRUCTION AND MAINTENANCE
                 FUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
             SUBTITLE D.  INTERNATIONAL REGISTRATION PLAN FUND
                 REVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
             SUBTITLE E.  DISTRICT DEPARTMENT OF TRANSPORTATION
                 OPERATING FUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
TITLE VII.   EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

**ENROLLED ORIGINAL**

To amend the Fiscal Year 2005 Budget submission to allow the Mayor to submit to the Council a segmented budget; to amend Title 47 of the District of Columbia Code to establish performance measures by which agencies under performance based budgeting or funded by O-type funds shall be evaluated; to establish a criteria for contingency funds spending; to allocate additional revenue realized through a revised quarterly revenue estimate; to amend the District of Columbia Government Comprehensive Merit Personnel Act of 1978 to provide that no subordinate agency may negotiate a collective bargaining agreement; to allow the Mayor to issue a grant solely for the purpose of education and informing the general public on the District's lack of voting rights; to amend the District of Columbia Appropriations Act, 1955, to create a nonlapsing working fund for the receipt and expenditure of certain funds received by the Office of Property Management; to amend the Tobacco Settlement Trust Fund Establishment Act of 1999 to provide that the Board of Trustees' duty to meet begins once funds are deposited into the Fund; to amend the District of Columbia Procurement Practices Act of 1985 to authorize an operating fund to pay the costs of conducting District of Columbia surplus personal property sales and of operating and maintaining the Personal Property Division of the Office of Contracting and Procurement; to amend Title 47 of the District of Columbia Official Code to increase the standard deduction from $2000 to $2500; to amend Title 47 of the District of Columbia Official Code to increase the earned income tax credit to 34% of the federal credit and make it nonrefundable; to amend the Title 47 of the District of Columbia Code to allow the Mayor to assess a collection fee; to amend Title 47 of the District of Columbia Code to establish a dedicated fund to fund the Compliance Administration and the Real Property Tax Administration; to amend Title 47 of the District of Columbia Official Code to increase the homestead deduction from $38,000 to $60,000; to amend Title 47 of the District of Columbia Code to create a dedicated fund for the payment of unbudgeted commodity costs; to amend An Act To authorize the Commissioners of the District of Columbia to prescribe penalties for the handling and collection of dishonored checks to establish a fund for the collection of fees from dishonored checks; to amend Title 47 of the District of Columbia Official Code to amend section 47-363 of the District of Columbia Official Code to make an adjustment to the reprogramming threshold for capital projects; to amend Title 47 of the District of Columbia Official Code to provide a real property tax deferral for low-income District resident property owners and a real property tax deferral for low-income senior property owners; to amend Title 47 of the District of Columbia Official Code to exempt from taxation certain property of and provides equitable real property tax relief to The Catholic University of America for the Soldier's and Airmen's Home; to amend Title 47 of the District of Columbia Official Code to provide tax and fee waivers and exemptions for the Carver 2000 Low-Income and Senior Housing Project provides WIN/Enterprise Fort Dupont Nehemiah Homes Inc. with a deferral

from recordation and real property taxes for 2 years and an exemption from the same for up to 4 years based on sales to low-income homeowners; to amend Title 47 of the District of Columbia Official Code to exempt from taxation certain property of and provide equitable real property tax relief to the Way of the Cross Church of Christ for use of the property as the home for their pastor; to amend Title 47 of the District of Columbia Official Code to exempt from taxation certain property of and provide equitable real property tax relief to the Board of Trustees of the Endowment Fund of Appalachian State University; to amend Title 47 of the District of Columbia Official Code to exempt intra-family transfers of property between grandparents and grandchildren from the recordation and transfer tax; to amend Title 47 of the District of Columbia Official Code to exempt from taxation certain property of a subsidiary of the American Psychological Association; to amend Title 47 of the District of Columbia Official Code to retroactively exempt the collection and disposal of recyclables in the District of Columbia from sales tax and provide tax relief to Consolidated Waste Industries; to amend Title 47 of the District of Columbia Official Code to make technical corrections to the existing provider tax; to amend Washington Convention Center Authority Act of 1994 to establish Washington Convention Center Authority Marketing Fund; to amend Title 47 of the District of Columbia Official Code to limit real property tax increases to 10% of the prior year's tax for certain owner-occupied properties; to amend Title 47 of the District of Columbia Official Code to revise real property tax rates for Class 1 real property; to amend Title 47 of the District of Columbia Official Code to provide for a mechanism for recomputing real property tax rates for Class 1 real properties; to amend Title 47 of the District of Columbia Official Code to provide real property valuation rules for limited-equity cooperatives; to amend Title 47 of the District of Columbia Official Code to provide real property valuation rules for certain nonprofit housing organizations; to amend Title 47 of the District of Columbia Official Code to adjust the prior year's taxable assessment for triennial groups 1 and 2 for purposes of the owner-occupant residential tax credit; to amend Title 47 of the District of Columbia Official Code to provide to disabled persons an income tax exclusion not to exceed $10,000 for income from any source; to amend Title 47 of the District of Columbia Official Code to provide a 50% reduction to disabled persons on their property tax liability; to create an administrative funding surtax for administering the unemployment compensation law; to create a year round employment program for out-of school District youth; to create a Transitional Employment and Pre-Apprenticeship Program for District residents; to establish the Great Streets Development Fund, and to require the Mayor to transmit legislation to implement the program; to amend the Housing Production Trust Fund of 1998 to allow the funds to be used for the New Communities Initiative upon approval of a plan by an act of the Council and in accordance with District of Columbia Municipal Rules and Regulations, and to permit the funds to secure the issuance of revenue bonds; to amend the Omnibus

Utility Amendment Act of 2004 to add a funding source for the Natural Gas Trust Fund;
to authorize the appropriation of additional revenues if the Chief Financial Officer
certifies that funds are available; to amend An Act Making appropriations to provide for
the expenses of the government of the District of Columbia for the fiscal year ending
June thirtieth, nineteen hundred and fourteen, and for other purposes to allow the Office
of People's Counsel to obtain assessments of special franchise tax deposits in instances
of cases involving bankruptcy of a company with whom a public utility has contracts
and where the utility alleges that the bankruptcy may have adverse consequences on
District of Columbia ratepayers; to amend the District of Columbia Housing Authority
Act of 1999 to provide that local revenues of the District appropriated funds for the
Housing Authority shall not be deposited in the dedicated fund of the Housing Authority
and shall be expended and accounted for in the same manner as all other District
agencies; to amend Title 28 of the District of Columbia Code to revitalize consumer
protection in the District, including enforcement options through the Department of
Consumer and Regulatory Affairs and before the Office of the Attorney General and the
courts; to amend the Insurance Regulatory Trust Fund Act of 1993 and the Certified
Capital Companies Act of 2003 to authorize the Department of Insurance, Securities,
and Banking to deposit fees generated from the Certified Capital Companies Act of 2003
in the Insurance Regulatory Trust Fund; to establish an Office of the Tenant Advocate as
an office within the Department of Consumer and Regulatory Affairs responsible for
education and outreach to tenants and the community about laws, rules, and other policy
matters involving rental housing; to improve contracting and procurement opportunities
for local, small, and disadvantaged businesses based in the District of Columbia by
elevating the Office of Local Business Development to the Department of Small and
Local Business Development, a subordinate agency in the executive branch of
government, and charging the Department with enhanced compliance monitoring,
meaningful advocacy, outreach, and efficient certification of eligible business
enterprises, to establish the District of Columbia Small and Local Business Opportunity
Commission to certify business enterprises for participation in the contracting and
procurement programs of the District government, and to repeal the remaining
provisions of the Minority Contracting Act of 1976 and the Equal Opportunity for Local,
Small, and Disadvantaged Business Enterprises Act of 1998; to amend the
Establishment of the Office of the Chief Medical Examiner Act of 2000 to establish the
Office of the Chief Medical Examiner Management Fund as a nonlapsing fund and to
require that all revenue collected and deposited into the fund be used for personnel and
non-personnel expenditures of the Office of the Chief Medical Examiner; to amend the
District of Columbia Government Comprehensive Merit Personnel Act of 1978 to
require, starting in fiscal year 2006, Legal Service attorneys employed by subordinate
agencies to be transferred to the employment and control of the Office of the Attorney
General for the District of Columbia, with agencies retaining responsibility for the

compensation of these attorneys out of their own budgets during fiscal year 2006, to grant the Attorney General for the District of Columbia the authority to manage the Legal Service full-time equivalent budgets in the subordinate agencies, to conform Title VIII-B of the CMPA to Mayor's Order 2004-92, which renamed the Office of the Corporation Counsel as the Office of the Attorney General; to amend the Department of Mental Health Establishment Amendment Act of 2001 to make the General Counsel, or the equivalent, at the Department of Mental Health an employee of the Office of the Attorney General, under the full control of the Attorney General for the District of Columbia; to amend An Act Making appropriations to provide for the expenses of the government of the District of Columbia for the fiscal year ending June thirtieth, nineteen hundred and fourteen, and for other purposes to repeal obsolete references and to clarify that the People's Counsel is in the Senior Executive Attorney Service as mandated by the Legal Service Establishment Amendment Act of 1998; to amend the District of Columbia Government Comprehensive Merit Personnel Act of 1978 to classify the attorneys and the Executive Director of the Public Employee Relations Board in the Legal Service; to establish the Department of Corrections Reimbursement Fund as a nonlapsing fund to be used to support the activities prescribed by the Memorandum of Understanding between the Department of Corrections and the United States Marshals Service; to amend the Education Licensure Commission Act of 1976 to require that all revenues collected by the Education Licensure Commission be deposited in the Education Licensure Commission Site Evaluation Fund; to amend the State Education Office Establishment Act of 2000 to establish the Education Licensure Commission Site Evaluation Fund as a nonlapsing fund to be used to cover costs associated with the Education Licensure Commission's review of educational institutions for licensing purposes; to amend the Uniform Per Student Funding Formula for Public Schools and Public Charter Schools and Tax Conformity Clarification Amendment Act of 1998 to reflect inflationary adjustments and to repeal the 5% set-aside for District of Columbia Charter Schools; to amend the District of Columbia School Reform Act of 1995 to establish restrictions on reductions of school-based employees by the Board of Education; to establish the Fiscal Year 2006 Educational Investments Fund for District of Columbia Public Schools and Public Charter Schools into which shall be deposited $25.2 million to be used by District of Columbia public schools and public charter schools to conduct activities leading to increased student achievement and improved school performance, and to provide that no funds from the fund may be available for expenditure unless the Superintendent, the District of Columbia Public Charter School Board, and the District of Columbia Board of Education Charter School Board submit to the Mayor, no later than December 31, 2005, a plan for the use of the funds; to establish a revolving, nonlapsing dedicated fund, within which shall be 2 dedicated accounts, within the General Fund of the District of Columbia to be used to pay the debt service on revenue bonds issued to finance the repair and renovation of District schools and to

make bond revenue available to the District of Columbia Public Schools for that purpose, and to establish criteria for the use of the bond revenue to make repairs and renovations to schools; to request that the Board of Education and Superintendent establish policies to ensure that 3rd grade students are able to read independently and understand the fundamentals of mathematics upon being promoted to the 4th grade, and that 8th grade students are able to read at or above grade level and are exposed to pre-algebra concepts in preparation for high school; to amend section 5(j) of the Health-Care and Community Residence Facility, Hospice and Home Care Licensure Act of 1983 to permit the Mayor to establish and modify license fees for health-care facilities and agencies without prior Council approval and to amend section 47-2842 of the District of Columbia Official Code to remove the prohibition against license fees for child development homes; to amend the Clinical Laboratory Act of 1988 to include a physician office or other health care facility laboratory within the definition of clinical laboratory, define tests, to allow laboratories to operate without a license for one year from the date rules are issued, to clarify activities that shall be licensed, to provide that licenses shall be renewed every 2 years and to establish personnel requirements; to amend the District of Columbia Health Occupations Revision Act of 1985 to permit a designee to serve on the Board of Medicine for the Director, Department of Health; to amend the District of Columbia Public Assistance Act of 1982 to provide for a $150-per-month child support pass-through and disregard for families in the Temporary Assistance to Needy Families program; to amend the Choice in Drug Treatment Act of 2000 to improve access to substance abuse rehabilitation; to amend the Department of Health Functions Clarification Act of 2001 to require that fee and fines relating to health be deposited in the Regulatory Enforcement Fund or the Health Occupations Regulations Fund; to require that the Maternal and Family Health Administration provide to the Council a plan for supplying Medicaid eligible service to children enrolled in public and charter schools; to amend title I of the AccessRx Act of 2004 to establish a Pharmaceutical Resource Center; to require that the Environmental Health Administration provide a report on the status a $250,000 allocation; to require that the Health Care Regulation and Licensing Administration provide a report on the number of District residents in long-term care facilities located outside of the District of Columbia; to require the Policy, Planning and Research Administration to provide a report on the status of the proposed updated District State Health Plan; to require the Medical Assistance Administration to report on its effort to use State Childrens Health Insurance Program funds to expand eligibility for health services provided by DC Healthy Families; to require the Department of Health to provide a report on its effort to enter into an agreement with the Office of Administrative Hearings; to require the Department of Health and the Department of Mental Health to offer training; to require the Department of Health to provide a report on its effort to ensure that its private community services providers are billing appropriate costs to Medicaid providers; to

require the Agency Management Program in the Department of Health to provide a report on all leases or tenancies for properties occupied by the Department Health; to require the Department of Mental Health, the Children and Family Services Administration, and the Department of Youth Rehabilitation Services to enter into an agreement for the Department of Mental Health to contract and authorize placement for children and youth requiring residential treatment center placement; to authorize the Department of Mental Health to participate in a retirement incentive program if one is offered; to amend section 115 of the Mental Health Establishment Amendment Act of 2001 to authorize the Department of Mental Health to seek amendment approval from the federal government and from the Council to provide for a per diem reimbursement for inpatient psychiatric treatment in certain cases; to establish a HIV/AIDs Crisis Area Capacity Building Fund to provide loans and grants to expand support to persons with HIV/AIDS in certain wards; to authorize the City Administrator to provide a grant, if available, of up to $1.8 million to the District of Columbia Primary Care Association; to require a $75,000 distribution to Howard University Hospital to support diabetes programs; to require a $250,000 distribution to Howard University Hospital to supplement its prostate cancer screening program; to require a $250,000 distribution to Greater Southeast Community Hospital to supplement a cancer screening program; to require a $400,000 distribution to the American Lung Association of DC for tobacco cessation initiatives; to require a $500,000 distribution to the Children's National Medical Center to meet Department of Health specified needs; to require a $600,000 distribution to the District of Columbia Area Health Education Center for primary care and prevention for professional training programs and supplemental services and to facilitate access to matching federal funds; to require a $100,000 distribution to the Washington Regional Transplant Consortium to assist with an organ transplant database; to require a $500,000 distribution to Food & Friends for supplemental services; to require that no less than $250,000 be made available for burial assistance; to require that $1 million be made available to the Addiction Prevention and Recovery Administration Choice in Drug Treatment Program to coordinate comprehensive treatment for and support of substance abusers with HIV/AIDS; to require that $323,000 of funds appropriated in fiscal year 2006 for the HIV/AIDS Administration be made available for inmates of Oak Hill Juvenile Detention Center and the D.C. Jail for the purpose of counseling, testing, and referral services; to require that $150,000 be provided to Transgender Health Empowerment, Inc., for HIV/AIDS support services and prevention education; to require that $50,000 be provided to Greater DC Cares to assist with creation of a volunteer emergency responder data base and $150,000 be provided to the District of Columbia Hospital Association for the Terrorism Response Planning; to make $5 million available for the Department of Health to contract with the School of Public Health at George Washington University; to allocate $2 million for contractual services in the Office of Program Integrity to perform audits of Medicaid programs; to

**ENROLLED ORIGINAL**

require that no less than $1.5 million be expended by the Office of Managed Care in the Medical Assistance Administration in the Department of Health to increase reimbursement rates and access to dental services; to require that no less that $1,505,250 be expended for services to the elderly and physically disabled from funds appropriated in fiscal year 2006 for the Office of Disabilities and Aging in the Medicaid Assistance Administration in the Department of Health; to require that $500,000 from funds for Office of Program Operations in the Medicaid Assistance Administration in the Department of Health be allocated to the Health Care Ombudsman Program; to require that $2 million in Department of Health funds be used exclusively for the purpose of funding the Nursing Facility Quality of Care Fund; to require that $1 million from Department of Health appropriated funds be granted to Southeastern University to develop training programs for allied health services; to require that $900,000 be made available to the Addiction Prevention and Recovery Administration Choice in Drug Treatment Program to coordinate comprehensive treatment for and support of substance abusers with mental illness; to require that $3.6 million of Department of Mental Health funds be allocated to school-based mental health services; to require that $1.5 million of Department of Mental Health Direct Community Services funds be allocated to expand jail diversion programs and to provide mental health services at the D.C. Jail; to require that $1 million of Department of Mental Health Direct Community Services funds be allocated to enhance the Department of Mental Health's housing program; to require that $250,000 of Department of Mental Health Direct Community Services funds be allocated for a contract with the District of Columbia Birth Center, Inc., to support critical community work; to require that $150,000 of Addiction Prevention and Recovery Administration funds be granted to the Wards on a priority need basis to be used for substance abuse prevention and outreach; to require that $100,000 of Department of Mental Health funds be allocated to mental health services at the Addiction Prevention and Recovery Administration Detoxification Facility; to require that designated appropriation allocation in subtitle N of Title V of this act be consistent with the requirements of the District of Columbia Procurement Practices Act of 1985 to chapter 5000 of Title 1 of the District of Columbia Municipal Code or the terms and conditions of the federal funding source; to provide that a request for additional funding in Fiscal Year 2006 for the Child and Family Services Agency to hire necessary personnel transmitted by the Mayor to the Council shall identify the source of the funding and include a certification from the Chief Financial Officer that the funds are available and needed, and to clarify that the additional funding would be in addition to $1 million of contingency funds potentially available to the agency for the hiring of personnel; to provide that $3.3. million allocated to the Department of Mental Health for the provision of mental health services to foster-care children shall be transferred to the Child and Family Services Agency if the Department of Mental Health is unable build the capacity to provide those services by October 1, 2005; to provide one-time

**ENROLLED ORIGINAL**

nonrecurring funds to the Department of Health from the budgets of agencies under the purview of the Committee on Finance and Revenue; to amend the District of Columbia Traffic Amendment Act of 1990 to permit the increase of the fine for immobilized vehicles; to amend the Title 18 of the District of Columbia Municipal Regulations to increase various parking fines; to amend the Highway Trust Fund Establishment Act of 1996 to include 50% of sales and use taxes collected by the District for parking and storing vehicles to the source of funds for the Local Roads Construction and Maintenance Fund; to amend the International Registration Plan Agreement Act of 1997 to provide that a certain portion of International Registration Plan fees may be used by the Department of Motor Vehicles for operating costs; and to amend the Department of Transportation Establishment Act of 2002 to establish the District Department of Transportation Operating Fund.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Fiscal Year 2006 Budget Support Act of 2005".

TITLE I. GOVERNMENT DIRECTION AND SUPPORT
SUBTITLE A. FISCAL YEAR 2006 BUDGET SUBMISSION AMENDMENT
Sec. 1001. Short title.
This subtitle may be cited as the "Fiscal Year 2006 Budget Submission Amendment Act of 2005".

Sec. 1002. The Fiscal Year 2006 Budget Submission Act of 2004, effective December 7, 2004 (D.C. Law 15-205; 51 DCR 8441), is amended as follows:
(a) Subsection (a) is amended to read as follows:
"(a) Beginning with the submission of the fiscal year 2006 budget, the Mayor shall submit a budget to the Council that is segmented and distinctly identifies:
    "(1) That portion of the budget submission in which local funds are consistent with the amount projected in spending for the previous fiscal year by the Council in its Committee of the Whole Report on the Budget Request Act; provided, that the amounts included in the Committee of the Whole Report are to be revised to incorporate supplemental budget actions approved by the District during the course of any fiscal year; provided further, that the revised projections are certified by the Office of the Chief Financial Officer; and
    "(2) Any additional proposed budget expenditures not included in paragraph (1) of this subsection that are supported by the revenue and resources certified as available by the Office of the Chief Financial Officer.".
(b) New subsections (e) and (f) are added to read as follows:
"(e) Beginning with the submission of the fiscal year 2007 budget, the Mayor shall include a Children's Budget report that:

Sec. 2213.  Fiscal impact statement.

The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

## SUBTITLE N.  SMALL, LOCAL, AND DISADVANTAGED BUSINESS ENTERPRISE DEVELOPMENT AND ASSISTANCE

### TABLE OF CONTENTS

#### Part A.  Short Title and Definitions.

Sec. 2301.  Short title.
Sec. 2302.  Definitions.

#### Part B.  Department of Small and Local Business Development.

Sec. 2311. Establishment of the Department of Small and Local Business Development.
Sec. 2312.  Director of the Department of Small and Local Business Development.
Sec. 2313.  Organization and functions of the Department.
Sec. 2314.  Reorganization of the Department.

#### Part C. Small and Local Business Opportunity Commission.

Sec. 2321. Small and Local Business Opportunity Commission Establishment; composition; appointment; term of office; qualifications; vacancies; removal; compensation.
Sec. 2322. Functions of the Commission.
Sec. 2323.  Additional functions of the Commission.
Sec. 2324.  Record keeping.
Sec. 2325.  By-laws and internal rules.

#### Part D.  Programs for Certified Business Enterprises.

#### Subpart 1.  Certified Business Enterprises.

Sec. 2331.  Local business enterprises.
Sec. 2332. Small business enterprises.
Sec. 2333.  Disadvantaged business enterprises.
Sec. 2334. Qualified metropolitan area business enterprises.

**ENROLLED ORIGINAL**

Sec. 2335.  Resident-owned businesses.
Sec. 2336.  Longtime resident businesses.
Sec. 2337.  Local business enterprises with principal offices located in an enterprise zone.

Subpart 2.  Requirements for Programs.

Sec. 2341. Goals for District agencies with respect to contracting and procurement with small
           business enterprises.
Sec. 2342.  Required programs, procedures, and policies to achieve contracting and
           procurement goals.
Sec. 2344.  Mandatory set-asides of small contracts for small business enterprises.
Sec. 2345.  Mandatory set-asides of contracts in the District of Columbia Supply Schedule
           for small business enterprises.
Sec. 2346.  Performance and subcontracting requirements for construction contracts;
           subcontracting plans.
Sec. 2347.  Unbundling requirement.
Sec. 2348.  Penalties.
Sec. 2349.  Other procedures and programs.
Sec. 2350.  Special requirements for government corporations.
Sec. 2351.  Waiver of subcontracting requirement.
Sec. 2352.  Enforcement mechanism against an agency.
Sec. 2353.  Agency reporting requirements.
Sec. 2354.  Department reporting requirements.
Sec. 2355.  Regional governmental entities.

Subpart 3.  Certification.

Sec. 2361.  Certificate of registration.
Sec. 2362.  Provisional certification; self-certification prohibited.
Sec. 2363.  Revocation of registration; challenges to registration; penalties.

Subpart 4.  Triennial Review and Rulemaking.

Sec. 2371.  Triennial review of program and subtitle.
Sec. 2372.  Rulemaking authority.

*Codification
District of
Columbia
Official Code*

**2001 Edition**

**2005 Fall
Supp.**

**West Group
Publisher**

**ENROLLED ORIGINAL**

Part E.  Conforming Amendments.

Sec. 2381.  Amendments.
Sec. 2382.  Repealers.

Part F.  Fiscal Impact.

Sec. 2391.  Fiscal impact statement.

Part A. Short Title and Definitions.

Sec. 2301.  Short title.
This subtitle may be cited to as the "Small, Local, and Disadvantaged Business Enterprise
Development and Assistance Act of 2005".

Sec. 2302.  Definitions.
For the purposes of this subtitle, the term:
(1)  "Agency" means an agency, department, office, board, commission, or
instrumentality of the District of Columbia government.
(2)  "Commission" means the District of Columbia Small and Local
Business Opportunity Commission, established by section 2321.
(3)  "Department" means the Department of Small and Local Business Development,
established by section 2311.
(4)  "Director" means the Director of the Department of Small and Local Business
Development.
(5)  "Disadvantaged business enterprise" means a business enterprise as described in
section 2333.
(6)  "District of Columbia Supply Schedule" or "DCSS" means the District of
Columbia's multiple award schedule procurement program for providing commercial products or
services to District government agencies.
(7)  "Economically disadvantaged individual" means an individual whose ability to
compete in the free enterprise system is impaired because of diminished opportunities to obtain
capital and credit as compared to others in the same line of business where such impairment is
related to the individual's status as socially disadvantaged. An individual is socially disadvantaged if
the individual has reason to believe that the individual has been subjected to prejudice or bias
because of his or her identity as a member of a group without regard to his or her qualities as an
individual.
(8)  "Enterprise zone" means:
(A)  The area of the District designated as the District of Columbia

Enterprise Zone under section 1400 of the Internal Revenue Code of 1986, approved August 5, 1997 (111 Stat. 863; 26 U.S.C. § 1400); or

(B) An economic development zone designated by the Mayor and approved by the Council pursuant to sections 2 through 5 of the Economic Development Zone Incentives Amendment Act of 1988, effective October 20, 1988 (D.C. Law 7-177; D.C. Official Code § 6-1501 et seq.).

(9) "Expendable budget" means the total budget of an agency, reduced by such funding sources, object classes, objects, and other items as shall be identified by the Mayor through rulemaking.

(10) "Government corporation" means an entity established as a corporate body or independent authority or instrumentality of the District government created to effectuate certain public purposes, with or without a legal existence separate from that of the District government.

(11) "Joint venture" means a combination of property, capital, efforts, skills, or knowledge of 2 or more persons or businesses to carry out a single project.

(12) "Local business enterprise" means a business enterprise as described in section 2331.

(13) "Longtime resident business" means a business which has been continuously eligible for certification as a local business enterprise, as defined in section 2331, for 20 consecutive years.

(14) "Regional governmental entity" means an organization that represents the District and surrounding local or state governments.

(15) "Resident-owned business" means a local business enterprise owned by an individual who is, or a majority number of individuals who are, subject to personal income tax in the District of Columbia.

(16) "Small business enterprise" means a business enterprise as described in section 2332.

Part B. Department of Small and Local Business Development.

Sec. 2311. Establishment of the Department of Small and Local Business Development.

(a) Pursuant to section 404(b) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 787; D.C. Official Code § 1-204.04(b)), there is established, as a subordinate agency, in the Executive Branch of the government of the District of Columbia, the Department of Small and Local Business Development.

Sec. 2312. Director of the Department of Small and Local Business Development.

(a)(1) The Department shall be under the supervision of a Director who shall carry out the functions and authorities assigned to the Department.

(2) The Mayor shall appoint the Director with the advice and consent of the Council.

(b) The Director shall have full authority over the Department and all functions and personnel assigned to the Department, including the power to re-delegate to other employees and

officials of the Department such powers and authority as in the judgment of the Director are warranted in the interests of efficiency and sound administration.

(c)  The Director shall monitor the accomplishment of the requirements of this subtitle in contracting and procurement performed by any government corporation involved in the development of a commercial ballpark or soccer stadium and in all projects exceeding $10 million in value.

(d)  The Director shall have authority to make a recommendation to the Chief Procurement Officer of the Office of Contracting and Procurement or a government corporation to reject proposed award of contract awards and procurements that the Director finds fail to comply with agency or project requirements for local, small, and disadvantaged business enterprise contracting and procurement.

(e)  The Director shall have authority to make a recommendation to the Chief Procurement Officer of the Office of Contracting and Procurement or a government corporation to require the payment of fines pursuant to section 2348 by prime contractors who fail to comply with the requirements of this subtitle.

(f)  The Director shall have the authority to make a recommendation to the Chief Procurement Officer of the Office of Contracting and Procurement or a government corporation to withhold payment on contracts shown to be substantially noncompliant as to their approved local, small, and disadvantaged business enterprise subcontracting plans, if a subcontracting plan is required pursuant to section 2346.

Sec. 2313.  Organization and functions of the Department.

(a)  It shall be the goal and responsibility of the Department to stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's contracting and procurement process.

(b)  The Department shall administer part D of this subtitle except for those responsibilities assigned to another agency by this subtitle or through an order of the Mayor.  The Director shall establish procedures and guidelines for the implementation of the programs established pursuant to part D of this subtitle. The Mayor shall not reassign a responsibility specifically assigned to the Department by this subtitle.

(c)  The Department shall include, and the Director shall establish, oversee, and administer, the following divisions which shall have the stated responsibilities:

(1)  The Office of Certification, Compliance, and Enforcement, which shall be responsible for:

(A)  Reviewing applications for certification as a local, small, or disadvantaged business enterprise, or as a resident-owned or resident business or as a local business enterprise with its principal office located in an enterprise zone;

(B)  Providing information and assistance to business enterprises regarding the certification and application process;

(C)  Recommending to the Commission whether an application for certification should be approved or denied;

**ENROLLED ORIGINAL**

(D)  Providing information and assistance to the Commission in the Commission's review of applications for certification;

(E)  Monitoring agency contracting and procurement activities to the extent those activities are related to the achievement of the goals set forth in section 2341;

(F)  Monitoring third-party contracting and procurement activities to the extent those activities are related to the achievement of goals related to contracting with, and procuring from, local, small, and disadvantaged business enterprises;

(G)  Preparing the quarterly and annual reports of the Department required by section 2353;

(H)  Reviewing the quarterly and annual reports of agencies required by section 2352; and

(I)  Reviewing any reports as may be required of third parties;

(2)  The Office of Contracting Opportunities, which shall be responsible for:

(A)  Maintaining, growing, and advocating on behalf of local, small, and disadvantaged business enterprises in the following areas;

(i)  Local, small, and disadvantaged business enterprises with less than $10 million in annual revenue;

(ii)  Under separate criteria, local, small, and disadvantaged business enterprises with over $10 million in annual revenue; and

(iii)  All local, small, and disadvantaged business enterprises that desire to participate in contracting opportunities with any government corporation;

(B)  Maintaining and providing public access to a list of all current District government contracting and procurement bids and solicitations;

(C)  Maintaining and providing public access to a list of other current government contracting and procurement bids and solicitations, including those of the federal government and nearby local jurisdictions;

(D)  Monitoring agency contracting and procurement activities to the extent those activities are related to the achievement of the goals set forth in section 2341;

(E)  Monitoring third-party contracting and procurement activities to the extent those activities are related to the achievement of goals related to contracting with, and procuring from, local, small, and disadvantaged business enterprises;

(F)  Monitoring and preparing recommendations to ensure agency achievement of the goals set forth in section 2341;

(G)  Monitoring agency implementation of the programs required by part D of this subtitle;

(H)  Maintaining a list of current private contracting and procurement bids and solicitations;

(I)  Organizing and publicizing local, small, and disadvantaged business enterprise opportunities and events where contracting, procurement, or networking opportunities will be available;

**ENROLLED ORIGINAL**

   (J)  Organizing or attending meetings with business groups and other organizations to provide information on the District's local, small, and disadvantaged business enterprise programs, the certification process, and the services and activities of the Department;

   (K)  Making known to the public and the business community information on the District's local, small, and disadvantaged business enterprise programs and the certification process; and

   (L)  Making known to the public and the business community information on the services and activities of the Department; and

   (3)  The Office of Training and Education, which shall be responsible for the following:

   (A)  Coordinating the District's offerings, curricula, and locations of educational and training classes, sessions, and seminars to assist small businesses in the following areas:

   (i)  Basic and intermediate business skills, such as bookkeeping, accounting, and marketing;

   (ii)  Locating and obtaining contracting and procurement opportunities; and

   (iii)  Locating and obtaining financing and capital;

   (B)  Maintaining a current list of educational and training classes, sessions, and seminars in the Washington Metropolitan Region in the subject areas set forth in subparagraph (A) of this paragraph offered by persons or organizations outside the District government;

   (C)  To the extent feasible, coordinating the offerings, curricula, and locations of educational and training classes, sessions, and seminars in the Washington Metropolitan Region in the subject areas set forth in subparagraph (A) of this paragraph offered by persons or organizations outside the District government;

   (D)  To the extent necessary, providing educational and training classes, sessions, and seminars in the subject areas set forth in subparagraph (A) of this paragraph which are not otherwise conveniently or comprehensively provided by the District government or persons or organizations outside the District government; and

   (E)  Training agency contracting officers on the requirements and procedures of this subtitle.

  (d)  The Director may establish such other offices and the Department may take such other actions as are necessary or appropriate to carry out the provisions of this subtitle.

Part C. District of Columbia Small and Local Business
Opportunity Commission.

  Sec. 2321.  District of Columbia Small and Local Business Opportunity Commission Establishment; composition; appointment; term of office; qualifications; vacancies; removal; compensation.

  (a)  Pursuant to section 404(b) of the District of Columbia Home Rule Act, approved

December 24, 1973 (87 Stat. 787; D.C. Official Code § 1-204.04(b)), there is established the District of Columbia Small and Local Business Opportunity Commission. The Commission is the successor in interest to the Local Business Opportunity Commission, established by section 4(a) of the Minority Contracting Act of 1976, effective March 29, 1977 ( D.C. Law 1-95; D.C. Official Code § 2-215.03(a)).

(b)(1)  The Commission shall consist of 9 members. The Mayor shall appoint one member from each ward of the District and one at-large member to staggered, 2-year terms with the advice and consent of the Council, in accordance with section 2 of the Confirmation Act of 1978, effective March 3, 1979 (D.C. Law 2-142; D.C. Official Code § 1-523.01).

(2)  All members of the Commission shall be residents of the District of Columbia.

(3)  Commissioners shall be eligible for reappointment.

(4)  All commissioners shall have knowledge of the small, local, or disadvantaged business community as it relates to employment and economic development.

(5)  Notwithstanding the provisions of this section, current members of the Local Business Opportunity Commission, as established by section 4(a) of the Minority Contracting Act of 1976, effective March 29, 1977 ( D.C. Law 1-95; D.C. Official Code § 2-215.03(a)), shall be considered qualified and may continue to serve as members of the Commission until new members are appointed.

(c)(1)  The Mayor shall appoint the chairperson of the Commission from among its members with the advice and consent of the Council. The nomination of the chairperson shall be submitted to the Council for a 45-day period of review, excluding Saturdays, Sundays, legal holidays, and days of Council recess.  If the Council does not approve or disapprove the nomination within the 45-day period of review, the nomination shall be deemed approved.

(2)  The chairperson shall serve as the chairperson at the pleasure of the Mayor.

(d)  Any person appointed to fill a vacancy on the Commission shall be appointed only for the unexpired term of the member whose vacancy is being filled.

(e)  The Mayor may remove any member of the Commission for misconduct, incapacity, or neglect of duty in accordance with procedures that the Mayor shall establish and that shall include procedures for notification and an opportunity for hearing.

(f)(1)  The Commission shall meet at least once each month for the purpose of transacting any business as may properly come before it.

(2)  The Commission shall meet with the Chairman of the Council Committee on Economic Development at least once per year.

(3)  Special meetings may be held at such times as the chairperson may provide. Notice of each meeting and the time and place thereof shall be given to each member in such manner as the Commission may provide.

(4)  The Commission may permit members to participate in meetings for the certification of joint ventures by means of a conference telephone, interactive conference video, or other similar communications equipment when it is otherwise difficult or infeasible for the members to attend the meeting in person; provided, that each member participating by such device

**ENROLLED ORIGINAL**

can be identified when speaking, all participants are able to hear each other at the same time, and members of the public attending the meeting are able to hear any member of the Commission who speaks during the meeting.

(g)  A majority of the members appointed to the Commission at any given time shall constitute a quorum for the transaction of official business. Official actions of the Commission shall be based on a majority vote of the members participating at the meeting.

(h)  A Commission member who has a direct financial or personal interest in any measure pending before the Commission shall disclose this fact to the Commission and shall not vote upon such measure.

(i)  Members of the Commission shall serve without compensation for their service on the Commission.

Sec. 2322. Functions of the Commission.

The Commission shall:

(1)  Determine a business enterprise's or joint venture's eligibility for certification under part D and review and determine the continued eligibility of business enterprises and joint ventures certified by the Commission;

(2)  Determine the percentage of the dollar amount of a joint venture which may be attributed toward an agency's percentage goal; and

(3)  Repeal and suspend the certification of a business enterprise pursuant to section 2363.

Sec. 2323. Additional functions of the Commission.

The Commission shall:

(1)  Educate the public, including District residents and businesses, about the District's programs for local, small, and disadvantaged business enterprises;

(2)  Stimulate and foster greater opportunities for local, small, and disadvantaged business enterprises to participate in the District's contracting and procurement process and provide recommendations to the Council and the Mayor on ways to increase the participation;

(3)  Maintain contacts with the business community, including financial institutions and bonding companies, and elicit cooperation for economic opportunities for local, small, and disadvantaged business enterprises;

(4)  Make recommendations related to agency and third-party contracting and procurement activities to increase participation by local, small, and disadvantaged business enterprises;

(5)  Review the annual reports of agencies and make appropriate recommendations as set forth in section 2352;

(6)  Review the triennial reports required by section 2371 and the goals, intents, and purposes of this subtitle, and make appropriate recommendations as set forth in section 2371; and

(7)  Take such other actions as are necessary or appropriate to carry out

**Exhibit 1, Part 2**

the responsibilities of the Commission under this subtitle.

Sec. 2324. Record keeping.
(a) A record of the proceedings of the Commission shall be kept and files shall be maintained.
(b) The Commission shall maintain a register of all applicants for registration showing for each applicant the date of the application, name, qualifications, place of business, place of applicant's residence, and whether the certificate was granted or denied.
(c) The books and register of the Commission shall be prima facie evidence of all matters recorded therein.

Sec. 2325. By-laws and internal rules.
The Commission may promulgate, amend, repeal, and enforce any by-laws and internal rules of operation, consistent with the provisions of this subtitle, as may be necessary or appropriate to carry out its responsibilities under this subtitle.

Part D. Programs for Certified Business Enterprises.
Subpart 1. Certified business enterprises.
Sec. 2331. Local business enterprises.
A business enterprise shall be eligible for certification as a local business enterprise if the business enterprise:
(1) Has its principal office located physically in the District of Columbia;
(2) Requires that its chief executive officer and the highest level managerial employees of the business enterprise maintain their offices and perform their managerial functions in the District; and
(3)(A) Is licensed pursuant to Chapter 28 of Title 47 of the District of Columbia Official Code;
(B) Is subject to the tax levied under Chapter 18 of Title 47 of the District of Columbia Official Code; or
(C) Is a business enterprise identified in § 47-1808.01 (1) through(5) of the District of Columbia Official Code and more than 50% of the business is owned by residents of the District.

Sec. 2332. Small business enterprises.
(a) A business enterprise shall be eligible for certification as a small business enterprise if the business enterprise:
(1)(A) Is a local business enterprise; or
(B) Is a qualified metropolitan area business enterprise;
(2) Is independently owned, operated, and controlled; and
(3)(A) Is certified by the United States Small Business Administration as a small

business concern under the Small Business Act, approved July 18, 1958 (72 Stat. 863; 15 U.S.C. § 631 *et seq.*); or

        (B)  Has had average annualized gross receipts for the 3 years preceding certification not exceeding the following limits:

| | |
|---|---|
| Construction, Heavy (Street and Highways, Bridges, etc.) | $23 million |
| Construction, Building (General Construction, etc.) | $21 million |
| Construction, Specialty Trades | $13 million |
| Goods and Equipment | $20 million |
| General Services | $19 million |
| Professional Services, Personal Services (Hotel, Beauty, Laundry, etc.) | $5 million |
| Professional Services, Business Services | $10 million |
| Professional Services, Health and Legal Services | $10 million |
| Professional Services, Health Facilities Management | $19 million |
| Manufacturing Services | $10 million |
| Transportation and Hauling Services | $13 million |
| Financial Institutions | $300 million. |

    (b)  A business enterprise that is affiliated with another business enterprise through common ownership, management, or control shall be eligible for certification as a small business enterprise if:

        (1)  The business enterprise seeking certification as a small business enterprise is a local business enterprise or a qualified metropolitan area business enterprise;

        (2)  The consolidated financial statements of the affiliated business enterprises do not exceed the average annualized gross receipt limits established by subsection (a)(3)(B) of this section; and

        (3)  In the event of a parent-subsidiary affiliation, the parent company qualifies for certification as a small business enterprise.

    (c)  If a business enterprise seeking certification as a small business enterprise is affiliated only with one or more business enterprises that are in a different line of business, subsection (b) of this section shall not apply, and the business enterprise shall be eligible for certification as a small business enterprise if it meets the requirements of subsection (a) of this section.

    Sec. 2333.  Disadvantaged business enterprises.

    (a)  A business enterprise shall be eligible for certification as a disadvantaged business enterprise if the business enterprise is:

        (1)  Owned, operated, and controlled by economically disadvantaged individuals; and

        (2)(A)  Is a local business enterprise; or

            (B)  Is a qualified metropolitan area business enterprise.

    (b)  A business enterprise that is affiliated with another business enterprise through common ownership, management, or control shall be eligible for certification as a disadvantaged business

enterprise if:

    (1)  The business enterprise seeking certification as a disadvantaged business enterprise is a local business enterprise or a qualified metropolitan area business enterprise; and

    (2)  In the event of a parent-subsidiary affiliation, both enterprises meet the requirements of subsection (a) of this section.

    Sec. 2334.  Qualified metropolitan area business enterprises.

    A business enterprise shall be eligible for certification as a qualified metropolitan area business enterprise if the business enterprise is independently owned, operated, and controlled and:

    (1)  Has its principal office located in the Washington-Arlington-Alexandria, DC-MD-VA-WV Metropolitan Division, as defined by the Office of Management and Budget Bulletin No. 05-02; and

    (2)  Meets 3 of the 4 following standards:

        (A)  More than 50% of the assets of the business enterprise, excluding bank accounts, are located in the District;

        (B)  More than 50% of the employees of the business enterprise are residents of the District;

        (C)  The owners of more than 50% of the business enterprise are residents of the District; or

        (D)  More than 50% of the total sales or other revenues are derived from transactions of the business enterprise in the District.

    Sec. 2335.  Resident-owned businesses.

    A business enterprise shall be eligible for certification as a resident-owned business if it meets the definition of resident-owned business pursuant to section 2302.

    Sec. 2336.  Longtime resident businesses.

    A business enterprise shall be eligible for certification as a longtime resident business if it meets the definition of longtime resident business pursuant to section 2302.

    Sec. 2337.  Local business enterprises with principal offices located in an enterprise zone.

    A local business enterprise shall be eligible for certification as a local business enterprise with principal offices located in an enterprise zone if its principal offices are located in an enterprise zone as defined by section 2302.

    Subpart 2.  Requirements of programs.

**ENROLLED ORIGINAL**

Sec. 2341.  Goals for District agencies with respect to contracting and procurement with small business enterprises.

(a)  Each agency, including an agency that contracts or procures in whole or in part through the Office of Contracting and Procurement, shall exercise its contracting and procurement authority so as to meet, on an annual basis, the goal of procuring and contracting 50% of the dollar volume of its goods and services, including construction goods and services, to small business enterprises.

(b)  The dollar volume referenced in subsection (a) of this section shall be based on the expendable budget of the agency.

Sec. 2342.  Required programs, procedures, and policies to achieve contracting and procurement goals.

To achieve the goals set forth in this subtitle, the Department shall establish by rules issued pursuant to section 2372, programs for local, small, and disadvantaged business enterprises, resident-owned businesses, resident businesses, and local business enterprises with principal offices located in an enterprise zone.  The Department shall include among these programs:

(1)  A bid preference mechanism for local and disadvantaged business enterprises, resident-owned businesses, resident businesses, and local business enterprises with principal offices located in an enterprise zone;

(2)  A set-aside program for small business enterprises; and

(3)  A set-aside program for local, small, and disadvantaged business enterprises for the District of Columbia Supply Schedule.

Sec. 2343.  Bid and proposal preferences.

(a)  In evaluating bids or proposals, agencies shall award preferences as follows:

(1)  In the case of proposals, points shall be granted as follows:

(A)  Three points for a small business enterprise;

(B)  Three points for resident-owned business;

(C)  Ten points for a longtime resident business;

(D)  Two points for a local business enterprise;

(E)  Two points for a local business enterprise with its principal office located in an enterprise zone; and

(F)  Two points for a disadvantaged business enterprise.

(2)  In the case of bids, a percentage reduction in price shall be granted as follows:

(A)  Three percent for a small business enterprise;

(B)  Three percent for resident-owned business;

(C)  Ten percent for a longtime resident business;

(D)  Two percent for a local business enterprise;

(E)  Two percent for a local business enterprise with its principal office located in an enterprise zone; and

(F)  Two percent for a disadvantaged business enterprise.

(b)  A certified business enterprise shall be entitled to any or all of the preferences provided in this section, but in no case shall a certified business enterprise be entitled to a preference of more than 12 points or a reduction in price of more than 12 percent.

Sec. 2344.  Mandatory set-asides of small contracts for small business enterprises.

(a)  Except as provided in section 2345, each agency shall set aside every contract or procurement of $100,000 or less for small business enterprises; provided, that the agency shall not be required to set aside a contract or procurement if the agency determines in writing that there are not at least 2 responsible certified small business enterprises that can provide the services or goods which are the subject of the contract.

(b)  An agency may refuse to award a contract or procurement set aside under this section, and may thereafter issue the contract or procurement in the open market if the agency determines in writing that the bids for the contract or procurement set aside for a small business enterprise are believed to be 12% or more above the likely price on the open market.

Sec. 2345.  Mandatory set-asides of contracts in the District of Columbia Supply Schedule for small business enterprises.

Each agency shall set aside every contract of $100,000 or less for the District of Columbia Supply Schedule for small business enterprises; provided, that the agency shall not be required to set aside a contract if the agency determines in writing that there are not at least 2 responsible certified small business enterprises on the DCSS that can provide the services or goods which are the subject of the contract.

Sec. 2346.  Performance and subcontracting requirements for construction contracts; subcontracting plans.

(a)  All construction contracts  shall include a requirement that at least 35% of the dollar value, excluding the cost of materials, goods, and supplies, be subcontracted to small business enterprises, except that if there are insufficient qualified small business enterprises to fulfill this requirement, then 35% of the dollar value, excluding the cost of materials, goods, and supplies, shall be subcontracted to local, small, or disadvantaged business enterprises.

(b)(1)(A)  Each construction contract for which a local, small, or disadvantaged business enterprise is selected as a prime contractor and is granted points or a price reduction pursuant to section 2343 or is selected through a set-aside program under this subpart shall include a requirement that the business enterprise perform at least  35% of the contracting effort, excluding the cost of materials, goods, and supplies, with its own organization and resources and, if it subcontracts, 35% of the subcontracted effort, excluding the cost of materials, goods, and supplies, shall be with local, small, or disadvantaged business enterprises.

(B)  If the total of the contracting effort, excluding the cost of materials, good, and supplies, proposed to be performed by local, small, or disadvantaged business enterprises is less

than the amount required by subparagraph (A) of this paragraph, then the business enterprise shall not be eligible to receive preference points or price reductions for a period of not less than 2 years.

(2)(A) Each construction contract for which a joint venture is selected as a prime contractor and is granted points or a price reduction pursuant to section 2343 or is selected through a set-aside program under this subpart shall include a requirement that the local, small, or disadvantaged business enterprise perform at least 50% of the contracting effort, excluding the cost of materials, goods, and supplies, with its own organization and resources and, if the joint venture subcontracts, 35% of the subcontracted effort, excluding the cost of materials, goods, and supplies, shall be with local, small, or disadvantaged business enterprises.

(B) If the total of the contracting effort, excluding the cost of materials, good, and supplies, proposed to be performed by local, small, or disadvantaged business enterprises is less than the amount required by subparagraph (A) of this paragraph, then the business enterprise shall not be eligible to receive preference points or price reductions for a period of not less than 2 years.

(c)  Each construction contract of $1 million or less for which a local, small, or disadvantaged business enterprise is selected as a prime contractor and is granted points or a price reduction pursuant to section 2343 or is selected through a set-aside program under this subpart shall include a requirement that the business enterprise perform at least 50% of the on-site work with its own work force.

(d)  Bids or proposals responding to a solicitation, including an open market solicitation, shall be deemed nonresponsive and shall be rejected if the solicitation requires submission of a local, small, or disadvantaged business enterprise subcontracting plan and the prime contractor fails to submit a subcontracting plan as part of its bid or proposal.  A local, small, or disadvantaged business enterprise subcontracting plan shall specify the following:

(1)  The name and address of the subcontractor;

(2)  Whether the subcontractor is currently certified as a local, small, or disadvantaged business enterprise;

(3)  The scope of work to be performed by the subcontractor; and

(4)  The price to be paid by the contractor to the subcontractor.

(e)  No prime contractor shall be allowed to amend the subcontracting plan filed as part of its bid or proposal except with the consent of the contracting officer and the Director.  Any reduction in the dollar value of the subcontracted portion resulting from such amendment of the plan shall inure to the benefit of the District.

(f)  No multiyear contracts or extended contracts in which the options or extensions exceed $1 million in value, which are not in compliance with this subtitle at the time of the contemplated exercise of the option or extension, shall be renewed or extended, and any such option or extension shall be void.

(g)  The subcontracting requirements of this section may be waived pursuant to section 2351.

Sec. 2347.  Unbundling requirement.

The Mayor shall establish procedures to ensure that solicitations are subdivided and unbundled and that smaller contracts are created to the extent feasible and fiscally prudent.

Sec. 2348.  Enforcement and penalties for willful breach of subcontracting plan.

The willful breach by a contractor of a subcontracting plan for utilization of local, small, or disadvantaged businesses in the performance of a contract, the failure to submit any required subcontracting plan monitoring or compliance report, or the deliberate submission of falsified data may be enforced by the Department through the imposition of penalties, including monetary fines of $15,000 or 5% of the total amount of the work that the contractor was to subcontract to local, small, or disadvantaged businesses, whichever is greater, for each such breach, failure, or falsified submission.

Sec. 2349.  Other procedures and programs.

(a)  The Mayor shall establish policies and procedures to maximize the participation of local, small, and disadvantaged business enterprises in the contracting and procurement processes, including:

(1)  A procedure whereby an agency may waive bid security requirements on contracts in excess of $100,000, where the waiver is appropriate to achieve the purposes of this subtitle; and

(2)  A policy whereby an agency shall make advance payments to a certified contractor, where the payments are necessary to achieve the purposes of this subtitle.

(b)  The Mayor may establish a pilot set-aside program for small business enterprises with gross revenues of $5 million or less.

Sec. 2350.  Special requirements for government corporations.

(a)  A government corporation shall comply with all provisions of this subtitle.

(b)(1)(A)  A government corporation shall take all measures as shall be reasonably necessary to assure that all contracts entered into by the government corporation, or any agency or subsidiary of the government corporation, with respect to each major phase of the development and construction of a project undertaken by the government corporation, including contracts for architectural, engineering, and construction services, shall provide that at least 35% of the work in the aggregate under such contracts shall be awarded to small business enterprises.

(B)  In the event that there are insufficient qualified small business enterprises to fulfill this requirement, 35% of the dollar value, excluding the cost of materials, goods, and supplies, shall be subcontracted to local, small, or disadvantaged business enterprises.

(2)  Of the work required to be awarded pursuant to paragraph (1) of this subsection, at least 10% of those business enterprises shall be located in the ward in which the work is being performed.

(3)  If 35% of the work required to be awarded pursuant to paragraph (1) of this

subsection, is unattainable, the government corporation shall report this fact to the Council for reconsideration of this requirement.

(c) The subcontracting requirement of subsection (b) of this section may be waived pursuant to section 2351.

(d)(1)  A government corporation shall take all measures as shall be reasonably necessary to assure that all contracts entered into by the government corporation, or any agency or subsidiary of the government corporation, with respect to the development and construction of a project undertaken by the government corporation, comply with the First Source Employment requirements of the First Source Employment Agreement Act of 1984, effective June 29, 1984 (D.C. Law 5-93; D.C. Official Code § 2-219.01 et seq.).

(2)  Of the jobs required to be filled pursuant to paragraph (1) of this subsection, at least 20% of those jobs shall be designated for residents in the ward in which the work is being performed.

(e)(1)  A government corporation shall take all measures as shall be reasonably necessary to assure that all contracts entered into by the government corporation or any agency or subsidiary of the government corporation with respect to the development and construction of a project undertaken by the government corporation shall comply with the requirements of An Act To provide for voluntary apprenticeship in the District of Columbia, approved May 21, 1946 (60 Stat. 204; D.C. Official Code § 32-1401 et seq.).

(2)(A)  Fifty percent of all apprenticeship hours performed pursuant to any apprenticeship programs related to the construction and operation of a project undertaken by the government corporation shall be performed by District of Columbia residents.

(B)  Any prime contractor or subcontractor that fails to make a good faith effort to comply with the requirements of this paragraph shall be subject to a monetary fine in the amount of 5% of the direct or indirect labor costs of the contract.  Fines shall be imposed by the Department of Employment Services to be applied to job training programs, subject to appropriations by Congress.

(f) Beginning with the first full quarter after the effective date of this subtitle, each government corporation shall provide a quarterly report to the Department within 30 days after the end of each quarter.  The quarterly report shall include the following information:

(1)  The dollar volume and percentage of awards to local, small, and disadvantaged business enterprises in construction and development projects;

(2)  The dollar volume and percentage of awards to local, small, and disadvantaged business enterprises in development projects as equity partners; and

(3)  The dollar volume and percentage of awards to local, small, and disadvantaged business enterprises for contracting and procurement of goods and services.

(g) Beginning with fiscal year 2006, each government corporation shall provide an annual report to the Department within 45 days after the end of each fiscal year.  The annual report shall include:

(1)  The information required to be included in the quarterly reports (with the dollar

**ENROLLED ORIGINAL**

percentages and volumes calculated on an annual basis);

(2) The dollar volume and percentage of the contracts and procurements awarded during the fiscal year which were actually paid (including payments through subcontracting) to:

(A) Local, small, and disadvantaged business enterprises;

(B) Local businesses enterprises;

(C) Small business enterprises; and

(D) Disadvantaged business enterprises;

(3) A description of the activities the government corporation engaged in, including the programs required by this part, in order to achieve the requirements set forth in this section; and

(4) A description of any changes the government corporation intends to make during the succeeding fiscal year to the activities it engages in to achieve the requirements set forth in this section.

(h) The Department shall monitor government corporation compliance with the reporting requirements of this section.

(i) The Department shall review the annual report of each government corporation to determine whether the planned activities of the government corporation for the succeeding fiscal year are likely to enable the agency to achieve the requirements set forth in this section. The Department shall make recommendations on activities the government corporation should engage in to meet or exceed the requirements set forth in this section. The Department's recommendations shall be submitted to the government corporation, the Council, and the Commission.

(j) The Commission may review the annual report of a government corporation to determine whether the planned activities of the government corporation for the succeeding fiscal year are likely to enable the government corporation to achieve the goals set forth in this section. The Commission may make recommendations concerning activities in which the government corporation should engage in to meet or exceed the requirements set forth in this section. The Commission's recommendations shall be submitted to the government corporation, the Council, and the Department.

Sec. 2351. Waiver of subcontracting requirements.

(a) The Director may waive the subcontracting requirements of sections 2346 and 2350 pursuant to this section.

(b) A contracting officer may request that the Director waive the subcontracting requirements for a particular contract by submitting to the Director with the request for waiver a statement of the reasons that justify a waiver.

(c) The Commission may find that a waiver of the subcontracting requirements of sections 2346 and 2350 for a particular contract are justified in order to achieve the purposes of this title.

(d)(1) The Director shall approve a waiver of the subcontracting requirements of section 2346 and 2350 requested by a contracting officer if the Director finds that no qualified business enterprises are available to satisfy the subcontracting requirements.

(2) The Director shall waive the subcontracting requirements of sections 2346 and

2350 if the Commission finds that a waiver is necessary to achieve the purposes of this title.

(e) In addition to a waiver granted pursuant to subsection (d) of this section, the Director may grant a waiver or modification of a subcontracting plan requested by the contracting officer if the Director finds that the applicant has made a good faith effort to meet the requirements of sections 2346 and 2350. In making a good faith determination, the Director shall consider the following factors:

(1) Whether the applicant conducted any pre-solicitation or pre-bid conferences to inform local, small, or disadvantaged business enterprises of contracting and subcontracting opportunities;

(2) Whether the applicant advertised in general circulation, trade association, and ethnic-focus media concerning the contracting and subcontracting opportunities;

(3) Whether the applicant provided written notice to a reasonable number of specific local, small, or disadvantaged business enterprises, in sufficient time to allow local, small, or disadvantaged business enterprises to participate effectively, that their interest in the contract was being solicited;

(4) Whether the applicant followed up initial solicitations of interest by conducting negotiations with local, small, or disadvantaged business enterprises;

(5) Whether rejections by the applicant of local, small, or disadvantaged business enterprises as being unqualified were based on sound reasoning and thorough investigation of their capabilities;

(6) Whether the applicant made efforts to assist interested local, small, or disadvantaged business enterprises in obtaining bonding, lines of credit, or insurance required by the applicant;

(7) Whether the applicant effectively used the services of the Commission in recruiting qualified and responsible local, small, or disadvantaged business enterprises;

(8) Whether bids submitted by local, small, or disadvantaged business enterprises were excessive or noncompetitive based upon a review of prevailing market conditions; and

(9) Any other factors which may be relevant in a particular case.

(f)(1) The contracting officer shall provide written notice of the waiver of the subcontracting requirements of sections 2346 and 2350 to the applicant prior to the acceptance of bids or proposals and upon approval of the waiver by the Director.

Sec. 2352.  Enforcement mechanism against an agency.

If an agency fails to meet any of the goals set forth in section 2341, the Department may require that a portion of the agency's contracts and procurements be made part of a set-aside program for small business enterprises.

Sec. 2353.  Agency reporting requirements.

(a) Beginning with the first full quarter after the effective date of this subtitle, each agency shall provide a quarterly report to the Department within 30 days after the end of each quarter.  The

**ENROLLED ORIGINAL**

quarterly report shall include the following information:

(1)  A list of each contract or procurement of the agency during the quarter, and, for each contract or procurement:

(A)  The dollar amount of the contract or procurement;

(B)  A description of the goods procured or the services contracted for;

(C)  The name of the business enterprise from which the goods were procured or services contracted;

(D)  Whether the business enterprise was a certified local, small, or disadvantaged business enterprise, and, if it was:

(i)  The category or categories under which the business enterprise is certified; and

(ii)  The identification number of the business enterprise assigned by the Department; and

(E)  The source of funding for the contract or procurement (local, federal, other, or capital);

(2)  The dollar percentage of the contracts and procurements awarded during the quarter which were awarded to:

(A)  Local, small, and disadvantaged business enterprises;

(B)  Local businesses enterprises;

(C)  Small business enterprises; and

(D)  Disadvantaged business enterprises; and

(3)  The dollar volume of the contracts and procurements awarded during the quarter which were awarded to:

(A)  Local, small, and disadvantaged business enterprises;

(B)  Local businesses enterprises;

(C)  Small business enterprises; and

(D)  Disadvantaged business enterprises.

(b)  Beginning with fiscal year 2006, each agency shall provide an annual report to the Department within 45 days after the end of each fiscal year.  The annual report shall include:

(1)  The information required to be included in the quarterly reports (with the dollar percentages and volumes calculated on an annual basis);

(2)  The dollar volume and percentage of the contracts and procurements awarded during the fiscal year which were actually paid (including payments through subcontracting) to:

(A)  Local, small, and disadvantaged business enterprises;

(B)  Local businesses enterprises;

(C)  Small business enterprises; and

(D)  Disadvantaged business enterprises;

(3)  A description of the activities the agency engaged in, including the programs required by this part, in order to achieve the goals set forth in section 2341; and

(4)  A description of any changes the agency intends to make during the succeeding

**ENROLLED ORIGINAL**

fiscal year to the activities it engages in to achieve the goals set forth in section 2341.

(c)  The Department shall monitor agency compliance with the reporting requirements of this section.

(d)  The Department shall review the annual report of each agency to determine whether the planned activities of the agency for the succeeding fiscal year are likely to enable the agency to achieve the goals set forth in section 2341.  The Department shall make recommendations on activities the agency should engage in to meet or exceed the goals set forth in section 2341.  The Department's recommendations shall be submitted to the agency, the Council, and the Commission.

(e)  The Commission may review the annual report of an agency to determine whether the planned activities of the agency for the succeeding fiscal year are likely to enable the agency to achieve the goals set forth in section 2341.  The Commission may make recommendations on activities the agency should engage in to meet or exceed the goals set forth in section 2341.  The Commission's recommendations, if any, shall be submitted to the agency, the Council, and the Department.

Sec. 2354.  Department reporting requirements.

Within 45 days of its receipt of the annual reports required by section 2352(b), the Department shall submit to the Council and the Commission a report containing the following documents and information:

(1)  A chart containing the following information with respect to each agency for the prior fiscal year:

(A)  The expendable budget of the agency;

(B)  Each goal of the agency under section 2341 in dollar and percentage terms;

(C)  The agency's achievement with respect to each goal established by section 2341, which shall include the following information:

(i)  The percentage of the expendable budget, the percentage of the total budget, and the dollar volume that was contracted or procured with the following:

(I)  Local business enterprises;

(II)  Small business enterprises; and

(III)  Disadvantaged business enterprises; and

(ii)  The dollar volume and percentage of the contracts and procurements awarded during the quarter which were actually paid (including payments through subcontracting) to:

(I)  Local business enterprises;

(II)  Small business enterprises; and

(III)  Disadvantaged business enterprises; and

(D)  A list of each contract or procurement of the agency, including:

(i)  A description of the contract or procurement;

(ii)  The dollar amount of the contract or procurement;

**ENROLLED ORIGINAL**

(iii)  The name of the business enterprise from which the goods or services were contracted or procured;

(iv)  Whether the business enterprise was a certified local, small, or disadvantaged business enterprise, and, if it was:

(I)  The category or categories under which the business enterprise is certified; and

(II)  The identification number of the business enterprise assigned by the Department; and

(v)  The source of funding for the contract (local, federal, other, or capital); and

(2)  A chart listing the following information with respect to each agency for the current fiscal year:

(A)  The total budget of each agency;

(B)  The expendable budget of each agency;

(C)  A description of each funding source, object class, object, or item that was excluded from the total budget of the agency in the Department's calculation of the expendable budget of the agency; and

(D)  Each goal of the agency under section 2341 in percentage and dollar terms.

Sec. 2355.  Regional governmental entities.

(a)  Except as provided in subsection (b) of this section, a regional governmental entity shall be exempt from the requirements of this subtitle to the extent that the requirements of this subtitle impact on the regional governmental entity's operations within the territory of a member government other than the District.

(b)  The District of Columbia Water and Sewer Authority shall be exempt from the requirements of this subtitle to the extent that the requirements of this subtitle are contrary to procurement regulations promulgated pursuant to statutes establishing the District of Columbia Water and Sewer Authority.

Subpart 3.  Certification.

Sec. 2361. Certificate of registration.

(a)  No business enterprise shall be permitted to participate in a program established under this part unless the business enterprise:

(1)  Has been issued a certificate of registration under the provisions of this subtitle; or

(2)  Has been issued a provisional certification under regulations issued pursuant to this subtitle.

(b)(1)  An enterprise seeking to be certified as a local, small, or disadvantaged business enterprise, as a resident-owned business, as a resident business, or as a local business enterprise with

**ENROLLED ORIGINAL**

its principal office located in an enterprise zone shall file with the Commission a written application on such form or forms as may be prescribed by the Commission or the Department.

(2) The application shall include, at a minimum, the following documents and information:

(A) A certification of the correctness of the information provided;

(B) Written evidence that the applicant is:

(i) A bona fide local business enterprise;

(ii) A bona fide disadvantaged business enterprise;

(iii) A bona fide small business enterprise;

(iv) A bona fide local business enterprise located in an enterprise zone;

(v) A bona fide resident-owned business; or

(vi) A bona fide resident business.

(C) Evidence of ability and character;

(D) Evidence of financial position, which may be the applicant's most recent financial statement. For the purposes of this subparagraph, the term "recent" means produced from current data no more than 90 days prior to the application date; and

(E) Any other information the Commission or Department may require.

(c) The Commission shall issue the applicant a certificate of registration if:

(1) The information provided in the application or additional filings is satisfactory to the Commission;

(2) The business enterprise meets the standards of this subtitle; and

(3) The applicant fulfills other requirements as may be established by the Commission or the Department.

(d) A certificate of registration shall expire 2 years from the date of approval of the application.

Sec. 2362. Provisional certification; self-certification prohibited.

(a) The Department may authorize a business enterprise to participate in a program established under this part without receiving a certificate of registration under section 2361; provided, that such authorization shall be granted only when:

(1) A business enterprise is applying for certification in order to bid on a contract or procurement for which responses are due within the next 45 days;

(2) The business enterprise has submitted a majority of the information required under section 2361; and

(3) The Department reasonably believes that the Commission will certify the business enterprise after the business enterprise has submitted all of the information required under this subtitle or regulations promulgated pursuant to this subtitle.

(b) An authorization granted under this section shall not last for more than 120 days.

(c) The Department shall make authorizations under subsection (a) of this section pursuant

**ENROLLED ORIGINAL**

to rules promulgated pursuant to this subtitle.

(d) A business enterprise may not self-certify or self-authorize to participate in a program established under sections 2343 through 2349.

Sec. 2363. Revocation of registration; challenges to registration; penalties.

(a) The Commission may revoke or suspend the certificate of registration of a business enterprise that:

(1) Engaged in fraud or deceit in obtaining the registration;

(2) Furnished substantially inaccurate or incomplete ownership or financial information;

(3) Failed to report changes that affect its eligibility for certification;

(4) Acted with gross negligence, incompetence, financial irresponsibility, or misconduct in the practice of a trade or profession; or

(5) Willfully violated any provision of this subtitle or rules adopted pursuant to this subtitle.

(b)(1) Any person may file with the Commission a complaint alleging a violation of this subtitle against an applicant for registration or a business enterprise registered pursuant to this subtitle. The complaint shall be in writing and sworn to by the complainant.

(2) The Commission may request that the Department investigate the facts and merits of the complaint.

(3) The Commission may, without a hearing, dismiss a complaint which it determines to be frivolous or otherwise without merit.

(4) If the Commission does not determine that a complaint is frivolous or otherwise without merit, it shall hold a hearing on the complaint within 3 months of the filing of the complaint. The Commission shall determine the time and place of the hearing. The Commission shall cause to be issued and served on the person or business enterprise alleged to have committed the violation, hereafter called the "respondent", a written notice of the hearing together with a copy of the complaint at least 30 days prior to the scheduled hearing. Notice shall be served by registered or certified mail, return receipt requested, or by personal service. At the hearing, the respondent shall have the right to appear personally or by a representative and to cross-examine witnesses and to present evidence and witnesses.

(5) If, after the conclusion of the hearing, the Commission determines that the respondent has violated the provisions of this subtitle or regulations issued pursuant to this subtitle, the Commission shall issue, and cause to be served on the respondent, a decision and order, accompanied by findings of fact and conclusions of law, revoking or suspending the respondent's registration, or taking any other action it deems appropriate.

(6) The Commission shall have the authority to issue subpoenas requiring the attendance of witnesses and to compel the production of records, papers, and other documents.

(c) In addition to the procedures and penalties provided in subsection (b) of this section, the Attorney General for the District of Columbia may bring a civil action in the Superior Court of the

District of Columbia against a business enterprise and the directors, officers, or principals of a business enterprise that is reasonably believed to have obtained certification by fraud or deceit or to have willfully furnished substantially inaccurate or incomplete ownership information to the Commission. A business enterprise or individual found guilty under this subsection shall be subject to a civil penalty of not more than $100,000.

(d)  The Commission may at any time reissue a certificate of registration to any firm or joint venture whose certificate has been revoked; provided, that a majority of at least 4 members of the Commission vote in favor of reissuance. The Commission may consider whether the firm or joint venture should be required to submit satisfactory proof that conditions within the company that led to the violation have been corrected.

Subpart 4.  Triennial review and rulemaking.

Sec. 2371.  Triennial review of program and subtitle.

(a)  Every 3 years following the effective date of this subtitle, the Department shall submit to the Council, the Mayor, and the Commission the results of an independent evaluation of the local, small, and disadvantaged business enterprise programs. This evaluation shall compare the costs of contracts awarded pursuant to this subtitle to the cost of contracts awarded without use of the set-asides and bid preferences authorized by this subtitle. This evaluation shall also compare economic outcomes such as revenue, tax payments, and employment of District residents for local, small, and disadvantaged business enterprises certified by the Commission to economic outcomes for similar firms that are not certified by the Commission.

(b)  The Department and the Commission shall review the findings in the triennial report and the goals, intents, and purposes of this subtitle.  The Department shall, and the Commission may, transmit to the Council and the Mayor a report setting forth any recommended amendments to this subtitle.

Sec. 2372.  Rulemaking authority.

The Mayor shall, pursuant to title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*), issue proposed rules to implement this subtitle.  The proposed rules shall be submitted to the Council for a 45-day period of review, excluding Saturdays, Sundays, legal holidays, and days of Council recess.  If the Council does not approve or disapprove the proposed rules, in whole or in part, by resolution within this 45-day review period, the proposed rules shall be deemed approved.

Part E. Conforming Amendments.

Sec. 2381.  Amendments.

(a)  Section 10b(a) of the District of Columbia Regional Interstate Banking Act of 1985, effective November 23, 1985 (D.C. Law 6-63; D.C. Official Code § 26-711(c)), is amended by striking the phrase "District of Columbia Local Business Opportunity Commission in accordance with the Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act of 1998

and inserting the phrase "Small and Local Business Opportunity Commission in accordance with the Small, Local, and Disadvantaged Business Enterprises Development and Assistance Act of 2005 (Subtitle N of title II of Bill 16-200)".

(b)  Section 17a(a) of the District of Columbia Savings and Loan Acquisition Amendment Act of 1988, effective October 12, 1988, (D.C. Law 7-175; D.C. Official Code § 26-1217(a)), is amended by striking the phrase ""District of Columbia Local Business Opportunity Commission in accordance with Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act of 1998 and inserting the phrase "Small and Local Business Opportunity Commission in accordance with the Small, Local, and Disadvantaged Business Enterprises Development and Assistance Act of 2005 (Subtitle N of title II of Bill 16-200)".

(c)  Section 47-351.11 of the District of Columbia Official Code is amended by striking the phrase "District of Columbia Local Business Opportunity Commission in accordance with subchapter IX of Chapter 2 of Title 2" and inserting the phrase "Small and Local Business Opportunity Commission in accordance with the Small, Local, and Disadvantaged Business Enterprises Development and Assistance Act of 2005 (Subtitle N of title II of Bill 16-200)".

Sec. 2382.  Repealers.

(a)  Sections 4, 5, and 13 of the Minority Contracting Act of 1976, effective March 29, 1977 (D.C. Law 1-95; D.C. Official Code §§ 2-215.03, 2-215.04, and 2-215.11), are repealed.

(b)  The Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act of 1998, effective April 27, 1999 (D.C. Law 12-268; D.C. Official Code § 2-217.01 *et seq.*), is repealed.

(c)  An order, rule, or regulation in effect under a law repealed by this section shall remain in effect under the corresponding provision enacted by this subtitle until repealed, amended, or superseded.

Part F.  Fiscal Impact.

Sec. 2391.  Fiscal impact statement.

The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

TITLE III.  PUBLIC SAFETY AND JUSTICE

SUBTITLE A. ESTABLISHMENT OF THE OFFICE OF THE CHIEF MEDICAL EXAMINER MANAGEMENT FUND

Sec. 3001.  Short title.

This subtitle may be cited as the "Office of the Chief Medical Examiner Management Fund Amendment Act of 2005".

**ENROLLED ORIGINAL**

"(A)  One hundred percent of the proceeds collected by the District for rental of public space;

"(B)  Fifty percent of the proceeds of sales and use taxes collected by the District for parking and storing vehicles; provided, that the funds shall be used exclusively to pay the debt service associated with approved programs, such as the Traffic Relief Program; and

"(C)  One hundred percent of the District's parking meter proceeds.

"(2)  Beginning on October 1, 2005, the Mayor shall submit to the Council a report, certified by the Office of the Chief Financial Officer, that details the activities, budget, expenditures, and variances, at the program level, of all programs, activities, and projects undertaken by the District Department of transportation from all available funding sources.  The report shall be submitted on a quarterly basis.

"Sec. 11b.  Securities funds; Council project approval.

"(a)  For each project for which funding is derived, in whole or in part, from securitized funds, the Mayor shall submit to the Council a resolution of project approval accompanied by a summary description of the proposed project, including the cost of the project, the expected duration of the project, details of the financing, and a summary of the public benefits to be derived from the proposed project for a 45-day period of Council review, excluding Saturdays, Sundays, legal holidays, and days of Council recess.

"(b)  The Council may approve, conditionally approve, or disapprove a proposed project by resolution within 45 days after the Mayor transmits to the Council the proposed resolution and information set forth in subsection (a) of this section.  If the Council takes no action on the resolution within the 45-day review period, the project shall be deemed approved.".

Sec. 6063.  Fiscal impact statement.

The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

TITLE VII.  EFFECTIVE DATE

Sec. 7001.  This act shall take effect following approval by the Mayor (or in event of veto by the Mayor, action by the Council to override the veto), a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24,

**ENROLLED ORIGINAL**

1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of Columbia Register.

_____

Chairman
Council of the District of Columbia

_____

Mayor
District of Columbia

Council of the District of Columbia
Case 1:05-cv-02337-RWR Document 6-6    Filed 03/20/2007    Page 1 of 6
Committee on Economic Development
**Report**                                    .,,,, ,-• ^7  p£ 30
1350 Pennsylvania Avenue, N.W. Washington, D.C. 20004

0 1 i ~ •

To:        All Councilmembers

From:      Councilmember Sharon Ambrose, Chair

           Committee on Economic Development

Date:      November 6, 2006

Subject:   Report on Bill 16-506, the "Longtime Resident Business Definition Amendment
           Act of 2006"

The Committee on Economic Development reports favorably on Bill 16-506, the
"Longtime Resident Business Definition Amendment Act of 2006".

**TABLE OF CONTENTS.**

I.     Background, Purpose and Effect
II.    Legislative History
III.   Summary  of  Testimony
IV.    Fiscal Impact Statement
V.     Section-by-Section Analysis
VI.    Impact on Existing Law
VII.   Committee Action
VIII.  Attachments

## I.    **BACKGROUND, PURPOSE AND EFFECT**

On November 2, 2005 Councilmember Kwame Brown (D-At Large) introduced Bill 16-
506, the "Longtime Resident Business Definition Amendment Act of 2006". The purpose of Bill
16-506, as introduced, is to amend the Small, Local, and Disadvantaged Business Enterprise
Development and Assistance Act of 2005 by defining a longtime resident business as a business
that had been continuously eligible for certification as a small business enterprise for 10
consecutive years. A Public Hearing was held on this bill on October 20, 2006, with testimony
from the public, the Small and Local Business Development Commission, and the Department of
Small and Local Business Development. The Committee met on November 6, 2006 to consider
and markup Bill 16-506.

## II.   **LEGISLATIVE HISTORY**

November 2, 2005    Bill 16-506 is introduced by Councilmember Kwame Brown.

November 7, 2006    Bill16-506 is referred to the Committee on Economic Development.

Exhibit 2

November 18, 2005 Notice of Intent to Act on New Legislation published in the District of Columbia Register.

Case 1:07-cv-00113-RJL   Document 6-6   Filed 03/20/2007   Page 2 of 6

October 20, 2006    Public Hearing on Bill 16-506 held by the Committee on Economic Development.

November 6, 2006    Committee on Economic Development's markup and consideration of Bill 16-506.

## III.    <u>SUMMARY OF TESTIMONY</u>

A Public Hearing on Bill 16-506 and other measures was held on October 20, 2006, at 10:00 am. Councilmember Kwame Brown presided over the Public Hearing on behalf of Chairperson Sharon Ambrose (D-Ward 6). No other Councilmembers were in attendance during the Committee's consideration of Bill 16-506 which commenced at 1pm. Acting Chairperson Brown called the first witness to the table to give testimony.

**Carmen Price Calhoun, Hodges Enterprises, Inc.** testified in support of the proposed legislation. Ms. Price Calhoun stated that Hodges Enterprises supports the legislation because the reduction in years to be eligible for the preference will allow a number of businesses to qualify for longtime resident business status. Hodges Enterprises also supports the legislation because it will level the playing field for the small business owner with longtime resident business status.

**Terri Woodfolk, Capitol Paving, Inc.** Ms. Woodfolk testified in support of the legislation because the current twenty year requirement for longtime resident business status is at present only available to one out of four local construction firms. Ms. Woodfolk stated that this creates a monopoly and that the law should be changed to require less than twenty years for longtime resident business certification.

**Keith Forney, Forney Enterprises, Inc.** Mr. Forney was not present at the hearing and a representative of his company read a statement prepared by Mr. Forney. According to the statement, Forney Enterprises, Inc. opposes the proposed legislation because the longtime business residency requirement should be thirty years and not ten as proposed by the legislation..

**Warner Sessions, National Minority Business Coalition** testified in strong support of the proposed legislation because it will lower the current law's twenty year requirement for qualification as a longtime resident business enterprise. Mr. Sessions testified that failure to lower the number of years as well as to find a way to reward smaller businesses that qualify will result in an uneven playing field.

Acting Chairperson Brown stated that he agreed with Mr. Sessions and the National Minority Business Coalition. Acting Chairperson Brown then stated that longtime resident businesses should be rewarded for staying in the District through the bad years of the economy. Acting Chairperson Brown further added that the current twenty year requirement may not

reward those companies that remained in the District during the bad years because the economy was not doing well either fifteen years ago.

**Carlos Perdomo, DC Hispanic Contractors Association** testified in support of the proposed legislation. Mr. Perdomo stated that his association had consulted with the Small and Local Business Opportunity Commission regarding the proposed legislation. Mr. Perdomo stated that in working with the Commission, the two entities had produced some suggested changes to the proposed legislation. Mr. Perdomo then stated that his association fully supported the recommendations of the Commission.

**Cardell Shelton, DC Contractors Guild** did not provide the Committee with a written copy of his testimony. Mr. Shelton's oral testimony did not address the proposed legislation directly if at all. Mr. Shelton instead testified on matters not before the Committee.

**Ronne L. Edwards, Acting Director, Department of Small and Local Business Development** testified in support of the proposed legislation. Acting Director Edwards suggested amending the proposed legislation prior to mark-up by reducing the twenty year requirement for longtime resident business certification as well as by including a two-tier point preference system. Under this system, certified small business enterprises and firms with longtime resident business certification will be entitled to receive ten preference points or ten percent price reduction on bids and proposals submitted to the District government. Businesses certified as longtime residents but not as small businesses will be entitled to receive five preference points or five percent price reduction. Acting Director Edwards testified that this change will reduce the significant advantage currently being enjoyed by larger longtime resident businesses when competing for city contracts against smaller companies.

Acting Director Edwards further recommended that the proposed legislation be amended to allow for the granting of five preference points or five percent priced reduction for businesses certified as resident owned business instead of the current three preference points or three percent price reduction awarded to such. Acting Director Edwards stated that this change will enable local businesses that are owned by individuals subject to personal income tax in the District to better compete for city contracts, which in turn assists a group of businesses that directly contribute to the District's tax base.

**Alberto Gomez, Small and Local Business Opportunity Commission** testified in support of the legislation. Mr. Gomez stated his support of the Department's proposed two-tiered system. Mr. Gomez also stated that the Commission viewed a fifteen year residency requirement as the most equitable and best suited for identifying longtime resident businesses.

Acting Chairperson Brown thanked all the witnesses for their testimony and comments. Acting Chairperson Brown then stated that the Committee would take a close look at whether the proposed legislation should require ten or fifteen years to qualify businesses as longtime resident businesses. Acting Chairperson Brown further noted that the two-tiered system would be taken into consideration. Acting Chairperson Brown then adjourned the Public Hearing's consideration

IV.    FISCAL IMPACT

Bill 16-506 has no fiscal impact on the District.

V.    SECTION-BY-SECTION ANALYSIS

Section 1 of Bill 16-506 provides the title of the bill as the "Longtime Resident Business Definition Amendment Act of 2006".

Section 2(a) amends the Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005, effective October 20, 2005 (D.C. Law 16-33; D.C. Official Code § 2-218.01 *et seq.*), by amending Section 2302(13) (D.C. Official Code § 2-218.02(13)) so that it will define a long term resident business enterprises as a business enterprise that has been continuously eligible during fifteen years for certification as a small or local business enterprise. At present, the law defines a long term resident business as a local business enterprise that has been continuously eligible for certification for a period of twenty years. The introduced version of B16-506 required eligibility only for small business enterprises for a period often years. The Committee Print reflects the input received from the public that fifteen years is the most equitable period for determining a business' longtime dedication to the District. As the majority of the witnesses testified, a ten year period does not reach far back enough in time to reward those businesses that endured the poorest years of the local economy estimated to have ended at a minimum of 15 years ago. The current law's twenty year requirement is inadequate as it reaches too far back in time and benefits too small a number of businesses.

Section 2(b) amends the Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005, (D.C. Law 16-33; D.C. Official Code § 2-218.01 *et seq.*), by amending Section 2343(a) (D.C. Official Code § 2-218.43(a)) to require an agency evaluating proposals to award 5 points for a local business enterprise, 5 points for a resident business enterprise, and 10 points for a local business enterprises also certified as a small business enterprise. In addition, an agency evaluating bids is required to grant a 5% price reduction for a local business enterprise, a 5% price reduction for a resident business enterprise, and a 10% price reduction for a local business enterprise also certified as a small business enterprise. The introduced version of B16-506 did not include such a change in the bid or proposal evaluation system currently in place. The Committee Print reflects the input of the Department of Local Business Development's suggestion of a two-tiered system that rewards small longtime residents businesses ten points/price percentage reduction and five points/price percentage reduction to larger longtime resident businesses.

Section 3 establishes that the Council adopts the fiscal impact statement attached to the bill.

4

## VI.   COMMITTEE REASONING

The Committee on Economic Development recommends the approval of this bill based on the public testimony and other commentary and analysis it received. The Committee's Print reflects key changes made to the introduced version of this bill after the Committee received input at the public hearing. These changes are explained in detail in the section by section analysis of this report. These changes, as evidenced by the attached public testimony, were supported by the majority of those who testified, including public witnesses, the Department of Small and Local Business Development, as well as the Small and Local Business Development Commission.

## VII.   IMPACT ON EXISTING LAW

Bill 16-506 amends the Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005.

## VIII.   COMMITTEE ACTION

The Committee on Economic Development met on November 6, 2006 at 10:00 am to mark-up Bill 16-506 along with other measures. Present at the mark up, were Chairperson Ambrose (D-Ward 6) and Councilembers Kwame Brown (D-At Large), Vincent Orange (D-Ward 5), Jack Evans (D-Ward 2), and Vincent Gray (D-Ward 7). The bill was approved by unanimous voice vote. The meeting was adjourned at 1 1am.

**Committee members voted as follows:**

| | |
|---|---|
| **Committee members voting in favor:** | **Chairperson Sharon Ambrose** |
| | **Councilmember Vincent Orange** |
| | **Councilmember Kwame Brown** |
| | **Councilmember Jack Evans** |
| | **Councilmember Vincent Gray** |
| **Committee members voting against:** | **none** |
| **Committee members present:** | **Chairperson Sharon Ambrose** |
| | **Councilmember Vincent Orange** |
| | **Councilmember Kwame Brown** |
| | **Councilmember Jack Evans** |
| | **Councilmember Vincent Gray** |
| **Committee members absent:** | **none** |

5

# IX.  ATTACHMENTS

A.    Bill 16-506 as introduced.

B.  Committee Print of Bill 16-506.

C.    Fiscal Impact Statement.

D. Public Hearing notice for Bill 16-506 witness list, and copies of testimony.



# Council of the District of Columbia
# Legislative Information Management System

● Back     ● Home     ● Help     ● FAQ     ● Contact Us

● **Help**

**Legislation # B16-0506**

**Short Title**  "LONGTIME RESIDENT BUSINESS DEFINITION AMEN DMENT ACT OF 2005".



View Legislation Online

*Previous Page*

## Council Action

**Committee Action** 11/6/2006     **Report Filed** 11-27-06     | **COW Action** 12-05-06     | |

**View Report**     | |     | |

**First Vote/Reading** 12-05-06, CC

**Final Vote/Reading** 12-19-06

**Third Vote/ Reading**     **Reconsideration**

## Mayoral Review

| **Transmitted** 12/26/2006 | **Review End Date** 1/10/2007 | **Returned** 12/29/2006 |
| --- | --- | --- |
| | | ☐ **w/o signature** |
| **Veto Date** | **Override Date** | **Act/Resolution #** A16-0622 |
| | | **Enactment/ Action Date** 12/28/2006 |

## Congressional Review

**Transmitted** 1/24/2007     **Re-Transmitted**     **Projected DC Law Date** 3/18/2007

## DC Register Publication

**Act/Resolution** 2/2/2007     **Vol** 54     **Page** 829     **Law**

## D.C. Law

| **Law #** | **Law Effective Date** | **Applicability Date** | **Expiration Date** |
| --- | --- | --- | --- |

**Exhibit 3**

# Council of the District of Columbia
# Legislative Information Management System

● Back      ● Home      ● Help      ● FAQ      ● Contact Us

**Enter Leg. #**  B16-0506      [ Get New Record ]

| Current Reading | 1st Reading |
|---|---|
| Date of Vote: | 12/5/2006 |

| Vote Type: | Vote Result: |
|---|---|
| ⦿ Voice Vote | ⦿ Approved |
| ○ Roll Call | ○ Disapproved |

## Council Members

**Readings on Record:**
1st Reading
Final Reading

| Chairman: **Cropp** | | | |
|---|---|---|---|
| Ambrose | **Vote:** ABSENT | Barry | **Vote:** YES |
| Brown | **Vote:** YES | Catania | **Vote:** YES |
| Cropp | **Vote:** YES | Evans | **Vote:** YES |
| Fenty | **Vote:** YES | Graham | **Vote:** YES |
| Gray | **Vote:** ABSENT | Mendelson | **Vote:** YES |
| Orange | **Vote:** YES | Patterson | **Vote:** YES |
| Schwartz | **Vote:** YES | | |

| YES | NO | PRESENT | ABSENT | RECUSED | ABSTAINED | VACANT |
|---|---|---|---|---|---|---|
| 11 | | | 2 | | | |

DISTRICT OF COLUMBIA REGISTER

**ENROLLED ORIGINAL**

*Codification
District of
Columbia
Official Code*

2001 Edition

2007 Winter
Supp.

West Group
Publisher

AN ACT

D.C. ACT 16-622

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

DECEMBER 28, 2006

To amend the Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005 to define a longtime resident business as a business that has been continuously eligible for certification as a local business enterprise for 20 consecutive years or as a small business enterprise for 15 consecutive years, and to require an agency evaluating proposals to award 5 points for a resident business enterprise and an agency evaluating bids to grant a 5% price reduction for a resident business enterprise.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Longtime Resident Business Definition Amendment Act of 2006".

Sec. 2. The Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005, effective October 20, 2005 (D.C. Law 16-33; D.C. Official Code § 2-218.01 *et seq.)*, is amended as follows:

(a) Section 2302(13) (D.C. Official Code § 2-218.02(13)), is amended by striking the phrase "years." and inserting the phrase "years, or a small business enterprise, as defined in section 2332, for 15 consecutive years." in its place.

Amend
§ 2-218.02

(b) Section 2343(a) (D.C. Official Code § 2-218.43(a)) is amended as follows:

Amend
§ 2-218.43

(1) Paragraph (1)(B) is amended by striking the word "Three" and inserting the word "Five" in its place.

(2) Paragraph (2)(B) is amended by striking the word "Three" and inserting the word "Five" in its place.

Sec. 3. Fiscal impact statement.

The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

Sec. 4. Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of Congressional review as

Codification District of Columbia Official Code, 2001 Edition    1    West Group Publisher, 1-800-328-9378.

829

Exhibit 4

**ENROLLED ORIGINAL**

provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of Columbia Register.

_____
Chairman
Council of the District of Columbia

_____
Mayor
District of Columbia
APPROVED
December 28, 2006

GOVERNMENT OF THE DISTRICT OF COLUMBIA
CONTRACT APPEALS BOARD

PROTEST OF:

CAPITOL PAVING OF D.C., INC.                )
                                            )    CAB No. P-0736
Under RFP No. POKA-2005-B-0015-LS           )

        For the Protester: Douglas A. Datt, Esq. For the District of Columbia Government: Howard
Schwartz, Esq., Senior Assistant Attorney General, and Jennifer L. Longmeyer-Wood, Esq., Assistant
Attorney General. For Fort Myer Construction Corp.: Christopher M. Kerns, Esq.

        Opinion by Chief Administrative Judge Jonathan D. Zischkau, with Administrative Judge
Warren J. Nash, concurring.

## OPINION
*LexisNexis Filing ID 12616269*

        Capitol Paving of D.C., Inc., has protested the District's award of an alley rehabilitation contract
to Fort Myer Construction Corporation, arguing that the contracting officer should not have assigned to
Fort Myer during bid evaluation a 10 percent bid preference as a "longtime resident business" ("LRB")
– a new form of preference instituted pursuant to the recently enacted Small, Local, and Disadvantaged
Business Enterprise Development and Assistance Act of 2005, D.C. Law 16-33 ("SLDBEDA Act").
Capitol Paving attacks the validity of the LRB certification on a number of bases, including that the
Small, Local Business Opportunity Commission ("SLBOC") incorrectly certified Fort Myer as a LRB,
that no certifications could be made in the absence of implementing regulations, that LRB certification
cannot be made to anyone until the year 2012, and that Fort Myer has not shown 20 years of eligibility
for local business enterprise status as a prerequisite to LRB certification. Because the record shows that
SLBOC certified Fort Myer as a LRB, and we defer to SLBOC's interpretation of the SLDBEDA Act,
we conclude that Capitol Paving has not shown that the contracting officer's reliance on that
certification violated law, regulation, or the terms of the solicitation. Accordingly, we deny the protest.

## BACKGROUND

        On March 3, 2006, the Office of Contracting and Procurement ("OCP") issued Solicitation No.
POKA-2005-B-0015-LS on behalf of the District's Department of Transportation ("DDOT") to seek a
contractor to rehabilitate alleys at various locations throughout the District. Nine amendments were
issued, and the bid opening date was extended from April 5, 2006, to May 26, 2006.

        Solicitation Section M, entitled "Evaluation Factors", contains the following relevant
provisions:

        M.1.1  Preferences for Local Businesses, Disadvantaged Businesses, Resident-owned
        Businesses, Small Businesses, Longtime Resident Businesses, Longtime Resident
        Businesses, or Local Businesses with Principal Offices Located in an Enterprise Zone

**Exhibit 5**

Under the provisions of the "Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005", D.C. Law 16-33, effective October 20, 2005, the District shall apply preferences in evaluating bids or proposals from businesses that are small, local, disadvantaged, resident-owned, longtime resident, or local with a principal office located in an enterprise zone of the District of Columbia.

M.1    General Preferences

For evaluation purposes, the allowable preferences under the Act for this procurement are as follows:

. . . .

M.1.1.3  Ten percent reduction in the bid price or the addition of ten points on a 100-point scale for a longtime resident business (LRB) certified by the SLBOC or the DSLBD, as applicable;

M.1.1.4  Two percent reduction in the bid price or the addition of two points on a 100-point scale for a local business enterprise (LBE) certified by the SLBOC or the DSLBD, as applicable;

. . . .

M.1.2    Application of Preferences

The preferences shall be applicable to prime contractors as follows:

. . . .

M.1.2.3  Any prime contractor that is an LRB certified by the SLBOC or DSLBD, as applicable, will receive a ten percent (10%) reduction in the bid price for a bid submitted by the LRB in response to an IFB or the addition of ten points on a 100-point scale added to the overall score for proposals submitted by the LRB in response to an RFP.

M.1.2.4  Any prime contractor that is an LBE certified by the SLBOC or the DSLBD, as applicable, will receive a two percent (2%) reduction in the bid price for a bid submitted by the LBE in response to an IFB or the addition of two points on a 100-point scale added to the overall score for proposals submitted by the LBE in response to an RFP. . .

(AR Ex. 1). Section M.1.5.1 recites that any vendor seeking to receive preferences on the solicitation must submit documentation at the time of its bid evidencing the vendor's certification by the SLBOC as an SBE, LBE, DBE, DZE, LRB, or RBO.

Section J entitled "List of Attachments" includes subsection J.11 ("LSDBE Certification Package (27 Pages))" containing various materials from the predecessor to the DSLBD including an obsolete listing the certification categories -- SBE, LBE, DBE, DZE, and RBO -- but not including the new category for LRB that was part of the 2005 SLDBEDA Act. The attachment contains other informational materials concerning the LSDBE program such as a fact sheet, user's guide, frequently asked questions, checklist, waiver application, and LSDBE certification application, but none of these other materials mention the new LRB certification category.

On March 22, 2006, OCP conducted a pre-bid conference. Four bids were received and opened on the bid opening date, May 26, 2006. At bid tabulation on June 1, 2006, Capitol Paving was the apparent low bidder before preference points. On June 2, 2006, the contract specialist completed the "Local, Small, Disadvantaged Business Enterprise Responsiveness Determination and Percentage Reduction Worksheet" ("worksheet") for all four bidders. The contract specialist states that the preference percentage reductions found in his worksheet were based on the evidence of certifications which he verified electronically using the LSDBE website. (AR, Ex. 6). Capitol Paving received a 2 percent reduction in its bid price for evaluation purposes based on its certification as an LBE. A September 30, 2005 letter certifying Capital Paving as an LBE was attached to the worksheet. (*See* AR Ex. 2). The 2 percent reduction lowers Capitol Paving's bid price from $26,556,255 to $26,025,129.90. The Fort Myer worksheet states that it is entitled to a 12 percent reduction because it is certified as both a LBE and a LRB. The 12 percent reduction lowers Fort Myers bid price from $27,132,323.20 to $23,876,444.42. Capitol Paving was advised on June 7, 2006, that Fort Myer was the low evaluated bidder after the application of preference points.

Capitol Paving challenges the certification of Fort Myer. From the record, we find that Fort Myer had been certified by the former LBOC effective on September 21, 2004, as a LBE, with an expiration date of September 21, 2006. On March 20, 2006, Fort Myer submitted to the SLBOC an application for certification as a LRB. (Fort Myer Surreply Ex. B). The submission contains prior certification letters of Fort Myer issued by predecessors to the SLBOC – the District's former Minority Business Opportunity Commission ("MBOC") and the District's former LBOC – spanning the period March 4, 1986, through the most recent certification on September 21, 2004. Fort Myer also included copies of realty leases, corporate annual reports, certificates of good standing, and other documentation in support of its application for LRB status. By letter of April 4, 2006, the SLBOC approved the certification of Fort Myer as a LBE and LRB. The April 4 letter states in relevant part:

> The District of Columbia Small & Local Business Opportunity Commission (SLBOC) during its meeting on 09/21/2004, approved your application for Certification and registered your business enterprise in the Small, Local, and Disadvantaged Business Enterprise Program as established by the Small, Local, and Disadvantaged Business Development and Assistance Act of 2005, effective October 20, 2005 (D.C. Law 16-33; 52 DCR 7503), as amended. The business enterprise is duly registered by the Commission as a:

> . . . .

> Local Business Enterprise

- 4 -                              *Capitol Paving*, CAB No. P-0736

Longtime Resident Business

. . . .

This Certification of Registration, pursuant to D.C. Law 16-33 Subpart 3 will expire two (2) years from the effective date of approval. . . .

DATE OF APPROVAL: 09/21/2004

DATE OF EXPIRATION: 09/21/2006

(AR, Ex 4). Although the SLBOC's certification letter confusingly states that the "approval" was on September 21, 2004, which is impossible because the letter references and relies on the SLDBEDA Act which was enacted in 2005, and Fort Myer's request for certification was submitted on March 20, 2006, we find that the SLBOC simply expanded Fort Myer's prior certification of September 21, 2004, as an LBE, to include LRB status. Thus, LRB certification was effective from the date of the SLBOC letter of April 4, 2006, through the expiration date of the original LBE certification (September 21, 2006) so that both certifications would expire on the same date. (*See* Fort Myer Surreply, at 2, n.2).

On June 16, 2006, Capitol Paving filed its protest with the Board, arguing that the solicitation does not properly incorporate section M, that section M conflicts with section J, and that for various reasons Fort Myer should not have received the 10 percent preference for LRB status.

## DISCUSSION

We exercise jurisdiction pursuant to D.C. Code § 2-309.03(a)(1).

Capitol Paving first argues that under block 11 of the cover page the solicitation only references sections B through L and omits mention of section M. We do not find this argument persuasive because pages 127 through 131 do indeed contain section M, and those pages and the section are referenced in the upper right hand corner of the cover page which reads "Page 1 of Pages 131 Includes Sec. B thru M and attachments." Although cover page block 11 incorrectly identifies section L for the page ranges covering both section L and M, the pages for section M (pages 127-131) are identified and no bidder could have been prejudiced by this typographical error on the cover sheet. Capitol Paving also argues that section M conflicts with section J because the attachments for section J.11 do not make any mention of LRB status. We see no conflict and even if there were an ambiguity, Capitol Paving had to raise that prior to bid opening. Section J contains information about the LSDBE program and some forms that may be used. However, no reasonable bidder could interpret the guidance in section J as contradicting the clear references in section M to evaluation preferences being determined under the provisions of the SLDBEDA Act of 2005. Moreover, section M's direct and repeated references to the availability of preferences for a Longtime Resident Business (LRB) can leave no doubt that the contracting agency would be applying the current law governing the LSDBE program, notwithstanding the fact that section J's guidance and informational data had not been updated by the SLBOC and the contracting agency to reflect the current law.

Next, Capitol Paving raises a number of arguments as to why Fort Myer should not have been

certified as a LRB and should not have received the 10 percent LRB preference. The SLDBEDA Act created a new definitions provision, codified at D.C. Code § 2-218.02, which contains the following definition for "Longtime resident business":

"Longtime resident business" means a business which has been continuously eligible for certification as a local business enterprise, as defined in §2-218.31, for 20 consecutive years.

D.C. Code § 2-218.31 states:

A business enterprise shall be eligible for certification as a local business enterprise if the business enterprise:

(1) Has its principal office located physically in the District of Columbia;
(2) Requires that its chief executive officer and the highest level managerial employees of the business enterprise maintain their offices and perform their managerial functions in the District; and
(3)(A) Is licensed pursuant to Chapter 28 of Title 47;
(B) Is subject to the tax levied under Chapter 18 of Title 47; or
(C) Is a business enterprise identified in § 47-1808.01 (1) through (5) and more than 50% of the business is owned by residents of the District.

Capitol Paving observes that the Mayor has not issued any regulations implementing the SLDBEDA Act, particularly with regard to the new certification category of LRB, and thus the SLBOC cannot make a LRB certification without regulatory guidance. In addition, according to Capitol Paving, without implementing regulations, contractors cannot know if they could qualify for a waiver of any of the provisions for LBE status that in turn support LRB status. Because the preference for the LRB is so much greater than the other preferences, Capitol Paving argues that the lack of a waiver provision eliminates competition in the heavy construction and asphalt paving and road work industry since only Fort Myer qualifies for LRB status. Capitol Paving also contends that since the LBE preference category was created in 1992 by virtue of the Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act of 1992, no contractor could be eligible for LBE status for 20 consecutive years. Under this logic, the first year that an entity could qualify for LRB status would be 2012, that is, 20 years after 1992. Finally, Capitol Paving argues that Fort Myer has not been "continuously" eligible for LBE certification because Fort Myer had been debarred by the Federal Highway Administration and later by the District government in 2003. According to Capitol Paving, the debarment interrupted Fort Myer's eligibility and thus it did not meet the 20 continuous years requirement for LRB status.

We conclude that there is no basis in the law or the facts here to justify our reviewing the legitimacy of the action by the SLBOC to certify Fort Myer as an LRB. Although there are no implementing regulations, we believe that the SLBOC made its LRB certification of Fort Myer based on the language of the SLDBEDA Act, and again, we see no basis for intruding on the SLBOC's interpretation of a statute that it is charged to interpret. Only in exceptional circumstances will we consider such a review, such as where the certifying agency has abdicated its function and we are left with no choice but to decide on the certification so as to protect the integrity of the procurement process and fulfill our statutory obligation under D.C. Code 2-309.08(d) of deciding whether an award complies with applicable law, regulations, and terms and conditions of the solicitation. *Cf.* Urban Service

- 6 -                                                   *Capitol Paving*, CAB No. P-0736

Systems Corp., CAB No. P-0714, Nov. 15, 2005, *with C&D Tree Service, Inc.*, CAB No. P-0440, Mar. 11, 1996, 44 D.C. Reg. 6426, 6433-6439. Those exceptional circumstances are not present here. Such challenges to a certification are properly addressed to the SLBOC through the statutory mechanism provided in the SLDBEDA Act. Each of the arguments raised by Capitol Paving with regard to how SLBOC could properly certify Fort Myer are not properly before us and we find no error by the contracting officer in relying on the certification made by the SLBOC in this case. Accordingly, we deny the protest.

      **SO ORDERED.**

DATED: <u>October 12, 2006</u>                    <u>/s/ Jonathan D. Zischkau</u>
                                                   JONATHAN D. ZISCHKAU
                                                   Chief Administrative Judge

CONCURRING:


<u>/s/ Warren J. Nash</u>
WARREN J. NASH
Administrative Judge

GOVERNMENT OF THE DISTRICT OF COLUMBIA
CONTRACT APPEALS BOARD

PROTEST OF:

CAPITOL PAVING OF D.C., INC.        )
                                  )    CAB No. P-0741
Under IFB No. POKA-2006-B-0090-LJ    )

    For the Protester: Douglas A. Datt, Esq. For the District of Columbia Government: Howard Schwartz, Esq., Senior Assistant Attorney General, and Talia S. Cohen, Esq., Assistant Attorney General.

    Opinion by Chief Administrative Judge Jonathan D. Zischkau, with Administrative Judge Warren J. Nash, concurring.

## OPINION
*LexisNexis Filing ID 12877636*

    Capitol Paving of D.C., Inc., has protested the District's solicitation for joint seal, slurry seal, and bituminous surface treatment for various roadways in the District of Columbia, arguing that the solicitation contains inconsistencies regarding how bids will be evaluated under the small, local, and disadvantaged business enterprise ("SLDBE") preference program as authorized by the Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005, D.C. Law 16-33 ("SLDBEDA Act"). Capitol Paving argues that while Section M of the solicitation defining the evaluation criteria refers to preferences for "longtime resident businesses" ("LRBs") and resident-owned business enterprises, the "LSDBE Certification Package" found in Attachment J.7 of the solicitation does not mention either preference. In addition, the preference percentage reductions found in section M and Attachment J.7 also differ. Capitol Paving further argues that no award may be made based on a LRB preference because (1) there are no regulations implementing the LRB certification preference authorized by the SLDBEDA Act, and (2) the LRB certification as a matter of law cannot be applicable to any contractor until the year 2012. Apparently because Capitol Paving currently does not qualify for the 10 percent LRB certification preference but one of its competitors has recently been certified as a LRB (Fort Myer Construction), Capitol Paving argues that employing the LRB preference absent any waiver provision would eliminate competition and thus cannot be used in bid evaluations.

    We conclude that the first protest ground relating to the inconsistency between Solicitation Section M and Attachment J.7 has been rendered moot because the District issued an amendment removing Attachment J.7. Concerning the other protest grounds involving legal arguments challenging the use of any LRB preferences in District procurements, we have recently rejected essentially the same arguments in *Capitol Paving of D.C., Inc.*, CAB No. P-0736, Oct. 12, 2006. Accordingly, we dismiss the protest in part as moot and deny the remaining protest grounds.

## BACKGROUND

    On July 28, 2006, the Office of Contracting and Procurement ("OCP") issued in the open market IFB No. POKA-2006-B-0090-LJ with a bid opening date of August 31, 2006. OCP issued the IFB on behalf of the District of Columbia Department of Transportation ("DDOT"), for a contractor to provide

**Exhibit 6**

joint seal, slurry seal, and bituminous surface treatment in order to repair cracks in various roadways in the District. (Agency Report ("AR") Ex. 1). Section J of the IFB lists seven attachments including Attachment J.7, the "LSDBE Certification Package." In accordance with the 2005 SLDBEDA Act, Section M of the IFB provides preferences for small, local, disadvantaged, resident-owned, longtime resident, and enterprise zone businesses. Specifically, Section M provides, in accordance with the SLDBEDA Act, that a ten percent reduction is allowed for a certified longtime resident business. Section M, entitled "Evaluation Factors", contains the following relevant provisions:

> M.1.1  <u>Preferences for Local Businesses, Disadvantaged Businesses, Resident-owned Businesses, Small Businesses, Longtime Resident Businesses, Longtime Resident Businesses, or Local Businesses with Principal Offices Located in an Enterprise Zone</u>
>
> Under the provisions of the "Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005" (the Act), Title II, Subtitle N, of the "Fiscal Year 2006 Budget Support Act of 2005", D.C. Law 16-33, effective October 20, 2005, the District shall apply preferences in evaluating bids or proposals from businesses that are small, local, disadvantaged, resident-owned, longtime resident, or local with a principal office located in an enterprise zone of the District of Columbia.
>
> M.1  <u>General Preferences</u>
>
> For evaluation purposes, the allowable preferences under the Act for this procurement are as follows:
>
> . . . .
>
> M.1.1.3  Ten percent reduction in the bid price or the addition of ten points on a 100-point scale for a longtime resident business (LRB) certified by the SLBOC or the DSLBD, as applicable . . . .

(AR Ex. 1). Attachment J.7, the solicitation's LSDBE Certification Package, contains information and forms regarding the District's preference program. (Protest, Ex. 2). The problem with the package is that it appears to be seriously outdated, with some of the documents bearing revision dates in 1999, and none of the documents reflecting the major statutory changes made by the 2005 SLDBEDA Act to the preference program. On August 15, 2006, Capitol Paving filed the instant protest, pointing out that there is no reference in Attachment J.7 to a certification for resident-owned or longtime resident businesses.

On August 21, 2006, OCP issued Amendment No. 2, which deleted Attachment J.7 of the IFB. (AR Ex. 1). On August 29, 2006, OCP issued Amendment 3, which extended the bid opening date to January 10, 2007. The District filed its Agency Report on September 5, Capitol Paving filed comments on September 11, and the District filed a reply on September 19, 2006.

## DISCUSSION

We exercise jurisdiction pursuant to D.C. Code § 2-309.03(a)(1).

In response to Capitol Paving's first protest ground alleging inconsistencies between Section M and Attachment J.7, the District issued Amendment No. 2 deleting in its entirety Attachment J.7 which contained the outdated LSDBE preference program information package. Capitol Paving nevertheless urges that this amendment does not moot the first protest ground because removing Attachment J.7 means that the solicitation no longer provides preference program information and certification and waiver application forms to prospective bidders. Capitol Paving's argument is without merit. The package is no more than an informational aid to bidders and its elimination does not render the solicitation defective in any respect. Section M provides the evaluation criteria regarding the District's preference program and that content is derived directly from the SLDBEDA Act. Bidders can obtain information and forms from the Small, Local Business Opportunity Commission ("SLBOC") or its supporting Department of Small and Local Business Development. Accordingly, we dismiss as moot Capitol Paving's first protest ground.

Capitol Paving next argues that no award may be made under the challenged solicitation based on a LRB preference because (1) there are no regulations implementing the LRB certification preference authorized by the SLDBEDA Act, and (2) the LRB certification as a matter of law cannot be applicable to any contractor until the year 2012. Apparently because Capitol Paving currently does not qualify for the 10 percent LRB certification preference but one of its competitors has recently been certified as an LRB, Capitol Paving argues that applying the LRB preference absent any waiver provision would eliminate competition and thus cannot be used in this procurement.

We recently rejected similar arguments in *Capitol Paving of D.C., Inc.*, CAB No. P-0736, Oct. 12, 2006, where Capitol Paving challenged OCP's applying a 10 percent preference to Fort Myer Construction based on a longtime resident business certification issued by the SLBOC to Fort Myer. We sustained the contracting officer's determination to evaluate Fort Myer's bid using the LRB preference. Although we certainly look forward to the Mayor's issuance of revised regulations to implement the SLDBEDA Act and to replace various regulations that are obsolete, we cannot conclude that the current solicitation, in providing preferences pursuant to the SLDBEDA Act, violates the law. Accordingly, we deny Capitol Paving's other grounds for protest.

**SO ORDERED.**

DATED:  November 9, 2006                 /s/ Jonathan D. Zischkau
                                         JONATHAN D. ZISCHKAU
                                         Chief Administrative Judge


CONCURRING:

/s/ Warren J. Nash
WARREN J. NASH
Administrative Judge

# U.S. Census Bureau

# UNITED STATES DEPARTMENT OF
# COMMERCE
# NEWS
## WASHINGTON, DC 20230

ECONOMICS
AND
STATISTICS
ADMINISTRATION

**BUREAU OF THE
CENSUS**

Exhibit 7

**FOR IMMEDIATE RELEASE AT 10:30 A.M. EDT
THURSDAY, JULY 12, 2001**

Public Information Office
301-457-3030/301-457-3670 (fax)
301-457-1037 (TDD)
e-mail: pio@census.gov

CB01-115

Eddie Salyers/Valerie Strang
301-457-3316

News Conference and Webcast

**Minority-Owned Firms Grow Four Times Faster
Than National Average, Census Bureau Reports**

Minority-owned businesses grew more than four times as fast as U.S. firms overall between 1992 and 1997, increasing from 2.1 million to about 2.8 million firms, according to a report released today [pdf] by the Commerce Department's Census Bureau.

The 30 percent growth rate exceeded the 7 percent increase for all U.S. firms, which jumped from 17.3 million in 1992 to 18.4 million in 1997.

Receipts of all minority-owned firms (excluding C corporations) rose 60 percent to $335.3 billion in 1997, compared with a 40 percent increase for all U.S. firms over the same period.

In releasing the report, Under Secretary for Economic Affairs Kathleen B. Cooper said, "We are pleased to report that this portrait of the American economy shows rapidly expanding opportunities for minority entrepreneurs and a more diverse universe of small businesses."

Ronald N. Langston, director of the Commerce Department's Minority Business Development Agency (MBDA), said, "Today's report clearly indicates minority businesses are growing at a faster rate than U.S. businesses overall." He further said, "As the director of MBDA, I will work to empower minority businesses to achieve higher levels of success by directing MBDA to be innovative and focused on entrepreneurship."

The growth estimates do not include C corporations, for which comparable 1992 data are not available. C corporations were covered for the first time in the report, 1997 Survey of Minority-Owned Business Enterprises: Summary. C corporations encompass all legally incorporated businesses, except for subchapter S corporations. Subchapter S corporations are those whose shareholders elect to be taxed as individuals rather than as corporations.

Forty-three percent ($255.9 billion) of all revenues generated by minority-owned businesses were produced by 252,900 C corporations.

Including C corporations, there were more than 3 million minority-owned business enterprises, employing 4.5 million people and generating $591.3 billion in revenues. Overall, minority-owned firms made up 15 percent of the nation's businesses and generated 3 percent of all receipts.

Minority-owned businesses are those owned by African Americans, Hispanics, Asians and Pacific Islanders, or American Indians and Alaska Natives.

The vast majority of these firms, 82 percent or 2.5 million, were sole proprietorships (unincorporated businesses owned by individuals).

Highlights from the report:

- California, Texas, New York and Florida, the nation's most populous states and home to nearly half of all minority residents, had the largest number of minority-owned businesses.
- While Hispanics owned the largest share of firms owned by minorities, Asian- and Pacific Islander-owned firms reaped the largest share of minority-owned business revenues -- 52 percent.

- Men were owners of about 55 percent of the firms owned by each of the four minority groups. African Americans had the largest percentage of firms owned by women -- 38 percent.

- Thirty-nine percent of all minority-owned firms had 1997 receipts of under $10,000; about 3 percent had sales of $1 million or more.
- Average receipts per firm were $194,600 compared with $410,600 for all U.S. firms, excluding publicly held corporations and firms (such as mutual companies) whose owners' race or ethnicity could not be determined.

- About 1 in 5 of all minority-owned firms had paid employees. More than 4,400 minority-owned firms had 100 or more employees.

- Fifty-nine percent of all minority-owned firms were in the services and retail trade industries, accounting for 43 percent of all receipts.

The following tables show the top states by number and percentage of minority-owned firms:

| Ten States with the Largest Number of Minority-Owned Firms: 1997 | | |
|---|---|---|
| Geographic Area | Total Minority-Owned Firms | Percent of Total Minority-Owned Firms in U.S. |
| U.S. Total | 3,039,000 | 100 |
| California | 738,000 | 24.3 |
| Texas | 365,500 | 12.0 |
| New York | 296,500 | 9.8 |
| Florida | 286,900 | 9.4 |
| Illinois | 110,300 | 3.6 |
| New Jersey | 102,300 | 3.4 |
| Georgia | 88,700 | 2.9 |
| Maryland | 82,600 | 2.7 |
| Virginia | 71,700 | 2.4 |
| North Carolina | 61,600 | 2.0 |

| States with the Largest Percentage of Minority-Owned Firms: 1997 | | | |
|---|---|---|---|
| **Geographic Area** | **Total Minority-Owned Firms** | **All Firms** | **Minority-Owned Firms as a Percent of All Firms** |
| U.S. Total | 3,039,000 | 20,821,900 | 14.6 |
| Hawaii | 54,300 | 94,000 | 57.8 |
| District of Columbia | 15,200 | 45,300 | 33.6 |
| California | 738,000 | 2,565,700 | 28.8 |
| New Mexico | 37,500 | 131,700 | 28.5 |
| Texas | 365,500 | 1,526,000 | 24.0 |
| Florida | 286,900 | 1,301,900 | 22.0 |
| Maryland | 82,600 | 400,200 | 20.6 |
| New York | 296,500 | 1,509,800 | 19.6 |
| Alaska | 10,700 | 64,100 | 16.7 |
| New Jersey | 102,300 | 654,200 | 15.6 |
| Georgia | 88,700 | 568,600 | 15.6 |

The data in the report were collected as part of the 1997 Economic Census from a large sample of nonfarm businesses filing tax forms as sole proprietorships, partnerships or any type of corporation with receipts of $1,000 or more in 1997. The economic census is taken twice a decade in years ending in 2 and 7.

The report presents data for minority-owned businesses by gender, size, type of business, geographic area (states, counties,

metropolitan areas and places) and specific race and ethnic groups.

The data are subject to sampling variability, as well as nonsampling errors. Sources of nonsampling error include errors of response, nonreporting and coverage.

Further details concerning survey design, methodology and data limitations are contained in the full report. Comparisons with 1992 data should be conducted with extreme caution because of changes in tax laws that cause inconsistencies between the 1992 and 1997 data. Changes in survey methodology also may contribute to differences.

| Percentage of Total Minority-Owned Firms by State Compared with Percentage of Minority-Owned Firms to All Businesses by State: 1997 | | | | |
|---|---|---|---|---|
| Geographic Area | Total Minority-Owned Firms | Percent of Total Minority Firms in U.S. | All Firms | Minority as a Percent of All Firms |
| U.S. Total | 3,039,000 | 100 | 20,821,900 | 14.6 |
| Alabama | 28,300 | 0.9 | 285,200 | 9.9 |
| Alaska | 10,700 | 0.4 | 64,100 | 16.7 |
| Arizona | 43,300 | 1.4 | 329,000 | 13.2 |
| Arkansas | 13,000 | 0.4 | 193,400 | 6.7 |
| California | 738,000 | 24.3 | 2,565,700 | 28.8 |
| Colorado | 37,000 | 1.2 | 410,200 | 9.0 |
| Connecticut | 20,400 | 0.7 | 284,000 | 7.2 |
| Delaware | 5,300 | 0.2 | 56,600 | 9.4 |
| District of Columbia | 15,200 | 0.5 | 45,300 | 33.6 |
| Florida | 286,900 | 9.4 | 1,301,900 | 22.0 |
| Georgia | 88,700 | 2.9 | 568,600 | 15.6 |

| | | | | |
|---|---|---|---|---|
| Hawaii | 54,300 | 1.8 | 94,000 | 57.8 |
| Idaho | 5,200 | 0.2 | 109,800 | 4.7 |
| Illinois | 110,300 | 3.6 | 882,100 | 12.5 |
| Indiana | 22,800 | 0.8 | 413,400 | 5.5 |
| Iowa | 5,300 | 0.2 | 227,600 | 2.3 |
| Kansas | 11,700 | 0.4 | 213,400 | 5.5 |
| Kentucky | 12,700 | 0.4 | 281,600 | 4.5 |
| Louisiana | 41,700 | 1.4 | 295,700 | 14.1 |
| Maine | 2,800 | 0.1 | 127,500 | 2.2 |
| Maryland | 82,600 | 2.7 | 400,200 | 20.6 |
| Massachusetts | 39,000 | 1.3 | 537,200 | 7.3 |
| Michigan | 51,800 | 1.7 | 677,500 | 7.6 |
| Minnesota | 15,300 | 0.5 | 410,600 | 3.7 |
| Mississippi | 22,000 | 0.7 | 167,900 | 13.1 |
| Missouri | 26,600 | 0.9 | 411,400 | 6.5 |
| Montana | 3,400 | 0.1 | 93,700 | 3.6 |
| Nebraska | 4,600 | 0.2 | 138,800 | 3.3 |
| Nevada | 15,200 | 0.5 | 129,800 | 11.7 |
| New Hampshire | 3,200 | 0.1 | 115,700 | 2.8 |
| New Jersey | 102,300 | 3.4 | 654,200 | 15.6 |
| New Mexico | 37,500 | 1.2 | 131,700 | 28.5 |

| New York | 296,500 | 9.8 | 1,509,800 | 19.6 |
| North Carolina | 61,600 | 2.0 | 570,500 | 10.8 |
| North Dakota | 1,500 | 0.0 | 55,300 | 2.7 |
| Ohio | 49,400 | 1.6 | 781,300 | 6.3 |
| Oklahoma | 28,500 | 0.9 | 280,700 | 10.2 |
| Oregon | 18,200 | 0.6 | 291,600 | 6.2 |
| Pennsylvania | 49,500 | 1.6 | 837,800 | 5.9 |
| Rhode Island | 4,800 | 0.2 | 80,900 | 5.9 |
| South Carolina | 30,800 | 1.0 | 260,300 | 11.8 |
| South Dakota | 1,700 | 0.1 | 65,800 | 2.6 |
| Tennessee | 32,500 | 1.1 | 415,900 | 7.8 |
| Texas | 365,500 | 12.0 | 1,526,000 | 24.0 |
| Utah | 8,600 | 0.3 | 169,200 | 5.1 |
| Vermont | 2,100 | 0.1 | 67,500 | 3.1 |
| Virginia | 71,700 | 2.4 | 480,100 | 14.9 |
| Washington | 42,900 | 1.4 | 447,400 | 9.6 |
| West Virginia | 4,300 | 0.1 | 111,700 | 3.8 |
| Wisconsin | 13,700 | 0.5 | 366,400 | 3.7 |
| Wyoming | 2,100 | 0.1 | 49,400 | 4.3 |

NOTE: Detail may not add to the total because a firm may be counted in more than one state.

−X−

*Source: U.S. Census Bureau*
*Public Information Office*
*(301) 763-3030*
Last Revised: February 11, 2002 at 11:40:30 AM

Newsroom | News Releases | Broadcast Services | Tip Sheets | Facts for Features | Minority Links

---

**Census Bureau Links:**  Home · Search · Subjects A-Z · FAQs · Data Tools · Catalog · Census 2000 · Quality · Privacy Policy · Contact Us

## U S C E N S U S B U R E A U

*Helping You Make Informed Decisions*

Page Last Modified: February 11, 2002

STATISTICS FOR HISPANIC-OWNED FIRMS BY STATE:  1992/*
(Data includes individual proprietorships, partnerships and subchapter S
corporations. Detail may not add to total due to rounding.)

| | All firms | | | | Firms with paid employees | | | | |
| Geographic area | Firms (number) A | r | Sales and Receipts ($1,000) B | r | Firms (number) C | r | Sales and Receipts ($1,000) D | r | Employees (number) E | ( |
|---|---|---|---|---|---|---|---|---|---|---|
| All firms | 862605 | 0 | 76842489 | 2 | (X) | (X) | (X) | (X) | (X) | |
| Not allocated by ST# | 90897 | 4 | 4018219 | 19 | (X) | (X) | (X) | (X) | (X) | |
| **States:** | | | | | | | | | | |
| Total | 771708 | 0 | 72824270 | 1 | 115364 | 1 | 57187370 | 2 | 691056 | 1 |
| Alabama | 1029 | 7 | 150817 | 5 | 255 | 10 | 131826 | 4 | 1935 | |
| Alaska | 766 | 8 | 57656 | 15 | 120 | 15 | 39341 | 13 | 469 | |
| Arizona | 17835 | 1 | 1298084 | 4 | 2989 | 4 | 989049 | 5 | 16559 | |
| Arkansas | 701 | 8 | 59870 | 12 | 155 | 11 | 49261 | 14 | 674 | |
| California | 249717 | 0 | 19552637 | 2 | 32551 | 1 | 14081341 | 2 | 182205 | |
| Colorado | 13817 | 2 | 1212137 | 4 | 2256 | 6 | 1005306 | 4 | 13139 | |
| Connecticut | 4502 | 4 | 437998 | 5 | 684 | 9 | 320294 | 6 | 3305 | |
| Delaware | 497 | 11 | 109088 | 37 | 96 | 16 | 92552 | 43 | 932 | |
| District Of Columbia | 1452 | 5 | 311741 | 3 | 176 | 12 | 292663 | 3 | 2945 | |
| Florida | 118208 | 1 | 16127202 | 3 | 19674 | 2 | 13668833 | 3 | 125935 | |
| Georgia | 5501 | 3 | 772015 | 5 | 1058 | 9 | 679219 | 6 | 7792 | |
| Hawaii | 3192 | 4 | 187717 | 7 | 277 | 12 | 131663 | 8 | 2357 | |
| Idaho | 1865 | 4 | 126479 | 6 | 356 | 10 | 102751 | 8 | 1705 | |
| Illinois | 18368 | 2 | 1950685 | 6 | 2692 | 6 | 1553281 | 7 | 17499 | |
| Indiana | 2454 | 5 | 310338 | 7 | 512 | 12 | 272638 | 8 | 4011 | |
| Iowa | 859 | 7 | 128915 | 5 | 158 | 11 | 120310 | 5 | 1148 | |
| Kansas | 2396 | 4 | 186109 | 7 | 368 | 10 | 143010 | 8 | 1983 | |
| Kentucky | 752 | 9 | 104438 | 6 | 199 | 11 | 92147 | 6 | 1280 | |
| Louisiana | 4983 | 3 | 700915 | 6 | 877 | 9 | 594909 | 7 | 7275 | |
| Maine | 427 | 11 | 40119 | 2 | 93 | 11 | 32753 | 2 | 713 | |
| Maryland | 7289 | 3 | 569988 | 6 | 828 | 10 | 413658 | 7 | 6008 | |
| Massachusetts | 6914 | 3 | 508199 | 6 | 838 | 9 | 329523 | 8 | 4244 | |
| Michigan | 5036 | 4 | 714053 | 5 | 909 | 10 | 616465 | 5 | 5997 | |
| Minnesota | 1583 | 6 | 171368 | 5 | 225 | 10 | 137882 | 6 | 2096 | |
| Mississippi | 660 | 9 | 93585 | 6 | 116 | 13 | 77194 | 6 | 949 | |
| Missouri | 2216 | 5 | 265111 | 20 | 427 | 13 | 229126 | 23 | 4328 | |
| Montana | 568 | 9 | 27440 | 8 | 112 | 8 | 18887 | 3 | 451 | |
| Nebraska | 1147 | 7 | 77303 | 21 | 222 | 14 | 59900 | 26 | 1230 | |
| Nevada | 3900 | 3 | 484071 | 7 | 719 | 9 | 403994 | 8 | 5280 | |
| New Hampshire | 487 | 11 | 80227 | 3 | 115 | 5 | 71388 | 1 | 682 | |
| New Jersey | 22198 | 1 | 2827937 | 17 | 3050 | 5 | 2275840 | 21 | 21803 | |
| New Mexico | 21586 | 1 | 1479650 | 3 | 3938 | 3 | 1142790 | 4 | 19004 | |
| New York | 50601 | 1 | 4732279 | 3 | 6296 | 4 | 3601089 | 3 | 34825 | |
| North Carolina | 2802 | 5 | 419243 | 7 | 575 | 9 | 365216 | 8 | 3671 | |
| North Dakota | 116 | 13 | 9890 | 13 | 28 | 12 | 8200 | 15 | 71 | |
| Ohio | 4289 | 4 | 827827 | 4 | 721 | 10 | 729691 | 4 | 8752 | |
| Oklahoma | 2854 | 4 | 246786 | 10 | 451 | 12 | 205938 | 12 | 3383 | |
| Oregon | 3538 | 4 | 330519 | 5 | 621 | 9 | 271533 | 5 | 4271 | |
| Pennsylvania | 5186 | 4 | 560027 | 9 | 835 | 10 | 422471 | 11 | 5174 | |
| Rhode Island | 1297 | 6 | 126311 | 6 | 234 | 9 | 101017 | 6 | 972 | |
| South Carolina | 1057 | 7 | 146620 | 11 | 196 | 12 | 118593 | 11 | 2715 | |
| South Dakota | 239 | 13 | 35050 | 2 | 71 | 12 | 32377 | 2 | 394 | |
| Tennessee | 1602 | 6 | 147882 | 7 | 306 | 11 | 114643 | 9 | 1840 | |
| Texas | 155909 | 0 | 11796301 | 2 | 24786 | 1 | 9083367 | 3 | 138798 | |

**Exhibit 8**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 2375 | 4 | 179580 | 4 | 376 | 7 | 141317 | 2 | 2078 |
| Vermont | 351 | 10 | 33033 | 5 | 76 | 7 | 27136 | 4 | 272 |
| Virginia | 7654 | 3 | 957962 | 29 | 997 | 9 | 803562 | 35 | 5966 |
| Washington | 6093 | 3 | 750302 | 6 | 1091 | 8 | 645973 | 7 | 8065 |
| West Virginia | 313 | 13 | 47784 | 8 | 111 | 13 | 38568 | 7 | 467 |
| Wisconsin | 1762 | 5 | 299878 | 4 | 379 | 11 | 264857 | 4 | 2552 |
| Wyoming | 766 | 6 | 53073 | 6 | 170 | 6 | 42027 | 7 | 859 |

|------------------------------------------------------------------------

```
/*  Source: DEPARTMENT OF COMMERCE, BUREAU OF THE CENSUS.

 -   Represents zero.
 r   Relative standard error.
(D)  Withheld to avoid disclosing data for individual companies;
     data are included in higher-level totals.
(X)  Not applicable.
 #   See "Estimates of Total Firms" for more detail.
```

**Summary Statistics for Changes in the Number of Hispanic-Owned Businesses and their Receipts:  1997 to 2002**

| Geographic area | All firms in 2002[1] | | All firms in 1997[2] | | Change from 1997 to 2002 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Firms (number) | Sales and receipts ($1,000,000) | Firms (number) | Sales and receipts ($1,000,000) | Net change in firm count | Firms (percent) | SE[3] of percent change in firms | Net change in receipts | Sales and receipts (percent) | SE[3] of percent change in sales and receipts |
| United States[4] | 1,573,464 | 221,927 | 1,199,896 | 186,275 | 373,568 | 31 | 1 | 35,652 | 19 | 4 |
| Alabama | 2,524 | 748 | 2,919 | 397 | -395 | -14 | 10 * | 351 | 89 | 11 |
| Alaska | 1,241 | 171 | 1,385 | 192 | -144 | -10 | 10 * | -21 | -11 | 19 * |
| Arizona | 35,104 | 4,295 | 28,894 | 4,227 | 6,210 | 21 | 4 | 68 | 2 | 6 * |
| Arkansas | 2,094 | 374 | 2,586 | 190 | -492 | -19 | 15 * | 184 | 97 | 30 |
| California | 427,678 | 57,186 | 336,405 | 51,682 | 91,273 | 27 | 2 | 5,504 | 11 | 13 * |
| Colorado | 24,054 | 5,114 | 20,859 | 3,068 | 3,195 | 15 | 5 | 2,045 | 67 | 7 |
| Connecticut | 9,408 | 1,277 | 6,594 | 1,163 | 2,814 | 43 | 9 | 114 | 10 | 20 * |
| Delaware | 879 | 137 | 898 | 504 | -19 | -2 | 15 * | -366 | -73 | 39 * |
| District of Columbia | 2,169 | 548 | 2,153 | 664 | 16 | 1 | 12 * | -116 | -17 | 15 * |
| Florida | 266,688 | 40,892 | 193,902 | 35,351 | 72,786 | 38 | 2 | 5,541 | 16 | 6 |
| Georgia | 18,310 | 4,200 | 11,741 | 1,888 | 6,569 | 56 | 7 | 2,312 | 122 | 11 |
| Hawaii | 3,095 | 483 | 4,153 | 277 | -1,058 | -25 | 11 | 206 | 74 | 15 |
| Idaho | 2,775 | 352 | 2,844 | 240 | -69 | -2 | 14 * | 112 | 46 | 20 |
| Illinois | 39,539 | 7,389 | 31,010 | 4,815 | 8,529 | 28 | 6 | 2,574 | 53 | 18 |
| Indiana | 5,482 | 792 | 4,277 | 818 | 1,205 | 28 | 7 | -26 | -3 | 14 * |
| Iowa | 1,536 | 289 | 1,343 | 233 | 193 | 14 | 13 * | 56 | 24 | 37 * |
| Kansas | 4,176 | 660 | 3,547 | 403 | 629 | 18 | 9 | 257 | 64 | 19 |
| Kentucky | 2,094 | 770 | 1,481 | 283 | 613 | 41 | 14 | 487 | 172 | 126 * |
| Louisiana | 7,645 | 1,945 | 6,645 | 1,283 | 1,000 | 15 | 8 | 662 | 52 | 37 * |
| Maine | 731 | 113 | 545 | 52 | 186 | 34 | 43 * | 61 | 117 | 25 |
| Maryland | 15,353 | 2,398 | 11,158 | 1,567 | 4,195 | 38 | 7 | 831 | 53 | 11 |
| Massachusetts | 15,933 | 2,068 | 12,725 | 1,623 | 3,208 | 25 | 6 | 445 | 27 | 9 |
| Michigan | 9,841 | 3,184 | 9,997 | 1,967 | -156 | -2 | 7 * | 1,217 | 62 | 9 |
| Minnesota | 3,984 | 463 | 3,616 | 392 | 368 | 10 | 11 * | 71 | 18 | 20 * |
| Mississippi | 1,326 | 213 | 988 | 124 | 338 | 34 | 25 * | 89 | 72 | 20 |
| Missouri | 3,652 | 682 | 4,107 | 587 | -455 | -11 | 5 | 95 | 16 | 11 * |
| Montana | 964 | 99 | 1,006 | 115 | -42 | -4 | 16 * | -16 | -14 | 35 * |
| Nebraska | 1,966 | 434 | 1,437 | 141 | 529 | 37 | 11 | 293 | 207 | 31 |
| Nevada | 9,741 | 1,643 | 6,565 | 1,221 | 3,176 | 48 | 7 | 422 | 35 | 13 |
| New Hampshire | 913 | 194 | 735 | 117 | 178 | 24 | 26 * | 77 | 66 | 36 |
| New Jersey | 49,841 | 7,245 | 36,116 | 5,107 | 13,725 | 38 | 5 | 2,138 | 42 | 12 |
| New Mexico | 29,708 | 4,678 | 28,285 | 3,668 | 1,423 | 5 | 4 * | 1,011 | 28 | 6 |
| New York | 163,588 | 12,326 | 104,189 | 10,311 | 59,399 | 57 | 3 | 2,015 | 20 | 8 |
| North Carolina | 9,043 | 1,789 | 7,270 | 1,080 | 1,773 | 24 | 9 | 709 | 66 | 17 |
| North Dakota | 230 | 16 | 444 | 22 | -214 | -48 | 37 * | -7 | -29 | 39 * |
| Ohio | 7,109 | 1,263 | 6,448 | 1,513 | 661 | 10 | 7 * | -249 | -16 | 15 * |
| Oklahoma | 5,442 | 1,140 | 4,349 | 772 | 1,093 | 25 | 8 | 369 | 48 | 7 |
| Oregon | 6,360 | 1,416 | 6,022 | 1,074 | 338 | 6 | 9 * | 343 | 32 | 37 * |
| Pennsylvania | 11,023 | 1,729 | 7,893 | 1,273 | 3,130 | 40 | 10 | 456 | 36 | 23 * |
| Rhode Island | 3,415 | 214 | 2,186 | 207 | 1,229 | 56 | 13 | 7 | 3 | 16 * |
| South Carolina | 3,015 | 691 | 2,036 | 251 | 979 | 48 | 18 | 441 | 176 | 69 |
| South Dakota | 355 | 122 | 261 | 59 | 94 | 36 | 24 * | 63 | 108 | 63 |
| Tennessee | 4,301 | 1,004 | 3,639 | 684 | 662 | 18 | 11 | 320 | 47 | 27 |
| Texas | 319,340 | 42,214 | 240,396 | 39,482 | 78,944 | 33 | 2 | 2,732 | 7 | 12 * |
| Utah | 5,177 | 555 | 4,740 | 455 | 437 | 9 | 10 * | 100 | 22 | 10 |
| Vermont | 452 | 38 | 898 | 184 | -446 | -50 | 26 | -146 | -79 | 70 * |
| Virginia | 18,987 | 3,452 | 13,703 | 1,809 | 5,284 | 39 | 6 | 1,643 | 91 | 7 |
| Washington | 10,261 | 1,538 | 10,009 | 1,711 | 252 | 3 | 7 * | -174 | -10 | 16 * |
| West Virginia | 648 | 187 | 940 | 96 | -292 | -31 | 20 * | 91 | 95 | 22 |
| Wisconsin | 3,750 | 975 | 3,020 | 817 | 730 | 24 | 11 | 159 | 19 | 9 |
| Wyoming | 1,320 | 221 | 1,239 | 117 | 81 | 7 | 16 * | 104 | 89 | 71 * |

[1] Source:  2002 Survey of Business Owners.  Data include firms with paid employees and firms with no paid employees.

[2] Source:  1997 Survey of Minority-Owned Business Enterprises.  Data include firms with paid employees and firms with no paid employees.

[3] For explanation of standard errors, see Reliability of Estimates in the introductory text.

[4] Detail may not add to total because firms with more than one domestic establishment are counted in each state in which they operate, but only once at the U.S. total.

*  Change is not statistically significant from 0.

**Exhibit 9**

STATISTICS FOR BLACK-OWNED FIRMS BY STATE:  1992/*
(Data includes individual proprietorships, partnerships and subchapter S
corporations. Detail may not add to total due to rounding.)

| | All firms | | | | Firms with paid employees | | | |
|---|---|---|---|---|---|---|---|---|---|
| Geographic area | Firms (number) | r | Sales and Receipts ($1,000) | r | Firms (number) | r | Sales and Receipts ($1,000) | r | Employees (number) |
| | A | r | B | r | C | r | D | r | E |
| United States | 620912 | 0 | 32197361 | 2 | 64478 | 1 | 22589676 | 3 | 345193 |
| Alabama | 14707 | 0 | 534692 | 2 | 1989 | 1 | 343331 | 2 | 6827 |
| Alaska | 739 | 0 | 39137 | 3 | 78 | 3 | 28871 | 5 | 855 |
| Arizona | 2936 | 1 | 137721 | 17 | 328 | 10 | 99734 | 23 | 1274 |
| Arkansas | 5738 | 1 | 232850 | 3 | 646 | 2 | 160875 | 4 | 1952 |
| California | 68968 | 0 | 5478365 | 2 | 6875 | 2 | 4155861 | 2 | 43292 |
| Colorado | 4372 | 1 | 295305 | 7 | 431 | 11 | 242385 | 8 | 2955 |
| Connecticut | 5714 | 1 | 292369 | 6 | 544 | 6 | 188098 | 7 | 2400 |
| Delaware | 2060 | 2 | 156880 | 12 | 243 | 7 | 125503 | 15 | 2352 |
| District Of Columbia | 10111 | 1 | 451861 | 4 | 787 | 3 | 313107 | 5 | 4277 |
| Florida | 40371 | 1 | 2265451 | 15 | 4435 | 4 | 1601641 | 22 | 22978 |
| Georgia | 38264 | 0 | 1677083 | 4 | 4095 | 3 | 1103546 | 6 | 18744 |
| Hawaii | 717 | 0 | 27382 | 24 | 42 | 8 | 16794 | 40 | 211 |
| Idaho | 152 | 3 | 24532 | 1 | 28 | 16 | 23079 | 1 | 119 |
| Illinois | 28433 | 1 | 1773293 | 3 | 2694 | 4 | 1272218 | 4 | 17972 |
| Indiana | 8349 | 1 | 710971 | 7 | 1260 | 6 | 599379 | 8 | 6894 |
| Iowa | 1106 | 2 | 75521 | 7 | 141 | 11 | 64082 | 9 | 604 |
| Kansas | 3078 | 1 | 92295 | 3 | 291 | 3 | 50991 | 3 | 1088 |
| Kentucky | 5097 | 1 | 250855 | 4 | 522 | 3 | 198117 | 4 | 2452 |
| Louisiana | 20312 | 0 | 774132 | 13 | 2086 | 3 | 487065 | 21 | 8626 |
| Maine | 235 | 2 | 25439 | 6 | 45 | 11 | 21925 | 7 | 293 |
| Maryland | 35758 | 0 | 1241530 | 5 | 2543 | 4 | 734155 | 9 | 31450 |
| Massachusetts | 7225 | 1 | 427948 | 5 | 567 | 8 | 307974 | 7 | 3692 |
| Michigan | 19695 | 1 | 1268426 | 4 | 2147 | 5 | 860556 | 6 | 13727 |
| Minnesota | 2785 | 1 | 283392 | 8 | 332 | 6 | 211664 | 4 | 2845 |
| Mississippi | 14067 | 0 | 504945 | 1 | 1891 | 1 | 300535 | 0 | 5699 |
| Missouri | 9973 | 1 | 403292 | 3 | 1089 | 2 | 276594 | 4 | 4879 |
| Montana | 113 | 10 | 6504 | 8 | 15 | 0 | 5311 | 0 | 124 |
| Nebraska | 1350 | 2 | 61523 | 13 | 154 | 6 | 46833 | 17 | 950 |
| Nevada | 1736 | 1 | 113338 | 23 | 161 | 9 | 84299 | 31 | 1570 |
| New Hampshire | 326 | 1 | 46369 | 0 | 46 | 7 | 40182 | 0 | 228 |
| New Jersey | 20137 | 1 | 1239325 | 6 | 1970 | 6 | 880252 | 9 | 9989 |
| New Mexico | 925 | 2 | 60631 | 9 | 96 | 4 | 45190 | 10 | 591 |
| New York | 51312 | 0 | 2267600 | 3 | 4033 | 4 | 1385469 | 5 | 16070 |
| North Carolina | 29221 | 0 | 893369 | 2 | 3479 | 1 | 530720 | 2 | 11166 |
| North Dakota | 117 | 13 | 7845 | 20 | 14 | 11 | 5201 | 7 | 105 |
| Ohio | 22690 | 1 | 1096178 | 4 | 2328 | 4 | 807206 | 5 | 11604 |
| Oklahoma | 4621 | 1 | 190517 | 6 | 510 | 7 | 134555 | 7 | 2027 |
| Oregon | 1447 | 3 | 100644 | 10 | 196 | 15 | 83726 | 13 | 1066 |
| Pennsylvania | 15917 | 1 | 1133581 | 4 | 1922 | 5 | 870766 | 6 | 12366 |
| Rhode Island | 857 | 4 | 65252 | 7 | 110 | 11 | 50353 | 7 | 1154 |
| South Carolina | 18343 | 0 | 672514 | 1 | 2485 | 1 | 435256 | 2 | 9464 |
| South Dakota | 111 | 1 | 10307 | 0 | 20 | 7 | 9160 | 0 | 91 |
| Tennessee | 14920 | 0 | 555015 | 4 | 1686 | 2 | 326870 | 3 | 5955 |
| Texas | 50008 | 0 | 2339221 | 17 | 4861 | 3 | 1604853 | 25 | 23745 |
| Utah | 354 | 5 | 45246 | 1 | 54 | 0 | 41444 | 0 | 269 |
| Vermont | 139 | 0 | 7202 | 0 | 33 | 0 | 5691 | 0 | 109 |
| Virginia | 26100 | 0 | 1211173 | 3 | 2958 | 3 | 892170 | 4 | 20992 |
| Washington | 4575 | 1 | 257073 | 8 | 595 | 8 | 200651 | 10 | 3601 |

**Exhibit 10**

| West Virginia | 1093 | 2 | 42228 | 2 | 127 | 2 | 32941 | 3 | 559 |
| Wisconsin | 3446 | 1 | 323743 | 30 | 488 | 7 | 278266 | 35 | 2858 |
| Wyoming | 97 | 0 | 5301 | 0 | 10 | 0 | 4230 | 0 | 85 |

|--------------------------------------------------------------------------------

    /*  Source: DEPARTMENT OF COMMERCE, BUREAU OF THE CENSUS.

    -  Represents zero.
    r  Relative standard error.
  (D) Withheld to avoid disclosing data for individual companies;
      data are included in higher-level totals.

**Summary Statistics for Changes in the Number of Black-Owned Businesses and their Receipts: 1997 to 2002**

| Geographic area | All firms in 2002[1] | | All firms in 1997[2] | | Change from 1997 to 2002 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Firms (number) | Sales and receipts ($1,000,000) | Firms (number) | Sales and receipts ($1,000,000) | Net change in firm count | Firms (percent) | SE[3] of percent change in firms | Net change in receipts | Sales and receipts (percent) | SE[3] of percent change in sales and receipts |
| United States[4] | 1,197,567 | 88,642 | 823,499 | 71,215 | 374,068 | 45 | 2 | 17,427 | 24 | 2 |
| Alabama | 28,666 | 1,651 | 19,077 | 1,009 | 9,589 | 50 | 4 | 642 | 64 | 10 |
| Alaska | 926 | 81 | 876 | 56 | 50 | 6 | 15 * | 25 | 45 | 30 * |
| Arizona | 6,330 | 530 | 3,582 | 314 | 2,748 | 77 | 10 | 216 | 69 | 16 |
| Arkansas | 8,942 | 442 | 6,721 | 387 | 2,221 | 33 | 5 | 55 | 14 | 17 * |
| California | 112,815 | 9,741 | 79,110 | 6,395 | 33,705 | 43 | 5 | 3,346 | 52 | 10 |
| Colorado | 7,066 | 758 | 4,926 | 513 | 2,140 | 43 | 8 | 245 | 48 | 31 * |
| Connecticut | 10,309 | 723 | 7,251 | 528 | 3,058 | 42 | 8 | 195 | 37 | 28 * |
| Delaware | 4,258 | 215 | 2707 | 185 | 1,551 | 57 | 11 | 30 | 16 | 21 * |
| District of Columbia | 12,198 | 1,568 | 10,909 | 1,335 | 1,289 | 12 | 6 | 233 | 17 | 7 |
| Florida | 102,053 | 5,721 | 59,732 | 4,092 | 42,321 | 71 | 4 | 1,629 | 40 | 14 |
| Georgia | 90,461 | 5,665 | 55,766 | 4,111 | 34,695 | 62 | 3 | 1,554 | 38 | 5 |
| Hawaii | 817 | 81 | 638 | 34 | 179 | 28 | 28 * | 47 | 136 | 94 * |
| Idaho | 373 | 58 | 164 | 18 | 209 | 127 | 52 | 40 | 228 | 139 * |
| Illinois | 68,699 | 4,980 | 41,244 | 3,913 | 27,455 | 67 | 4 | 1,067 | 27 | 13 |
| Indiana | 14,056 | 1,688 | 11,107 | 1,192 | 2,949 | 27 | 6 | 496 | 42 | 21 |
| Iowa | 1,609 | 258 | 1,353 | 233 | 256 | 19 | 14 * | 25 | 11 | 11 * |
| Kansas | 4,468 | 376 | 3,396 | 594 | 1,072 | 32 | 7 | -217 | -37 | 24 * |
| Kentucky | 7,592 | 1,106 | 5,629 | 659 | 1,963 | 35 | 7 | 448 | 68 | 31 |
| Louisiana | 40,243 | 1,934 | 25,782 | 1,917 | 14,461 | 56 | 5 | 16 | 1 | 9 * |
| Maine | 327 | 32 | 257 | 28 | 70 | 27 | 28 * | 4 | 14 | 14 * |
| Maryland | 69,410 | 4,655 | 47,614 | 3,965 | 21,796 | 46 | 4 | 690 | 17 | 6 |
| Massachusetts | 12,819 | 1,239 | 11,834 | 1,013 | 985 | 8 | 4 | 226 | 22 | 12 |
| Michigan | 44,366 | 4,294 | 24,954 | 4,623 | 19,412 | 78 | 5 | -330 | -7 | 14 |
| Minnesota | 7,837 | 682 | 4,024 | 523 | 3,813 | 95 | 11 | 159 | 30 | 14 |
| Mississippi | 25,002 | 1,314 | 17,617 | 853 | 7,385 | 42 | 5 | 461 | 54 | 10 |
| Missouri | 16,750 | 1,345 | 13,678 | 1,261 | 3,072 | 22 | 5 | 83 | 7 | 13 * |
| Montana | 220 | 12 | 62 | 4 | 158 | 255 | 109 * | 9 | 242 | 155 * |
| Nebraska | 2,091 | 141 | 1,565 | 129 | 526 | 34 | 11 | 12 | 9 | 23 * |
| Nevada | 4,343 | 434 | 2,796 | 226 | 1,547 | 55 | 12 | 208 | 92 | 14 |
| New Hampshire | 470 | 68 | 326 | 32 | 144 | 44 | 22 | 36 | 111 | 43 * |
| New Jersey | 36,280 | 3,202 | 26,500 | 2,160 | 9,780 | 37 | 5 | 1,042 | 48 | 16 |
| New Mexico | 1,541 | 255 | 1,132 | 143 | 409 | 36 | 14 | 112 | 79 | 16 * |
| New York | 129,329 | 7,481 | 86,469 | 5,067 | 42,860 | 50 | 3 | 2,414 | 48 | 11 |
| North Carolina | 52,122 | 3,549 | 39,901 | 2,299 | 12,221 | 31 | 3 | 1,250 | 54 | 17 |
| North Dakota | 78 | 14 | 99 | 17 | -21 | -21 | 21 * | -4 | -22 | 9 |
| Ohio | 35,658 | 3,600 | 26,970 | 3,947 | 8,688 | 32 | 3 | -346 | -9 | 12 * |
| Oklahoma | 7,441 | 458 | 5,309 | 333 | 2,132 | 40 | 8 | 125 | 38 | 10 |
| Oregon | 2,222 | 371 | 2,219 | 436 | 3 | 0 | 9 * | -65 | -15 | 27 * |
| Pennsylvania | 24,757 | 2,118 | 19,791 | 1,994 | 4,966 | 25 | 4 | 124 | 6 | 9 * |
| Rhode Island | (S) | (S) | 1,269 | 124 | 496 | 39 | 10 | 128 | 103 | 134 * |
| South Carolina | 28,613 | 1,597 | 23,216 | 1,409 | 5,397 | 23 | 3 | 188 | 13 | 8 |
| South Dakota | 122 | 61 | 150 | 17 | -28 | -19 | 30 * | 44 | 254 | 20 |
| Tennessee | 26,811 | 1,755 | 20,196 | 1,645 | 6,615 | 33 | 3 | 110 | 7 | 8 * |
| Texas | 88,768 | 6,419 | 60,427 | 6,857 | 28,341 | 47 | 4 | -438 | -6 | 14 * |
| Utah | 649 | 188 | 440 | 23 | 209 | 48 | 26 | 165 | 717 | 44 |
| Vermont | 211 | 21 | 168 | 37 | 43 | 26 | 38 * | -16 | -44 | 15 |
| Virginia | 41,165 | 3,719 | 33,539 | 3,408 | 7,626 | 23 | 3 | 311 | 9 | 8 * |
| Washington | 6,982 | 1,053 | 5,553 | 504 | 1,429 | 26 | 8 | 549 | 109 | 15 |
| West Virginia | 1,472 | 92 | 1148 | 88 | 324 | 28 | 12 | 4 | 5 | 21 * |
| Wisconsin | 6,685 | 633 | 4,848 | 550 | 1,837 | 38 | 6 | 83 | 15 | 13 * |
| Wyoming | 149 | 10 | 232 | 13 | -83 | -36 | 34 * | -3 | -24 | 45 * |

[1] Source: 2002 Survey of Business Owners. Data include firms with paid employees and firms with no paid employees.

[2] Source: 1997 Survey of Minority-Owned Business Enterprises. Data include firms with paid employees and firms with no paid employees.

[3] For explanation of standard errors, see Reliability of Estimates in the introductory text.

[4] Detail may not add to total because firms with more than one domestic establishment are counted in each state in which they operate, but only once at the U.S. total.

S - Estimates are suppressed when publication standards are not met, such as, the firm count is less than 3, or the relative standard error of the sales and reciepts is 50 percent or more.

* Change is not statistically significant from 0.

**Exhibit 11**

**Summary Statistics for Changes in the Number of Women-Owned Businesses and their Receipts: 1997 to 2002**

| Geographic area | All firms in 2002[1] | | All firms in 1997[2] | | Change from 1997 to 2002 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Firms (number) | Sales and Receipts ($1,000,000) | Firms (number) | Sales and Receipts ($1,000,000) | Net change in firm count | Firms (percent) | SE[3] of percent change in firms | Net change in sales and receipts | Sales and receipts (percent) | SE[3] of percent change in sales and receipts |
| United States[4] | 6,489,259 | 939,538 | 5,417,034 | 818,669 | 1,072,225 | 20 | - | 120,869 | 15 | 2 |
| Alabama | 81,821 | 11,435 | 69,515 | 10,230 | 12,306 | 18 | 3 | 1,205 | 12 | 3 |
| Alaska | 16,308 | 2,348 | 16,633 | 1,942 | -325 | -2 | 5 * | 406 | 21 | 9 |
| Arizona | 109,748 | 15,761 | 88,780 | 11,305 | 20,968 | 24 | 3 | 4,456 | 39 | 3 |
| Arkansas | 49,618 | 8,339 | 42,581 | 6,490 | 7,037 | 17 | 3 | -151 | -2 | 6 * |
| California | 870,496 | 137,692 | 700,513 | 121,191 | 169,983 | 24 | 1 | 16,501 | 14 | 6 |
| Colorado | 135,220 | 16,359 | 114,807 | 13,763 | 20,413 | 18 | 2 | 2,596 | 19 | 6 |
| Connecticut | 82,118 | 12,218 | 72,393 | 9,278 | 9,725 | 13 | 2 | 2,940 | 32 | 5 |
| Delaware | 15,344 | 2,021 | 13,662 | 1,831 | 1,682 | 12 | 5 | 190 | 10 | 5 |
| District of Columbia | 15,675 | 2,403 | 13,979 | 1,813 | 1,696 | 12 | 6 | 590 | 33 | 7 |
| Florida | 437,355 | 61,275 | 337,811 | 48,261 | 99,544 | 29 | 2 | 13,014 | 27 | 4 |
| Georgia | 196,195 | 30,027 | 145,578 | 25,267 | 50,619 | 35 | 2 | 4,760 | 19 | 4 |
| Hawaii | 29,943 | 4,594 | 25,807 | 3,253 | 4,136 | 16 | 5 | 1,341 | 41 | 14 |
| Idaho | 28,824 | 3,216 | 25,763 | 2,405 | 3,061 | 12 | 4 | 811 | 34 | 8 |
| Illinois | 284,954 | 46,862 | 239,725 | 44,273 | 45,229 | 19 | 2 | 2,589 | 6 | 4 * |
| Indiana | 118,857 | 16,481 | 107,082 | 13,578 | 11,775 | 11 | 1 | 2,903 | 21 | 4 |
| Iowa | 63,821 | 7,399 | 57,527 | 8,093 | 6,294 | 11 | 3 | -694 | -9 | 12 * |
| Kansas | 59,635 | 6,949 | 54,638 | 6,928 | 4,997 | 9 | 2 | 21 | 0 | 6 * |
| Kentucky | 77,159 | 9,451 | 65,965 | 9,877 | 11,194 | 17 | 3 | -425 | -4 | 3 * |
| Louisiana | 86,878 | 12,253 | 70,550 | 11,463 | 16,328 | 23 | 3 | 790 | 7 | 7 * |
| Maine | 32,512 | 3,282 | 30,598 | 3,212 | 1,914 | 6 | 4 | 70 | 2 | 7 * |
| Maryland | 137,410 | 17,295 | 115,801 | 14,657 | 21,609 | 19 | 2 | 2,638 | 18 | 5 |
| Massachusetts | 161,918 | 23,134 | 142,661 | 18,753 | 19,257 | 13 | 2 | 6,381 | 38 | 4 |
| Michigan | 217,673 | 29,217 | 184,590 | 26,499 | 33,083 | 18 | 2 | 2,718 | 10 | 6 |
| Minnesota | 123,905 | 16,252 | 108,417 | 13,458 | 15,488 | 14 | 2 | 2,794 | 21 | 6 |
| Mississippi | 47,102 | 6,728 | 38,321 | 5,995 | 8,781 | 23 | 4 | 733 | 12 | 5 |
| Missouri | 120,443 | 18,605 | 103,626 | 15,003 | 16,817 | 16 | 2 | 3,602 | 24 | 3 |
| Montana | 24,519 | 2,139 | 22,404 | 2,048 | 2,115 | 9 | 4 | 91 | 4 | 5 * |
| Nebraska | 38,679 | 5,785 | 33,469 | 4,537 | 5,210 | 16 | 3 | 1,228 | 27 | 8 |
| Nevada | 47,675 | 8,643 | 33,311 | 5,972 | 14,364 | 43 | 3 | 2,671 | 45 | 5 |
| New Hampshire | 31,024 | 4,685 | 27,265 | 3,113 | 3,759 | 14 | 4 | 1,553 | 50 | 5 |
| New Jersey | 185,197 | 35,573 | 155,345 | 30,001 | 29,852 | 19 | 2 | 5,572 | 19 | 5 |
| New Mexico | 42,254 | 4,714 | 38,706 | 4,450 | 3,548 | 9 | 1 | 264 | 6 | 5 * |
| New York | 505,077 | 70,838 | 394,014 | 59,497 | 111,063 | 28 | 2 | 11,341 | 19 | 6 |
| North Carolina | 173,874 | 26,743 | 139,900 | 24,166 | 33,974 | 24 | 2 | 2,577 | 11 | 4 |
| North Dakota | 13,203 | 1,318 | 12,417 | 1,167 | 786 | 6 | 5 | 151 | 13 | 6 |
| Ohio | 229,972 | 32,315 | 205,044 | 30,597 | 24,928 | 12 | 2 | 1,718 | 6 | 4 |
| Oklahoma | 75,025 | 9,255 | 67,481 | 8,912 | 7,544 | 11 | 1 | 344 | 4 | 5 * |
| Oregon | 88,317 | 10,608 | 80,543 | 10,335 | 7,774 | 10 | 2 | 273 | 3 | 4 * |
| Pennsylvania | 227,117 | 38,998 | 202,990 | 34,043 | 24,127 | 12 | 2 | 4,955 | 15 | 5 |
| Rhode Island | 23,195 | 3,641 | 19,886 | 2,684 | 3,309 | 17 | 6 | 957 | 36 | 22 |
| South Carolina | 76,831 | 10,891 | 64,232 | 10,634 | 12,599 | 20 | 2 | 257 | 2 | 4 * |
| South Dakota | 15,573 | 1,547 | 14,121 | 1,202 | 1,452 | 10 | 5 | 344 | 29 | 14 |
| Tennessee | 117,935 | 17,641 | 99,772 | 14,538 | 18,163 | 18 | 2 | 3,103 | 21 | 4 |
| Texas | 468,705 | 65,817 | 381,453 | 65,065 | 87,252 | 23 | 2 | 752 | 1 | 5 * |
| Utah | 48,475 | 5,920 | 41,991 | 5,096 | 6,484 | 15 | 3 | 824 | 16 | 6 |
| Vermont | 18,989 | 1,454 | 17,030 | 1,313 | 1,959 | 12 | 5 | 141 | 11 | 6 |
| Virginia | 157,030 | 22,123 | 132,219 | 17,486 | 24,811 | 19 | 2 | 4,637 | 27 | 9 |
| Washington | 137,394 | 17,388 | 123,042 | 15,099 | 14,352 | 12 | 2 | 2,269 | 15 | 4 |
| West Virginia | 31,301 | 3,252 | 30,231 | 3,299 | 1,070 | 4 | 4 | -47 | -1 | 12 * |
| Wisconsin | 104,170 | 17,582 | 89,284 | 15,654 | 14,886 | 17 | 2 | 1,928 | 12 | 5 |
| Wyoming | 12,945 | 1,130 | 11,148 | 945 | 1,797 | 16 | 6 | 185 | 20 | 13 * |

[1] Source: 2002 Survey of Business Owners. Data include firms with paid employees and firms with no paid employees.

[2] Source: 1997 Survey of Minority-Owned Business Enterprises. Data include firms with paid employees and firms with no paid employees.

[3] For explanation of standard errors, see Reliability of Estimates in the introductory text.

[4] Detail may not add to total because firms with more than one domestic establishment are counted in each state in which they operate, but only once at the U.S. total.

\-   Represents zero.

\*   Change is not statistically significant from 0

**Exhibit 12**

# LOCAL, SMALL AND DISADVANTAGED BUSINESS OPPORTUNITY DEVELOPMENT REPORT

## Volume 1

### Submitted to:

### Mayor Anthony A. Williams

### Prepared by:

### The Mayor's Task Force
### On
### Local, Small and Disadvantaged Business
### Opportunity Development

### October 16, 2002

**Exhibit 13, Part 1**

# TASK FORCE MEMBERS

Malcolm E. Beech
William Black
Kathleen Walsh Carr
Frederick D. Cooke, Jr.
Maudine R. Cooper
Henry Gilford
Dr. Charlene Drew Jarvis (Advisor)
Steven Jumper (Chairman)
Barbara B. Lang
Marc Loud
Pedro A. Lujan
Jeanette P. Mobley
Robert Peck
Knox Tull
Henry J. Turner (Advisor)


## Ex-Officio Members

Jacques Abadie
Theodore Carter
Kelvin Robinson


## Support Team

Traci Blunt
Causton Toney
Rose Lindsay
Pamela McKee
Jessica Montoya
Nicole Stevenson
Ellery Taylor

# ACKNOWLEDGEMENTS

The Task Force wishes to acknowledge the support and collaboration of individuals and organizations that assisted in the completion of the Report on Local, Small and Disadvantaged Business Opportunity Development. The Task Force assumes full responsibility for the Report contents.

Mayor Anthony A. Williams
Councilmember Harold Brazil, Chairman, Committee on Economic Development
Councilmember Adrian Fenty
Councilmember Vincent B. Orange, Sr.
Eric Price, Deputy Mayor for Planning and Economic Development
Jacqueline Flowers, Director, Office of Local Business Development, and Staff
Joy Arnold, Deputy Chief of Staff for Community Affairs, EOM
DC Chamber of Commerce Small and Minority Business Committee
Minority Business Coalition
Local Business Opportunity Commission
Marshall Heights Community Development Corporation
Vicki Johnson, President Johnson Consulting Group
L.S. Caldwell and Associates, Inc.
Dr. M. C. Roberts
Turner, Harper & Associates, Inc.
Ivy Planning Group, LLC

# TABLE OF CONTENTS

**TASK FORCE MEMBERS** i

**ACKNOWLEDGEMENTS** ii

**TABLE OF CONTENTS** iii

**LIST OF EXHIBITS** v

**EXECUTIVE SUMMARY** 1

Introduction 2
The Business Case 2
The LSDBE Program 2
The Six Pillars of Success 3
Findings 4
Best Practices 6
Recommendations 7
Next Steps 9

**I. INTRODUCTION** 10

1.0 Introduction 11
1.1 Legal Evolution of the Program 12
1.2 The State of Local, Small and Disadvantaged Businesses 14
1.3 Methodology 15
1.4 Organization of the Report 16

**II. CURRENT ENVIRONMENT** 18

2.0 Introduction 19
2.1 OLBD Legislative Mandate 21
2.2 Interrelationships and Interdependencies 23

**III. FINDINGS** 24

3.0 Introduction 25
3.1 Strategic Direction 28
3.2 Effective Structure of Functions and Systems, Including
    Communication Mechanisms 29
3.3 Identification and Certification of LSDBEs 30

3.4  Widespread Utilization of the Participant Pool                 31
3.5  Vigorous Advocacy                                             33
3.6  Quantitative Analysis Highlights                              34
3.7  Enforcement of Program Mandates                               35

**IV. BEST PRACTICES**                                            **37**

4.0  Introduction                                                  38
4.1  Advocacy                                                      38
4.2  Organizational Placement of the Certification Process         42
4.3  Capacity Building                                             43
4.4  Technology                                                    45

**V. RECOMMENDATIONS**                                           **47**

5.0  Introduction                                                  48
5.1  Strategic Direction                                           50
5.2  Structure, Functions, Systems, and Communication Mechanisms   50
5.3  Identification and Certification                              51
5.4  Utilization                                                   51
5.5  Enforcement                                                   52
5.6  Advocacy                                                      53
5.7  Next Steps                                                    54

**APPENDIX 1 – SUBGROUP REPORTS**                                **55**

Advancing Subgroup Report                                          56
Procurement Subgroup Report                                        83
Technical Support and
    Business Assistance Subgroup Report                           104
Compliance and Enforcement Subgroup Report                        136
Quantitative Analysis Report                                      147
Agency Comment Letter(s)                                          200

**APPENDIX 2 – BACKGROUND MATERIALS (_contained in Volume 2_)**
Focus Group Interview Transcript
Office of Local Business Development Director's Interview Transcript
Community Business Forum Transcripts

# LIST OF EXHIBITS

Exhibit 1.1    Historical Listing of Local Business Development Programs in
               the District of Columbia and Related Events                        12

Exhibit 2.1    LSDBE Current Environment Primary Interrelationships
               and Interdependencies                                              20

Exhibit 3.1    LSDBE Six Pillars                                                  26

Exhibit 5.1    Summary of Recommendations by Pillar and Subgroup                  49

*EXECUTIVE SUMMARY*

# Introduction

On March 19, 2002, The Mayor of the District of Columbia, Anthony A. Williams, issued Executive Order 2002-62 to establish and appoint a task force to study how the Government of the District of Columbia develops, strengthens, advances and retains local, small and disadvantaged business enterprises (LSDBEs). The Mayor created the Task Force to help the District identify strategies, processes, practices, and systems to better leverage the universe of LSDBEs in the District of Columbia. To accomplish its mission, the Task Force was divided into four Subgroups:

- ♦ Advancing
- ♦ Procurement
- ♦ Technical Support and Business Assistance
- ♦ Compliance and Enforcement

This Report presents the Task Force's assessment of the current status of programs to support LSDBEs in the District of Columbia and offers recommendations to strengthen the program based on feedback from stakeholders, best practices, and an analysis of information about utilization, processes, systems, roles and responsibilities, and legislation.

## The Business Case

In general, given the importance of small business to the economic-base of the District and to its renaissance in real estate and neighborhood development, it is incumbent upon the District government to better understand the contributions that LSDBEs make to the District's operations, the City's tax-base, its neighborhoods, and the tourist trade.

Many people believe that procurement programs to promote and support LSDBEs exist solely for social reasons and that the procuring organization or community at large receive no benefit from LSDBEs. Empirical data have shown that small businesses have been a key source of product and service innovations, new delivery mechanisms, and job creation. While large corporate dollars certainly influence economic development, policy- makers and business leaders cannot ignore the benefit of having local business dollars circulate locally multiple times, where the money is earned.

## The LSDBE Program

As a result of a discrimination study and a Court of Appeals decision, the Council of the District of Columbia enacted DC Law 12-268, the "Equal Opportunity for Local, Small, and Disadvantaged Business Enterprise Act" in 1992. The Act created the LSDBE certification pro-

gram, which is designed to build the capacity of LSDBEs and to stimulate economic development in the District of Columbia. Management of the LSDBE program involves a number of entities – the Office of Local Business Development (OLBD), the Office of Contracting and Procurement (OCP), the Local Business Opportunity Commission (LBOC), and District agencies. The primary legislative mandate rests with OLBD. DC Code. Sec. 2-1205.3 sets forth the following responsibilities of OLBD:

- ◆ Educational and promotional activities
- ◆ Certification administration
- ◆ Advocacy
- ◆ Oversight of procurement and utilization
- ◆ Compliance and enforcement

## The Six Pillars of Success

The District of Columbia's OLBD has been given an important mandate – to ensure that LSDBEs are full participants in the contracting process that procures goods and services for the District's agencies, using expendable budget dollars. Taken at face value, this may seem to be just a numbers issue – monitoring and enforcing the percent participation commitments and reporting requirements mandated by DC Law 12-268 "Equal Opportunity for Local, Small and Disadvantaged Business Enterprise Act." In fact, however, it is an enormously intricate and broad-based mandate, one whose success relies upon the efficient and effective management of a complex web of interdependent constituencies supported by extensive cooperation, communication, collaboration, and coordination.

A successful LSDBE program must be founded on the following six pillars – see Exhibit 3.1.

- ◆ Strategic direction, strong leadership and collective will
- ◆ Effective structure of functions and systems, including communications mechanisms
- ◆ Identification and certification of LSDBEs
- ◆ Widespread utilization of the participant pool
- ◆ Vigorous advocacy
- ◆ Enforcement of program mandates

For the District's LSDBE program to achieve maximum success, it must include all of these elements in a fully integrated plan. Because of their interrelatedness and interdependency, a weakness in any one of these pillars can significantly hinder the success of the entire program.

# Findings

The Task Force found enhancement opportunities in all six of these areas within the District's LSDBE program. As a result, the current Administration is presented with significant opportunities to further enhance the effectiveness and performance of the program. The key findings in each of the six success areas are presented below.

## Strategic Direction

♦ There is confusion and a lack of understanding around the specific mission and purpose of the program.

♦ Efforts to communicate the desired outcomes for the LSDBE program to the stakeholders have not been successful.

♦ The true measures of the program's success are not well defined.

♦ Lack of clarity and understanding of program goals and objectives has resulted in differing expectations and negative perceptions.

♦ Too often the program seems to be little more than a set of numbers that must be reached rather than a dynamic, coordinated program to develop and grow LSDBEs into full participants in the contracting process.

## Structure of Functions and Systems

♦ There is no strong program implementation link between the LSDBE program requirements and the actual procurement of goods and services.

♦ Although mandated and provided the authority to "review agency procurement plans," OLBD is frequently not part of this most basic procurement planning process.

♦ Exacerbating the communication and collaboration process between OLBD and the procuring agencies is a manual OCP procurement system, multiple yet disparate communication and application technologies, and poorly defined measurement and data collection criteria.

## Identification and Certification

♦ The process often takes too long and applications presented to LBOC are often incomplete.

♦ The process accounts for too much of OLBD staff time.

♦ Information contained in the LSDBE database maintained by OLBD is not always useful or timely.

♦ There is concern about the business capacity of some of the certified LSDBEs.

- The base of certified LSDBEs is too small.
- There are often no, or not enough, certified LSDBEs in the National Institute of Government Purchasing (NIGP) codes under which goods and services need to be procured.

## Utilization

- Before broader LSDBE program advocacy can occur within the District government, agency directors and senior procurement officials must be given the training needed to serve as advocates, and they must be held accountable for upholding the program's legislative mandate.
- There is a perception that there are not enough certified LSDBEs with the capacity and capabilities to meet procurement needs.
- The LSDBE database would be significantly more useful, and procurement officials would find it easier to identify qualified LSDBEs, if the database contained performance evaluation and measurement of LSDBEs.
- There is a lack of financial and educational information assistance being provided to LSDBEs to facilitate capacity building.
- There is concern about the business capacity and capabilities of many of the certified LSDBEs.
- While there are a number of programs and facilities in the District that provide small business educational and assistance opportunities, there is neither an existing comprehensive inventory of the available programs, a comprehensive strategy on how to use these services, nor the organizational leadership to deliver this help to LSDBEs in a coordinated fashion.
- There is no central or convenient way in which LSDBEs can learn of contracting opportunities on a timely basis.

## Advocacy

- A significant gap exists between expectations and service delivery.
- Stakeholders expect a level of program advocacy that is far greater than that which is currently being provided by OLBD.
- OLBD has focused more of its limited resources on its role as LSDBE program regulator than on its role as program advocate.
- OLBD is often not part of the procurement planning review process where contract set-asides for LSDBEs are determined.
- OLBD does not promote its procurement success stories or its "best-in-class" LSDBEs.

**Enforcement of Program Mandates**

♦ There are no comprehensive administrative and program management methodologies in place to ensure effective reporting of procurement data by all agencies of the District government.

♦ Procurement partners' management information systems are incompatible.

♦ There is a lack of clarity and specificity around key success measures.

♦ There is an absence of data elements specific to the LSDBE program, such as National Industrial Government Policies (NIGP) commodity codes and LSDBE certification, in the various procurement process partners' databases.

♦ OLBD is unable to create a reliable District-wide report that summarizes LSDBE activity in a comprehensive, yet simplified, manner.

## Best Practices

As part of its data collection efforts, the Task Force looked to agencies and organizations in other jurisdictions that are tasked to do many of the same OLBD required tasks in support of similar programs. This research provided an opportunity to test hypotheses and identify potential solutions to some of the issues and opportunities that emerged from the Task Force's qualitative research.

The research on best practices suggests that there are effective practices, programs and functions being applied in other jurisdictions and organizations that, if appropriately applied in the District, could augment the effectiveness and efficiency of the District's LSDBE program. Specific elements for consideration include:

♦ Broaden the way that the District approaches advocacy efforts – including policy research and the proactive investigation of proposed legislation, regulations, and other factors that could impact LSDBEs.

♦ Establish "advocates" within each agency – including independent agencies. On-site advocates can carry the mission of OLBD directly to the agencies and more effectively work with agencies to incorporate LSDBEs into the purchasing process.

♦ Institute an ombudsman position to act as an intermediary between LSDBEs, agencies, and procurement in resolving disputes and concerns.

♦ Recognize and publicize the successes of District agencies that make a significant effort to promote the program and use LSDBEs.

♦ Proactively recruit new LSDBEs to be certified, particularly in areas where there are only one or two certified LSDBE entities.

- Move the LSDBE certification process to OCP in an effort to centralize similar functions and simplify the process for applicants.

- Explore how business incubators and the One-Stop Capital Shops can be incorporated into future small business development programs within the Office of the Deputy Mayor for Planning and Economic Development.

- Use technology to communicate LSDBE capacity, successes, and qualifications. Provide a one-stop electronic repository of information and data required to participate in the program.

# Recommendations

Supporting local, small and disadvantaged business enterprises makes good business sense and is good public policy. They contribute to the City's tax-base, expand employment opportunities, invest in the District, and generate needed products and services. To help the District strengthen its LSDBE program, the Task Force has used feedback from stakeholders, the review of available quantitative data, and the lessons learned from the research on best practices to develop a set of recommendations designed to move the program to the next level of effectiveness. The recommendations are presented category specific, and are listed below:

## Strategic Direction

- To address misperceptions of the program within and outside of District government and to clarify objectives and foster accountability, appropriate leaders need to convene, articulate, and revalidate program objectives; and develop success measures clearly linked to the desired outcomes.

- As part of this process, a tactical plan should be developed that prioritizes next steps and provides a roadmap to strengthen the program and to move it forward.

## Structure, Functions, Systems, and Communication Mechanisms

- OCP should reengineer its processes and continue with its plans to implement an integrated, automated procurement system.

- OCP, OLBD, and LBOC should work together to conduct a requirements analysis of the information needed from the new procurement system. This should be done to insure that the new system is able to produce required LSDBE reports and data.

- LSDBE specialists should be deployed within each agency to facilitate communication, promote the program, and heighten agency-level accountability.

- OLBD's staffing should be increased by four FTEs to enable the office to better meet its expanded advocacy mission.

**Identification and Certification**

♦ Use other established certifying organizations for the certification of specified LSDBEs (e.g., U.S. Small Business Administratin (SBA), the National Minority Supplier Development Council (NMSDC), and develop Memoranda of Understanding (MOUs) with those organizations to expedite LSDBE certifications.

♦ Increase the revenue ceiling from $23 million to $35 million for small local businesses.

♦ Assess the District's current spending patterns to understand the types of firms needed.

♦ Move the LSDBE certification and re-certification process from OLBD to OCP.

**Utilization**

♦ OLBD should create a clearinghouse of information concerning services available to LSDBEs.

♦ OLBD should contract with an organization or consortium of business training providers to deliver business assistance and technical support to certified LSDBEs and LSDBE applicants.

♦ OLBD, LBOC and OCP should create an LSDBE capabilities assessment program to determine business readiness for new applicants and, where warranted, refer applicants for appropriate business training and counseling prior to award of full certification.

♦ The District should reconsider plans to create a business resource center within OLBD and, instead, concentrate resources on expanding the District's Department of Employment Services (DOES) and Howard University's Small Business Development Canter (HUSBDC) business resource center to model a One-Stop Capital Shop.

♦ The District should expand the existing DOES and HUSBDC incubator program by creating a small business incubator pilot project for certified construction firms, funded with public and private resources.

♦ OLBD should provide, through coordination of external service providers, information on how to obtain financing, how to prepare firms to attract capital, what sources of capital exist, and what are the various financial products.

♦ The District should promote the Department of Banking and Financial Institutions' (DBFI) efforts to continue partnering with financial institutions to ensure community reinvestment, community development, and to promote more lending opportunities for DC businesses.

♦ The District should establish a two–tier local business opportunity program that distinguishes large local businesses from small local businesses.

♦ The District should establish a formal early warning scan of upcoming procurement activities to allow LSDBEs to be identified, and where non-certified LSDBEs exist, consider fast tracking the certification process.

**Advocacy**

♦ Establish an annual leadership recognition program to honor agency leadership in LSDBE contracting, and highlight LSDBE successes.

♦ Include a component on LSDBEs in the Management Supervisory Services training program to educate and train key government officials about the LSDBE program.

♦ Identify a senior-level LSDBE officer with sign-off authority over all agency solicitations of $75,000 or more for each of the three Deputy Mayor clusters of agencies.

♦ Amend current law to expand OLBD'S advocacy role. Fund advocacy function at four FTEs and an additional budget appropriation of approximately $600,000.

♦ Convene an annual public hearing to solicit comments and suggestions from LSDBEs and review agencies' LSDBE utilization reports.

♦ Provide an e-mail notification system of small purchase notices and procurement alerts for all government solicitations. Link the OLBD web-site to that of OCP and agencies with independent buying authority.

**Enforcement**

♦ Include a liquidated damages provision, if permitted, in all future Industrial Revenue Bond (IRB) contracts and private sector MOUs for failure to meet LSDBE goals.

♦ Include stronger LSDBE compliance language in all Request for Proposals (RFPs) and Requests for Quotes (RFQs).

♦ OLBD should contract its compliance monitoring and reporting functions out to the private sector.

♦ The Office of the Chief Technology Officer should work with OLBD and OCP to assess management reporting information requirements and ensure that the new procurement system can produce required reports and incorporate all LSDBE data requirements.

♦ Establish vendor performance database to track performance of all vendors doing business with the District of Columbia.

# Next Steps

To maintain the momentum the Task Force has generated, District leaders must act quickly to move forward with the proposed recommendations. The suggested tactical plan should provide an integrated roadmap that specifies timeframes for completion and the parties responsible for given activities. The Task Force suggests that the Mayor convene a meeting of key agency managers, policy representatives of the Mayor's Office, City Councilmembers or their designees, and at a minimum the Task Force's Subgroup leaders. This group should work to prioritize the recommendations as an immediate next step and begin drafting policy and legislation to implement the recommendations. The ultimate demonstration of commitment is action.

# I.   INTRODUCTION

# 1.0   Introduction

In March 2002, Mayor, Anthony A. Williams, issued an Executive Order to establish a task force to study how the District of Columbia Government develops; strengthens; advances; and retains local, small, and disadvantaged businesses (LSDBEs). The study was initiated in recognition of the need to do more to advance, develop, and support LSDBSEs in the District of Columbia.

In 2000, according to Bureau of the Census (Census), 93.6 percent of the 26,157 employer-based businesses in the District of Columbia were classified as small businesses (i.e., businesses with 500 employees or less). Despite legislation requiring District agencies to spend 50 percent of their expendable budget with LSDBEs, it is a widely held perception among many stakeholders across the City that District agencies are not fully utilizing these enterprises. The Mayor created the Task Force to not only determine the legitimacy of such perceptions, but also to help the City identify strategies, processes, practices, and systems to better leverage the universe of LSDBEs in the District of Columbia.

Given the importance of small business to the economic base of the District and its renaissance in real estate and neighborhood development, it is essential that policy-makers as well as line government employees better understand the value of LSDBE contributions to the Mayor's goals and objectives, as well as the contributions that LSDBEs make to the District's operations, the City's tax-base, its neighborhoods, and its overall economy.

The Task Force was composed of thirteen official members and 3 ex-officio members. To ensure that all perspectives were taken into consideration, the Mayor selected Task Force members from the following communities:

♦ The LSDBE community, including a LSDBE banking institution.

♦ Trade associations representing the interests of LSDBEs.

♦ Small business technical assistance programs.

♦ Local business activists.

♦ Local government officials (current and prior).

♦ The Local Business Opportunity Commission, which is responsible for certifying companies in the District as LSDBEs.

♦ Private sector contractors.

Not only were Task Force members selected for their affiliation with various constituencies, but also for their knowledge of:

◆ The universe of LSDBEs in the community.

◆ LSDBE program goals and authorizing legislation.

◆ Private and public services, programs, and service providers that support LSDBEs.

◆ The District's Office of Local Business Development.

◆ The District's Office of Contracts and Procurement.

◆ The business development opportunities available to local, small and disadvantaged businesses.

◆ Affirmative Action laws.

This report presents the Task Force's assessment of the current status of programs to support LSDBEs in the District of Columbia. It offers recommendations to strengthen those programs based on feedback from stakeholders; best practices; and the analysis of information about utilization, processes, systems, roles and responsibilities, and legislation.

## 1.1   Legal Evolution of the Program

Since 1977, the District of Columbia has formally recognized the need to support LSDBEs. The end result is a program designed to support, grow, and use local, small, and disadvantaged businesses while integrating them into the District's procurement process and the expenditure of public funds. Exhibit 1.1 illustrates the sequence of legislative and legal events that have influenced LSDBE-related policy in the District of Columbia.

## Exhibit 1.1

## Evolution of Legislative and Legal Events That Have Influenced LSDBE Policy



In March of 1977, the District of Columbia Council enacted the District of Columbia Minority Contracting Act (DC Law 1-95, 23 DCR 953 2(b)). The Act established the goal of awarding 25 percent of the dollar value of all District contracts for construction and goods and services to local minority-owned business enterprises. In 1980 and 1983, the Council expanded the ethnic group eligibility to participate in the program and increased the utilization goal from 25 percent to 35 percent.

In January 1989, the Supreme Court ruled that race-based business enterprise set-aside programs were unconstitutional. As a result of the "strict scrutiny" standard that a majority of the Supreme Court decided was constitutionally mandated in reviewing such programs – in the Croson decision (City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989)) the District of Columbia and many states conducted extensive Discrimination Studies. The purpose of these studies was to document the historical under- utilization of minority-owned businesses and to determine if a disparity existed between the availability of minority-owned businesses in the District's market and their utilization in the District's contracting activities. The study provided statistical and anecdotal evidence that supported a finding of contracting discrimination against Black and Hispanic businesses in the District of Columbia geographic market area.

The District's set-aside program came under additional scrutiny in 1992, when the U.S. Court of Appeals suspended the District's minority contracting set-aside program. The U.S. Court of Appeals found that the District's:

♦ 35 percent goal operated as an inflexible requirement and that there was "no strong basis in evidence" for setting its minority contracting goal at that level

♦ Adoption of the Minority Contracting Act was based on "general allegations of discrimination" rather than on relevant and statistical findings of disparity

As a result of the discrimination study and the U.S. Court of Appeals decision, the Council enacted DC Law 12-268 the "Equal Opportunity for Local, Small, and Disadvantaged Business Enterprise Act." This is the law that guides the existing program to support and promote LSDBEs. Under the law, each agency of the District, among other things, shall:

♦ Allocate its construction contracts in such a way to reach a goal of 50 percent of the dollar volume of all construction contracts to small businesses.

♦ Allocate its procurement of goods and services, other than construction, in such a way to reach goals of 50 percent of the dollar volume to small business enterprises.

♦ Allocate five percent of its contracts to prime contractors who agree to subcontract a portion of the contract work to local or disadvantaged businesses.

DC Law 12-268 also provides for a bid preference mechanism, a separate set-aside program for small business enterprises, a set-aside program for local, small and disadvantaged businesses at the sub-contracting level, and a set-aside program for local, small and disadvantaged businesses for the "Blanket Order Blitz" program.

## 1.2   The State of Local, Small and Disadvantaged Businesses

Small business is critical to the growth and maintenance of the economy. Small businesses produce half of the gross domestic product and employed half of all employees in the United States. More than 75 percent of new jobs are created by small businesses, and 90 percent of new businesses are categorized by the U.S. Census Bureau as small businesses.

In the District of Columbia, small businesses are represented in a wide range of industries, such as:

- Professional, Scientific, and Technical Services
- Real Estate Rental and Leasing
- Health Care and Social Assistance
- Arts, Entertainment, and Recreation
- Transportation and Warehousing
- Administrative, Support, Waste Management and Remediation Services
- Retail Trade
- Information
- Construction
- Finance and Insurance
- Other Services

According to the 1997 Economic Census: Surveys of Minority- and Women-Owned Businesses (the latest data available), minority-owned businesses, defined, as those owned by Blacks, Hispanics, Asian and Pacific Islanders, American Indians and/or Alaskan Natives, represented nearly 34 percent of all businesses in the District. A total of 15,200 minority-owned businesses accounted for $3.0 billion of business revenues in 1997. Of the total minority-owned businesses, 3,200 of them employed a total 27,428 workers in 1997. Based on 1998 Census data (the latest available) small businesses employed nearly 48 percent of the District's total employment base.

There are challenges negatively impacting the viability of any business concern. They include access to capital, access to markets, misperceptions about capabilities, and the inability to outperform any negative publicity the particular industry may receive. While not unique to small and disadvantaged businesses, these challenges are compounded by the perceptions held of small business. In the District, some small businesses have faced challenges due to the resurgence in commercial and residential real estate development. For example, rising rents on leased space, increased property values and property taxes, changes in customer demographics

and new uses for existing property are all factors that have led to the displacement of some small neighborhood businesses.

Temporary disruptions caused by large-scale real estate development projects throughout the District have placed survivability and growth pressures on some small businesses. Given that many small businesses already operate under capital constraints and have little to no cash flow cushion to weather economic downturns, these seemingly temporary pressures may jeopardize the survival of individual small businesses and may result in a loss of the goods, services, and jobs.

Accessing capital in the District is further exacerbated by the fact that the number of banks have decreased over the past five years. Furthermore, Federal Reserve Board data indicate that few banks can boast strong lending results in the District's small business community and even fewer can boast strong Community Reinvestment Act (CRA) ratings from bank regulators.

Non-bank lenders have been undergoing industry consolidation, leaving fewer non-bank lending sources for the District's small businesses. Also, the SBA-certified micro-lenders (providing financing in increments of less than $50,000) have not been successful in providing capital to the District's small businesses.

In addition to facing limited sources of traditional bank financing, non-bank and micro-loan financing in the District, many small businesses continue to face a shortage of available equity financing and contract or asset-based receivables financing to support their business' growth. The SBA's Small Business Investment Companies (SBICs) and Specialized Small Business Investment Companies (SSBICs) have fallen short in their mission to provide competitive equity financing to small, entrepreneurial companies.

## 1.3  Methodology

The Task Force followed a seven-step approach to complete its work:

- ◆ Review legislative intent.
- ◆ Understand the perspectives of key stakeholders.
- ◆ Identify key areas of opportunity.
- ◆ Research best practices in government and private industry.
- ◆ Form recommendations to address the opportunities identified through the research on best practices.
- ◆ Validate findings and recommendations with key stakeholders.
- ◆ Finalize analysis and recommendations.

In the context of examining local, small and disadvantaged business opportunity development in the District, the Task Force believes that it is important to understand the role of the primary District agencies tasked with implementing the program – OLBD and OCP.

To complete its work, the Task Force organized itself into four Subgroups (per the Mayor's Order) – Advancing, Procurement, Technical Support and Business Assistance, and Compliance and Enforcement. Consistent with the prescribed methodology, each group:

♦ Reviewed the statutory framework, executive orders, agency rules, and memoranda of understanding related to its focus area.

♦ Analyzed the current state of the District's LSDBE program and related procurement activities, including utilization of LSDBEs, compliance with governing requirements, and program administration and related processes and systems.

♦ Developed a range of hypotheses, based on the research and members' experience and knowledge of the program and key stakeholder concerns.

♦ Identified findings based on available qualitative and quantitative data, such as resulting focus group data, community business forums, individual interviews and statistical data analysis. The Subgroups used this information to test their hypotheses. In analyzing the findings, each group worked to asses 1) the District's compliance with program requirements and 2) the effectiveness of overall program compliance efforts.

♦ Researched and evaluated the best practices of other municipal governments, the Federal Government, and the private sector to identify programs; polices; processes; and structures that would support the District's LSDBE efforts.

♦ Developed recommendations for specific actions to improve the manner in which the District develops, advances, strengthens, and retains local, small, and disadvantaged businesses. The Task Force also identified areas for further study or investigation.

## 1.4  Organization of the Report

This Report has eight sections. They are:

♦ The Executive Summary, which summarizes the essence of the Report.

♦ An Introduction, which establishes the base for the rest of the Report.

♦ The Current Environment section, which provides a description of current processes, systems, and structure that supports the LSDBE program in the District of Columbia.

♦ A section on Findings, which is a presentation of the key findings that impact the effectiveness of the District in advancing, retaining, and utilizing LSDBEs.

- A presentation of Best Practices, which presents the structure, processes, programs, and policies in place in other federal, state, municipal and private sector organizations that could be adopted and adapted to increase the effectiveness of the District's LSDBE program.

- The Recommendations section, in which the Task Force presents its recommendations to address the challenges and opportunities identified using best practices and feedback from stakeholders.

- An Appendix, which contains the four detailed reports of the Subgroup committees.

## II.  CURRENT ENVIRONMENT

## 2.0   Introduction

The LSDBE program in the District of Columbia involves a number of entities – OLBD, OCP, LBOC, District agencies, and LSDBEs.  In this chapter we provide an overview of the responsibilities and interaction among the various entities in delivering the LSDBE program. (Exhibit 2.1 provides a high level overview of the process.)  The primary player is OLBD.

The LSDBEs' Certification Program is designed to build the capacity of local, small, and disadvantaged businesses and to stimulate economic development in the District of Columbia. District-based small and disadvantaged businesses are eligible to participate in this set-aside program under DC Law 12-268.  Eligibility is determined by such things as primary business office location, average revenues over the past three years, and, in some cases, proven economic disadvantage.

Certified businesses that can demonstrate a capacity to provide goods and services to the District government are provided with procurement matching opportunities through the certified LSDBE contractor database and are eligible for partnerships to assist the District in reaching LSDBE participation goals.

The Local Business Opportunity Commission, whose members are appointed by the Mayor, is "authorized to promulgate, amend, repeal and enforce such regulations, consistent with the provisions of the Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act, as may be necessary and appropriate to promote the ethical practice of contracting and subcontracting and to carry out the provisions, intents and purposes of the Act."

More specifically, the LBOC is charged with establishing procedures and guidelines for the implementation of programs established pursuant to the Act, determining which business enterprises will be eligible for certification, and making various recommendations about specific contracting arrangements and LSDBE participation in District procurement opportunities.

The Office of Local Business Development serves as the administrative arm and liaison for the LBOC.  OLBD receives, analyzes, and processes LSDBE certification applications on a continuous basis.  LSDBE applications are processed, and summary reports are presented to LBOC for certification review.  The LBOC meets monthly to approve LSDBE applications.

The current mandate for OLBD is extremely broad and more extensive than that of other similar offices in municipalities studied by the Task Force as part of its best practices research.  A review of DC Code. Sec. 2-1205.3 that sets forth the responsibilities of OLBD indicates that the Office has sufficient and explicitly worded statutory mandate to promote growth and development of LSDBEs.

# EXHIBIT 2.1 – LSDBE Current Environment Primary Interrelationships and Interdependencies



## 2.1   OLBD Legislative Mandate

OLBD has the statutory responsibility for LSDBE program education, certification/re-certification of LSDBEs, enforcement of procurement regulations, and LSDBE program evaluation. And it is responsible for program compliance monitoring, receiving and investigating complaints of violations of the LSDBE Act, and stimulating and fostering greater opportunities for certified LSDBEs. The agency is expected to successfully perform this broad mandate with an annual appropriation of $1 million and a staff of 10 full-time equivalent employees.

More specifically, the law states that the function of OLBD shall be to:

♦ Educate the public, including District residents and businesses, about the LSDBE program;

♦ Receive and review applications for certification, in conjunction with the Local Business Opportunity Commission;

♦ Stimulate and foster greater opportunities for certified LSDBEs to participate in District procurement for goods and services than would otherwise be possible;

♦ Educate, disseminate, and market contract opportunities information; and

♦ Enforce procurement regulations for businesses already holding certification.

OLBD also has authority to:

♦ Evaluate the LSDBE programs under DC Code. Sec. 2-217.02 (2001).

♦ Review the procurement plans of each agency of the District government and determine, if it deems appropriate, which contracts, or parts thereof, shall be reserved for the programs established under DC Code. Sec. 2-217.03. If the agency has failed to meet the goals set forth in DC Code Sec. 2-217.02 (2001), the Office shall reserve portions of the agency's contracts to be performed in accordance with programs established under DC Code Sec. 2-217.03, so that the agency's failings may be timely remedied.

♦ Review agency plans and take appropriate action pursuant to DC Code Sec. 2-217.02.

♦ Consider an agency request for adjustment of agency LSDBE contracting goals, provides that OLBD report to the Mayor and the Council on a semi-annual basis, and to make recommendations for changes of the goals on an agency basis, if appropriate.

♦ Review bids in the small business enterprise set-aside arena and may authorize agencies to refuse to award a contract where OLBD determines that bids for a particular contract are excessive.

♦ Review contracting problems and make further recommendations that increase LSDBE contractor participation with District government. Recommendations shall include improved

schedules that ensure prompt payment to contractors, special geographic radius require-
ments on certain contracts, innovative contract advertising procedures, the encouragement of
joint ventures, and advice for the Mayor on methods to be utilized to ensure participation.

◆ Receive and investigate complaints of violations of the LSDBE Act and take appropriate
enforcement action regarding such complaints; certify a complaint to the Office of the Cor-
poration Counsel for any legal action needed; and forward to the LBOC, for a hearing, de-
cision and order, any complaint that has resulted in a finding of probable cause by OLBD.

## Educational and Promotional Activities

OLBD's activities in the areas of education are varied. They include such activities as the
creation of brochures, fact sheets, LSDBE applications, newsletters, checklists of certification
requirements, web-site, the "Marketplace" (an annual exhibit event held in the Spring), orien-
tation seminars for companies wishing to learn more about contracting with the District gov-
ernment, and monthly contracting roundtables for LSDBEs and procurement officials. A com-
prehensive table of these activities appears in the Advancing Subgroup report contained in the
Report Appendix.

## Certification Administration

The administrative review of the applications submitted under the certification and re-
certification process is the responsibility of OLBD. It is the Local Business Opportunity
Commission who actually accepts or rejects LSDBE applications. Further, OLBD is the liai-
son with current and prospective LSDBEs to answer questions and provide guidance in applica-
tion completion.

## Advocacy

Based on Task Force research, the OLBD advocacy functions and activities are not meeting pro-
gram stakeholder expectations. Other than the education activities mentioned above, the advo-
cacy function is implemented primarily on an informal basis, through other OLBD activities,
with limited effort being placed on a coordinated, strategic plan to leverage the input and maxi-
mize the outcome. Budgetary constraints inhibit the agency's ability to implement new outreach
programs and initiatives that would provide for enhanced advocacy and LSDBE support.

## Procurement and Utilization

In addition to OLBD's responsibility for program promotion, advocacy and certification ad-
ministration, the overriding mandate for OLBD is the responsibility for monitoring agency
compliance with the requirements of DC Law 12-268. A number of mechanisms are designed
to fulfill this mandate. The descriptions presented below represent the key elements of the

processes as utilized. The degree to which these processes are successfully and consistently implemented varies.

In order to facilitate compliance monitoring, OLBD requests that District agencies submit a series of documents, including an Annual Budget Allocation Letter, an Expendable Procurement Projection Report, an Operating Expenses Checklist, and Quarterly Reports. At the end of each fiscal quarter, the OLBD compiles the quarterly expenditure reports and files them with the Office of the Mayor and the Council of the District of Columbia.

OLBD also reviews and approves Affirmative Action Plans submitted by District agencies for public/private partnerships and for contractors with contracts in excess $25,000. In addition, through Memoranda of Understanding, OLBD monitors the use of LSDBEs by the District's "economic development project partners." These are entities participating in the District's Industrial Revenue Bond and Tax-Increment Financing (TIF) Programs. These entities execute an MOU pledging their "best efforts" to provide LSDBEs contracting opportunities in an amount equal to 35 percent of the value of the bond proceeds or project costs. OLBD monitors MOUs through review of quarterly reports submitted by project partners.

The other primary parties involved in the process of ensuring agency compliance with LSDBE goals are agency directors and the Office of Contracting and Procurement staff. Because agency directors have limited contracting authority, responsibility for meeting LSDBE goals is shared by OCP. The agency directors and OCP jointly decide the agencies' LSDBE goals and formulate ways to achieve them. In the beginning of the fiscal year, each agency submits an estimate, or forecast, of its goal for the year to OLBD. Agencies are expected to achieve 25% of their goals each quarter, and progress against those goals is monitored quarterly.

## 2.2    Interrelationships and Interdependencies

As is evident from the above discussion, OLBD's mandate for the LSDBE program requires, among other things, extensive procurement knowledge, practiced communication skills, effective collaboration efforts, and the successful performance of varied other functions. Further, OLBD's activities require a high degree of interdependence and interrelatedness with OLBD's constituents. Exhibit 2.1 summarizes the interrelated and interdependent activities that occur between OLBD and its constituents.

## III.  FINDINGS

# 3.0   Introduction

The District of Columbia's Office of Local Business Development has been given an important mandate – to ensure that local, small and disadvantaged business enterprises are full participants in the contracting process which procures goods and services for the District's agencies, using expendable budget dollars.  Taken at face value, this may appear to be a numbers issue – monitoring and enforcing the percent participation commitments and reporting requirements mandated by DC Law 12-268 the "Equal Opportunity for Local, Small and Disadvantaged Business Enterprise Act."  In fact, it is an enormously intricate and broad-based mandate whose success relies on the efficient and effective management of a complex web of interdependent constituencies supported by extensive cooperation, communication, collaboration, and coordination.

A successful LSDBE program must be founded on the following six "pillars."  (See Exhibit 3.1.)

- ◆   Strategic direction, strong leadership, and collective will.

- ◆   Effective structure of functions and systems, including communications mechanisms.

- ◆   Identification and certification of LSDBEs.

- ◆   Widespread utilization of the participant pool.

- ◆   Vigorous advocacy.

- ◆   Enforcement of program mandates.

Strategic direction clarifies the focus and sets the priorities for actions taken and decisions made.  It also helps to manage expectations and provides a foundation for measuring success.  Inherent in this process is the assumption of strong and committed leadership, coupled with the will to succeed.  Without these elements, successful implementation cannot be achieved.

The effective structure of functions and systems helps to define the areas where communication, collaboration and cooperation must take place; establishes roles, responsibilities and accountability; identifies the protocol for the sharing of information and specifies the type of information to be gathered; and facilitates compliance with and ease of use of the program components.

No program of this kind can be successful without a well-defined and robust pool of LSDBE participants.  Identifying and recruiting LSDBEs into the program is essential for full program utilization.  Participation should be viewed not just in terms of numbers of certified companies but also in terms of the mix of qualified participants meeting the needs of the contracting agencies.  It is also important to insure that the certification process is well understood by all constituents and allows for rapid turn-around of applications.

**Exhibit 13, Part 2**

# Exhibit 3.1

# LSDBE Six Pillars



The successful utilization of certified LSDBEs should be the primary objective of the program. This implies that procurement officials have a clear understanding of the program goals and objectives and the benefits that accrue to them from program participation. Further, they must have real-time access to a current listing of LSDBEs as well as the kind of pertinent information about the companies that will assist procurement officers in selecting appropriate product and service providers. Types of information to be provided include, but are not limited to: 1) certification status, 2) contact information, 3) NIGP codes, 4) readiness and ability to perform the work (including general bonding and insurance capabilities), and 5) measurement of past performance.

Additionally, maximum utilization implies having a pool of LSDBEs who have the capacity, technical and business skills, and financial strength to perform the work for which they have been certified. It is further necessary for LSDBEs to have convenient and timely access to information about procurement opportunities. Lastly, timely, accurate and frequent reporting of LSDBE program performance against goals must support the utilization plan. Without this accountability mechanism, firmly in place lack of performance can more easily be excused and/or justified.

Underpinning a successful LSDBE program is the requirement for vigorous advocacy on behalf of both the LSDBEs and the procuring agencies. This advocacy involves strong and collaborative relationships among members of all constituencies, especially between the Office of Contracts and Procurements (OCP) and the Office of Local Business Development (OLBD). It also involves a widespread training and communication effort to insure that contracting officers and LSDBEs understand and appreciate the opportunities and complexities of the program; a strong belief in the mutual benefits that a successful program will provide the participants as well as the community-at-large. And it further involves the means to collect, analyze, and respond to data about the program's effectiveness on an ongoing and timely basis.

Without the last pillar, enforcement of compliance with mandates, the program becomes just a "wish list" of desired outcomes. To be able to provide effective enforcement, it is necessary to clearly define roles, responsibilities and authority. Further, timely, dependable and reliable reporting of performance against stated goals is required. In addition, those being monitored and measured must clearly understand both the benefits and the consequences of their performance. Finally, there must be consistent and equitable application of the enforcement policies and procedures.

For the District's LSDBE program to achieve maximum success, it must include all of these elements in a fully integrated plan. Because of their interrelatedness and interdependency, a weakness in any one of these pillars can significantly hinder the success of the entire program. The Task Force Subgroup findings indicate significant opportunities for enhancement of the District's LSDBE program in all six of these areas. These findings are summarized below. Detailed descriptions can be found in the individual Subgroup reports contained in the Report Appendix. Specific recommendations for improvement are presented in Section 5 of this report.

## 3.1  Strategic Direction

Developing a clearly stated mission, with related goals and objectives, is the first step in designing and implementing a successful LSDBE program. Through the forums, focus groups; and interviews it became apparent that, although there was a general understanding of the intent of the LSDBE program, there was confusion and lack of understanding around the specific mission and purpose of the program. Further, the respondents felt that the true measures of the program's success - such things as LSDBE utilization in contracting, advocacy efforts, enforcement, and certification - were not well defined. Without clear targets to shoot for, it is difficult to know if the efforts of the various constituents are driving the program to its desired outcomes.

One of the significant findings of this study is that key stakeholders largely misunderstand the program. Many people believe that the current government must do a more effective job of communicating the desired outcomes for the LSDBE program to the community. Many of them do not understand the mission, goals and scope of the program. Clearly, lack of understanding impairs a constituent's ability to successfully use and implement the program. Respondents believe that because there has not been a clear and consistent effort to define and communicate the mission of the LSDBE program, there is uncertainty regarding the level of the District's commitment to the program.

More specifically, the true measure of the success in utilizing LSDBEs in District procurement is not well defined. It is not clear to Task Force respondents if the measure of success is, for example, the number of dollars paid to LSDBEs, or the number of contracts awarded to LSDBEs. Without well-defined measurements, OLBD finds it difficult to articulate LSDBE program success.

Further, lack of clarity and understanding of program goals and objectives has resulted in differing expectations and negative perceptions of 1) the LSDBE program as a whole, 2) many of the LSDBEs that participate in the program, and 3) many District agencies that are required by law to comply with the program. Some agency directors said that too often the program seems to be little more than a set of numbers that must be reached rather than a dynamic, coordinated program to develop and grow LSDBEs into full participants in the contracting process. Such perceptions are one of the factors driving public opinion about the level of LSDBE program success. Negative perceptions make it more difficult to encourage program participation, compliance, and resource allocation.

## 3.2   Effective Structure of Functions and Systems, Including Communication Mechanisms

The Task Force found that there is a lack of meaningful coordination and information sharing among OLBD, OCP, agency directors, and procurement officers.  This inhibits consistent internal communication and program implementation.  Further, it found that OLBD staff does not appear to have contract management and procurement technical skills to advocate sufficiently with OCP at the procurement stage on behalf of LSDBEs and, therefore, are likely missing opportunities to provide input into buying decisions.

The Task Force findings also highlight a disconnect between the certification and procurement processes.  Although there is one staff person assigned as a liaison between OLBD and OCP, there is no strong program implementation link between the LSDBE program requirements and the actual procurement of goods and services or program administration.  Even though the statutory authority exists for OLBD to promote the utilization of LSDBEs, the Task Force believes that the bifurcated relationship between the LSDBE certification process and the actual procurement process contributes to an under-utilization of LSDBEs in the District's procurement supply line.  The regulatory or procedural ties that should bind the LSDBE certification process to the procurement process, in order to result in the meaningful utilization of LSDBEs in procuring goods and services by the District government, do not exist.

The Task Force further found that, although mandated with the authority to "review agency procurement plans," the OLBD director was seldom part of that process.  Consequently, LSDBEs who rely on OLBD to foster public sector contracting opportunities find that OLBD is frequently not even part of the most basic procurement planning process.

Exacerbating the communication and collaboration process between OLBD and District government agencies is a manual OCP procurement system, multiple yet disparate communication and application technologies, and poorly defined measurement and data collection criteria.  As a result, it is almost impossible to determine program performance and compliance and, therefore, difficult to communicate program successes and to enforce program mandates.

An effective LSDBE structure rests on a foundation of communication, collaboration, cooperation, and coordination.  Clearly, if those parties who have a demand for goods and services have neither open lines of communication with nor cross-functional understanding of those who hold the supply, there is the potential for a serious breakdown in effective working relationships.

## 3.3    Identification and Certification of LSDBEs

Task Force findings were mixed on OLBD's performance with application processing. For those respondents who had negative experiences, they commented that the process took too long and that OLBD staffers were not particularly knowledgeable about the program, nor where they helpful. LBOC respondents indicated that applications were often incomplete at the time of submission to LBOC for approval, thus delaying the certification process by at least 30 days until the LBOC reconvened. Others felt that the certification process accounted for too much of OLBD staff time, leaving little time for the performance of other important program activities by OLBD personnel.

Currently, the LSDBE certification process attests only to the LSDBE's compliance with specific size, location, ownership, and ethical criteria. The certification process is not designed to attest to an LSDBE's skill set, business acumen, financial strength, or quality of past performance. There was significant discussion among respondents over the need to have some assurances and/or information about LSDBE contractors' financial wherewithal to acquire performance bonds and insurance, proficiency with both their trade and general business management, and the quality of their overall performance on past contracts. Agency directors, procurement officers and private sector developers agreed that more useful and timely information about LSDBEs' business capabilities and past contract performance should be made available in an electronic database format.

Among the LSDBE program stakeholder groups interviewed, private developers, in particular, expressed concern about the business capacity of some of the certified LSDBEs. These respondents noted that the lack of bonding and insurance capability, and the lack of overall financial strength of LSDBE's have caused problems, either during projects or when attempting to bring an LSDBE into a bid proposal.

Further, agency directors, procurement offices and developers noted that, in addition to a generally small pool of certified LSDBEs (currently approximately 600 out of the 15,000+ small businesses in the District), many of whom were not of sufficient size or quality performance to qualify for a particular contract, there were often no certified LSDBEs in the NIGP codes under which they needed to procure goods and services.

For a robust LSDBE program to exist, it is important to have a full compliment of participants who can perform services and provide goods in accordance with the needs of the procuring agencies. To achieve this, it is necessary to have comprehensive coordination and communication between those bringing participants into the program (OLBD) and those using the services of its participants (OCP and District agencies). Determining the needs of the "buyers" is the starting point. It should then be the function of the LSDBE program office (OLBD) to actively recruit the "sellers" in sufficient number and diversity to enable the procurement officers to meet their program goals and adequately staff their contracts. There is no question that a program of this kind requires a certification process to insure that those entities the program is de-

signed to serve are in fact the only ones who are given the privilege of participation. In order to encourage program participation, it is important for the certification application process to be efficient and effective.

## 3.4    Widespread Utilization of the Participant Pool

To achieve maximum utilization of LSDBEs in the procurement process and to provide intra-agency advocacy on behalf of the certified companies, it is first necessary for the contracting officers and agency directors to understand not only the regulations of the program but also to know the spirit of the program. Respondents felt that before broader LSDBE program advocacy can occur within the District government, agency directors and senior procurement officials must be given the training needed to serve as advocates. They must also be held accountable to the program's legislative mandate. Agency directors believe that their chief contracting officers understand the vision and commitment of meeting the goals of the LSDBE program. However, they think that they have not had adequate and appropriate training for a full understanding of the program.

It is evident from the Task Force's research that OLBD has not performed an adequate job of educating government stakeholders to assist and support the agency in promoting the LSDBE program or its certified LSDBE businesses. The Task Force believes that the District is poised to capitalize on further nurturing, promoting and leveraging advocacy opportunities for the LSDBE program and its participants in the District government.

In addition to understanding the specific objectives of the program, procurement officers must feel comfortable that the LSDBEs have the wherewithal to perform and compete effectively. Currently, other than through personal knowledge of an LSDBE's past performance, there is no effective way to know or learn of the capacity or the capabilities of any particular LSDBE. The perception among the respondents is that there are not enough certified LSDBEs with the capacity and capabilities to meet their procurement needs. Many of the respondents would like, and expect the LSDBE database to contain some performance evaluation and measurement of the LSDBEs. Some of them say that not weeding out or indicating LSDBEs with recurring performance problems and lack of capacity or capability limitations diminishes the value of the database.

The most common criticism of the program is the lack of assistance, whether financial or educational, that is provided to the LSDBEs to assist with capacity building. Developers, agency directors and agency procurement officers understand that one of the intents of the LSDBE program is to support the development of local, small and/or disadvantaged businesses; but they see no formal efforts being made by OLBD to coordinate access to or directly provide LSDBEs with meaningful training, advisory services or financial resources they need to survive and thrive in the market place.

All of the private developers interviewed by the Task Force expressed concern about the business capacity and capabilities of many of the certified LSDBEs. These business leaders noted

that the lack of bonding capability, the lack of insurance and the overall weak financial strength of LSDBEs present problems when projects are underway and/or when attempting to bring an LSDBE into a bid proposal. Building business capacity entails, among other things:

◆ Helping to insure that essential business infrastructure, systems, and processes are in place.

◆ The availability of adequate financing.

◆ LSDBEs who are seasoned in competitively marketing their goods and services.

LSDBEs specifically identified a need for more training in:

◆ The certification process.

◆ Ways to identify procurement opportunities within the District.

◆ The best means to market their products and services to District procurement officials.

◆ Ways to obtain bonding, insurance, financing, and other business development advisory services and training.

The Task Force found that, while there are a number of programs and facilities in the District that provide small business educational and assistance opportunities, there is neither an existing comprehensive inventory of the available programs, a comprehensive strategy on how to use these services, nor the organizational leadership to deliver this help to LSDBEs in a coordinated fashion.

An assessment of the available technical support and business assistance products and services reveals that there are over 15 District government agencies that operate some type of direct assistance program that businesses might want to access. In addition, another eight entities serve small businesses through some type of public/private partnership, and 12 community-based organizations offer direct assistance to small businesses.

But even if the District had a soundly qualified, diverse pool of LSDBEs, the findings indicate that attention should be given to ways of making the procurement system more responsive to the needs and use of LSDBEs. Agency directors and procurement officers who were interviewed specifically noted that aspects of the procurement system work counter to their utilization of LSDBEs and the implementation of the program – that there is always competitive pressure to select the lowest bidder, who may or may not be a certified LSDBE. It was further noted that the system currently appears to provide more incentive to District agencies to select the "safe" vendor rather than to use an unknown, unproven LSDBE.

Lastly, for widespread utilization of LSDBEs, procurement officers must have access to, through an electronically accessible database, reliable, current information on the availability of LSDBEs. Conversely, LSDBEs must have timely access to information about contracting

opportunities. The respondents to the Task Force's inquiries indicate that in addition to the limited usefulness of the information in OLBD's LSDBE database, it is not current and that the database was cumbersome to navigate. Conversely, LSDBEs are frustrated with the lack of information about or links to available contracting opportunities posted on OLBD's web-site.

## 3.5   Vigorous Advocacy

The Task Force found that key program stakeholders expect a level of program advocacy that is far greater than that which is currently being provided by OLBD. While the agency's statutory authority provides broad latitude to meet these expectations in a number of ways, a significant gap exists between expectations and service delivery.

One reason given for this shortfall is the limited amount of resources allocated to OLBD to carry out its broad-based mandate. Additionally, findings support the conclusion that OLBD has focused more of its limited resources on its role as LSDBE regulator than on its role as program advocate. The perceptions of prime contractors, LSDBEs, and small business advocacy groups are that a stronger advocacy role is required for a successful LSDBE program.

The Task Force found that one area where improvement in OLBD advocacy could reap significant rewards is in the review of agency procurement plans. During the Task Force's interview with the OLBD Director, it was determined that although District law clearly provides OLBD with the authority to review these plans and determine which contracts or portions of them may be set-aside, the Director noted that often the Office was "not part of that process." Therefore, one of OLBD's most effective internal advocacy tools – the authority to influence contracts for the set-aside market – is not being used effectively.

Additionally, the Task Force notes that OLBD does not promote its success stories, its "best-in-class" LSDBEs. Given the negative perceptions of both the program's success and the quality of the certified LSDBEs in the program, celebrating true successes would represent a strong, positive step towards enhanced advocacy. To begin addressing issues related to small business support and approaches to helping small business grow and thrive, the District must look for ways to leverage existing "best-in-class" business services.

The Task Force believes that, given its resource constraints, OLBD can be a more valuable aide to LSDBEs by, in some cases, helping to coordinate, package and promote existing best-in-class services rather than attempting to create new government initiatives. By doing so, OLBD would maximize its executive branch leverage to influence public and private sector program and policy decisions that directly impact its program constituents.

Just as the District must support and promote its public and private sector best-in-class business service providers, OLBD must also identify ways to promote its best-in-class LSDBE businesses. In showcasing LSDBE successes in government contracting, OLBD can begin to positively influence public opinion about both the quality of work provided by LSDBEs and the success of the program as a whole.

A strong LSDBE program requires vigorous and committed advocacy. The role of the advocate is to provide a strong voice for and to be the promoters of the interests of the group for which advocacy is being provided. In the case of the District's LSDBE program, OLBD is in the unique position of being expected both to advocate on behalf of the LSDBEs in front of the procurement community and to advocate on behalf of the program in front of current and prospective certified LSDBEs and agencies. To manage this dual role successfully, resources (time, personnel, money) must be allocated specifically to this task.

One of the opportunities available to a strong advocacy program is the ability to leverage resources by dealing with multiple constituents simultaneously. Rather than divide and conquer, the key is to combine and partner. A well-designed program of coordination and communication, implemented on a regular and consistent basis can provide the "horse power" needed to successfully promote and support both the overall goals and objectives of the LSDBE program and the constituents that the program is designed to serve.

## 3.6   Quantitative Analysis Highlights

A quantitative analysis of the District's FY 2001 LSDBE program performance was conducted on behalf of the Task Force. A more extensive analysis can be found in Appendix 1. The analysis suggests that in FY 2001, the District government exceeded its 50 percent LSDBE utilization goal. The analysis revealed that the District's total expendable budget was $403,519,692, of which $201,851,601 or 50 percent was considered the "eligible goal" for LSDBE utilization. Based on the report findings, the District actually awarded $376,609,311 or $174 million more than its FY 2001 goal. The report did not examine other fiscal years for comparative purposes.

With regard to the total agency expenditures to LSDBE firms, the quantitative analysis indicates that a total of 3,060 contracts were awarded to 296 different certified businesses. This represents 46 percent of all eligible certified firms. The table below shows the number and dollar value of contract awards to each certification type:

| | No. of Contracts Awarded | Total Contract Value | Certification Type(s) | Percentage Awarded by Type |
|---|---|---|---|---|
| | 66 | $100,143,749 | LSDBE | 38% |
| | 90 | $40,142,157 | LS | 15% |
| | 0 | $0 | LD | 0% |
| | 3 | $770,206 | SD | <1% |
| | 9 | $119,502,126 | L | 46% |
| | 2 | $365,970 | S | <1% |
| | 0 | $0 | D | 0% |
| TOTAL | 170* | $260,924,208 | | |

*The remaining 126 contractors could not be classified by certification type from the data received.

Based on the table above, only firms certified as local businesses received the greatest value of LSDBE contracts (46%), and firms certified as local, small and disadvantaged received the second largest value of contracts awarded at 38 percent. Firms certified as local, small and disadvantaged businesses received 66 contracts or 39 percent of the 170 contracts awarded (see footnote above). Of the 625 firms certified by OLBD, 46 percent or 288 of those firms were awarded a contract from the District government in FY 2001.

With regard to program compliance by District government agencies, the analysis revealed that of the 60 District and independent agencies and commissions examined, 19 agencies failed to meet their FY 2001 LSDBE utilization goal. No determination could be made for 18 agencies due to reporting discrepancies. Among the agencies that reported participation, several submitted reports that show contract dollars that not only exceeded their LSDBE goal or eligible budget, but their entire expendable budget. It is assumed, although not proven with the information provided, that these agencies have included capital, federal, or other dollars when calculating their LSDBE participation.

The District executed 16 Memorandums of Understanding with Industrial Revenue Bond recipients and 12 as Capital Revitalization Corporation approved projects. In all instances, the LSDBE goal was 35 percent. As of July 6, 2002, total bond financing for Industrial Revenue Bond (IRB) agreements was $9,672,700,000, with a goal of $156,714,617. As of the same date, the total LSDBE contract awards were $12,643,115 or 8 percent of the cumulative goal. Given the duration of many IRB projects, however, IRB partners expect to meet their utilization goals. The total development budgets for the 12 CRCAP was $407,425,550 with the same 35 percent utilization goal. To date, gross LSDBE participation totals $17,485,250 or 12 percent of the cumulative goal.

## 3.7   Enforcement of Program Mandates

The Task Force found that there are no comprehensive administrative and program management methodologies in place to ensure effective reporting of procurement data by all agencies of the District government. Nevertheless, OLBD is responsible for enforcing procurement regulations for businesses already holding certification and for reviewing the agency procurement plans in accordance with DC Code. Sec. 2-1205.3 (5), (10), (2001).

The lack of comprehensive management methodologies is due in large part to:

♦ The incompatible information systems used by the District's three major procurement process partners, OLBD, OCP, and the Office of the Chief Financial Officer (CFO).

♦ The lack of clarity and specificity around key success measures (e.g., should performance and compliance be measured by the amount of contract dollars awarded or the total contract dollars expended).

♦ The absence of data elements specific to the LSDBE program, such as NIGP codes and LSDBE certification, in the various procurement process partners' databases.

As a result, OLBD is unable to create a reliable District-wide report that summarizes LSDBE activity, in a comprehensive yet simplified manner, that compares actual performance against the District's requirement to spend 50% of its contracting dollars with LSDBEs.

Further, without reliable reporting and clear measures of success, OLBD has a limited arsenal from which to draw success stories that can further promote the LSDBE program and work to shift negative perceptions surrounding program compliance, enforcement, and performance.

Finally, the absence of reliable data makes enforcement of program mandates inconsistent at best, and inequitable at worst. Until OLBD can:

♦ Clearly establish success measures.

♦ Define appropriate roles and responsibilities as they relate to the LSDBE contracting process.

♦ Provide adequate training and education for procurement officials and agency personnel.

♦ Improve its ability to communicate and collaborate with its contracting partners.

♦ Collect and report reliable information.

Its ability to enforce the LSDBE program mandates is limited. Without strong enforcement mechanisms in place, consistently and equitably applied, the LSDBE program will continue to encounter negative perceptions and limited success.

One of the key components of an enforcement system is the ability to collect reliable data on a timely and consistent basis in support of program goals and objectives. In order to track LSDBE program success and make mid-course corrections, it is critical for OLBD to obtain the information it needs to measure actual performance against desired or mandated outcomes. Without this information, the Office stands in a weak position vis-à-vis enforcement of the program's mandates.

# IV.  BEST PRACTICES

# 4.0  Introduction

As part of its data collection effort, the Task Force looked at agencies and organizations in other jurisdictions that were tasked to do many of the same things OLBD is required to do in support of the LSDBE program.  This research provided an opportunity to test hypotheses and identify potential solutions to some of the issues and opportunities that emerged from the Task Force's qualitative research.

Often when organizations look outside of themselves for ideas, they have an opportunity to re-validate what they are doing well, and also to generate ideas for new programs, processes, functions, or strategies to expand or enhance functions and activities that they already have in place.  A review of best practices can facilitate this process. For its best practices research, the Task Force:

Identified relevant organizations and programs in federal agencies, other municipalities, state government, and private industry.

Researched processes, functions, and practices related to advocacy, organizational placement of certification function, capacity building, and use of technology.

The following sections of the report, presents some of the more compelling practices identified.

# 4.1  Advocacy

The Federal and Maryland State Governments offer examples of practices, functions, and pro-cedures that the District could adopt to strengthen and expand the manner in which it advocates and promotes local, small, and disadvantaged businesses.  These examples include:

◆ Maryland and the federal Office of Small and Disadvantaged Business Utilization have "advocates" for local, small, and disadvantaged businesses positioned within governmental agencies

◆ Ombudsman to receive complaints and concerns and investigate if necessary on behalf of small business.

◆ Research and policy coordination to promote, protect, and strengthen small business.

◆ Communication about opportunities, certified vendors, and strategic partners.

## Advocates

Because so much of the procurement process occurs outside of OCP and OLBD, an advocate within the agencies would help ensure that LSDBEs have a representative where many of the purchasing decisions are made.  Every federal agency with procurement powers is required to

have an Office of Small and Disadvantaged Business Utilization (OSDBU). The goal of OSDBUs is to institutionalize the use of small businesses and to fully integrate them into the federal government's competitive base of contracts. OSDBUs are typically tasked to:

◆ Increase contracts and subcontract awards to small businesses.

◆ Share information.

◆ Identify potential small businesses for use by the agency, its bureaus and prime contractors.

◆ Negotiate contract goals with the U.S. SBA in an effort to increase awards to small businesses.

◆ Publish an Annual Forecast of Contract Opportunities, listing upcoming procurements.

◆ Review procurement requisitions to maximize small business participation.

◆ Establish partnerships with federal agencies and customers to obtain feedback and improve services.

◆ Create awareness of the benefits of working with small businesses.

In Maryland, each government agency has a minority business enterprise (MBE) officer who acts as a liaison between the small and minority business community and the respective agency. The MBE officer:

◆ Provides information on contract opportunities.

◆ Identifies resources.

◆ Represents the voice of the small and minority business owner(s) to the agency.

A function such as this in each District agency, including independent agencies, could facilitate and augment the work of OLBD and OCP. The person in this role would report to OLBD.

## Ombudsman

The SBA Office of the Ombudsman serves as a liaison between small business concerns and federal agencies with regulatory authority. The Office's jurisdiction covers issues involving federal regulatory compliance and enforcement. The Office of the Ombudsman investigates repetitive audits or investigations, excessive fines, penalties, threats, retaliation or other unfair enforcement action taken by a federal agency against a small business entity. An ombudsman typically serves as an objective, third party to resolve sensitive disputes and complaints. An ombudsman program for LSDBEs may provide an objective means to resolve issues between LSDBEs and procurement, OLBD, or agencies. The ombudsman function might be affiliated with OLBD in a manner similar to the Local Business Opportunity Commission.

**Research and Policy Coordination**

Research and policy coordination are among the functions of the U.S. Small Business Administration's (SBA) Office of Advocacy. The office represents the nation's small businesses within the Federal Government, conducts policy studies, and compiles statistics on small business characteristics and contributions. According to its web-site, the fiscal year 2002 appropriation for the Office of Advocacy was $8 million and has a staff of 33, as compared to OLBD's budget of $1million and a staff of 10.

The Office of Advocacy is organized into three units:

♦ **The Office of Economic Research** serves as the principal source for small business statistics and analyzes small business in the economy.

♦ The Office of Interagency Affairs serves as the voice for small business in the Federal Government with regard to proposed regulations.  The office prepares comment letters and testimony on federal proposals that may affect small firms.  Among the issues addressed are access to capital, the burdens of regulatory compliance, and tax policies.

♦ The Office of Information provides outreach to the small business community.  The office also communicates with the White House, Congress, regulators, state policy-makers, industry, and the media.

The Office of Advocacy's policy and research oriented duties include:

♦ Examination of the role of small business in the American economy and the contribution small business can make to improve competition, encourage economic mobility, and expand employment opportunities.

♦ Assessment of the effectiveness of existing federal subsidy and assistance programs for small business.

♦ Measurement of the direct costs and other effects of government regulation on small businesses and to make legislative and non-legislative proposals for eliminating excessive or unnecessary regulations of small businesses.

♦ Determination of the impact of the tax structure on small businesses and to make legislative and other proposals to alter the tax structure to enable small businesses to realize their potential for contributing to the improvement of the nation's economic well-being.

♦ Studying the ability of financial markets and institutions to meet small business credit needs and to determine the impact of government demands for credit on small businesses.

♦ Assessment of the availability of financial resources and to recommend methods for delivery of financial assistance to minority enterprises, including methods for securing equity capital.

- ◆ Providing business education and technical assistance in complying with federal, state, and local law.

- ◆ Evaluating the efforts of federal agencies and business and industry to assist minority enterprises.

- ◆ Recommending policies and to assist in the development and strengthening of minority and other small business enterprises.

- ◆ Recommending measures to create an environment in which all businesses will have the opportunity to compete and expand to their full potential.

- ◆ Ascertaining the common reasons, if any, for small business successes and failures.

- ◆ Determining the desirability of developing a set of rational, objective criteria to be used in defining small business, and to develop such criteria, if appropriate

The policy and research focused activities of the Office of Advocacy are important because they demonstrate a proactive role in assessing the effectiveness of existing programs, evaluating the impact of new policies and regulations, and identifying future opportunities to strengthen and protect small business. Rather than only monitoring federal agencies activities, the office works to collect, generate, and analyze data that will shape policy-makers and industry's understanding and actions around the promotion, development, and strengthening of small business in America.

## Communication and Outreach

Effective communication and outreach to local, small, and disadvantaged businesses can lead to a greater understanding of the program and an increase in the number of businesses becoming certified. Communication with and recognition of agencies may also promote goodwill, increase their understanding and appreciation of the LSDBE program, and encourage expanded participation. The Commonwealth of Virginia and Apple Computer's "Supplier Diversity Program" offer examples of communication and outreach activities the District may want to incorporate.

In 1993 Apple instituted a supplier diversity program to ensure that historically underutilized businesses (HUBs) were provided maximum opportunity to do business with the company. To identify HUBs, Apple proactively seeks diverse suppliers through minority business development organizations and participation in trade show activities. Staff in the Supplier Diversity Program review HUB qualifications and refer them to appropriate purchasers for consideration. So rather than simply making purchasing needs known, the supplier diversity program actively matches HUBs with potential opportunities.

The Virginia Department of Minority Business Enterprise (VDMBE), an organization similar to OLBD, certifies small and minority businesses, facilitates access to capital, and provides small business assistance. To advocate for small business, VDMBE:

♦ Electronically circulates its Quarterly Vendor List to more than 500 public and private sector procurement officials.

♦ Promotes the products and services of certified minority businesses to state procurement officials.

♦ Recognizes agency strategic partners who have demonstrated a commitment to enhancing services to the minority and disadvantaged business communities. This is important because it communicates to agency officials that making the effort to use minority and disadvantaged businesses is valued and appreciated.

♦ Communicates VDMBE's successes. The department has hired a media and public relations specialist. To date 27 articles have been published about minority and disadvantaged business enterprise accomplishments.

## 4.2   Organizational Placement of the Certification Process

One of the Task Force's hypotheses was that "public purpose programs like the LSDBE program (e.g., supplier diversity programs and minority and disadvantaged business programs) are typically aligned with the procurement function, both organizationally and physically." The discussion that follows describes the organizational relationship between procurement and LSDBE-like certification programs in Chicago, Florida, Philadelphia, and Maryland.

In the City of Chicago, the Minority and Women-owned Business Procurement Program promotes contracting opportunities to minority and women-owned business enterprises (M/WBE). This program is located within the Department of Procurement Services in the Division of Contract Monitoring and Certification. This Division certifies M/WBEs as well as administers the City's Equal Employment Opportunity and Affirmative Action requirements. The Contract Monitoring and Certification Division also plans educational outreach programs and workshops for minority and women-owned businesses.

Following a review of operations, the State of Florida moved its Minority Business Advocacy and Assistance Office from the Department of Labor and Employment Security to the Department of Management Services, where the majority of procurement activities take place. The State found the Office of Minority Business Advocacy and Assistance spent most of its time certifying businesses and setting what it called misleading spending goals. State officials believed that moving the office would help procurement agents find and recruit qualified minority businesses.*

In the City of Philadelphia, there is a Minority Business Enterprise Council (MBEC) which certifies minority, women-owned, and disadvantaged business enterprises (M-DBEs, W-DBEs), provides information on contracting opportunities to certified firms and reviews City department requests for proposals and bid specifications to identify requirements, which unduly

---

*(*Equity in Contracting Plan*, Executive Summary, www.myflorida.com).

restrict participation of these businesses.** According to staff in this office, the MBEC is separate from the Office of Procurement.

In Maryland, the various functions associated with local, small, and disadvantaged business development are distributed across a number of state agencies and organizations. The Department of Transportation Office of Minority Business Enterprises is responsible for certification of minority business enterprises across the State. As mentioned earlier, each agency has a MBE specialist.

Within the Governor's Office are the Office of Minority Affairs, which provides technical and management assistance, and the Governor's Office of Business Advocacy and Small Business Assistance. This Office connects small and minority-owned businesses to appropriate resources and provides information and assistance on issues, such as business permits, licensing, and small business planning.

While the Task Force identified alternative models for organizational placement of the certification process, it thinks alignment of certification with OCP would best serve the goals of the District's LSDBE program and provides LSDBEs with "one-stop-shopping" convenience.

## 4.3   Capacity Building

A part of the Task Force's charge was to identify ways to develop, strengthen, and retain local, small, and disadvantaged businesses in the District. Three models that the Task Force identified for consideration are:

♦ Business incubators – Maryland Technology Development Center

♦ One-Stop Capital Shops

♦ SBA's ACE-NET

### Business Incubation

Business incubation catalyzes the process of starting and growing companies. A proven model, it provides entrepreneurs with the expertise and networks and tools that they need to make their ventures successful. Incubation programs diversify economies, create jobs, and build wealth. Today, there are more than 900 of these programs in the United States. A business incubator is an economic development tool designed to accelerate the growth and success of entrepreneurial companies through an array of business support resources and services. These incubator "graduates" create jobs, revitalize neighborhoods, commercialize critical new technologies, and strengthen local and national economies.

---

**(Executive Order 1-93, www.phila.gov/pdfs/venorguide.pdf).

Thirty percent of incubator clients typically graduate each year. According to the *Impact of Incubator Investments Study*, 1997, eighty-seven percent of incubator graduates remain in business.

Two principles characterize effective business incubation:

♦ The incubator aspires to have a positive impact on its community's economic health by maximizing the success of emerging companies.

♦ The incubator itself is a dynamic model of a sustainable, efficient business operation.

Maryland has established one incubator for high-tech companies and plans are in the works for one in both Silver Spring, MD and Arlington, VA to foster micro business growth. The Maryland Technology Development Center (MTDC) is a newly constructed facility, which offers low-cost rental space and a network of technical and business support services to help local and new businesses succeed. The objective of the MTDC is to help young enterprises grow over the critical period of "incubation." Once the business has achieved a momentum of its own and has the ability to survive outside of the incubator, it will graduate into regular commercial and industrial space.

## One-Stop Capital Shops

Examples of private sector training initiatives are the One-Stop Capital Shops (OSCS) in Boston, Massachusetts and Atlanta, Georgia. Both entities are organized as non-profit corporations and provide a more comprehensive program for the business community through a network of on-site professional advisers. These advisers include representatives from SCORE, the Small Business Development Center, local banks, U.S. Small Business Administration and the City's Loan Guarantee Program. Services include business management and planning, legal support, and financial planning.

The One-Stop program located in Atlanta's City Hall, provides information on business training programs offered throughout the City and coordinates mentoring programs. Boston's OSCS is located in the Empowerment Zone and is designed to assist local small businesses in establishing and developing viable businesses in the empowerment zone, using the same resources as those offered in Atlanta.

The District's Department of Employment Services and the Howard University Small Business Development Center have teamed up to create a business incubation program in its newly established business resource center. The incubator provides basic office services and equipment, technology support services, meeting space, and assistance in obtaining information on the financing necessary for company growth. HUSBDC staff is available to counsel business owners and others who visit the business resource center. While still in its early stages, this pro-

gram could serve as a launching pad for an expanded business incubator program and a hub for the One-Stop Capital Shop model.

## SBA's ACE NET

The SBA has developed an Internet-based program called ACE NET, which offers new options to both small companies looking for investors and investors looking for promising opportunities. The database marries "angel investors" with those seeking equity capital. There is typically a small charge to "angels" and/or to businesses seeking to list in ACE NET databases.

Within the District, there are three ACE NET operators, including Howard University's Washington, DC SBDC Network's system at the School of Business, Economic Development Finance Corporation's (NEDCO/EDFC) located at 1660 L Street, NW and the United States/Mexico Chamber of Commerce's National Office and Mid-Atlantic Chapter located at 1300 Pennsylvania Avenue, NW.

Business incubators, One-Stop Capital Shops, and programs such as ACE NET, are designed to help small, disadvantaged businesses have access to the information, resources, and support critical to their development, growth, and sustenance. While there exists a plethora of business assistance services and providers in the District of Columbia, the City may want to look for ways to centralize access to these services and establish a program similar to the One-Stop Capital Shops as a part of its formal program to support LSDBE.

## 4.4    Technology

Technology is a key enabler of processes and a proven communication tool, assuming that the intended audience has access to it. The Task Force recognizes that the District may have opportunities to expand the way it uses technology to support the LSDBE program and related procurement activities. To better understand expanded technology opportunities, the Task Force reviewed the web-sites of comparable organizations in neighboring jurisdictions and studied Metropolitan Washington Airport Authority's (MWAA) Project E-Lert and SBA's Pro-Net.

## Comparable Web-sites

Metropolitan Washington Airport Authority's (MWAA) Project E-Lert is a weekly e-mail based publication alerting registered businesses to the latest information regarding contracting opportunities with the Airport Authority. Certification with MWAA is not required to receive these notifications. Consequently, as other local, small, or disadvantaged organizations learn of upcoming opportunities, they might be more inclined to become certified or participate in OLBD programs.

SBA's Pro-Net is a search engine for contracting officers, a marketing tool for small firms and a link to procurement opportunities and information. Pro-Net can be searched by Standard Industrial Codes (SIC), key words, location, qualifications, ownership race and gender, business

type and other factors. Users are given pass codes to access SBA files with information on participating firms. Certified registered companies have the ability to link their business web pages, as marketing tools. The system is also linked to FedBizOps (FBO) that contains most of the contracting opportunities in the Federal Government.

The adoption, by the Office of Contracting and Procurement, of the Project E-Lert system would mitigate the notification issues inherent in a decentralized procurement system. Each agency's contracting officer would be required to download current contracting opportunities to one site. This one-stop access might be available to certified businesses only.

As the table below indicates, OLBD's web-site includes many of the items found on the web-sites for comparable organizations in neighboring jurisdictions. Nonetheless, the Task Force's research provides some new ideas for functionality to be incorporated into the OLBD site.

| Feature | DC | Maryland | Baltimore | Virginia |
|---|---|---|---|---|
| Mission Statement | X | X | X | X |
| Goals/Objectives | X | X | X | |
| Searchable database of certified businesses | X | X | X | X |
| Application forms | X | X | X | X |
| Online certification | | | | |
| RFPs/Procurement Opportunities | | | X | X |
| Announcements of Awards | | | X | |
| Feedback opportunity | X | X | X | X |

◆ The best practices research suggests that there are effective practices, programs and functions being applied in other jurisdictions and organizations that, if appropriately applied in the District, could augment the effectiveness and efficiency of the District's LSDBE program. Specific elements for consideration are contained in the recommendations in the next section. Additionally, the following suggestion should be taken into consideration: institute an ombudsman to act as an intermediary between LSDBEs, agencies, and procurement in resolving disputes and concerns.

◆ Use technology to communicate LSDBE capacity, successes, and qualifications. Provide a one-stop electronic repository of information and data required to participate in the program. For example, on the OLBD web-site provide links to a myriad of small business development programs and services and more direct access to relevant procurement information.

Incorporating these practices into the LSDBE program may help the District address some of the findings the Task Force has outlined.

## V.    RECOMMENDATIONS

# 5.0   Introduction

Supporting local, small, and disadvantaged businesses makes good business sense.  They contribute to the tax-base, expand employment opportunities, invest in the District, and generate needed products and services. To help the District strengthen its LSDBE program, the Task Force has used feedback from stakeholders, the review of available quantitative data, and the lessons learned from the best practices research to develop a set of recommendations designed to move the District's program to the next level of effectiveness.

The recommendations are organized around six foundational pillars (see Exhibit 3.1) that support the LSDBE program.  Strengthening and fortifying the foundation of the program is essential if the District is to have a thriving small business community integrated into the economic fabric of the City.  The recommendations are designed to address the primary issues and opportunities the Task Force identified, such as:

♦   More effective communication of program success.

♦   Clarification of program goals and objectives among government officials and stakeholders.

♦   Increased technical assistance or access to it.

♦   Perceptions about the capabilities of LSDBEs.

♦   Access to capital.

♦   Improved customer service.

♦   Inadequate resources to support program objectives.

♦   Weak enforcement activities.

♦   Difficult to access management information data.

♦   Limited promotion of the program to potential LSDBEs and agency personnel.

Exhibit 5.1 summarizes the recommendations by pillar and Subgroup.

# Exhibit 5.1
# Summary of Recommendations by Pillar and Subgroup

| | Advancing | Procurement | Technical Assistance | Compliance & Enforcement |
|---|:---:|:---:|:---:|:---:|
| **Strategic direction**<br>• Develop a tactical plan to implement strategy to meet goal<br>• Clarify program intent<br>• Agree to performance measures | X | X | X | X |
| **Structure**<br>• Certification moves to OCP<br>• Identify LSDBE/OLBD reporting requirements for inclusion in new procurement system<br>• Increase interactivity of OLBD web-site; provide more coordination/integration with procurement information<br>• Automate procurement process | X | X | X | X |
| **Identification and certification**<br>• Expand pool of certified LSDBEs<br>• Identify LSDBEs to fill gaps where there are less than 2 in an NIGP<br>• Expedite certification via agreements with US SBA and National Minority Supplier Development Council<br>• Transfer certification process to OCP | X | X | | |
| **Utilization**<br>• Conduct a spend analysis<br>• Further study issues around securing appropriate bonding<br>• Establish capabilities assessment program<br>• Serve as clearinghouse for information about business assistance and technical assistance<br>• Contract with providers to deliver technical assistance and business skills training to LSDBEs<br>• Create an incubator for construction firms<br>• Conduct a joint Office of Banking and Financial Institutions' and OLBD evaluation of existing small business lending programs (micro and others) | X | X | X | |
| **Enforcement**<br>• Contract out compliance monitoring<br>• Develop stronger contract language<br>• Establish enforceable penalties for failure to meet LSDBE contracting goals | | X | | X |
| **Advocacy**<br>• Establish an agency leadership recognition program<br>• Identify senior-level LSDBE officer in each of the Deputy Mayor clusters<br>• Use Mgt. Supervisory Services program to educate key govt. officials<br>• Add 4 FTE and $600K<br>• Conduct annual hearing to collect LSDBE feedback<br>• Revise eligibility standards<br>• Develop a strategic communication plan | X | X | X | X |

## 5.1    Strategic Direction

To address misperceptions of the program within and outside of the District government and to clarify objectives and foster greater accountability, public and private sector leaders should convene to articulate and revalidate program objectives and develop program measures. This is important so that government officials and stakeholders know what is expected of them. The success of the program depends on a demonstrated commitment by leaders inside and outside government. With consensus achieved around the desired program outcomes, the creation of a tactical plan with clearly defined goals and objectives will be key. This roadmap will serve as the guide to capitalizing on the tremendous opportunities to further advance the District's LSDBE program.

## 5.2    Structure, Functions, Systems, and Communication Mechanisms

The Task Force recommends that:

♦ Contract administration, and compliance be transferred from OLBD to OCP to incorporate LSDBEs directly into procurement supply chain.

♦ OCP reengineers its processes and continues with its plans to implement an integrated, automated system.

♦ OCP, OLBD, and LBOC work together to conduct a requirements analysis of the information needed from the new procurement system so that the new system is able to produce required reports and data.

♦ LSDBE specialists be deployed within each agency to facilitate communication and promote the program.

♦ OLBD's staffing be increased by four FTEs in order for the office to better meet its mission.

These factors provide the infrastructure to deliver the program. The Task Force believes that the current organizational placement of the certification function makes the program cumbersome for LSDBEs. The members also think that contract administration and compliance should be aligned with procurement. The existing technology does not facilitate exchange of information among agencies and limits the usefulness of management information and reporting data.

## 5.3   Identification and Certification

The Task Force recommends:

♦ The use of other established certifying organizations (e.g., U.S. SBA, NMSDC) and the development of Memorandum of Understanding with those organizations to expedite LSDBE certifications for District based SBA 8 (a) and Regional Maryland DC Minority Supplier Development Council certified businesses in certain program categories

♦ Increase revenue ceiling from $23 million to $35 million for small local businesses and require three consecutive years of earning at this level before graduation.

♦ Assess the District's current spending patterns to understand the types of firms needed.

♦ Move the certification process from OLBD to OCP.

The viability of the program hinges to some extent on there being an adequate pool of certified LSDBEs. Currently only 600 of a possible 15,217 LSDBEs are certified. Some procurements are not classified as set-asides because there is an insufficient number of certified LSDBEs to compete for a solicitation.

## 5.4   Utilization

The Task Force recommends that:

♦ OLBD create a clearinghouse of information about services available to LSDBEs.

♦ OLBD contract with an organization or consortium of business training providers to deliver business assistance and technical support to certified LSDBEs and LSDBE applicants.

♦ OLBD, LBOC, and OCP create an LSDBE capabilities assessment program to determine business readiness for new applicants and, where warranted, refer applicants for business training prior to award of full certification.

♦ The District reconsider plans to create a business resource center within OLBD and concentrate resources on expanding the District's Department of Employment Services and Howard University's Small Business Development Center (HUSBDC) program to model a One-Stop Capital Shop.

♦ The District expand the existing DOES and HUSBDC business incubator program to incorporate an incubator pilot project in a specific growth industry, funded with public and private resources. The Subgroup recommends creating the pilot program for small construction firms.

- ◆ OLBD provide information about how to obtain financing, how to prepare firms to attract capital, what sources of capital exist and what are the various products, all through promotion and education and coordination of external service providers.

- ◆ The District should promote the Department of Banking and Financial Institutions' (DBFI) efforts to continue partnering with financial institutions to ensure community reinvestment, community development, and to promote more lending opportunities for DC businesses.

- ◆ The District establish a two-tier local business opportunity program that distinguishes large local businesses from small local businesses.

- ◆ The District set-aside 50 percent of agency expendable budgets for small local businesses (Tier 2).

- ◆ The District establish a formal early warning scan of upcoming procurement activities to allow LSDBEs to be identified and where non-certified LSDBEs exist, fast track the certification process.

Utilization is about more than how many LSDBEs received contracts or the dollar value of the contracts. It also is about having a pool of LSDBEs ready to be used and having enough LSDBEs in each NIGP category. LSDBEs cannot be used if they do not know what opportunities are available for pursuit. Procurement officers cannot award, promote and expand the use of LSDBEs if they do not have an accurate list of certified and qualified LSDBEs.

## 5.5  Enforcement

The Task Force recommends that the District:

- ◆ Include a liquidated damages provision, if permitted, in all future Industrial Revenue Bond contracts and private sector MOUs for failure to meet LSDBE goal.

- ◆ Include stronger LSDBE compliance language in all RFPs/RFQs.

- ◆ Contract out for private sector compliance monitoring and reporting.

- ◆ Assess management reporting information requirements and ensure new procurement system can produce required reports.

- ◆ Establish a vendor-tracking performance database for all vendors doing business with the District of Columbia.

- ◆ Work with OCP to identify requirements, a fair process, and evaluate existing software tools (the new OCP system may have some functionality related to tracking vendor performance).

New levels of accountability must be established if the program is to be taken seriously. What happens if the goals of the Act are not met? What individuals and organizations are responsible for the successful utilization of LDSBEs? What are the implications for prime contractors

that fail to utilize LSDBEs as subcontractors? What are the implications for LSDBEs that fail to perform effectively? At every level there must be consequences. The LSDBE program needs greater enforcement of requirements on three fronts in the performance of work: 1) agencies, 2) prime contractors, and 3) LSDBEs. Because much of the data required to track performance, utilization, and spending is not available, and "back-end" contract administration may be lacking, some private sector contractors may feel comfortable not complying with all requirements, in particular if there are limited consequences to non-compliance.

## 5.6  Advocacy

The Task Force Recommends that the District:

♦ Establish an annual leadership recognition program to honor agency leadership in LSDBE contracting and highlight LSDBE successes. Involve representatives of the public and private sectors in the selection process.

♦ Include a component on LSDBE in the Management Supervisory Services program to educate and train key government officials about the program.

♦ Identify a senior-level LSDBE officer with sign-off authority over all agency solicitations of $75,000 or more for each of the three Deputy Mayor clusters of agencies. To minimize the burden on the officer and staff and not slow the procurement process, the LSDBE officer should conduct a retrospective quarterly review of spending. If LSDBE goals were not met, then corrective action would be required.

♦ Amend current law to expand OLBD'S advocacy role. Fund advocacy function at four FTEs and an additional budget appropriation of approximately $600,000.

♦ Convene an annual public hearing to solicit comments and suggestions from LSDBEs and review agencies LSDBE utilization reports.

♦ Provide an e-mail notification system of small purchase notices and procurement alerts for all government solicitations. Link the OLBD web-site to that of OCP and agencies with independent buying authority.

The LSDBE program must be integrated into the mainstream procurement system. Contracting officers, agency heads and prime contractors' all must understand that there are significant benefits to the District's economic development plans when a viable LSDBE program exists. There must be consistent advocacy to ensure that the program is understood and executed. This includes addressing misperceptions about the capabilities of LSDBEs, communicating the benefits of the program, promoting success stories and identifying best practices that can be imported to the District. There must be champions throughout the District that are prepared to speak of the importance of an LSDBE program, and where authorized ensure that LSDBE utilization goals are met or exceeded.

## 5.7  Next Steps

To maintain the momentum the Task Force has generated, City leaders must act quickly to move forward with the proposed recommendations.  The suggested tactical plan should provide an integrated roadmap that specifies timeframes for completion and the parties responsible for given activities.  The Task Force suggests that the Mayor convene a meeting of key agency managers, representatives of the Mayor's policy office, City Councilmembers or their designees, and at a minimum the Task Force's Subgroup leaders.  This group should work to prioritize the recommendations as an immediate next step and begin developing legislative and policy implementation drafts.  The ultimate demonstration of commitment is action.

**Exhibit 13, Part 3**

# *APPENDIX 1*

# *SUBGROUP REPORTS*

# *Advancing*
# *Subgroup Report*

# TABLE OF CONTENTS

1.0    Introduction

2.0    Statutory Framework

3.0    Issues:  Identification, Analysis, and Validation

4.0    Models for Consideration

5.0    Recommendations

# 1.0   Introduction

The Advancing Subgroup (AS) was charged with examining the strategies and approaches that the District could utilize in encouraging, developing, strengthening, promoting, advancing and retaining small, local and disadvantaged businesses (LSDBEs) in the District of Columbia. The Subgroup also identified strategies to advance LSDBE's views, concerns, and interests.

At the outset of the project, the Advancing Subgroup assumed that the District government's LSDBE program, and specifically the Office of Local Business Development (OLBD) faced major program communication challenges. The project research validated that these communication challenges have resulted in a program that is largely misunderstood by key stakeholders. In most cases, these are the same stakeholders – agency directors and private sector officials that LSDBEs rely on to not only promote the program, but, more importantly, to comply with the program utilization goals. This lack of effective program communications has contributed significantly to a current negative perception of the program and the agency charged with carrying out the LSDBE program goals. Our research clearly demonstrates that the District's LSDBE program suffers from a host of factors that inhibit the program from reaching its desired goals and outcomes. The AS's initial hypothesis was confirmed as we solicited input from various program stakeholder groups.

The AS Report seeks to identify the communication challenges facing the City's LSDBE program, examine effective ways to improve program communication and to effectively meet the expectations of the LSDBE community. The overall goal is for the program to serve as a strong advocate on behalf of LSDBEs.

The AS's internal advocacy recommendations are based on combining the best in-class advocacy program models, recommendations received from OLBD and those received from other key internal stakeholder groups, including agency directors, senior procurement officials and the Local Business Opportunity Commission (LBOC).

# 2.0   Statutory Framework and Program Expectations

DC Law 12-268 provides OLBD with broad statutory authority to advocate for the District's LSDBE program as well as the LSDBE community in general. Specifically, the office is empowered to:

♦ Educate the public, including District residents and businesses about the LSDBE Act.

♦ Stimulate and foster greater opportunities for businesses certified as LSDBEs to participate in the District's procurement of goods and services than would otherwise be possible.

♦ Educate, disseminate, and market contract opportunities information to those businesses already holding certification as LSDBEs.

The statute also provides OLBD with broad latitude to advance issues of importance to LSDBEs. These functions include the authority to a) receive complaints of violation of the LSDBE Act, b) enforce procurement regulations for certified businesses, c) review bids in the small business enterprise set-aside arrangement, and where appropriate, authorize agencies to refuse to award a contract under certain conditions, d) review contracting problems and make recommendations that increase small, local, and disadvantaged contractor participation with the District government, and e) review agency procurement plans and determine which contracts or parts of them may be reserved to assist agencies in meeting their program goals. Recommendations may include such things as improved schedules that ensure prompt payment, innovative contract advertising procedures, and the encouragement of joint ventures and the provision of advice to the Mayor on methods to be utilized to ensure program participation.

The role of procurement plan review of each agency and determining which contracts should be reserved for the small business set-aside program provides a significant opportunity for OLBD to advocate on behalf of certified LSDBEs. Likewise, OLBD's responsibility for reviewing contracting problems and recommending actions that increase LSDBE contractor participation provides another key opportunity to advocate on behalf of LSDBEs.

## 3.0   Issues:  Identification, Analysis, and Validation

The Task Force examined the internal advocacy functions and standards of several local, state, and federal government entities with responsibility for administering similar "protected class" procurement programs. The objective of the examination was to 1) determine whether the OLBD's internal advocacy responsibilities and standards were comparable to other such programs and 2) to determine whether OLBD's organizational mandate for certifying LSDBE applicants and program advocacy was unique, and if so, whether or not this duel mandate impedes the agency's ability to effectively perform both.

## 3.1   Current OLBD Advocacy Efforts

OLBD's internal program advocacy within the District government is carried out primarily though working relationships with other agencies, particularly that of the Office of Contracting and Procurement (OCP). In theory, the agency works with OCP to locate, match, and promote certified LSDBEs with contracting solicitations and opportunities. This relationship is especially important since OCP serves as the procurement agent for approximately 56 District agencies, purchasing over $1.5 billion annually in goods and services. Other OLBD internal program advocacy channels or opportunities include the Mayor's monthly economic development cluster meetings, where the OLBD Director has the opportunity to brief, educate, or present issues to the Mayor and the Deputy Mayor. OLBD also conducts monthly contracting roundtables where LSDBEs are brought face to face with agency contracting officers to discuss

upcoming procurements, agency concerns, and issues that various LSDBEs present concerning a particular agency.

During the Task Forces' interview with the OLBD Director, it was determined that although the agency's statue clearly provides the authority to review agency procurement plans and to determine which contracts or parts of them may be set-aside, the agency noted that often times the OLBD was "not part of that process." Therefore, one of OLBD's most effective internal advocacy tools – the authority to influence contracts for the set-aside market – is not being utilized effectively.

## Leveraging Program Advocacy Impact

During both of the Community Business Forums held by the Task Force, several LSDBE representatives clearly stated that the agency had interceded on their behalf with other District government officials. Most often, they noted the agency's help in facilitating past due invoice payment requests, introducing them to private sector businesses when the LSDBEs had been unsuccessful in making a business contact, and facilitating discussions between LSDBEs and agency officials regarding certain upcoming procurement opportunities. It is difficult, however, for the Task Force to measure the extent and effectiveness of this type of internal advocacy since no related measurement data is maintained by the agency. The agency does not track its day-to-day activities in this respect. Consequently, it does not provide an effective means to measure the level of success of its advocacy work.

The Task Force gathered its qualitative data on the subject of advocacy through interviews with three internal focus groups (agency directors, procurement officials, and the Local Business Opportunity Commission (LBOC). The groups provided their internal perceptions, experiences, and satisfaction with the LSDBE program. These three internal stakeholder groups could play a valuable role in advancing the LSDBE program throughout the District government had they significant knowledge of the LSDBE program. The Task Force believes that the evident lack of program awareness and knowledge among these groups serves as an indicator of the limited effectiveness of program advocacy. It is evident from this research that OLBD has not adequately educated government stakeholders to assist and support the agency in promoting the LSDBE program or its certified LSDBE businesses.

A representative summary of some of the qualitative findings related to advocacy are listed below:

♦ Of the five different stakeholder groups, the LBOC seems to have the clearest perception of the mission and purpose of the LSDBE program.

♦ Although most interviewees have a general understanding of the intent of the LSDBE program, overall there is a lack of understanding concerning what the program is specifically trying to accomplish.

♦ Many interviewees believe that OLBD and internal LSDBE program partners have not done enough or have not been successful in their efforts to communicate to the community what exactly it hopes to achieve with the LSDBE program to date.

♦ Developers, agency directors, and agency procurement officers say that their organizations are receiving little if any direct benefit from the LSDBE program.

♦ As a result of not seeing benefits from the LSDBE program, many agency officials believe that there is a general perception that the program is not working.

♦ Interviewees believe that because there has not been sufficient effort to define and communicate the mission of the LSDBE program, there is a degree of uncertainty regarding the level of commitment the City has for the program.

♦ Some directors say that too often the program appears to be little more than a set of numbers that must be reached.

♦ Agency directors think that they have not received adequate and appropriate training for a full understanding of the program.

♦ Some officials say that it is one thing to know the regulations of the LSDBE program, but another to know the spirit of the program in order to act as advocates within the agency.

These officials must become program missionaries within the government. They will only be able to do so when provided appropriate training, invited to be a part of the goal planning and implementation, and recognized for their contribution to the success of the District's LSDBE program. On-going communications must be improved between OLBD, OCP, and other agency procurement officers to ensure consistent internal and external messaging and program implementation. Additional steps are needed to communicate the purpose, goals and value of the LSDBE program to senior agency officials and policy-makers.

## 3.2   An Independent Office of Advocacy

Across the District, stakeholders acknowledge the need for greater advocacy. One of the options for consideration is the establishment of an independent Office of Advocacy.

Prior to the completion of the Task Force Report, Bill 14-458 "LSDBE Improvement Act of 2002" was introduced by Councilmember Harold Brazil (At-Large), and Bill 14-459 the "'Equal Opportunity for Local, Small or Disadvantaged Business Enterprise Amendment Act of 2002" was introduced by Councilmember Adrian Fenty (D-Ward 4). Both bills seek, among other things, to expand the authority and role of the LBOC. By doing so, the LBOC would have an increased opportunity to advocate directly on behalf of the LSDBE program and certified LSDBEs. New or expanded advocacy opportunities for the LBOC would be provided in Bill 14-458 by:

♦ Requiring that any adjustment to the LSDBE goals of an agency be approved by the LBOC.

♦ Renewing the authority of the LBOC to review contractor problems and make recommendations to increase agency contracting with LSDBEs.

♦ Restoring authority to the LBOC to review contracting problems and to make further recommendations to increase small, local, and disadvantaged contractor participation with the District government.

Bill 14-459 addresses the issue of advocacy specifically by:

♦ Establishing the DC Local, Small and Disadvantaged Business Enterprise Office of Advocacy.

♦ Granting authority to OLBD and LBOC to monitor agency compliance.

♦ Authorizing OLBD and LBOC to affirmatively approve agency expendable budgets.

Under Bill 14-459, the OLBD Office of Advocacy would serve as an independent source of advice and policy recommendations to OLBD, LBOC, the Mayor and the Council. The Advocate would be expected to:

♦ Meet on a quarterly basis with all certified LSDBEs to hear concerns, assist them with finding resolutions to concerns, and to submit a report of these findings to the Mayor and Council.

♦ Make recommendations concerning changes in policies that would improve the competitive position of LSDBEs, including recommendations relating to incentives which could be provided to larger corporations to maximize their use of District LSDBEs.

♦ Promote and assist in the development of a LSDBE census and other surveys of LSDBEs.

♦ Monitor and promote the plans, programs, and operations of District agencies, which may contribute to the establishment and growth of LSDBEs.

♦ Advise and consult with the OLBD in the design of a comprehensive plan for a joint public-private sector effort to facilitate growth and development of LSDBEs.

♦ Submit to the Mayor, the Council, the OLBD and the LBOC a report describing detailed activities of the Advocate and OLBD; and findings, conclusions and recommendations for legislative and administrative actions considered appropriate to promote LSDBEs.

During a public hearing held on June 20, 2002 to receive comments on Bills 14-458 and 14-459, the District's Minority Business Coalition testified in support of the provision to create an independent Office of Advocacy. Other witnesses, including the DC Chamber of Commerce, representatives from the Greater Washington Board of Trade Community Partnerships Program, and the Task Force did not specifically oppose or support the provision to create an in-

dependent Office of Advocacy, but strongly emphasized the importance of the need for enhanced program advocacy within the government and throughout the business community.

During the focus group interviews with members of LBOC, interviewees had mixed reactions to the creation of an independent Office of Advocacy. Some members viewed it as a good idea, while others felt this function should reside with the OLBD. Despite mixed views within LBOC, the perception among all internal stakeholder groups, including agency directors, procurement officials, and the LBOC was that the current level of advocacy was not meeting their expectations.

In comparing the scope of OLBD's organizational mission to that of five local, state and federal agencies, the Task Force found that most agencies did not have the scope of statutory authority currently mandated to OLBD. With that in mind, the Task Force considered two options: 1) increase the funding to and staff support level for OLBD to significantly strengthen program advocacy or 2) streamline the current statutory functions of the agency to "free-up" time and resources to more effectively advocate for the program and LSDBEs.

## 3.3  Internal Communication

While DC Law 12-268 provides OLBD with broad statutory authority to advocate for the District's LSDBE program, as well as the local, small and disadvantaged business community in general, there are no specific references, requirements or other mandates which compel this Office to communicate its mission to District agencies. Likewise, OCP has the broad authority to enforce the District's Procurement Practices Act, and as the City's Chief Purchasing Agent, has a responsibility and opportunity to promote the LSDBE program.

Given the authorizing statutes for OCP and OLBD, it appears that the primary context for internal communications with District agencies is compliance-based. OLBD serves as the conduit through which the agencies statistically communicate their compliance with LSDBE goals. OCP works more directly with agencies to establish utilization goals and to enforce compliance.

It is important to note that while no specific mandate exists which compels communication with District agencies, OLBD and OCP recognize their broader responsibility and have taken a number of steps to ensure awareness of the LSDBE program goals among select District agency staff. Such efforts, however, do not appear to have been consistent or widely successful, and little accountability is evident.

There are a number of activities that have been undertaken by the OLBD and OCP to communicate both the existence and reporting requirements of the LSDBE program to agencies.

Current OLBD internal communications efforts include:

- Distribution of the *Agency Compliance* brochure, which encourages agency compliance with Mayoral LSDBE commitments, provision of suggestions for tracking and achieving LSDBE goals, noting and providing quarterly reporting deadlines, and indicating where LSDBE directories and additional assistance may be obtained.

- Regular correspondence to document agency reporting compliance (Annual Budget Allocation Letter, Expendable Procurement Projection Report, Operating Expenses Checklist, and Quarterly Reports).

- Periodic meetings with agency directors, or designees and agency procurement officers.

- Periodic presentations at Cluster and Cabinet-level meetings.

Current OCP internal communication and program enforcement efforts include:

- Distribution of the OLBD Agency Compliance brochure.

- Receipt of reports that are submitted annually by agencies that forecast yearly procurement activity and identify LSDBE utilization.

- Maintenance of an LSDBE vendor database by vendor name and category accessible through the OCP and OLBD web-sites.

- Staffing of an Agency program for Chief Contracting Officers (ASCOs), Assistant Directors for Procurements for Public Safety and Human Services, and Business Development and Contract Compliance Officers who regularly work with agencies on procurement matters.

- Routine discussions of LSDBE compliance issues at senior staff and ASCO meetings within the OCP.

- Written certification that the LSDBE vendor database has been reviewed prior to any procurement being initiated, and determination whether or not a solicitation is eligible for the "set aside" market.

- Regular advice to agency directors about LSDBE requirements.

- Implementation of a new DC Supply Schedule that is for LSDBE vendors only. This allows the LSDBE vendor base to be the first source for all procurements within the District within OCP's control.

- Monitoring of all sub-contracting plans for LSDBE compliance. Where compliance fails, the issue will be addressed as a contract compliance issue.

- Development of additional educational/informational materials for agency staff to expand awareness of the LSDBE program.

- Program coordination and communication between the OLBD and OCP operations.

The Task Force engaged in lengthy discussion regarding the important roles and responsibilities of OLBD and OCP in implementing, promoting, and enforcing the District's LSDBE pro-

gram. Research supports the notion that there exists a real breakdown in effective communication and program coordination between the OLBD and OCP. The Subgroup concluded that the real or perceived lack of communication and coordination between these agencies adversely impacts the advancement of LSDBE goals. Information obtained through the focus group interviews encourages organizational modifications to ease internal administrative and restrictive procurement processes as one remedy to address this issue.

Another significant factor contributing to the lack of program coordination and communication is that independent and quasi-independent agencies are not mandated by law to comply with the District's LSDBE program. Approximately 17 District agencies are exempt from the Procurement Practices Act and the LSDBE program. Combined, these 17 agencies represent over $1 billion annually in local spending authority. In essence, neither OLBD nor OCP has any formal knowledge of independent agency projection plans or actual contract solicitations prior to contract award. While OLBD has been successful in encouraging some independent agencies like the Water and Sewer Authority and the Convention Center Authority to report LSDBE expenditures, these agencies do so not because of legal mandates, but to demonstrate a level of support for the City's LSDBE program.

Some comments from agency directors concerning the level of internal coordination are listed below:

♦ They do not feel that centralized procurement is the answer to the problem. In fact, they see centralized procurement as only bogging down the entire system, making it even more cumbersome.

♦ They express frustration that problems with the procurement system have been known for sometime, yet no real process seems to have been made to rectify the situation.

♦ They believe that a program like the LSDBE program is good public policy. However, they are unclear concerning the specific mission and objective of the program.

♦ They think that a more realistic system needs to be developed to specify how the goals are to be met. Some officials believe that the program should focus on measuring results via indicators other than dollars awarded to LSDBE contractors.

♦ They describe themselves as being motivated to support the program and use LSDBEs, as opposed to being obligated to do so.

Stakeholders also reported a lack of coordination between OLBD and OCP in ensuring agency understanding and program compliance. In fact, in review sessions with both agencies, there was acknowledgement that such coordination is lacking. Specifically, the Task Force observed disconnects in the following areas:

♦ OLBD is not part of the Service Level Agreement Plan process and does not consistently receive agency procurement projection plans.

♦ Prior to setting or approving procurement objectives, OCP does not involve OLBD in the process.

♦ OCP does not share contracts that they control with OLBD.

♦ While OLBD has routine interactions with agency procurements officers, there are no formal or regular meetings among senior officials at OCP.

♦ OCP is staffed with only one senior-level LSDBE program liaison, who cannot effectively provide the level of program oversight, advocacy, and enforcement within OCP that is outlined in his position description.

## 3.4   External Advocacy

(External advocacy is as important as internal advocacy.)

The Task Force reviewed qualitative data on external advocacy through interviews with three external groups: 1) prime contractors, 2) LSDBEs and small business advocacy organizations, including the Greater Washington Board of Trade; the DC Chamber of Commerce, the Minority Business Coalition, Marshall Heights Community Development Corporation, and 3) the Howard University Small Business Development Center. Based on the following statements from prime contractors, LSDBEs, and small business advocates, the Task Force believes that the District is failing to stimulate and foster greater opportunities for LSDBEs in the private sector. Currently:

♦ Prime contractors and quasi-independent agencies do not receive any formal orientation about the benefits of the LSDBE program.

♦ There is no contract administration to monitor prime contractors' adherence to contract terms and conditions related to LSDBE goals.

♦ LSDBEs do not receive notification of sub-contracting and joint venture opportunities on a regular basis from OLBD or from OCP, other than OCP's web-site, which is not linked to OLBD, and newspaper announcements.

♦ Many members of the public perceive the program as merely "social" in nature without a clearly defined economic benefit impact. OLBD does not publish timely data on the increases in local revenue, tax payments or LSDBE employment of District residents. Although the law requires that such a report be made by April 2002, no report was made. With proper positioning in the public, such economic reporting would demonstrate the program's economic value, and over time, shift public perception of the program from a "social" program to an economic one.

♦ The number of "highly qualified" LSDBEs is directly related to the total pool of certified LSDBEs. Therefore, the lack of a highly energized LSDBE recruitment and advocacy programs only perpetuates the "myth" that only poorly qualified LSDBEs are participating in

the program. Several stakeholder groups emphasized the need to promote LSDBE success stories and showcase best-in-class businesses.

Private contractors and developers reported:

♦ A sense that the City has not been successful in communicating to developers what the program is meant to accomplish.

♦ It is the "non-capital intensive" types of LSDBEs that are the most successful, i.e., firms that tend to provide services (e.g., messenger services, cleaning, and printing).

♦ There is a perception that there are not currently enough "qualified" LSDBE contractors to meet their needs. Specifically, developers say that not only is the pool of LSDBEs too small, but that there are not LSDBEs (or not enough) in the specific trades to meet their needs.

♦ Some developers have hired consultants to help them understand and comply with the LSDBE program.

♦ Incurring additional administrative costs to try to involve LSDBEs in a project, including locating a LSDBE, and checking their qualifications and capabilities is financially burdensome.

♦ They would like OLBD to provide more information about the LSDBEs and their capabilities.

♦ A desire for a training program to help developers and prime contractors understand the LSDBE program and how to make it work more efficiently.

♦ The City has not been successful in communicating to developers what the program is meant to accomplish. In particular, there is confusion regarding the definitions: What is a local business?, What is a small business?, and What is a disadvantaged business?

♦ Concern that information OLBD provides is not adequate, timely, and reliable. Developers think that the web-site is not up to date. Specifically, developers reported that navigating the database (of certified LSDBEs) is cumbersome and that listings are not always current.

During the focus group sessions, LSDBEs reported that:

♦ Many of them feel that the program's mission is not clearly defined and that the LSDBE community does not understand the program.

♦ They are not sure what benefits the LSDBE program really offers businesses like theirs. Therefore, many small businesses in the community are not interested in participating in the program.

♦ They are not seeing any strong advocacy being made for this program, which makes them question the level of commitment the City has to the overall success of the LSDBE program.

♦ A desire to see the OLBD become more of an advocate for and key player in the LSDBE program.

♦ There is a need for the Mayor to take the lead in developing the program to meet the needs of the District's small and disadvantaged businesses.

Small business advocacy organizations that participated in the two Community Business Forums indicated that:

♦ OLBD should measure how effective an advocate it is on behalf of the small business community within the District government.

♦ A small local business resource guide is needed.

♦ Some prime contractors erroneously believe that a "best effort" is all that is required.

♦ Program successes need to be communicated.

♦ OLBD should act not only as a regulator, but also as an advocate for the City's LSDBE community.

The Task Force believes that the necessary level of external program advocacy has not been demonstrated by OLBD. The Office has focused on its role as LSDBE regulator more than its role as advocate. More of its budget resources have been utilized for LSDBE regulation than advocacy. All stakeholders believe a stronger advocacy role is required for a successful LSDBE program.

## External Message Communications

The authorizing law clearly anticipates that the proper functioning of this program requires an informed public. In order for qualified businesses and individuals to take advantage of the LSDBE program, they must know it exists and what it is designed to do.

The table that follows outlines current channels of communication that OLBD uses:

# External Message Vehicles

| Communications Vehicle | Audience | Description |
|---|---|---|
| Brochure | Business owners | ◆ Tri-fold<br>◆ Letter from the Mayor<br>◆ Program Eligibility<br>◆ Benefits<br>◆ Frequently Asked Questions |
| Fact Sheet | Business owners<br>All Interest parties | ◆ 4-page letter-sized brochure<br>◆ Overall description of the program<br>◆ Statutory citations<br>◆ Definitions of disadvantaged business enterprise, local business enterprise, small business enterprise.<br>◆ Benefits<br>◆ Joint ventures<br>◆ Enterprise zone<br>◆ Waiver provisions<br>◆ Certification expiration<br>◆ Penalties |
| Application | Business owners | ◆ 8-page, letter-sized |
| Newsletter | Business owners<br>Policymakers | ◆ News regarding LSDBE program<br>◆ Contract awards<br>◆ Updates on legislation or regulations |
| Checklist | Business owners | ◆ A number of letter-sized one-pagers that outline requirements for various types of businesses to obtain LSDBE designation. |
| Web-site | All interested parties | ◆ Information about program<br>◆ Services available<br>◆ Schedule of events<br>◆ Business resources<br>◆ List of certified contractors with links |
| Marketplace | Business owners<br>Public officials<br>News media<br>Prime contractors | ◆ Annual exhibit event held in the Spring |
| Orientation seminars | Business owners | ◆ Held monthly in partnership with the Office of Contracting and Procurement.  Provides basic information on how to conduct business with the District government. |
| Monthly Contracting Roundtables | Business owners<br>Contracting officers | ◆ Face to face meetings between LSDBEs and contracting officers<br>◆ Issues discussed include:<br>  • upcoming procurements<br>  • concerns agency contracting officers have engaging LSDBEs<br>  • LSDBEs communicating their difficulty in working with that particular agency<br>Also, veteran LSDBEs share their experiences with companies new in the LSDBE program on how they were successful bidders on DC procurements. |

The materials developed by the OLBD are accessible and communicate the functions of the office well. The web-site compares reasonably well with other similar sites reviewed by the Task Force. However, as noted below, the information is reported to be dated and lacks the kind of interactivity that effective sites are currently using. Additionally, the OLBD web-site provides no links to OCP or government contracting solicitations.

With respect to the meetings that OLBD sponsors, the concept is excellent, but the execution appears to fall short. Specifically, there is very little follow-up from the meetings. The Annual Marketplace draws a large crowd, but there are no data indicating what results are achieved, what contracts have been secured or what connections were made. Similarly, the Monthly Contracting Roundtables have become somewhat perfunctory, no agenda, or goals are set and nothing measurable is achieved. Ultimately, the true measure of success of anything that OLBD does is the extent to which LSDBEs are able to obtain work from the City. Data simply does not exist to measure the extent of such success.

OLBD's monthly Orientation Seminars provide a significant amount of information to prospective LSDBEs, but the sessions are not adequately organized to fully explain the program, its mission, and what resources are available to LSDBEs. Further, there is no follow-up with the prospective LSDBE applicant.

Finally, the newsletter, which is nicely presented and accessible, is issued only once a year. If a newsletter has value, it must be distributed on a more frequent and regular basis.

**Effective Use of Communication Vehicles**

Feedback from stakeholders suggests that the external messages are not getting through to the OLBD's key audiences. Many of the messages are unclear with respect to the goals of the program. Stakeholders express confusion and concern on how to obtain program assistance. And, once they have reached program staff, they express frustration with the level of cooperation from other District government agencies that have contract responsibility.

LSDBEs reported being frustrated about whom to contact and where to get relevant information about procurement opportunities. Basically, they seem to feel that their voices are not heard by OLBD or the agencies issuing contacts. For the future, it is important that an ongoing mechanism be instituted for soliciting feedback from the LSDBE community. New communication technologies offer easy ways to accomplish this goal. Periodic e-mail surveys to representative samples of LSDBEs could be developed that would maintain a constant flow of information to program participants from the population designated for assistance.

## 3.5  Technology as a Communication Tool

For purposes of external messages, web-site technology offers the most effective and timely way to get information to interested parties. Brochures, fact sheets and newsletters are

valuable tools and OLBD makes good use of them. But the success of the LSDBE program rests on the ability of the District to provide relevant information to those who need it, whether they are LSDBEs, general contractors, or procurement officers. The Web is uniquely suited for this purpose. Therefore, one of the Task Force recommendations is to focus on using the Web for this purpose.

The Task Force reviewed the web-site OLBD maintains and compared it to minority business enterprise sites offered by the Commonwealth of Virginia, the State of Maryland, and the City of Baltimore. The following table compares the sites based on the major categories of information found on them.

## Comparable Web-Sites

| Feature | DC | Maryland | Baltimore | Virginia |
|---|---|---|---|---|
| Mission Statement | X | X | X | X |
| Goals/Objectives | X | X | X | |
| Searchable database of certified businesses | X | X | X | X |
| Application forms | X | X | X | X |
| Online certification | | | | |
| RFPs/Procurement Opportunities | | | X | X |
| Announcements of Awards | | | X | |
| Feedback opportunity | X | X | X | X |

Overall, the Task Force found that the OLBD web-site compares reasonably well with other program sites in the region. The all provide the basic information needed to understand and participate in these programs. Some are more "user-friendly" than others. Some have more information than others. They all fall into an acceptable range in terms of their usefulness for visitors in terms of information provided. So, judged by the standards displayed by adjoining jurisdictions' web-sites, the information contained in the OLBD site is appropriate.

However, participants at the Community Forums and in the focus groups noted that the information on the OLBD site is not current. They complained that the listing of LSDBE's is not up to date and that the information included about the firms is inadequate in other ways. The web-site, while presented well, does not appear to be maintained on a daily basis. Maintaining a web-site is a time intensive task requiring constant attention and clear accountability. It would appear that insufficient staff resources are devoted to the OLBD web-site.

Moreover, the site does not take advantage of new interactive technologies that would make the program more accessible and valuable to its users. While visitors to the site can search the database, there could be other opportunities to actually exchange information. For instance,

many state-of-the-art web-sites offer the opportunity to sign up for e-mail newsletters. These newsletters can be targeted to the interest of the user. Good comparisons as a "best practice" would be the *Wall Street Journal, CNN,* and *The Economist* web-sites, all of which allow visitors to sign up for e-mail alerts based on industry group and areas of interest. Similarly, visitors to the OLBD site could sign up for contract notices targeted to specific industry type, such as office supplies, construction, information technology, *etc.* Contract opportunities and other news could be sent to interested parties on a real time basis. Further, contractors could be able to easily identify appropriate LSDBE sub-contractors and joint venture partners.

## Accessibility of Procurement Information to LSDBEs

The accessibility of procurement information is fundamental to the success of the LSDBE program. This is where the "rubber meets the road." It is the first step in the process which endpoint is the actual utilization of LSDBEs by the District government. It is also essential that the system be transparent in order to build confidence among LSDBEs and is perceived to be fundamentally fair. Many comments received by the Task Force indicated that required information is hard to obtain. At one Community Business Forum that the Task Force hosted, a defender of the program said that, "The LSDBE program works if you know the right people." Other comments suggested that, even when information is available, it is outdated. One LSDBE representative said that, "When I've called them, they've told me, basically . . . the contract's already gone." In summary, another participant in a community forum said, "We need to have some more, a flow of information to the LSDBEs about how the District buys and purchases goods and services."

Presently, there are limited ways in which the District Government makes procurement information available to the LSDBE community. The OLBD conducts monthly contracting roundtables in which LSDBEs and contracting officers have the opportunity to meet face to face to discuss upcoming procurements. However, these meetings are often unstructured and lack follow-up. Further, many LSDBEs do not have a lot of time to allocate to general meetings, especially when more efficient means of sharing information are available, such as e-mail and fax announcements. The OCP posts government solicitations on its web-site and advertises in the *Washington Times*, *El Progonero*, *Asian Times*, and the *Common Denominator*. Solicitations are also available for "walk in" pick up.

The lack of coordination between OLBD and OCP extends to the exchange of procurement information. At a minimum, there should be a link from the OLBD site directly to procurement information on the OCP site. Although OCP has a senior-level staff member who is responsible for monitoring compliance of the LSDBE laws and advocating for the utilization of LSDBEs, there appears to be no formal systems in place to institutionalize information exchange between OCP and OLBD with respect to procurement forecasts and solicitations.

Nevertheless, many of the opportunities for LSDBEs to obtain work from the District government do not even go through the procurement process. But a significant amount of work is

issued through purchase orders by agency chief financial officers. These opportunities would be well suited for LSDBEs, but OLBD is unaware of them. Also, procurements are often for contracts that are too large for LSDBEs. The Subgroup suggests that formal mechanisms be established to track purchasing opportunities directly from agency CFOs.

Through focus group and community forum discussions, the Task Force learned that reliable forecasting information is not provided to the LSDBE community by the District government. Many LSDBE vendors expressed frustration with the information that is presently posted on OCP's website. According to these vendors, often times data are posted late, or are out of date.

The LSDBE community also expressed concerns about the "digital divide" and questioned the fairness of posting the information on the Web, as opposed to some other type of communication, i.e., e-mail alerts, fax alerts and/or newsletters.

# 4.0   Models for Consideration

The Subgroup believes that the federal and state advocacy programs studied represent some of the best-in-class models of how government can advocate within its ranks on behalf of protected class business programs that it is intended to serve.

In comparing OLBD's statutory mandate to that of other city, state, and federal agencies with similar program responsibilities, the Task Force questioned whether or not the agency's organizational mission was too broad to allow it to effectively perform each of its stated purposes. OLBD has the statutory responsibility for LSDBE program education, certification/recertification of LSDBEs, enforcement of procurement regulations, LSDBE program evaluation, program compliance monitoring, receiving and investigating complaints of violations of the LSDBE Act, and stimulating and fostering greater opportunities for certified LSDBEs. The agency is expected to successfully perform this broad mandate with an annual appropriation of $1 million and 10 full-time equivalent employees.

The Task Force's Advancing Subgroup examined five local, state, or federal agencies that administer similar protected class business programs to compare their scope of responsibility to that of OLBD's. With the exception of the Commonwealth of Virginia, the Task Force found that, amongst jurisdictions studied, no other local, state or federal agency shared as broad a program mandate as does the District's Office of Local Business Development.

## Federal Models

There are several statutory authorities that govern small business activity within the Federal Government. These statutes govern several agencies, including those that advocate for small business. The Federal Government's role of advocating on behalf of small businesses and other protected class businesses both within and outside the Federal Government rests primarily in two agencies: 1) the SBA's Office of Advocacy and 2) the Office of Small and Disadvan-

taged Business Utilization (OSDBU). Also within the SBA is the Office of the Ombudsman. The Ombudsman serves as a liaison between small business concerns and federal agencies with regulatory authority. The office's jurisdiction covers issues involving federal regulatory compliance and enforcement and activities such as repetitive audits or investigations, excessive fines, penalties, threats, retaliation or other unfair enforcement action taken by a federal agency against a small business entity.

## Small Business Administration – Office of Advocacy

The management of the SBA Office of Advocacy is vested in a Chief Counsel for Advocacy, which is established within the Small Business Administration (SBA). The Chief Counsel for Advocacy's mission is to encourage policies that support the development and growth of America's small businesses. The occupant of the office is appointed by the President with the consent of the Senate. The office represents the nation's small businesses within the Federal Government, conducts policy studies, and compiles statistics on small business characteristics and their contributions to the Nation's economy. The fiscal year 2002 appropriation for the Office of Advocacy is $8 million.

Three departmental units perform the functions of the Office of Advocacy: 1) the Office of Economic Research, which serves as the principal source for small business statistics and analyzer of small business in the economy; 2) the Office of Interagency Affairs, which serves as the voice for small business in the Federal Government with regard to proposed regulations; and 3) the Regional Advocates office, which serves as the Chief Counsel's direct link to local businesses, state and local government agencies, state legislatures, and small business organizations.

The statutory authority for the Office of Advocacy is in 15 U.S.C. Sec. 634 (2002). The primary functions of the Office of Advocacy are to:

♦ Examine the role of small businesses in the American economy and the contribution that small businesses can make in improving competition, encouraging economic and social mobility, restraining inflation, spurring production, expanding employment opportunities, increasing productivity, promoting exports, stimulating innovation and entrepreneurship, and providing an avenue through which new and untested products and services can be brought to the marketplace.

♦ Assess the effectiveness of existing federal subsidy and assistance programs for small businesses, the desirability of reducing the emphasis on such programs, and increasing the emphasis on general assistance programs designed to benefit small businesses.

♦ Measure the direct costs and other effects of government regulation on small businesses and make legislative and non-legislative proposals for eliminating excessive or unnecessary regulation of small businesses.

♦ Determine the impact of the tax structure on small businesses and make legislative and other proposals for altering the tax structure to enable them to realize their potential for contributing to improvement of the nation's economic well-being.

♦ Study the ability of financial markets and institutions to meet small business credit needs and to determine the impact of government demands for credit on small businesses.

♦ Determine financial resource availability and recommend methods for delivery of financial assistance to minority enterprises, (including methods for securing equity capital), for generating markets for goods and services (for providing effective business education), more effective management and technical assistance and training, and for providing assistance to them in complying with federal, state, and local laws.

♦ Evaluate the efforts of federal agencies, businesses, and industries to assist minority enterprises.

♦ Make such other recommendations as may be appropriate to assist in the development and strengthening of minority and other small businesses enterprises.

♦ Recommend specific measures for creating an environment in which all businesses will have the opportunity to effectively compete and expand to their full potential; and to ascertain the common reasons for small business successes and failures.

♦ Determine the desirability of establishing a set of rational, objective criteria to be used in defining small business; and to develop such criteria, if appropriate.

## Office of Interagency Affairs

The Advancing Subgroup was particularly interested in the mission of the Office of Interagency Affairs, given its interagency role for monitoring compliance by federal agencies with various federal laws. AS believes that this office provides one of the best models for examining how the government can and should monitor its own laws and regulations related to promoting small business utilization.

The Office of Interagency Affairs includes advocates who pursue regulatory, legislative, and other policy initiatives that support small business growth. The office prepares comment letters and testimony on federal proposals that may affect small firms. The Office also addresses regulatory issues that affect specific industries.

The Office also monitors federal agencies' compliance with the Regulatory Flexibility Act (RFA). The RFA requires federal agencies to analyze the impact of proposed regulations on small firms, and each year the Office of Advocacy reports to Congress on agencies' compliance with the Act.

**Office of Small and Disadvantaged Business Utilization (OSDBU)**

Another federal government model for promoting the use of small business within the Federal Government is the Office of Small and Disadvantaged Business Utilization. The OSDBU was established under the authority of 15 U.S.C. 95-507 to promote the use of small, small disadvantaged, 8(a), HUB Zone, veteran-owned, service disabled veteran-owned, and women-owned small businesses in prime and subcontracting opportunities. Every federal agency having procurement powers is required to have an OSDBU to carry out the goals of 15 U.S.C. 95-507. The goal of the OSDBU is to institutionalize the use of small businesses and to fully integrate them into the Federal Government's competitive contracting system.

While specific program activities may vary among federal agencies, each OSDBU typically focuses on the following areas within its agency:

♦ Increasing contracts and subcontract awards to small businesses.

♦ Sharing information.

♦ Identifying potential small businesses for use by the agency, its bureaus and prime contractors.

♦ Negotiating contract goals with the SBA in an effort to increase awards to small businesses.

♦ Publishing an annual forecast of contract opportunities and listing upcoming procurements.

♦ Reviewing procurement requisitions to maximize small business participation.

♦ Establishing partnerships with federal agencies and customers to obtain feedback, improve services, and to make other improvements.

♦ Creating awareness of the benefits of working with small businesses.

OSDBU officers are empowered to enforce several public laws viewed to be critical to the promotion of small businesses in federal sector procurement.

**State Models**

*Commonwealth of Virginia*

In the Commonwealth of Virginia, the Virginia Department of Minority Business Enterprise (VDMBE) serves a duel function similar to the District's OLBD. It certifies small and minority businesses and promotes access to pools of capital for them, and provides small business assistance and minority certification procurement opportunities. Women-owned businesses also receive certification from VDMBE, which also oversees the 30 small business development centers located throughout the state. VDMBE describes its most important program component as certification. According to the agency, "the most important of these programs are designed to open doors to state and local government contracting opportunities by assuring

that a contractor is a bonafide minority-owned business." The department promotes the utilization of certified minority-owned businesses within the state by:

♦ Electronically circulating the department's Quarterly Vendor List to more than 500 public and private sector procurement officials.

♦ Promoting minority-owned products and services of certified businesses to state procurement officials.

♦ Recognizing agency strategic partners who have demonstrated a commitment to enhancing services to the minority business enterprise and disadvantaged business communities.

♦ Establishing a media and public relations specialist within the department to, among other things, ensure the distribution of information concerning department activities. This has resulted to-date in 27 articles published concerning minority and disadvantaged business enterprise accomplishments.

### Maryland

In the State of Maryland, the Department of Transportation's Office of Minority Business Enterprise is responsible for minority business enterprise certification. Each Maryland government agency has a minority business enterprise (MBE) officer who acts as a liaison between the small business community and the respective agency. The MBE officer provides information on contract opportunities, identifies resources, and represents the voice of the small and minority business owner(s) with the agency. Other offices in the State of Maryland with responsibility for promoting protected class businesses include the Governor's Office of Minority Affairs (which provides minority-owned firms with technical and management assistance, and promotes and coordinates programs), and the Governor's Office of Business Advocacy and Small Business Assistance. The latter's goal is to connect small and minority-owned businesses to the appropriate resources, provide information, and to offer assistance – such as business permitting and licensing and small business planning. The Governor's Office of Minority Affairs has no statutory authority for certifying businesses of any type.

### City of Baltimore, MD

While the Office of Minority Business Enterprise serves as the certifying body for Maryland's MBE program, the Mayor's Office of Minority Business Development plays a major role in carrying out the City's minority business utilization program goals. In 1999, the City of Baltimore's Ordinance establishing contracting goals for minority-owned and women-owned businesses was found unconstitutional by the U.S. District Courts. In September 2000, Mayor Martin O'Malley issued an Executive Order governing the utilization of minority-owned and women-owned businesses in city contracting.

The City's minority business program objective is to dramatically increase the number, significance, and success rate of minority-owed businesses in Baltimore, dramatically increase contracting and procurement dollars spent with minority-owned and women-owned businesses, and to facilitate greater involvement of minority-owned and women-owned businesses in identified growth sectors.

# 5.0    Recommendations

## Issue:  The District Can Leverage LSDBE Advocacy by Training and Engaging Partners

The Task Force believes that OLBD can more effectively leverage  its resources, talents, and expertise to advocate aggressively for the LSDBE program and its certified LSDBE businesses. To accomplish this, internal advocates must include the Mayor, Councilmembers, deputy mayors, agency directors, and procurement officials at every level of government. OLBD must look for creative opportunities to engage these officials as well as its private sector partners in the identification, selection, and promotion of LSDBE businesses.  However, before these stakeholders can be engaged as program missionaries, several short-term steps must take place, including adequate program training.  Task Force research clearly confirms that wide-scale training is needed both within and outside of the government to help stakeholders better understand the LSDBE program's mission and goals.  Once trained, OLBD must develop a comprehensive program to engage and exploit advocacy partnerships to strengthen the LSDBE program in the District.  Several recommendations are provided below to begin capitalizing on the wealth of talent and advocacy support available to OLBD.

## Recommendations:

♦   OLBD should engage in the development of a comprehensive strategic communication plan to define communication roles and responsibilities, develop key program messages, and examine new external and internal (inter-governmental) communications mechanisms that include explicit measurable goals.

♦   OLBD should establish an annual recognition program to honor agency leadership in LSDBE contracting and highlight LSDBE successes.  It should involve representatives from the public and private sector in the process.

♦   OLD should include a training component for senior agency officials on LSDBE goals and program requirements.

## Issue:  The Scope of OLBD's Organizational Mission

Based on its research of several other local, state, and federal protected class programs, the Task Force believes that OLBD's organizational mission is too broad to meet the public expectation for advocacy expressed by internal and external stakeholders.  Effective advocacy re-

quires dedicated resources devoted to conducting extensive research on issues affecting program participants. Research findings suggest that OLBD lacks the resources to conduct the scope of advocacy that would make it a best in class model in this area. To perform an effective advocacy role, OLBD would have to acquire the staffing expertise and budget resources to at minimum:

♦ Pursue legislative, regulatory and policy initiatives that impact LSDBEs.

♦ Study the current state of LSDBEs in the marketplace and examine new methods to enhance greater utilization of LSDBEs

♦ Encourage government policies that support the growth of LSDBEs and aggressively oppose policies that may negatively impact LSDBEs.

♦ Compile and disseminate economic statistics related to LSDBEs

The Task Force believes that OLBD can meet stakeholder program advocacy expectations, but only by either significantly increasing agency resources or streamlining its existing mission. As noted previously, in its examination of other jurisdictions, AS found few agencies with as broad a program mandate as OLBD's. Given its current mandate for LSDBE certification, public and private sector compliance and enforcement, program monitoring and reporting, advocacy and technical assistance, the Task Force believes that OLBD's mission and resources could be realigned to more effectively meet stakeholder expectations.

**Recommendations:**

The Task Force recommends:

♦ Identifying a senior-level LSDBE officer in each of the three Deputy Mayors' cluster of agencies and assigning them functions similar to those of the OSBDU officer in the Federal Government. The LSDBE officer should have sign-off authority over all agency cluster solicitations of $75,000 or more prior to the issuance of the solicitation by the Office of Contracting and Procurement to ensure maximum utilization of LSDBEs.

♦ Transferring the LSDBE program certification and re-certification responsibilities from OLBD to OCP. (Also see the Procurement Subgroup report.)

♦ Expanding the agency's role to conduct LSDBE capability assessments and coordinate business and technical assistance support.

♦ Hosting, in conjunction with LBOC, an annual public hearing to solicit comments and program suggestions from LSDBEs, and to receive utilization reports from District agencies. We believe that such a forum would have a significantly positive impact on the business community by demonstrating increased government accountability and enforcement, while at the same time providing LSDBEs with an opportunity to influence executive branch program and policy recommendations.

♦ Securing executive branch support for several of the provisions contained in Bill 14-459, introduced by Councilmember Adrian Fenty that specifically relate to the functions of an Office of Advocacy.

♦ Securing executive branch support for several of the provisions contained in Bill 14-458, introduced by Councilmember Harold Brazil.

Establishing an LSDBE officer within each cluster may or may not require the creation of a new position. Each Deputy Mayor should determine whether or not an existing position could be expanded to include the functions of the LSDBE officer. However, AS recommends that the position be staffed at the DS-14 or above grade of pay to ensure senior-level accountability.

This recommendation models the federal Office of Small and Disadvantaged Business Utilization (OSDBU). Every federal agency having procurement authority is required to have an OSDBU to carry out the goals of Public Law 95-507. Like the goals of OSDBUs, the proposed LSDBE officer would be responsible for institutionalizing the use of LSDBEs and for fully integrating them into the District's competitive contracting system. Cluster LSDBE officers would focus on the following areas within its cluster of agencies.

♦ Negotiating contract goals with the OCP in an effort to increase awards to small businesses.

♦ Publishing an Annual Forecast of Contract Opportunities listing upcoming procurements on its respective Cluster web-site with agency contracts.

♦ Reviewing procurement requisitions to maximize small business participation.

The Task Force believes that a budget of $600,000 and four full-time equivalent employees would be required to adequately fund an Office of Advocacy functions. The enhanced advocacy function should include:

♦ Consistently promoting the LSDBE program benefits to government officials, prime contractors, LSDBEs and quasi-independent agencies.

♦ Developing matchmaking and mentor-protégé programs for LSDBEs and prime contractors.

♦ Examining the role of LSDBEs in the District's economy.

♦ Assessing the effectiveness of existing and proposed programs for local, small and disadvantaged businesses.

♦ Serving as the focal point for the receipt of complaints, criticisms and suggestions concerning policies and activities of the Administration and any other District agency, which affects local, small and disadvantaged businesses.

♦ Developing proposals for changes in policies and activities of any agency that will better fulfill the purpose of DC Law 12-268.

◆ Representing the views and interests of LSDBEs before other District agency, civic organizations, business organizations and others whose policies and programs may affect LSDBEs in the District of Columbia.

◆ Assisting in the coordination and marketing of business opportunities for specific industries identified by the Deputy Mayor for Economic Development as "growth industries" for future DC resident employment, increased revenues, and tax payments.

The Task Force recommends that the Executive Branch support several of the provisions contained in Bill 14-459 that specifically relate to the functions of an Office of Advocacy.

**Recommendations:**

The Office of Advocacy should:

◆ Meet on a quarterly basis with all certified LSDBEs to hear concerns and assist LSDBEs with finding resolutions to their concerns. Submit a report of these findings to the Mayor and Council.

◆ Make recommendations for changes in policies that would improve the competitive position of LSDBEs, including recommendations for incentives, which could be provided to larger corporations to maximize their use of District LSDBEs.

◆ Promote and assist in the development of a LSDBE census and other surveys of LSDBEs.

◆ Monitor and promote the plans, programs, and operations of District agencies which may contribute to the establishment and growth of LSDBEs

◆ Advise and consult with the OLBD in the design of a comprehensive plan for a joint public-private sector effort to facilitate growth and development of LSDBEs.

◆ Submit to the Mayor, the Council, the OLBD, and the LBOC a report describing detailed activities of the Advocate and OLBD and findings, conclusions and recommendations for legislative and administrative actions considered appropriate to promote LSDBEs.

AS does not, however, recommend the creation of a new independent Office of Advocacy as proposed in Bill 14-159. Instead, AS recommends transferring some of the existing statutory functions from OLBD, thereby enabling the agency to devote more attention to LSDBE program advocacy.

AS recommends the Executive Branch support of the Bill 14-458, "LSDBE Improvement Act of 2002," except those provisions contained in Sec 2. Clarification of definitions. The DC Office of the Corporation Counsel is currently examining the amended definitions proposed in Bill 14-458 in light of *O'Donnell v. District of Columbia*. AC also believes that our Report has sufficiently addressed Sec 4, Task Force on Compliance and Monitoring, and that the need

to create another Task Force for that purpose would result in duplicative work. The Task Force's Compliance and Enforcement Subgroup has examined ways to improve compliance with the Act and offers several recommendations in that connection.

## Issue: Using Communications Vehicles More Effectively

The following recommendations are made with respect to this issue.

## Recommendations:

♦ Ensure that all external communications vehicles have explicit, measurable goals attached to them. The newsletter, orientation meetings, and the contracting roundtables should all have measurable goals and should provide for follow-up. The meetings should have clearly defined agendas and outcomes should be tracked. The justification for the newsletter should be explicit and its effectiveness should be matched against that justification. In the end, the true measure of success should be the extent to which more LSDBEs are getting involved in City contracts.

♦ Conduct an annual survey of LSDBEs to determine their satisfaction with the performance of the program and the effectiveness of its communications techniques. This survey could be conducted by e-mail, with a Web-based questionnaire, including multiple-choice questions that allow participants to rate certain activities that OLBD performs.

♦ Upgrade the OLBD web-site

♦ Post a simplified mission statement on the home page of the site. The site maintained by the Commonwealth of Virginia offers a good model for prominent placement of the mission statement.

♦ Ensure that information on the web-site is current and timely. While the site claims to be updated monthly, feedback to the Task Force indicated that the information on the site was outdated. The list of LSDBEs was singled out as needing updating.

♦ Increase interactivity of the site. Develop an email notification system that provides news and information about the LSDBE program. The Washington Metropolitan Washington Airports Authority provides a good model in its Project eLERT for this kind of tool. As an enhancement, the OLBD site might allow visitors to register by product or service type, thereby allowing targeting of information.

♦ The site should also announce recent awards to LSDBEs. The Airport Authority posts awards on a separate page. The Baltimore Minority Business Enterprise site has a ticker tape across the top of the screen announcing new contract awards.

**Exhibit 13, Part 4**

# *Procurement*
# *Subgroup Report*

# TABLE OF CONTENTS

1.0    Introduction

2.0    Statutory Framework and Program Expectations

3.0    Issues:  Identification, Analysis, and Validation

4.0    Recommendations

## Attachments

A.    Office of Contracting and Procurement – General Procurement Process

B.    Agencies Served and Not Served by OCP

C.    Planning for LSDBE Set-Asides

D.    Performance Management (Contract Administration)

# 1.0   Introduction

The Procurement Subgroup Report examines the strategies and approaches that the District could utilize in providing competitive, public sector contracting, and procurement opportunities to local, small and disadvantaged business enterprises (LSDBEs) in the District.  The Subgroup examined how to improve upon LSDBE's contracting opportunities within the District government and upon outside private sector opportunities.  To link the LSDBE program goals and requirements to the procurement processes, the Subgroup spent considerable time examining the District's procurement process, specifically those of the Office of Contracting and Procurement (OCP), which is responsible for contracting out a significant portion of City contracts. OCP provides acquisition services for 56 District agencies under the authority of the Mayor, as well as independent agencies subject to the Procurement Practices Act.  In FY 2002, the Office accounted for over $1.5 billion in acquisitions, including 1,600 contract actions and 19,000 small purchases.

# 2.0   Statutory Framework and Program Expectations

The statutory framework for the local, small and disadvantaged business development was established by the "Equal Opportunity for Local, Small and Disadvantaged Business Enterprises Act" (DC Code Sec. 2-215, 2002).  Chapters 6 and 7 of Title 27 of the District of Columbia Municipal Regulations establishes the framework for the Office of Contracting and Procurement.  These regulations also set forth the responsibilities of the Local Business Opportunity Commission (LBOC).  The Commission promulgates rules and regulations in order to accomplish the goals of the Act and the various programs established under the authority of the Local, Small and Disadvantaged Business Enterprises Act of 1992 (DC Code Sec. 2-115 (2002).

Though these regulations set forth rules for establishing sheltered market programs, there are many other avenues of procurement that are available to LSDBEs.  Such avenues include the use of LSDBEs on a District-wide supply schedule and the establishment of blanket purchase agreements utilizing LSDBE contractors.  The Procurement Subgroup reviewed additional processes and mechanisms that could be used to ensure that LSDBEs are full participants in the contracting process.

The Equal Opportunity for Local, Small and Disadvantaged Business Enterprises Amendment Act of 2000 – DC Law 13-169 (DC Code Sec. 2-217 (2001) creates LSDBE preference points for evaluating bids and proposals by government agencies.  DC Law 12-268 establishes the 50% procurement target to be reached by District agencies in their contracting with small businesses.  The 2000 amendment created a new preference category for "Resident Business Ownership."

Under the existing administrative framework, there is uncertainty on the part of some LSDBEs and legislators concerning how, and whether in fact, District agencies are complying with the requirement to provide 50% of their procurement opportunities to small businesses.  OLBD is

responsible for enforcing procurement regulations for businesses already holding certification and for reviewing the agency procurement plans in accordance with DC Code Sec. 2-1205.3 (5), (10), (2001). However, there are no comprehensive administrative and program management methodologies in place to ensure effective reporting of procurement data by all agencies of the District government. This is due, in large part, to incompatible information systems used by the District's three major procurement process partners; OLBD, OCP, and the Office of the Chief Financial Officer (CFO). As a result the Task Force found disparate reporting systems and data, making it extremely difficult to prove.

A review of DC Code Ann. Sec. 2-1205.3 that sets forth the responsibilities of OLBD, indicates that the Office has a sufficient and explicitly worded statutory mandate to promote the growth and development of LSDBEs. With regard to LSDBE procurement, the law states that the function of the Office shall be to:

♦ Stimulate and foster greater opportunities for certified LSDBEs to participate in District procurement for goods and services than would otherwise be possible.

♦ Educate, disseminate, and market contract opportunities information.

♦ Enforce procurement regulations for businesses already holding certification.

The Office also has the authority to:

♦ Evaluate the LSDBE programs under DC Code Sec. 2-217.02 (2001).

♦ Review the procurement plans of each agency of the District government and determine, if it deems appropriate, which contracts, or parts thereof, shall be reserved for the programs established under DC Code Sec. 2-217.03. If the agency has failed to meet the goals set forth in DC Code Sec. 2-217.02 (2001), the Office shall reserve portions of the agency's contracts to be performed in accordance with programs established under DC Code Sec. 2-217.03, so that the agency's failings may be timely remedied.

♦ Review agency plans and take appropriate action pursuant to DC Code Sec. 2-217.02.

♦ Consider an agency request for adjustment of agency LSDBE contracting goals, provided that the Office report recommendations for changes of the goals on an agency basis, if appropriate, to the Mayor and the Council on a semi-annual basis.

♦ Review bids in the small business enterprise set-aside arrangements. It may authorize agencies to refuse to award a contract where the Office determines that bids for a particular contract are excessive.

♦ Review contracting problems and make further recommendations that increase LSDBE contractor participation with the District government. Recommendations shall include improved schedules that ensure prompt payment to contractors, special geographic radius requirements on certain contracts, innovative contract advertising procedures, the encour-

agement of joint ventures, and advice to the Mayor on methods to be utilized to ensure program participation.

The regulatory or procedural ties that should bind the LSDBE certification process to the procurement process in order to generate meaningful utilization of LSDBEs in procuring goods and services by the District government do not exist.

# 3.0   Issues:  Identification, Analysis, and Validation

Although the statutory authority exists for OLBD to promote the utilization of LSDBEs, the Subgroup found that the bifurcated relationship between the LSDBE certification process and the actual procurement process contributes to an under utilization of LSDBEs in the District's procurement supply chain.  While the procurement process would normally begin when a unit decides that it needs to procure a good or service, the focus of our work is on LSDBE procurement.  Therefore, the Subgroup believes that the procurement process should begin with the certification process so that LSDBEs program goals and requirements become an integral part of acquisition planning, and that LSDBEs are linked with actual contract award opportunities in the supply chain.

OLBD currently has responsibility to process applicants into the LSDBE program in an effort to foster economic development and job creation in the District of Columbia. The agency's mission clearly encourages OLBD to advocate for inclusion of LSDBE's in contracting opportunities with District agencies and with private sector partners.  Though not explicitly included as a function of the agency, OLBD feels that it is within its mandate to monitor District agency and private sector memoranda of understanding to ensure compliance with LSDBE goals and objectives.  While the commitment and passion for advancing the LSDBE initiative by OLBD is evident in its administration of the program (related to outreach and referrals for certified businesses) its success in goal attainment, as defined by the LSDBE community, is inhibited by several factors:

- ♦ The certification process accounts for too much staff time, leaving little time for other important program functions by OLBD personnel.

- ♦ The certification process is not connected to the procurement process.  Although there is one staff person assigned as a liaison between OLBD and OCP, there is no strong program implementation link between the LSDBE program requirements and the actual procurement of goods and services or the program administration.

- ♦ OLBD staff does not have adequate contract management and procurement backgrounds to sufficiently advocate before OCP at the procurement stage and, therefore, are likely missing opportunities to influence buying decisions.

- ♦ The true measure of success in LSDBE utilization in contracting is not well defined (is the measure of success the number of dollars paid to LSDBEs, the number of contracts

awarded to LSDBEs, or payments or distribution of procurement with LSDBE vendors?). Without well-defined measurements, OLBD will find it difficult to articulate LSDBE program success.

♦ Both the OLBD and OCP lack the required resources to hire and train additional personnel to administer the program effectively.

♦ There is a difference in perception between OLBD and the business community concerning the role that OLBD should play in ensuring LSDBE utilization.

## 3.1    Linking Certification to Procurement

A complete process review of the current LSDBE certification and procurement processes reveals a fundamental gap between the two processes. If closed, the Subgroup believes that LSDBEs will have a greater opportunity to compete for procurement opportunities from the District government. Many businesses painstakingly go through the LSDBE certification process and are often disappointed that a contract does not result. While the false perception by some businesses that certification equates to contract award, the Subgroup does believe that a formal "hand-off" to the OCP of certified LSDBEs would generate greater contracting opportunities for LSDBEs. Many vendors go to great lengths to get their certification, and then must start anew to establish contacts within the agencies of the government in order to pursue contracts. These vendors find it difficult to break through the barriers to get agency contacts to even explain their goods or services. To be successful in meeting the procurement objectives of increasing contracting opportunities for LSDBEs, the two processes under discussion must be connected and certification integrated into the procurement process.

The OLBD is responsible for the certification process while the OCP is responsible for issuing contracts to qualified vendors. If the certification process could be aligned closer to the procurement process, such that once certified the LSDBE vendor is brought into the supply line, the LSDBE community would benefit tremendously.

## 3.2    Organizational Positioning of the Certification Process

The Office of Local Business Development has some organizational hierarchy challenges that inhibit successful completion of its broad program scope, mission, and responsibilities. These challenges are exacerbated by the systematic lack of contract administration through the procurement supply chain, vague program measurements and accountability, and a communications breakdown between OLBD and OCP. The OLBD currently reports to the Deputy Mayor for Planning and Economic Development, and the OCP reports to the Deputy Mayor for Operations. It is our view that the certification process must be aligned organizationally and physically with the Office of Contracting and Procurement, which has the authority to enter into contracts on behalf of the District of Columbia, and, at present, is responsible for facilitat-

ing over $1.5 billion annually in government acquisitions for approximately 56 District government agencies.

Our research of public purpose programs similar to the LSDBE program in the public and private sectors indicates that successful supplier diversity programs are organizationally and physically aligned with the procurement function. In fact, a recent benchmarking study by the Center for Advanced Purchasing Studies indicates that eighty-three percent of the cities in the study with populations greater than 500,000 have a procurement outreach program for LSDBEs.

There are different approaches to accomplishing the goal of organizationally connecting the certification process to the procurement process. In the City of Chicago, the Minority and Women-owned Business Procurement Program promotes contracting opportunities to minority and women-owned business enterprises (M/WBE). This program is located within the Department of Procurement Services in the Division of Contract Monitoring and Certification. This Division certifies M/WBEs as well as administers the City's Equal Employment Opportunity and Affirmative Action requirements. The Contract Monitoring and Certification Division also plans educational outreach programs and workshops for minority and women-owned businesses.

In testimony at one of the Community Business Forums held by the Task Force, it was asserted that DC's OLBD spends most of its time on the certification process. When the State of Florida reviewed the operations of its Minority Business Advocacy and Assistance Office, it found that most of its time was spent certifying businesses and setting what some call misleading spending goals. In an effort to reprioritize the operations of the Office, Florida transferred the Office of Minority Business Advocacy and Assistance from the Department of Labor and Employment Security to the Department of Management Services, where the majority of procurement activities take place. They made this move because the Office would be "more successful in helping procurement agents find and recruit qualified minority businesses." (See *Equity in Contracting Plan*, Executive Summary, www.myflorida.com).

In some cities, offices with similar responsibilities to OLBD's are required to provide the procuring agency with a list of qualified LSDBEs for specific procurements. In Baltimore, there is a Mayor's order that sets forth the steps agency and procurement officials must follow to include LSDBE businesses in City procurements. The Equal Opportunity Compliance Office provides the Agency or Department with a list of minority business enterprises and women's business enterprises qualified to provide the public works, services, materials, equipment, or supplies required by the City and provides the electronic mail addresses of the MBEs, and WBEs whenever applicable. The Subgroup believes that this can best be accomplished in the District if the certification process is handled in the procurement organization.

In the City of Philadelphia, there is a Minority Business Enterprise Council which certifies minority, women-owned, and disadvantaged business enterprises (M-DBEs, W-DBEs), provides information on contracting opportunities to certified firms, and reviews City department's Requests for Proposals (RFPs) and bid specifications to identify requirements which unduly restrict participation

of protected class businesses. (See Executive Order 1-93 at www.phila.gov/MBEC/Certrification). The Council is separate from the procurement organization.

Positioning certification within OCP would facilitate one-stop shopping for LSDBES. This means that in addition to the actual certification, vendors would receive information and directions that may assist them in landing contract awards. Once certified, LSDBEs can be introduced to specific contract opportunities directly from OCP officials, and can be assisted in getting on the City's LSDBE supply schedule.

Today, vendors must rely on fragmented procurement outreach by OLBD and OCP, or in some cases, have to rely on business relationships within agencies in order to learn of specific contracting opportunities with the District government. The Subgroup believes that a seamless procurement process, integrating LSDBEs in the beginning, can best be achieved with OCP as the certification process leader. Essential to the successful integration of LSDBEs into the procurement process, however, is the need for improved procurement information flow. Although procurement opportunities are currently housed on the OCP web-site and are advertised in various publications, many LSDBEs find that the procurement notification system is outdated, not specific to the needs of the LSDBE, and in some cases advertised contracts are already awarded when they appear on the agency's system.

Apple Computer provides an example of the one-stop concept. In 1993, a supplier diversity program was established by the Apple Computer Company to ensure that historically underutilized businesses (HUB) were provided with the maximum opportunity to do business with the company. A review of the Apple Supplier Diversity web-site yielded information about the basic components of their supplier diversity program including:

♦ Outreach – activity seeking diverse suppliers through minority and business development organizations and participation in various trade shows activities.

♦ Certification – verification of HUB status through screening processes.

♦ Qualification – review and input of selected business criteria and referral to appropriate purchaser for consideration.

♦ Development – review of additional needs of suppliers and exploring ways to provide assistance to them.

♦ Utilization – activities in the purchasing processes, such as routine purchases, requests for bids and contracts and other forms of purchase. (See www.apple.com/supplierdiversity.)

While the District's program includes local, small and disadvantaged businesses, this supplier diversity program could be a model for bringing more LSDBEs into the procurement process, integrating into one process each of the key components to a successful business utilization program.

## 3.3   Procurement Knowledge and Expertise

The vast majority of municipalities that the Subgroup studied have combined the procurement function and the function that brings local, small and disadvantaged businesses into the procurement system. It is, therefore, key that in any supplier diversity initiative that the staff charged with carrying out the mission be versed on the procurement process. Without this knowledge, the OLBD staff can be an advocate for the LSDBE, but will have difficulty with execution because they lack knowledge and understanding of the supply line process. With expertise in the procurement and contracting processes, the staff of OLBD or OCP could determine the best way to prepare the LSDBE community and successfully match their capabilities with opportunity. In the City of Baltimore, there is a Minority and Women Business Enterprise Coordinator in the Bureau of Purchasing who is able to match these businesses with procurement opportunities. While OCP currently has a staff liaison with OLBD, the Subgroup believes that this liaison relationship falls short of aggressively promoting the utilization of LSDBEs inside of OCP, taking advantage of match-making opportunities with LSDBEs and current contract opportunities, and positioning LSDBEs for future contacting opportunities.

The basis of the procurement system is established in the Procurement Practices Act of 1985 (as amended). It established the Office of Contracting and Procurement as a central agency focal point for procurement activities within the District. It also established guidelines for procurement activities in the government. The regulatory procedures are outlined in municipal regulation 27 DCMR and were first published in 1988. The regulations have had several revisions over time. There are also financial thresholds and requirements for legislative oversight by District of Columbia Council.

The procurement process involves three major agency participants and is highlighted in Attachment A: *Office of Contracting and Procurement General Procurement Process*. The major process partners include the Program Office, which is normally the agency representative or customer, the Office of Contracting and Procurement, which is responsible for administering the legal and regulatory process necessary to acquire goods or services, and the Office of the Chief Financial Officer, which handles all of the fiscal issues dealing with the payments and availability of contract funding. The procurement process begins with the planning process in the agency, where budgetary and spending plans are formulated and used as the basis for agency procurement planning. These plans are validated by the Program Office and sent to the financial officer for commitment of funding. Once the funds are committed, the requirement is sent to the procurement organization, which performs all of the steps necessary to legally procure the supplies and services on behalf of the government entity. Once the contractual obligations are satisfied, an invoice is received and processed for payment in the Office of the Chief Financial Officer. Payment is made either by check or by electronic means, and occurs most of the time within 30 days after receipt of the invoice at the CFO.

The procurement process is basically a paper driven process and is controlled by the FORM 100. Attachment A outlines the typical actions that occur with the procurement process. The

requisitioner completes the FORM 100 and submits the form to the CFO office, which in turn performs the financial operations necessary to encumber the funds. The Form is then submitted to OCP. Once the contract or purchase order is ready for award, the CFO must encumber the funds. Then, a notice that the distribution of contract documents is complete is manually sent to five separate areas. The procurement process ends with the award of a contract and further actions occur at the agency as necessary. The contract closeout point is where many procurements encounter difficulty.

There are currently 56 agencies that are supported by the Office of Contracting and Procurement (see Attachment B). However, there are 17 agencies that are not being supported by OCP and do not fall within the guidelines of the Procurement Practices Act as described in this Report. Each of these agencies is considered independent and operates under their own procurement authority, processes, and activities. This independent contracting authority represents a significant challenge for the City's procurement planning process, and specifically impacts the administration of the District's LSDBE program and the utilization of its program participants. While several of the independent agencies do seek to comply with DC Law 12-268 DC Code Sec. 2-217, 20010, and do meet the LSDBE program goals, the District lacks the enforcement power to mandate reporting and compliance. Some of the larger independent agencies not governed by the Procurement Practices Act include the DC Public Schools, the Washington Convention Center Authority, the DC Water and Sewer Authority, and the DC Court System.

Improvement of the procurement process is tied to the automation of the entire supply line. Attachment C outlines how planning for LSDBE set-asides in the procurement process can be done using automation. Notice that the planning and contract administration encompasses automation and that the automation facilitates the process from the beginning to the end. It would be difficult to impossible to effect the improvements proposed without automation of the process, and cannot be attained by simply changing procedures or eliminating regulatory requirements. Within an automated environment, the planning for LSDBE set-asides occurs at the beginning of the process. The program manager develops an acquisition plan that provides the detail for the future fiscal year procurement activities. Included in the plan are the projected procurement activities and spending goals for the LSDBE program. The program plan contains the requirements as well as the funding for the next fiscal year. The plan actually ties the expenditures in the program to the goals of the LSDBE program. The document is called the Agency Acquisition Plan and is subsequently transmitted to OCP, where it is consolidated with the District plan for the entire City. This information is shared with the public and vendor community so that proper planning and procurement forecasting is available to the LSDBE community prior to solicitation. The final plan is then loaded and monitored into the automated system. In this way the contract expenditures planned and forecast are monitored and adjusted according to real world dynamics and changes.

There are always procurements that are not planned or forecasted in advance, and the automated system would also allow for the efficient processing of these types of requirements. In an automated system, unplanned procurements would start in the program office when the pro-

gram manager identifies the requirement, generates the required Statement of Work (SOW), and electronically submits the document to the system for validation and financial encumbrance of funding. The buyer in OCP would be notified electronically and would send the procurement to an online bidding system that selects a vendor based on the lowest price. After the item of concern is received in the agency, payment is electronically processed quickly and automatically. The three-way match would be performed among OCP, CFO, and the program manager. If an invoice is submitted electronically, it is processed with literally no paper work. Once the contract is issued, a performance management system would start and monitor the contract performance through the cycle.

During testimony at the Community Business Forums held by the Task Force, numerous LSDBEs commented on the need for better contract administration and forecasting of procurements. The Subgroup supports OCP's assessment and belief that automating the procurement process will go a long way in solving some of the contract administration and forecasting problems that these LSDBEs complained about. The CAPS Purchasing Performance Benchmarking Study for Municipal Governments indicates that 94.7% of the municipal governments surveyed have an automated purchasing system, a web-site, and maintain a prospective bidders list. In a 2000 study of different cities, 100% of the municipalities reporting had automated systems.[1]

## 3.4   Contractor Performance Management

To further strengthen the procurement process, with an emphasis on increasing LSDBE utilization, consideration must also be given to oversight and reporting of vendor performance. This contract evaluation and administration is crucial to the success of the vendor and the LSDBE procurement environment. In the process of identifying and selecting a LSDBE contractor, this issue becomes apparent. The Subgroup applauds the efforts of OLBD to provide vendor listings of LSDBEs online to the agencies of the government and private sector stakeholders. However, interested buyers lack critical decision-making information regarding a vendor's business capabilities and performance history. During the course of the Task Force research, many of the contracting officers, agency directors, and private sector developers interviewed complained about the quality or capacity of the smaller businesses. Some expressed concern that it is difficult to remove a vendor from a contract for poor quality and often it is simply easier to accept the under-performance than to change vendors. Without some performance management data, prospective buyers are forced to spend long hours making inquiries about LSDBEs from a variety of other sources. This, of course, operates against the fundamental core of the LSDBE program, which is to *facilitate* the utilization of these businesses, and not to burden prospective prime contractors with onerous processes and steps. It is difficult for any prime contractor to determine the star performers, and, equally important there is no process of identifying poor performance. Promoting the successful performance on past contracts

---

[1] (The Center for Advanced Purchasing Studies, Study #4 August 15, 2001.)

by LSDBE vendors to government and private sector prime contractors must be a key goal of OLBD and OCP.

The Subgroup believes that the proposed Performance Management System addresses many of the issues related to performance management requirements. The Performance Management System would be automated and provide many contract administration functions from start to finish. The system could load the cost, quality, delivery and cycle time for the procurement. As the situation demands, the information would be posted for the various participants involved in the procurement process. Notifications would be sent to OCP, the vendor, and the program manager, as required. The procurement team at OCP would provide scrutiny of the contract and the requirements related to contract administration.

The system would generate an issue resolution plan, developed for each vendor and each situation where action is needed to correct contract performance. OCP would collaborate with the necessary procurement partners to resolve the issue with a corrective action plan. The eventual resolution of the situation would be documented into the system and provided to all of the users in an online format. This format would allow for the evaluation of lessons learned and also form the basis for some type of performance and information pattern analysis. (Attachment D outlines an automated performance management/contract administration process.)

The findings of the qualitative research conducted on behalf of the Task Force clearly support the Subgroup's conclusions. Focus group interviews with key program stakeholders indicate that some common themes emerged. These interviews included agency directors, procurement officers, private sector developers, and LSDBEs. Interviews with agency directors and procurement officers on their experience with the LSDBE program yielded criticisms that the District's procurement system is not working as well as it could, and that the District's supply line must be automated as soon as possible. Agency directors and procurement officers who were interviewed specifically note that aspects of the procurement system work counter to their utilization of LSDBEs and that there is always competitive pressure to select the lowest bidder, who may or may not be a certified LSDBE. Additionally, agency directors and procurement officers indicate that they find fewer or no LSDBEs in certain procurement areas, which makes it much harder for some agencies to meet their utilization goals. On the other hand, the LSDBE focus group interviewees indicate that District agencies "are not sensitive enough to the problems they face when trying to compete for city contracts." They believe that the agencies feel that LSDBEs lack the capabilities to handle larger projects, and therefore, may be overlooked when issuing contracts.

Agency directors, procurement officers, and private sector developers agree that more useful and timely information about LSDBEs business capabilities and contract performance should be made available in an electronic database format. The findings indicate that attention should be given to ways of making the procurement system more responsive to the use of LSDBEs. Currently the system appears to provide more incentive for District agencies to select the

"safe" vendor than to use an LSDBE." Agency directors and procurement officers should be encouraged to find new ways of bringing more LSDBEs into the contracting process.

The Subgroup reviewed the organizational structure of the Office of Contracting and Procurement's and determined that more individualized attention should be given to vendor issues, including LSDBE utilization. This could be accomplished by providing more operational authority at the lower levels of OCP. A look at the staffing patterns in the OCP indicates that several staff members have the same job classifications. They were called either contract specialists or supervisory contract specialists. The addition of a more versatile job classification system would allow the office to concentrate its personnel into specific duties and responsibilities. The Procurement Practices Act (PPA) directs centralization of a procurement supply line that must include contract administration.

## 3.5   Contract Administration

Even without completion of the automated system, there is a critical need to establish contract administration as an integral part of the procurement process in the District. Many of the issues considered by the Task Force relate to contract administration functions. However, the District's procurement system could be described as "front loaded", i.e. focusing almost exclusively on the timely award of contracts. Contract administration relates primarily to the vendor's adherence to the terms and conditions documented in a contract, and represents the "back-end" functions associated with procurement. After the award of the contract occurs, very little contract administration attention is paid to the vendor or the customer. The Subgroup recommends including administration functions within OCP and expanding job classifications that describe the additional staff contract administration functions. Performing this change is not an easy task because it encompasses many functions that are currently not being performed by either OCP or OLBD. It is important to note that the Subgroup is not recommending that contract administration replace good program management. In fact, good program management and contract administration go hand in hand. Program management develops the policies and procedures that the contract enforces. It is not a substitute for the lack of detail in a specification, or the omission of critical policies and procedures. This deals with aspects outside the realm of contract administration.

To properly staff and supply contract administration functions, it will be important to include selected parts of the wide range of contract administration functions. The Subgroup assumes that the Chief Procurement Officer could perform the administration functions previously described with ten people, provided that only contracts above $1 million are addressed. To ensure that the contract administration functions are performed properly for every agency in the government, additional personnel would be needed in contracting operations throughout the government.

It is important to note that few regulations or laws have to be changed or put in place for centralized contract administration within OCP. Many of the laws concerning contract administra-

tion have been codified in DC Mun. Regs. Title 27 (2002). Contract administration functions must have qualified personnel to ensure compliance with contract terms and conditions. This is especially the case as it relates to contracting and subcontracting with LSDBEs. During the Task Force community meetings, the Subgroup heard anecdotal statements that some prime contractors are guilty of not paying their subcontractors properly or guilty of not complying with local labor laws or statutes. In many instances, the government can neither admit nor deny that this occurs. For example, prior to the award of major contracts, affirmative action plans are required from prime contractors. For years, LSDBEs have complained that their company's name often appear on prime contractor's affirmative action plan, but not only are they not contacted to offer bids, often times they are not even notified by the prime that their company name has even been listed. Timely subcontractor payments from the prime contractor are another issue that many LSDBEs complain about. Strong contract administration would mitigate the likelihood of these type occurrences.

## 3.6  Measures of Program Success

While automating the District's procurement process will allow the District to capture all transactions, including those with LSDBEs, automation will also improve the integrity of LSDBE utilization data. The Subgroup found a strong perception among program stakeholders that LSDBE utilization data was not reliable. It becomes difficult for the District to dispute this perception because the financial and procurement reporting systems used are so disparate. In reporting program outcomes, OLBD relies on a "hodgepodge" of procurement and financial reports from OCP and the CFO to compile its program report. Neither of these data sources use reporting elements specific to the LSDBE program, such as National Institute of Governmental Purchasing (NIGP) codes, nor is the LSDBE's certification used as a data element. Ensuring that essential LSDBE program data elements are integrated into a procurement and financial system is critical to successfully and accurately measuring program success.

At present, OLBD tracks and uses the following performance measures:

♦ Number of LSDBEs certified and/or re-certified.

♦ Number of District agencies that meet their LSDBE contracting goals.

♦ Percentage of total contracts awarded on the new Washington Convention Center development.

With regard to program measures, the Subgroup finds a number of issues with the current measures of success. The Subgroup believes that:

♦ Contract award amounts are not the correct measure of success; but that *contract payments* are a better measure.

- Contract awards are announced as total contract amount – though the contract may span over a 3 – 5 year period; measures should be for the current year only.

- Announcing solicitations are of little value because they may never come to fruition.

- Agency LSDBE utilization goals are not clearly defined, and are <u>not</u> based on contract execution.

## 4.0    Recommendations:

### ISSUE:  Linking Certification to Procurement

- Transfer LSDBE certification and re-certification functions and resources from OLBD to OCP.

This would require administrative rule changes to address the role and responsibilities of the Local Business Opportunity Commission (LBOC).  The Subgroup is not recommending any changes in the role, duties, or authority of the LBOC. The District should benchmark the time it takes for certifications and re-certifications to be processed to determine whether additional certification officers are required in OCP.

### ISSUE:  Add Procurement Technical Expertise in OLBD

**Recommendation:**

- Ensure that some OLBD staff have strong technical backgrounds and expertise in procurement or transfer OCP's Business Development and Compliance Officer to OLBD. In order for OLBD to be an effective advocate for LSDBE utilization with OCP, staff must have sufficient expertise in procurement.

In the City of Baltimore, one of the primary objectives of the Office of Minority Business Development is to dramatically increase contracting and procurement dollars spent with minority businesses.  There is also a Minority and Women Business Enterprise Coordinator in the Bureau of Purchasing who is able to match these businesses with procurement opportunities. Similarly, OCP's staff includes a senior level Business Development and Compliance Officer with responsibilities for reviewing agency procurement plans, determining agency expendable budget amounts, receiving and analyzing quarterly compliance reports, resolving contract disputes between agencies and LSDBEs and interceding on behalf of LSDBEs on invoice processing issues. In addition, this individual's position description includes numerous other duties including LSDBE capacity building, contract monitoring/compliance and business consulting/counseling and technical assistance.

**Issue:  Procurement Process Re-engineering**

♦ Completely reengineer and automate the District's procurement process to include contract administration functions and compliance tracking requirements related to the LSDBE program.  Fix the processes prior to automating them.

The Office of Contracting and Procurement is planning to automate the procurement process.  This automation will require a multi-year, multi-million dollar commitment.  The Subgroup recommends that the automation plan continues and that any new automated procurement system include features to capture contract administration, compliance, and vendor performance data related to the LSDBE program.

**Issue:  Contractor Performance Management**

OCP should implement a vendor performance management system to document LSDBE business capabilities and past contract performance.  Elements of the system should be accessible to all District agencies and private sector buyers as well individuals who are interested in learning more about certified LSDBEs.

A review of vendor evaluation forms used by members of the Center for Advanced Purchasing Supply (CAPS) yielded examples of supplier evaluation forms that the Subgroup suggests that the District could use as model.  Numerous procurement programs in corporations and large cities include vendor performance data that allows agencies and procurement officers to determine the quality of work performed by the contractors.  The Subgroup suggests that the District adopt a vendor evaluation system for all vendors.

**Issue:  Measures of Program Success**

**Recommendations:**

♦ Allocate funding in OLBD's FY 2004 budget to support LSDBE related systems requirements.  Funding is recommended to ensure that data reporting requirements outlined in DC Mun. Regs. title. 27 (2002) are fully considered, met and funded with the adoption of a new automated procurement system.  This will help ensure that the new procurement systems captures data required to monitor the effectiveness of the LSDBE program.

♦ Redefine the measures of success with emphasis on expenditures of dollars with LSDBE's rather than the number of contracts awarded.

**Issue:  Contract Administration**

**Recommendations:**

♦  Transfer all contract administration and contract monitoring functions to the Office of Contracting and Procurement.  Add contract administration personnel and functions to the Office of Contracting and Procurement.


The Subgroup believes that complete automation of the procurement process will enable OCP to provide enhanced contract administration and improve compliance.  The system design should include contract administration and compliance functions.  The Subgroup assumes that OCP could perform these functions with 10 additional people.  OCP does not currently perform these functions for the LSDBE program.



Office of Contracting & Procurement
General Procurement Process (excluding P-Card)

# AGENCIES SERVED AND NOT SERVED BY OCP

## AGENCIES SERVED BY OCP

- Board of Appeals & Review
- Board of Real Property Assessments & Appeals
- Commission on Judicial Disabilities & Tenure
- Commission on National & Community Services
- Commission the Arts & Humanities
- Court Services & Offender Supervision Agency
- DC Energy Office
- Department of Corrections
- Department of Employment Services
- Department of Fire & Emergency Medical Services
- Department of Health
- Department of Housing & Community Development
- Department of Human Services
- Department of Insurance & Securities Regulation
- Department of Mental Health
- Department of Motor Vehicles
- Department of Parks & Recreation
- Department of Public Works
- Office of Advisory Neighborhood Commissions
- Office of Motion Pictures & Television Development
- Office of Banking & Financial Institutions
- Office of Cable TV & Telecommunication
- Department of Consumer & Regulatory Affairs
- Office of Employee Appeals
- Office of Finance & Resource Management
- Office of Human Rights
- Office of Intergovernmental Relations
- Office of Labor Management Programs
- Office of Neighborhood Action
- Office of Operational Improvements
- Office of Partnership & Grants Development
- Office of Personnel
- Office of Planning
- Office of Property Management
- Office of the Chief Medical Examiner
- Office of the Chief Technology
- Office of the Corporation Counsel

- Office of the Deputy Director for Planning & Economic Development
- Office of the Deputy Mayor for Children, Youth, Families & Elders
- Office of the Deputy Mayor for Public Safety & Justice
- Office of the Deputy Mayor / Office of the City Administrator
- Office on Aging
- Office on Latino Affairs
- Office of Labor Relations & Collective Bargaining
- Office of Local Business Development
- Public Library
- State Education Office
- University of the District of Columbia
- Office of Communications
- Mayor's Office of Boards and Commissions
- Metropolitan Police Department
- Executive Office of the Mayor
- Deputy Director for Children, Youth & Families
- District Division of Transportation
- Judicial Nomination Commission
- Office of Tuition Assistance Grant Program

## AGENCIES NOT SERVED BY OCP

- Convention Center
- Sports Commission
- Housing Finance Agency
- Retirement Board
- Council of the District of Columbia
- Office of the Chief Financial Office
- DC Water and Sewer Authority
- DC Court System
- Pretrial Services Agency
- Corrections Trustee
- Advisory Neighborhood Commissions
- Public Service Commission
- DC Public Schools
- Child and Family Services Agency
- Department of Mental Health
- DC Housing Authority

ATTACHMENT C

# Planning for LSDBE Set-Asides



**START**

Tom, an agency program manager, develops a proposed acquisition plan for the upcoming year based upon his program's spending history, projected business requirements and the District's business strategy and budget goals

Tom works to get his program's plan approved and funded

With the help of the program managers, each director develops a comprehensive Agency Acquisition Plan

OCP consolidates the individual Agency Acquisition Plans into a single District-wide plan.

OCP defines performance standards and works to identify program needs that can be set-aside for LSDBE awards.

OCP matches planned program needs with potential LSDBE vendors and identifies new areas for LSDBE vendor development

The final, approved sourcing plan, including LSDBE set-asides are loaded and maintained in the procurement system

As appropriate, contracts are competed, and awarded to LSDBE vendors to meet the planned needs and LSDBE participation goals of the District

ATTACHMENT D

# Performance Management (Contract Administration)



START

The system will track performance data such as cost, quality, delivery, and cycle time

OCP will gather additional information as necessary
- User feedback
- Customer
- Service Levels
- Responsiveness

The system will post the data for on demand viewing by the vendor, the agencies, and OCP

The system will automatically send notification of certain performance issues to the vendor, the agencies, and OCP

OCP team will document any performance issues

OCP will review relevant performance data
- Cost
- Quality
- Responsiveness
- Deviation from Plan

An Issue Resolution Plan will be developed for each issue/vendor

OCP will collaborate with the vendor on the corrective action plan

OCP will document the resolution

OCP will incorporate the information into the sourcing plan
- Lessons Learned
- Performance Information/patterns

*The Mayor's LSDBE Report*

# *Technical Support and Business Assistance Subgroup Report*

# TABLE OF CONTENTS

1.0     Introduction

2.0     Statutory Framework and Program Expectations

3.0     Issues:  Identification, Analysis, and Validation

4.0     Recommendations

# 1.0   Introduction

Mayor's Order 2002-62, which established the Task Force on Local, Small and Disadvantaged Business Opportunity Development, charged the Technical Support and Business Assistance Subgroup with examining the strategies and approaches that the District could utilize in providing technical assistance to local, small, and disadvantaged businesses in the District. In addressing this subject, the Subgroup focused on identifying the specific technical support and business assistance needs of LSDBEs and companies seeking LSDBE certification. The Technical Support and Business Assistance Subgroup sought to identify opportunities to improve the coordination of the numerous technical support and business services that currently exist in the District. The Subgroup interviewed LSDBEs businesses seeking LSDBE status, prime contractors, staff within the District's Office of Contracting and Procurement, DC Small Business Development Center Network, and business development officers within the U.S. Small Business Administration's (SBA) District Office.

The primary needs stakeholders identified were related to demystifying and simplifying the certification process; especially as compared to certifications by other states and the Federal Government, understanding and expanding LSDBE capabilities and capacity, and gaining access to information about contract opportunities, bonding, insurance, and financing. Whether these needs can best be met by OLBD or existing business support organizations and how existing programs could be better coordinated was of significant importance to the Subgroup.

# 2.0   Statutory Framework And Program Expectations

DC Law 12-268 does not provide a clear statutory mandate for OLBD to directly provide or to fund technical assistance programs for local, small, and/or disadvantaged businesses. The law does offer the opportunity for such activities through its mandates. Section §2-217.03, entitled "Assistance programs for local business enterprise contractors, disadvantaged business enterprise contractors, and small business enterprise contractors," gives the Mayor the authority to establish programs that will assist contractors in achieving the goals established in DC Law 12-268. These provisions relate only to bid preference, set-aside, joint venture and mentoring and are designed to assist in the bidding and contract award process only.

Further, Section §2-1205.3 identifies fourteen statutory functions of OLBD, and the functions numbered 3, 4 and 14 are the clearest link to OLBD providing the technical support and business assistance that is needed by certified businesses. Section §2-1205.3 03) requires that OLBD "stimulate and foster greater opportunities for businesses, certified as local, small and disadvantaged businesses, to participate in District procurement for goods and services than would otherwise be possible." Section §2-1205.3 04) requires that OLBD "educate, disseminate, and market contract opportunities information to those businesses already holding certification as local, small, or disadvantaged business enterprises." Under Section §2-1205.03 14),

the agency is required to "review contracting problems and make further recommendations that increase small, local, and disadvantaged contractor participation with the District government."

Although OLBD does not currently have funding allocated specifically for the delivery of technical assistance to LSDBEs, the Task Force believes that the current law and implementing statutes require much more than is currently provided through OLBD. Tremendous flexibility is required for OLBD to provide or support the provisioning of technical assistance and business support to LSDBEs, based on their unique needs. Specifically, sections of the law that speak to knowledge of contracting opportunities, joint ventures, mentoring relationships, and bond waivers offer opportunities for additional support, outreach, networking and training programs for certified LSDBEs. The Technical Support and Assistance Subgroup believes that the law that created OLBD provides the opportunity for the agency to better serve the needs of LSDBEs. To ensure the preparedness of these businesses in meeting the procurement needs of the District requires expanding program functions to enhance the technical assistance and business development support that is offered. This technical assistance can be provided through District government resources. Increased coordination of the many sources of technical assistance, business training, and business services currently available in the District is also required. The Task Force recommends that these services be made available to businesses that have already been certified as LSDBEs and to those seeking LSDBE certification or recertification. These findings are supported by the February 28, 2002 Proposal for the District of Columbia Small Business Development Program, as commissioned by the District's Office of the Deputy Mayor for Planning and Economic Development.

In the absence of a clear statutory mandate, the Task Force has also found that neither OLBD nor OCP may have the capability to meet the technical assistance needs of LSDBEs. This issue requires more extensive assessment. It was important for the Subgroup to analyze this issue, for private developers, agency directors and agency procurement officers regard the capabilities of many LSDBEs as very limited. There is a feeling among these stakeholder groups that many LSDBEs lack the skills, manpower, and financial resources needed to compete successfully.

There is some lack of clarity about OLBD's role in providing technical assistance. OLBD staff does not see technical assistance as one of its primary roles. But members of the Local Business Opportunity Commission (LBOC) maintain that there are three primary functions of OLBD, and they are: 1) certification, 2) advocacy, and 3) technical assistance.

## 3.0 Issues: Identification, Analysis and Validation

Overall, stakeholder expectations around technical assistance are far greater than the level of services that OLBD's current resources allow it to provide. Many stakeholders expressed a desire for the Office of Local Business Development to expand its role and become involved in providing or coordinating programs to provide the training, business development and financing support needed to place LSDBEs on an equal footing with the companies against which

they have to compete. These stakeholders seem to understand that this is a major undertaking that will require greater and better trained staff, and agree that OLBD is the logical department to lead this effort.

In its work to identify the key issues surrounding the demand for and delivery of local business and technical support, the Subgroup relied extensively on data gathered from various LSDBE program stakeholder groups. To analyze the level of technical assistance provided, the need for additional technical assistance, and to identify potential options for its provision, the Task Force reviewed findings from the Community Business Forums, the Focus Groups, individual interviews; examined the practices of other municipalities and local, regional, and national technical assistance and business development programs.

## 3.1   Stakeholder Perceptions of LSDBEs and the LSDBE Program

The following items compose a list of common observations provided to the Subgroup from stakeholders, including private developers, District government agency directors, District government procurement officers, LSDBEs and Local Business Opportunity Commissioners.

♦ Developers, agency directors and agency procurement officers understand that the program is meant to support the development of LSBDEs, but they see no formal efforts being made by OLBD to ensure the provision of training, advisory services, or financial resources to LSDBEs. As a result, they feel as though the program places a burden on developers, agency directors, and agency procurement officers to provide technical support and business services that they are not equipped to offer LSDBEs.

♦ Local Business Opportunity Commissioners also believe that the program has not done enough to support LSDBEs in providing technical assistance and training. They also feel that LBOC does not address the lack of financial resources, which they see as a major issue for many small and disadvantaged businesses.

♦ A common theme among the developers, agency directors, and agency procurement officers is that there are not enough certified LSDBEs with the capacity and capabilities to meet their procurement needs. Many of these developers and officials would like, and expect, the LSDBE database to contain some performance evaluation of the LSDBEs. Some say that the value of the database is diminished by not weeding out or indicating LSDBEs with recurring performance problems, lack of capacity, or who have capability limitations. Another concern expressed by some developers and officials is the difficulties they face when trying to remove a vendor from a contract for poor services delivery. They say that it is easier to accept the under performance than to change vendors.

♦ Further, these stakeholders say that, while they would like to use more LSDBEs, many of the categories from which they purchase have no certified LSDBE vendors.

♦ Agency directors and procurement officers say that efforts to break contracts into smaller, more LSDBE-friendly increments are time consuming and often not practical or not al-

lowed. Likewise, partnering a LSDBE with an established or larger vendor to act as a mentor is not practical and is costly to the mentoring firm. Stakeholders cite examples of how some prime contractors will partner with an LSDBE only to use them as a "pass through contract." This practice clearly defeats the spirit of the program in attempting to develop these small businesses.

♦ From the LSDBE's perspective, District agencies are not being sensitive enough to the problems they face when trying to compete for District contracts. They believe that there is a feeling among the agency directors and procurement officials that LSDBEs can only compete for smaller projects and lack the capacity and capability to handle larger contracts. As a result, they say that they are being overlooked on many projects. Overall, LSDBEs question the level of commitment the agencies have to using them and/or ensuring their use and development by prime contractors. They think that agency directors and procurement officers are not being monitored or held accountable for meeting their LSDBE goals and are not monitoring Memoranda of Understanding and other contracts with prime contractors. Private developers confirmed this by saying that they do not expect to be penalized for not meeting their LSDBE goals.

♦ The stakeholders who took part in the Focus Groups offered a variety of different viewpoints concerning the overall goals of the LSDBE program, including "help for businesses to get started, the provision of training to allow businesses to become self-sufficient, help for businesses to compete for government contracts, and ultimately to help return tax dollars to local businesses and the City in general." One LSDBE stated, and others agreed, that, "This is the vehicle to use me expeditiously and use me before you use somebody else."

♦ The Technical Support and Business Assistance Subgroup analyzed the key issues identified on a stakeholder-by-stakeholder basis in an effort to ensure that the issues of each of these stakeholder groups are adequately addressed. These issues follow:

## Private Developers

All of the private developers expressed concern about the business capacity and capability of many of the certified LSDBEs. These business leaders noted that the lack of bonding, the lack of insurance, and the overall weak financial strength of LSDBEs present problems when projects are underway and/or when attempting to bring a LSDBE into a bid proposal. Further, they note that there are not enough LSDBEs to choose from in certain vendor categories.

## Agency Directors and Procurement Officials

The general consensus among District government agency directors and procurement officials interviewed by the Task Force is that the LSDBE program is good "public policy." However, they have experienced problems with the quality of LSDBE's work and with the enforcement of quality and performance standards of many LSDBEs. Some procurement officials even expressed a level of comfort in only awarding "smaller contracts" to LSDBEs. Further, in con-

cert with private developers, they note that there are not enough LSDBEs to choose from in certain vendor categories.

**Local Business Opportunity Commissioners**

Local Business Opportunity Commissioners pointed to inefficiencies in the certification process. They also expressed concern that the program has not provided sufficient support in the area of technical assistance and training, as well as addressing the lack of financial resources available to the small business community.

**LSDBEs**

LSDBEs provide mixed reviews about the certification process, but consistently agree that the program does not adequately provide technical assistance and training support or referrals for such support. LSDBEs specifically stated that there is a need for more training in the certification process, ways to identify procurement opportunities within the District, the best means to market their products and services to District procurement officials; and ways to obtain bonding, insurance, financing and other business development advisory services and training.

## 3.2 Technical Support and Business Assistance Currently Offered by OLBD

As previously noted, OLBD is not explicitly mandated to provide technical and business assistance programs. OLBD states that it dedicates considerable staff time to outreach in the community and within the District government (agency directors and procurement officers disagreed with this). Currently, technical assistance offered through OLBD is limited to the certification, bidding, and contract award processes. OLBD offers the following forms of technical assistance to the LSDBE community:

◆ Monthly LSDBE Recruitment and Orientation Seminars: Interested businesses are introduced to the LSDBE program and its benefits, instructed on how to do business with the District government by representatives from OCP, are and provided with an information package of relevant resource materials in a brief two-hour session. These information packages include certification application materials, a reference sheet of business development resources, procurement forecasts (as available) with contracting officer contact information, upcoming technical assistance training program calendars, joint venture requirements, and a summary of the U.S. Small Business Administration's (SBA) financing program information. All materials are not discussed during these short sessions, but the information, along with relevant contacts, is provided to participants. Some businesses that are seeking certification have stated that this session is too rushed to be valuable.

◆ Monthly Business Roundtables: These sessions are designed to introduce LSDBEs to the chief contracting officers and the business opportunities available within District govern-

ment agencies. A different agency is highlighted each month, and LSDBEs have the opportunity to share issues and experiences in the procurement process. As available, agency procurement forecasts are also discussed during Monthly Business Roundtables. According to OLBD, monthly business roundtables generally attract 40 to 50 participants.

♦ Community Business Events: In addition, OLBD reported that during 2001, the agency participated in 125 community-business events.

## 3.3    Technical Support and Business Assistance Offered and Planned Through the District and Federal Governments

In conjunction with the DC Office of Banking and Financial Institutions (DBFI), the SBA and the Washington, DC Small Business Development Center Network have been working to establish One-Stop "Business Resource Centers @ Your Library" in several of the local libraries and a "One-Stop Capital Shop" at the Martin Luther King, Jr. library, in an effort to make SBA-administered technical support and business assistance services, and those offered through other federal and private sector sources more easily accessible to small and disadvantaged businesses. Funding has not yet been obtained. However, this effort remains a priority for the local and federal government agencies involved. Based on its research, the Subgroup has determined that more easily accessible and better coordinated technical support and business assistance services for LSDBEs are needed in the District.

The District's Department of Housing and Community Development provides funding to several local Community Development Corporations (CDCs) for small business technical assistance. This effort's funded largely through proceeds from the US Department of Housing and Urban Development. Given limited funding, these programs have not been able to offer the in-depth training and business advisory services that many local, small and/or disadvantaged businesses require. Much of the assistance provided is targeted to start-up businesses and focuses on elementary business training. There is very little assistance provided by way of procurement assistance, joint venturing, financing or business expansion assistance. Based on its own audits, the Department of Housing and Community Development has determined that the CDCs have not managed their financial resources adequately and have not provided the level of technical assistance that they proposed.

Also, OLBD plans to launch an LSDBE business resource center where businesses can receive specialized training on issues such as tax preparation, planning, and business financing. The resource center, expected to be located adjacent to OLBD's offices, will also house four computers for LSDBEs who do not have Internet access or other computer capabilities.

In its research, the Subgroup has found that these same services are offered through the SBA's Single-Business Resource Center located at 1110 Vermont Avenue in Northwest, through its Service Corps of Retired Executives (SCORE). These services are also offered through SBA's

**Exhibit 13, Part 5**

network of Small Business Development Centers (SBDCs) that are managed by Howard University. There are four such centers in the District, all managed and funded by Howard University and located at:

◆ Howard University School of Business

◆ Center for Urban Progress at 2000 14th Street, NW

◆ Anacostia Economic Development Corporation (AEDC) at 2021 Martin Luther King Jr. Avenue, SE

◆ University of the District of Columbia's David Clark School of Law at 4200 Connecticut Avenue, NW

These centers offer free or low cost training and advisory services to all small and disadvantaged businesses located in the Washington, DC Metropolitan Area. Noteworthy is the fact that Howard University has provided the funding match that the SBA requires for these Small Business Development Centers since their inception in 1977, while the District government does not allocate any funding to support these efforts. This is in stark contrast to every other State in the nation. These States contribute funding to their Small Business Development Center Networks, typically in conjunction with their university networks, local economic development agencies, and chambers of commerce.

However, the DC Chamber of Commerce's Georgia Avenue Business Resource Center does offer low cost and no cost small business training and advisory services, though largely to businesses along the upper Georgia Avenue, NW corridor. SunTrust Bank's branch at 1445 New York Avenue, NW has a business resource library that small businesses can access for conducting research, preparing marketing materials and a wide range of other business support services. Very limited advisory services are offered at no cost.

In July 2002, the District's Department of Employment Services opened its first Business Resource Center, located at 77 P Street, NE. The center provides start-up companies and small business owners business counseling services, technical assistance, on-line access to the Master Business License application process, and other types of assistance. Additionally, the Resource Center serves as an incubator for several small businesses by providing basic office services and equipment, technology support services, meeting space, and assistance in obtaining information about small business financing. Howard University's Small Business Development Center staff support the Resource Center by counseling small business owners and conducting business workshops.

The Subgroup has also found that the Office of the Deputy Mayor for Planning and Economic Development has announced a new program initiative structured to provide neighborhood business districts the technical and financial assistance needed to address a variety of revitalization opportunities and challenges. The initiative consists of four complementary components:

♦ The **DC MAIN STREETS** program is administered in conjunction with the National Trust for Historic Preservation and provides a comprehensive package of technical and financial assistance to competitively selected neighborhood business districts. The goal of this program is to establish and implement an ongoing, comprehensive revitalization program based on the National Historic Trust's Main Street approach to historic preservation and economic development along major commercial corridors. The Office of Planning is the primary supporting agency for this component of the program. The FY02 budget is $1.1 million in private/other funds appropriated by Congress. Five neighborhood programs were designated in FY02, and five more are expected to be designated annually thereafter. Businesses along these corridors will receive assistance in developing their real estate properties.

♦ The **Commercial District Technical Assistance Program** (CD-TAP) provides technical assistance resources for any commercial district in the District of Columbia. Business districts with specific technical assistance needs apply to CD-TAP for matching funds of $500 to $25,000 to procure technical assistance or advisory services related to a specific "quick-hit" revitalization activity or project(s). The FY02 budget is $900,000 ($400,000 in private/other funds appropriated by Congress; $500,000 in CDBG funds appropriated to DHCD for obligation through NDAP).

♦ The **Commercial Property Acquisition and Development Program** (CP-A&D) provides matching funding for non-profit organizations to acquire, redevelop, or build commercial properties located anywhere in the District of Columbia. These properties are targeted for a wide range of businesses, small and large, and community organizations. The FY02 budget is approximately $5 million.

♦ The District-wide **Small Business Development Program** is expected to initially be coordinated by the Office of Deputy Mayor for Planning and Economic Development, in close cooperation with the Department of Banking and Financial Institutions, following DBFI's proposed "Business Resource Centers @ Your Library" model. The first location is expected to be the Martin Luther King, Jr. Library. This program proposes to provide each of the District's eight wards a library-based facility that small businesses can visit to receive technical information and have access to capital. This effort is modeled after the successful Washington, DC Small Business Development Center Network and the Georgia Avenue Business Resource Center. The component is to be supported by other cluster agencies, including OLBD, Consumer and Regulatory Affairs, Housing and Community Development, and the National Capital Revitalization Corporation (NCRC). The FY02 budget is $1 million that was obtained through an Industrial Revenue Bond (IRB) fund allocation.

In addition to the technical support and business assistance programs identified above, the February 28, 2002 Proposal for the District of Columbia's Small Business Development Program provides an inventory of other federal and private sector programs and resources that are available to small businesses. This program was commissioned by the District's Office of the Deputy Mayor for Planning and Economic Development.

## 3.4   Key Issues in the Provision of Technical Support and Business Assistance to Small and Disadvantaged Businesses in the District

In the above-referenced Small Business Development Program report, the author examined a number of key issues related to the small business community, including existing conditions and an assessment of the scope of existing technical assistance programs offered to small businesses in general. The Subgroup relied on this report's examination of several of the Federal Government's "protected class" business programs to gauge the extent of technical assistance offered to protected class businesses. The report also looked at what, if any, government entities have the statutory authority to deliver business and technical support to their protected class business populations.

Consistent with the Subgroup's findings, the report concluded that "most technical assistance is provided by community-based organizations, a handful of which are partially funded by the U.S. Department of Housing. The DC Department of Housing and Community Development is also a funding source through its neighborhood development assistance program grants. The U.S. Small Business Administration and its Small Business Development Centers also provide funds. Other business and technical assistance programs are funded by District agencies, non-profit foundations, universities, and corporate sponsors." In total, the report identified 15 District government agencies that operate "direct assistance programs," broadly described as programs that small businesses would want to access. Another eight entities serve small businesses through some type of public-private partnership and regional organization, and 12 community-based organizations offer direct assistance to small businesses. As confirmed through the Subgroup's research, the report provides, amongst other things, the following findings and conclusions related specifically to small business technical assistance in the District of Columbia:

### Lots of Help, but There Are No Existing "One-Stop Shop" or Comprehensive Coordination Strategy

♦ There is an abundance of useful programs, services, and information for the benefit of District businesses, though none specifically targeting LSDBEs.

♦ No single entity is responsible for ensuring that small and disadvantaged businesses know how or where to obtain all of the assistance they need.

♦ Local, small and disadvantaged business owners and those who assist them do not believe that a comprehensive business strategy is focused on their unique needs.

♦ The proliferation of new direct assistance starting points for small business – in addition to existing ones – needs to reflect methodical centralized planning, development of measurable objectives, and elimination of redundancy to ensure the efficient use of resources and effective service delivery.

**There Is No Existing Program Inventory, nor an Assessment of the Quality of These Programs**

♦ Even with recent enhancements, comprehensive information specific to small businesses is not easy to locate on the www.dc.gov web-site and are not available through OLBD's web-site or through the Office of Consumer and Regulatory Affairs.

♦ Local government agencies, community organizations and local businesses do not have adequate awareness of the existing and planned technical assistance programs.

♦ Inventories of direct assistance include the "usual suspects" of major programs, while neglecting to mention the smaller programs that can also deliver significant benefits to small businesses.

♦ Informative printed brochures, applications, and information about direct assistance is most easily accessible only at agency locations in or near downtown, which are difficult for small and disadvantaged businesses to actively access.

There is no available assessment of the quality of these programs.

**Communications Not Oriented to the Small Business Owner**

♦ Outreach events and promotional activities are frequently focused on one agency or program, rather than the portfolio of direct assistance.

♦ Schedules for small business-oriented events are typically published by individual agencies or promoted on individual agency web-sites. This information is typically not widely distributed, and events are often not scheduled when small business owners can take time away from their businesses, i.e. evenings, weekends and before 9:00 a.m.

**Disconnect Between Small Business Owners and Their Ability to Access Digital Resources**

♦ In many cases, agencies are depending on the Internet to distribute information and perform service delivery, while many small businesses lack Internet access or computer literacy.

♦ Business owners complain that they have very limited time and resources to continuously check the Internet for information. They need information that is targeted to their needs to be delivered directly and most efficiently through email or fax.

**Agencies Are Vertically-Oriented and Small Businesses Need Horizontal Integration**

♦ Without a guide to understand what is generally available, small businesses need to know in advance what kind of specific assistance is available and what assistance they need.

♦ Some agency officials have unrealistic expectations regarding the time, energy, expertise, and patience that a small business should need to expend in order to access assistance.

## 3.5    Best Practices: State and Federal Government Programs

In researching best practices, the Subgroup examined, amongst other programs, the City of Baltimore's Minority/Women's Business Enterprise Program, the City of Philadelphia's Minority Business Enterprise Council, and the State of Florida's Office of Supplier Diversity. These cities and State have been identified as those that have some of the best coordinated business assistance programs.  The Subgroup found that none of the administering agencies directly offer technical assistance or training to its protected class businesses.  Nationally, offices/agencies that are similar to those in Baltimore, Philadelphia and Florida focus strictly on certification and the bid process and have no mandate to deliver business assistance directly. However, technical assistance program offerings in these cities and State are well coordinated between their SBA-certified Small Business Development Centers, college and university networks, their local economic development agencies, and their Chambers of Commerce.  For example, in Baltimore, the City and the State have offered a broad range of City/State funded debt and equity financing and loan guaranty programs and an extensive SBA-licensed Small Business Development Center Network.  The latter has been managed by the University of Maryland, for many years.  Although the State of Florida has essentially eliminated minority set-asides and bid preferences, the State's recently created Office of Diversity has committed to the enhancement of financial and technical assistance programs that target minority businesses. These programs include the Bond Guarantee Program at Florida A&M University and the minority franchising program of the Black Business Investment Board.

Examples of training and counseling initiatives that are coordinated between a number of local and federal government agencies and the private sector are the One-Stop Capital Shops (OSCS) in Boston, Massachusetts, Atlanta, Georgia, and Chicago, Illinois.  All three entities are organized as 501(c) 3 corporations.  They provide a comprehensive program of business management and planning, legal support, and financial planning for the business community.  These services are provided through a network of on-site professional advisers from the U.S. SBA's (SCORE), its Small Business Development Centers (SBDCs), local banks, representatives from the SBA, local government Loan Guarantee and Business Investment Programs, local universities, and the Department of Commerce's International Trade Assistant Programs.

The One-Stop Capital Shop located in Atlanta's City Hall provides information on training programs offered throughout the City, coordinates mentoring programs, and provides business planning assistance, and training.  Boston's OSCS is located in its Empowerment Zone and is designed to assist local small businesses in establishing and developing viable businesses in that zone, using the same resources as those offered in Atlanta.

## 3.6    The Certification Process

The scope of work included in the Office of Local Business Development's program is primarily focused on certification, monitoring, and reporting on the LSDBE's utilization by District

government agencies. The office has made significant strides towards streamlining the certification process, by reducing the number of pages in its certification application from 17 to 8 during FY2000. However, prospective LSDBEs complain that the same extensive detail is required, largely as attachments now, and that required information is similar to that required by lenders and/or investors.

During the two-year period 2000, 2001, the agency issued, on average, 253 new and renewal certifications to LSDBEs. Thus far during 2002 (October – June), OLBD has issued 217 new or renewal LSDBE certifications. All total, approximately 600 companies are certified as LSDBEs in the District of Columbia. To put these data into context, the SBA's *2001 Small Business Profile* of the District of Columbia shows that there were 26,157 businesses in the District in 2000, and 24,482 of those were classified as small businesses (i.e. those with 500 or fewer employees). The latest data available (2002), show that there were 15,200 minority-owned businesses in the District, representing 33.6% of all businesses.

Based on the total population of small and/or potentially "disadvantaged" businesses in the District of Columbia, according to SBA data, the District's LSDBE program is not finding widespread appeal among the overwhelming majority of potentially qualified businesses. Considering that the small business size-standard for SBA certified small businesses is comparable to the District's small business size-standard, the above data suggests that thousands more small businesses could potentially become certified under the LSDBE program. This was especially troubling to the Subgroup, as a common theme among the developers, agency directors, and agency procurement officers interviewed is that there are too few certified LSDBEs to meet their procurement needs. These stakeholders say that, while they would like to use more LSDBEs, with the exception of a few selected industries, many of the categories they purchase from have no certified LSDBE vendors.

Overall, the LSDBE certification and re-certification processes received mixed reviews from the stakeholders that were interviewed. Several of the developers and agency representatives have the impression that the certification/re-certification process is difficult and discourages applicants, while some LSDBEs found the certification and re-certification processes to work smoothly and commented that OLBD staff was very helpful. However, other LSDBEs encountered problems and delays when they went through the process.

## Perceptions of the Certification and Re-Certification Process

Participants in the Task Force's Focus Groups stated that:

- ◆ "They (OLBD) believe that, once you are the client, then they give you service. But, until you become a client, it's like, 'We want you to be certified,' until you get this particular certification. That has not sunk in that those who are uncertified are still their constituents."

- ◆ "The certification process is pretty good."

♦ "I didn't even have to call in; they called me for re-certification. This was just last week."

♦ "It was horrible. It took three months. And with the exact same paperwork that I submitted in December, they said I had something missing, as though I left something out, and it took them three months. I had to continually call them and fax them the same information over and over and over to the point where I had to call my Councilmember and complain. And, it wasn't until their office got involved that I actually got a tip letter. I was waiting on that certification to do work, and it took me three months."

One issue the Local Business Opportunity Commissioners have with OLBD relates to the preparation of the LSDBE applications. Commissioners find that often information is missing or incomplete, delaying their ability to grant certification in a timely manner. One Commissioner stated, "Our suggestions have been to improve the quality time that the staff spends on these applications, because my experience is the same mistakes month after month after month. And if they really made an all-out effort to minimize commissioner's questions, then they wouldn't be answering to us all the time about whether this person really runs the business out of 'x' place or why this individual didn't submit last year's tax returns. It's all there. We require the previous two years; the previous two years is not 1999, it's 2001."

**Perceptions of the LSDBE Program and Why So Few LSDBE Certified Businesses Feel That They Have Truly Benefited From the LSDBE Program**

With regard to experiences with the LSDBE program and why so few certified businesses feel that they have benefited from the program, the Task Force received the following feedback from Focus Group participants. This feedback was consistent with data collected during the Community Business Forums:

♦ Many LSDBEs find that trying to work with the District's agencies is a significant barrier for them when competing for District government business. One interviewee states, "We have to jump through so many hoops to get this thing, for a small business, you just give up. I still apply for things but, I do most of my business with the Federal Government and it's just a much easier dance than the hoops of the District. Each agency has its own practices, everybody wants a different thing and when you're truly a small business you can't go through all of that."

♦ Many LSDBEs find that District agencies tend to have the viewpoint that LSDBEs are generally not capable of handling large projects. As a result, they are either overlooked or told that they need to partner with a prime contractor because they are too small to bid on projects alone. These small businesses view this as insensitivity on the part of the agencies and that LSDBEs are not being given an opportunity to demonstrate their capabilities. One respondent stated that: "It's the minority firm that's always the sub these days because somehow the perception is the minority firm cannot do the job."

♦ A Local Business Opportunity Commissioner stated, "As you look at the categories of certification, the local, disadvantaged and the small businesses, the major share of the dollars go to the local."

## Why Are So Few Potentially Eligible Small and or Disadvantaged Businesses Certified in the District's LSDBE Program In Relationship to the Number of Potentially Eligible Businesses?

Participants in the Task Force's Community Business Forums and Focus Groups believe that the overall business community trends to have negative impressions of the LSDBE program. Several groups commented that the lack of participation by much of the District's small business community is the result of LSDBEs not believing that the program can directly benefit, or be of value to their firms.

♦ Among the procurement officers interviewed there was the general feeling that the LSDBE program is not performing as well as it should. Several of them were able to point to LSDBEs that have succeeded as a result of their participation in the program. The Subgroup learned that these LSDBEs tend to be in non-capital intensive areas, such as the information technology (IT) field or other service-oriented fields. One procurement officer stated that, "I think that's probably because there are some pockets of success. I was at the LSDBE Marketplace . . . there were so many IT firms that came up to the exhibit booth, and they wanted to know if we could do business with them . . . so I know there's a lot of supply there and there's a lot of demand on our side. Now, you get to other areas that are more capital intensive, like road construction work, you get a slightly different story. We make the decision to set aside, we've done that in the past but it's getting increasingly difficult to do because of the limitations posed by the availability."

♦ Agency directors are also of the opinion that the LSDBE program, as implemented, has experienced only limited success. While they believe that there are LSDBE success stories, for the most part they believe that the program is not impacting the small business community in any meaningful way. Participants indicate that while some LSDBEs are benefiting from the LSDBE program, there tends to be only a small number of businesses that actually bid on a large number of contracts. Directors say that they are not seeing an influx of new LSDBEs enter into the process, but rather the program tends to be populated by a core group of LSDBEs. One agency director provided the following insight: "There always seem to be, from my observation, a number of the same individuals and/or firms that are always sort of 'there' but you always sort of see some of the same mix. In other words, you would expect the pool to change as the requirements and everything changes. And there are a few firms that step-up and say, 'Well, I can do "A" but oh yeah, if you need me to do "B" I can do B.' And, then if "C" comes along, 'I do "C," too!' So, the pool isn't changing as much as it should be; there's not an interchange of a variety of companies." Another procurement officer stated that: "The IT LSDBE firms. Of the 78 firms that I have on my list of LSDBEs, I've only contracted with 28 of those, and of those 28, the top ten have

done more than 50 percent of the work. So, when you say 'who's benefiting,' there is a small group of LSDBEs that are benefiting. Of course there are LSDBEs doing a good job, so it's deserved. But, that is an issue for those that are not getting the work."

♦ Private developers have the perception that the certification process is difficult for a small and/or disadvantaged contractor to complete. One private developer stated that, "It seems like the program, in terms of getting people qualified, must be very cumbersome because there always seems to be, from what I've seen, a hindrance of some sort. I can't put my finger on it." Another stated, "I've heard that as well from a number of people. When they have been urged to become involved, to become certified, meet the qualifications, they have all expressed disdain for the process, how long it takes, how expensive it is and how intrusive it is in their business practices. So I think there would be a lot more participation if the process were somehow streamlined."

## 3.7    The Negative Impact LSDBEs Shortages Have on Procurement Officers, Agency Directors and Private Developers

A common theme among the agency procurement officers, agency directors, and private sector developers is that there are not enough certified LSDBEs in specific categories to meet their procurement needs. These stakeholders say that while they would like to use more LSDBEs, with the exception of a few selected industries, many of the categories they purchase from have no certified LSDBE vendors to provide those goods and services.

This shortage of certified LSDBEs in specified categories, in turn, leads to other problems. For example, the cost of using an LSDBE for a project is not cost-inefficient because there are so few from which to select. This narrows the number of LSDBEs who provide quality services. Several interviewees said that using an LSDBE adds approximately 10% to the project's cost. For example, developers say that they incur administrative costs when they try to involve LSDBEs in a project, including costs related to locating a quality LSDBE, checking their qualifications and capabilities, arranging bonding or insurance, etc. This has the unfortunate result of introducing a trade-off decision with respect to paying the extra cost to use an LSDBE or simply incurring a 5% penalty for not doing so. In addition, because there are a limited number of LSDBEs from which to select, agencies find that to meet their program goals, they contract with LSDBEs whose performance falls below what would normally be acceptable.

While some of the developers say that they have successfully used LSDBEs on major projects, overall, there is the feeling that, at the present time there are not enough qualified LSDBE contractors to meet their needs. Developers also say that, not only is the pool of LSDBEs too small, but there are not enough LSDBEs in certain construction trades (drywall, plumbing, etc.) to meet their needs and to allow them to meet their program goals. The lack of LSDBEs in the construction trades has had a negative impact on developers trying to meet their program goals.

**What Actions Should OLBD Take to Certify More Businesses, Including Those in Vendor Categories that Have Been Identified as Most Needed by Procurement Officers, Agency Directors and Private Developers?**

The Subgroup reviewed the business certification process of the U.S. Small Business Administration, U.S. Department of Transportation, the cities of Philadelphia, Pennsylvania and Atlanta, Georgia and the Washington Area Regional Committee on Minority Business Enterprise Certification. We found that the certification applications used by these organizations were similar to OLBD's certification application with regard to the type and volume of information requested. Many of the actual applications appeared to be modeled after the SBA 8 (a) certification program. Careful review of both OLBD's and SBA's certification applications support the idea that a unified certification program is feasible. Based on discussions with the SBA's District office, the agency is extremely interested in establishing a mutual agreement/Memorandum of Understanding through which the SBA and the District would reciprocally accept each other's certified small businesses.

Further, the Washington Area Regional Committee on Minority Business Enterprise Certification is a consortium of nine local and regional governments and organizations, created in the early 1990s to provide for universal certification amongst its members. The representative jurisdictions, which include the District of Columbia, developed a universal certification program that allowed program applicants to use certifications from participating members to waive certain application filing requirements.

This Subgroup was told that the development of the certification agreement between organizations resulted in an exponential increase in business opportunities for companies, and the concept of certification streamlining has been adopted by both SBA and the Department of Transportation through the establishment of a Memorandum of Agreement to accept each other's certifications.

While the SBA certifies businesses as "small" under the 8(a) program, other certification programs certify businesses in other categories. The National Minority Supplier Development Council (NMSDC) certifies business through its regional affiliates as "minority-owned." Although the District's LSDBE program definition of "disadvantaged" should not be construed to mean minority or race-based, the Subgroup believes that a "minority-owned" certification could be used to support a business' application for certification as a disadvantaged business under the District's LSDBE program.

**What Actions Should OLBD Take to Ensure That Greater Numbers of LSDBES See Value in the Program?**

The Subgroup believes that the majority of LSDBE certified businesses do not realize the potential business opportunities available through the District's LSDBE program, opportunities that could aid in expanding their business capacity and capabilities. Some of the key reasons why this capacity and capability building is required:

- Many LSDBEs have limited capacity, including no access to capital funding, very little credit capacity, limited capacity to further develop their businesses, and a lack of "savvy" in addressing financing, bonding, and insurance issues. Participation in the LSDBE program provides opportunities to overcome these deficits.

- Some prime contractors and District government officials have perceptions that LSDBEs are not qualified for certain contracting opportunities. In some instances, LSDBE participation could disprove this perception.

- Information about procurement opportunities is not viewed as easily accessible and readily available to them. Program participation may prove that such information is readily available.

- Procurement opportunities are often outside of the scope and capacity of LSDBEs. Increased participation could provide LSDBEs with the necessary scope and capacities.

- In the solicitations posted, they see no business development opportunities available to them. This view may not be true, and program participation and technical assistance may allow participants to see business opportunities.

Based on its research, the Technical Support and Business Assistance Subgroup believes that OLBD could offer, and do a better job of recommending, technical assistance programs during the certification process and through the LSDBE growth cycle, especially programs that can assist LSDBEs in responding to RFPs, expanding their business capacity, and enhancing their capabilities. These actions would enhance LSDBE success in the program.

The Subgroup conducted research that addressed the needs of certain minority and immigrant LSDBEs and prospective LSDBEs. For example, according to the SBA, there were 2,200 Latino-owned firms in the District of Columbia in the year 2000. Many of these firms are small "mom and pop," or micro businesses, with owners who are Latino and have left their countries of origin and come to the U.S. seeking freedom and the American dream. Many Latino business-owners from this population come from countries where political unrest, civil war, and general distrust of the government are a way of life. In addition, many of them are not fluent in English and, thus, find it difficult or extremely intimidating to communicate with government agencies. In response to these special needs, OLBD should provide outreach and recommend technical support and business assistance at the grassroots level. According to Janet Farrell, President of the DC-based Latino Economic Development Corporation, "Latino and other micro businesses do want to pursue contracting and subcontracting opportunities with the District government, but are unsure of the processes, how to get information, and what the various rules and regulations are. There is a perception that this process is so tedious, confusing, and time-consuming that it's not worth the effort. Also, Latino and immigrant business-owners may have special language needs that make the process even more daunting."

To alleviate these barriers, the District should use established business and community groups, like the Latino Economic Development Corporation, to provide this type of support and assis-

tance at the grassroots level in the communities where these business-owners live and work. Because the local government is not legally mandated to provide technical support and business assistance, this population of business-owners is left to rely on other sources to supply technical support and business assistance services.

## 3.8   LSDBE Business Capacity, Capabilities and Performance Quality

The Technical Support and Business Assistance Subgroup focused its attention on examining ways to enhance small business capacity and, thereby, create a more capable, marketable and robust pool of businesses ready to compete for government and private sector business opportunities. Based on all of its research, the Subgroup has determined that the District must do a better job of providing its local, small and/or disadvantaged community the resources that will allow them to take better advantage of the LSDBE program. This improved service must be offered either directly or through other public and private sources

The Subgroup believes that many more businesses could be certified as LSDBEs and many of those that are certified would reap the benefits of expanded contract opportunities, if training and technical assistance that specifically address their needs are made available to them. To date, all stakeholder groups have said that they believe that the program has not done enough to support LSDBEs through the provision of technical assistance and training or in addressing the lack of access to and knowledge of available financial resources. The latter is a major issue for many small and disadvantaged businesses. Many of the stakeholders interviewed said that they would like the LSDBE program to include a training and business assistance component, whether offered through OLBD staff or through existing programs. This component would assist in capacity building, expanding capabilities, identifying sources of bonding and insurance, raising debt and equity capital, and aid them in remaining viable. These stakeholders think that OLBD is understaffed, especially in comparison to previous years. Consequently, the program is less successful.

Until the District makes significant improvements in assisting businesses in building capacity to compete, many LSDBEs will continue to complain that the program does not work for them and that the District does not appear committed to the program. Building capacity entails, amongst other things, helping to ensure that essential business infrastructure, systems, and processes are in place, that adequate financing is available. It also entails facilitating LSDBEs in becoming seasoned marketers of their goods and services. LSDBEs interviewees expressed an interest in OLBD offering assistance in the areas of financial functions, e.g., financing, bonding, and insurance. They also want assistance in business development skills, e.g., marketing, public relations, business expansion and growth, and the fundamentals of submitting RFPs, including bidding and estimating. Further, assistance in computer skills and training is also desired.

The Subgroup believes that the LSDBE certification process provides an excellent opportunity for OLBD to assess the technical and business assistance needs of LSDBE certification appli-

cants, and to systematically refer them to business and technical assistance service providers capable of meeting their needs. The LSDBE certification process could be the first step in building small businesses' capacity by getting applicants into a "pipeline" of capacity building training and advisory services.

Specifically, training and other business support assistance should be designed as opportunities for LSDBEs to develop their business acumen. Many businesses need to be actively "nursed along" to realize success. Currently, OLBD did not have adequate staffing to directly provide technical assistance; however, as mentioned earlier in this Report, the Subgroup has determined that there are numerous technical assistance programs available in the District. The next critical step is for the District government to coordinate these vast resources and to offer ways to enhance these programs to meet the specific needs of LSDBEs and businesses seeking certification. This may include providing some additional funding to existing programs.

While the lack of qualified LSDBEs is a major concern amongst procurement officers, agency directors and developers, they have encountered other critical issues when working with LSDBEs. For example, several developers said that when they work with an LSDBE they often have to train that LSDBE. This creates a certain amount of frustration on their part and adds to their cost of doing business. As previously stated, several interviewees calculated that using LSDBEs for government financed projects, adds about 10% to their project cost. In addition, developers said that there are also administrative costs to consider when trying to involve LSDBEs in a project. These costs are related to locating an LSDBE, checking its qualifications and capabilities, arranging for bonding or insurance, etc. Developers feel that LSDBEs need assistance in "getting up-to-speed financially, how to bid the job, and how to estimate it." Also, bonding, insurance, and the overall financial strength of LSDBEs create problems either during project operation or at the bidding point. Agency directors and procurement officers express frustration in learning that after contract award, a LSDBE cannot obtain bonding or insurance. Likewise, obtaining adequate funding is a major barrier faced by many LSDBEs. These interviewees feel strongly that the local, small and disadvantaged business people have special financial, bonding and insurance needs that are not being addressed.

Quality, capacity, and capabilities were three common areas where procurement officers, agency directors, and private developers had issue with LSDBEs. The commonly held viewpoint is that OLBD needs to provide an updated listing of LSDBEs and provide additional information about each LSDBE's skills, financial health, bonding capacity, and prior performance. One developer said, "If we agree to reach a certain goal, where all we had to do was call a certain entity in the District and say, "Okay, we're going to be subject to this requirement, tell us which six drywall, which six painting, which six mechanical, which six architects, we should talk to about doing business with," and with the comfort of knowing that they're qualified, they have the expertise, they have the financial stability and we're not paying a huge premium. That would be great! That would be fantastic! But that doesn't exist today." There are examples of databases being used to track the performance of contractors in the marketplace. The National Institutes of Health (NIH) has a program to monitor past per-

formance of contractors that other federal agencies have adopted. The Subgroup suggests that the OLBD and OCP perform due diligence on such databases, for potential use.

Agency directors are also critical concerning the lack of follow-up and evaluation of LSDBE program participants' work. As a result, the poor quality of the work performed by some LSDBEs has become a major issue for agencies. These agency directors understand that part of the goal of the LSDBE program is to help the disadvantaged businesses to grow and enter the mainstream marketplace. But, because many of these businesses lack the resources, expertise, and experience of more established firms, quality problems occur in their performance, their work falls below contract requirements. One agency director made the following statement: "I've always felt it lacked – whether it's for want of resources or whatever, a true advocacy function as well as an evaluation function at the end. Because there is no credibility with the program, even if you are using local, small, disadvantaged if those people don't perform and don't produce. Tax payers' dollars should be going to local – and should be nurturing and growing and developing small businesses here in the District of Columbia. But the balance of that also is to somehow assure through monitoring, evaluation and whatever, that you are developing and encouraging and financing performers."

The issue of quality is very frustrating to the directors on a number of levels. On one hand, they feel that the procurement system allows businesses to compete or obtain contracts in areas where they have no expertise. Agency directors have experienced situations where an LSDBE has stated that it had certain skill sets, only to learn later that the LSDBE does not have the capabilities or technical know-how needed to successfully execute the project. This has lead some people to raise the question of whether or not the right companies are being certified for the program. But, more importantly, they feel that someone needs to step in and assist LSDBEs in developing the skills needed to compete. On the other hand, they find that to remove an LSDBE from a contract for non-performance has become so politically and legally difficult that it is often just easier to accept the poor service. Notably, because of the pressure to meet the agency's LSDBE program goals, there is a reluctance to replace an LSDBE for poor performance, because it could negatively impact the director's own compensation.

Furthermore, procurement officials say that there is a perception among some persons that LSDBEs can only handle smaller jobs, makings it difficult to bring LSDBEs into certain projects. Interestingly, the question of LSDBEs' capabilities extends beyond their skill set or expertise to do a job to their internal administrative capability. Procurement officers say that many LSDBEs lack the administrative capacity to respond to their requests to, "turn documents around timely." The Subgroup has considered that LSDBEs lack of capabilities and expertise may only be an incorrect perception held by local government officials. If this is true, the problem can be addressed through appropriate training of agency directors and procurement officers and more effective advocacy on the part of OLBD and the Mayor.

Based on the above-referenced data, and the obvious need for a wide range of technical support and business assistance training and advisory services, the Subgroup believes that the District

should identify programs or incentives for large companies to partner with and mentor LSDBEs. One focus group participant stated the following view, which was shared by all stakeholders: ". . . big business . . . I think you need to do more in the way of enforcement, making them better incubators, better partners, to have some real commitments, some real obligations to teaching new businesses how to fish and not just how to eat . . . it seems to me that a little bit more could be negotiated . . . so that if the middle-sized businesses or the large-sized businesses are serious about playing and they do want to take advantage of some of the preferences that are afforded by having the designation, then they need to play a big brother or a big sister in the real world."

Also, additional effort should be made to follow-up with businesses that are certified to ensure that they become viable contributors to their community's and to the City's economic sustainability. Many interviewees said that they would like to see an effort made to follow-up with LSDBEs after projects are completed to determine how they performed, to help correct deficiencies, to focus on how businesses can improve their performance and obtain the next contract, compete more effectively and grow. The consensus is that help should be in the areas of developing skills, as well as in how to successfully operate a business.

## Bonding and Insurance

In addition to training and business advisory services, interviewees stated that they would like to see greater support of LSDBEs by assisting them in obtaining bonding and insurance. This was viewed as a critical component of developing LSDBEs.

The SBA offers a Small Contractor's Bond Guarantee program. The Subgroup has determined that there is a need to provide this information to all LSDBEs. Depending on the flexibility of the SBA's program, there may also be a need to create a vehicle to provide bonding assistance and bond guarantees. The Subgroup recommends that the District analyze the bond guarantee programs that are offered through the States of Maryland and Florida.

## Business Incubation

Other means through which the District government can offer technical support and business assistance to perspective, start-up, and growing LSDBEs is through business incubation. Business incubation catalyzes the process of starting and growing companies. A business incubator is an economic development tool designed to accelerate the growth and success of entrepreneurial companies through an array of business support resources and services. Two principles characterize effective business incubation:

♦ The incubator aspires to have a positive impact on its community's economic health by maximizing the success of emerging companies.

♦ The incubator itself is a dynamic model of a sustainable, efficient business operation.

An incubator program's main goal is to produce successful graduates, i.e. businesses that are technically, managerially, and financially viable and freestanding when they leave the incubator, usually in two to three years. Thirty percent of incubator clients typically graduate each year. According to the *Impact of Incubator Investments Study*, 1997, eighty-seven percent of incubator graduates remain in business. A proven model, it provides entrepreneurs with the expertise, networks and tools they need to ensure their success, including low-cost rental space (with rents usually based on projected cash-flow and graduating payments), business plan development, strategic planning, commercializing new technologies, marketing, day-to-day administration, and the raising of capital. Incubator "graduates" create jobs, revitalize neighborhoods, commercialize critical new technologies, strengthen and diversify local and national economies and build wealth. Today, there are more than 900 of these programs in the United States.

Though there are many incubation programs that could have been examined, the Subgroup has selected two successful, nationally recognized, local programs as examples: Maryland has one of the most well known programs in the nation, and has established one for high technology companies, especially in the area of biotechnology. The Maryland incubator program is called the Maryland Technology Development Center (MTDC). Additional information can be found at their web-site, http://mdhitech.org/Entrepreneur/. MTDC has a recently constructed facility and offers low-cost rental space and a network of technical and business support services to help local and new businesses succeed. The objective of the MTDC is to help young enterprises grow over the critical period of "incubation." Once the business has achieved momentum on its own and has the ability to survive outside of the incubator, it graduates into regular commercial and industrial space. There is also a well-known incubator in Fairfax County, VA called the Morino Institute. It operates using a strategy similar to MTDC's.

The Subgroup has learned that there are also plans to develop business incubators in Silver Spring, MD and in Arlington, VA to foster micro-businesses and economic growth.

## 3.9   Small Business Lending and Investing

In addition to training and business advisory services, interviewees consistently stated that they would like to see a greater support of LSDBEs in the preparation of raising debt and equity financing and working capital (e.g. contract receivables) and equipment. The Subgroup believes that this assistance is essential to the long-term sustainability of LSDBEs in business as successful contractors in the District.

Many lenders and investors perceive that there are greater risks and greater costs involved in underwriting loans of small and disadvantaged businesses. As such, it is very difficult for these businesses to obtain appropriate financing to meet their needs. Further, many small and disadvantaged business owners lack the know-how and financial expertise to prepare the required financial forms to obtain financing.

The government of the District of Columbia looks to private lenders and investors as an important resource for urban revitalization. In its Strategic Economic Development Plan for the 21st Century, the DC government emphasizes the importance of private lenders and investors in facilitating its plans for small business, real estate development, and social service growth. The DC government recognizes that growth in the City must include plans to assist small businesses in their start-up and expansion phases, and to assist community organizations through the provision of a number of services and job-training facilities. Entities involved in small real estate development projects also require such assistance. Thus, the District government outlined seven key actions designed to "forward the City's strategy for growing the private sector" and identified the important role of capital in this effort and the need for a "concerted effort to mobilize capital resources and to coordinate them more effectively."

## Lending

The SBA's Office of Advocacy reports in its 2001 Small Business Profile that small businesses often rely on local bank services. Unfortunately, the number of banks within the District has decreased over the past five years. Based on information collected by the Federal Reserve Board, there are very few banks that can boast of strong lending results in the District's small business community, and even fewer that can boast of strong Community Reinvestment Act ("CRA") ratings from bank regulators. The SBA's Office of Advocacy offers a complete list of those banks that it considers as "small-business-friendly" on its web-site at www.sba.gov/advo/lending.

While the Subgroup believes that lending products targeted for small businesses are available in the Washington, DC market, recent bank consolidations and mergers are also likely to have a negative impact on small business lending. According to a report written for the Federal Reserve System's Board of Governors, there is evidence of lower, small business loan growth in urban markets where market merger activity has occurred. The report goes on to note that small business lending relies heavily on "local expertise" for underwriting and monitoring borrower-specific risks. As such, lenders who lack a truly local presence make it difficult for small businesses to obtain credit. Although the types of loan products, like mortgages and large commercial loans, focused on by larger commercial banks do require product expertise, these products do not require the same level of local presence that small business loans do.

In addition to traditional loans, banks also provide loans to small businesses that are guaranteed by the SBA. There are several such programs offered through the SBA. Refer to the SBA's web-site at www.sba.gov/financing for a detailed breakdown of its various financing programs, which include micro-loans, real estate loans, equipment loans, working capital financing, seasonal lines of credit, small contractor financing, and international trade financing. The SBA provides a wide range of guarantees to participating lending institutions, depending upon the financing program used. This type of information is provided to LSDBEs during their Orientation Seminars, but is not discussed in detail. Further, OLBD does not asses the financing needs of LSDBEs and, thus, does not refer them to lenders for specific programs.

*The Washington Business Journal 2002 Book of Lists* identified four banks with operations in the District as being among the top 25 small business lenders in the region. Combined, these four banks approved 38 SBA Guaranteed loans, for a total amount of $8.7 million in 2000. In comparison, eight Virginia-based banks were responsible for approving a total of 122 SBA loans, totaling over $48 million in 2000.

Further, non-bank lenders have been undergoing industry consolidation, leaving fewer non-bank lending sources for the District's small businesses, and the SBA-certified micro-lenders (providing financing in increments of less than $50,000) have not been successful in reaching a significant portion of the DC small business market, have not generated profitability to expand their operations, and have not encouraged micro-level activities from an industry-wide perspective.

In addition to facing limited sources of traditional bank financing, non-bank financing and micro-loan financing in the District, many small businesses continue to face a shortage of available contract or asset-based receivables financing to support their business' growth.

The New Markets Tax Credit program (NMTC program) is a national economic development program that is administered by the U.S. Department of Treasury's Community Development Financial Institutions Fund (CDFI Fund). It was enacted into law as a component of the Community Renewal Tax Relief Act of 2000. NMTCs offer a partial tax subsidy to increase private capital available for loans and investments in commercial real estate and businesses located in low to moderate-income census tracts. Businesses and commercial real estate projects are eligible if located in census tracts with poverty rates of 20% or more, or a median income that is equal to or less than 80% of the median income for the Metropolitan Statistical Area (MSA). The credit enhances return to private investors over the seven-year holding period. In effect, investors earn an additional 5% to 6% per year, above the amount that the underlying investment earns. This shallow subsidy offsets the higher costs of finding, assembling, and evaluating deals in low-income communities, and the lower returns that such investments may pay. In total, the credit will spur the investment of $15 billion on a national basis in new private equity capital into privately-managed investment entities, called "Community Development Entities" or CDEs, that will make loans to and equity investments in businesses and real estate projects located in eligible census tracts. The NMTC program can be the catalyst for financing the following type businesses and economic development projects:

♦ Commercial real estate developments within eligible low-income communities, including private, public and public/private partnerships.

♦ Businesses, whether small, large, new or existing, supporting eligible economic revitalization projects.

♦ Businesses, whether small, large, new or existing, generating income from and employing workers in eligible communities.

The US Department of Treasury's CDFI Fund will competitively award allocations of New Markets Tax Credit throughout the nation. The CDFI Fund plans to allocate NMTCs totaling $2.5 billion in 2002 and 2003, $2.0 billion in 2004 and 2005, and $3.5 billion in 2006 and 2007. There are no geographic standards; thus, the Washington, DC area is not guaranteed an allocation. However, as mentioned earlier, with the financial support of the District's Office of Planning and Economic Development, the support of the Mayor, the National Capital Revitalization Corporation (NCRC), and City First Bank of DC, in partnership with The Bernstein Companies, has submitted an application seeking $107.5 million in NMTCs to offer to private investors. As the only CDFI Fund-certified community development bank in the District, City First Bank of DC will continue to make flexible senior bank loans to small and disadvantaged businesses, including loans to small real estate contractors, and businesses dependent upon local and federal government contracts. City First Capital will make senior debt and mezzanine investments in commercial, retail, mixed-use, industrial and community facilities, in NMTC-eligible census tracts in Washington, DC, on flexible terms.

### Equity Investing

There is very limited publicly available data that provides insight into the amount of equity capital that has actually been invested in local, small and disadvantaged businesses in the District. However, based on years of research by the U.S. SBA, Ernst & Young LLP, Price Waterhouse Coopers, Venture Economics (a national venture capital research firm), and the National Association of Small Business Investment Companies (NASBIC), small and disadvantaged businesses (those with fewer than 500 employees), those that are minority-owned, and/or those that are located in or are locating in low to moderate income communities throughout the nation, report a scarcity of equity capital available to meet their needs. Lenders support this research, as many deals cannot be completed due to a lack of appropriate levels of equity capital to offset their risks and to provide the means for these small and disadvantaged businesses to grow and survive.

Equity capital is available through U.S. SBA-licensed Small Business Investment Companies (SBICs), Specialized Small Business Companies (SSBICs), New Markets Venture Capital Companies (NMVCCs), traditional private equity firms, and angel investors. Further, and as mentioned earlier, through its new, nationally-focused New Markets Tax Credit Program, the U.S. Department of Treasury's CDFI Fund expects to certify CDEs throughout the nation to provide debt and equity capital to businesses and to real estate development projects in census tracts characterized with 20% or greater poverty levels or median incomes less than 80% of the median income through the related Metropolitan Statistical Area (MSA).

SBICs and SSBICs were created to fill the gap in equity financing being provided to small companies. SSBICs were formed to target the equity financing needs of minority-owned firms, including those owned by African-Americans, Hispanic-Americans, Asian-Americans and Native-Americans. These equity providers are funded through private equity investments, which are leveraged up to 3 to 1 by the SBA on advantageous debt and preferred equity terms. There

are three SBICs and one SSBIC based in the District. Many other SBICs and SSBICs include Washington, DC in their target markets. Even with the SBICs and SSBICs small businesses consistently report to the SBA and to the Washington, DC Small Business Development Center Network that equity capital is not readily available to them.

When equity capital is available, return expectations make it impossible for many of the District's small, predominately service-oriented businesses to obtain equity financing. SBICs and SSBICs seek returns on capital that are similar to traditional private investors to satisfy their investor base. Equity returns are expected to exceed 20%, with average returns in the 25% to 30% range, depending upon the stage of the businesses development/expansion level. With these investor return requirements, SBICs and SSBICs seek to invest in businesses with a high probability of completing an initial public offering and/or those with characteristics that are attractive to major market players; those seeking vertical and/or horizontal integration through acquisitions. These providers of equity capital state that, the majority of businesses based in the District are service-oriented. Some of them are retail business and some of them depend upon government contracts. However, underwriting/investing standards require identifiable, stable, growing cash-flow, and a strong asset-base for investment purposes, which are characteristics difficult to identify in many of the businesses discussion, therefore, ideal opportunities to meet investor return expectations are also difficult to identify.

NMVCCs were created to fill a gap that was still not being met by the SBICs and SSBICs, i.e. small businesses in "New Markets," defined as low and moderate income areas. They are also defined as those faced with a median income of 60% or less than the median income throughout the MSA. These equity providers are also funded through private equity investments, which are leveraged up to 3 to 1 by the SBA on advantageous debt and preferred equity terms. The SBA has licensed only one NMVCC to support businesses throughout the Washington, DC metropolitan area. The University of Maryland's Dingman Fund was licensed in 2001 and has a $10 million fund, targeting small, early stage investments in companies with an expected high growth rate. No investments have been made to date.

The SBA has also developed a program called ACE-NET, which is an Internet-based network sponsored by the SBA's Office of Advocacy that gives new options to both small companies looking for investors and to investors looking for promising opportunities. ACE-NET's database marries "angel investors" with those seeking equity capital. There is typically a small charge to "angels" and/or to businesses seeking to be listed in ACE-NET databases. Within the District, there are three ACE-NET operators: 1) Howard University's Washington, DC SBDC Network's system at Howard University's School of Business, 2) the Economic Development Finance Corporation (NEDCO/EDFC) located at 1660 L Street, NW, and 3) the United States-Mexico Chamber of Commerce's National Office and Mid-Atlantic Chapter located at 1300 Pennsylvania Avenue, NW. There is also an ACE-NET program operated in Maryland through Prince George's County Economic Development Corporation. There is no comparable program available in Northern Virginia. In addition to the SBA's ACE-NET,

there are a number of local and national angel networks that the District's local, small and/or disadvantaged business community could access.

Also noteworthy is the fact that the District's Department of Banking and Financial Institutions has been preparing to develop a venture capital program that will target start-up businesses seeking equity investments between $1 million and $5 million. This program is still under development.

The Subgroup has determined that, the District must improve the information flow to LSDBEs concerning existing business lending and financing products and programs. It must also ensure that public and private small business lending and investing sources offer flexible and competitively-priced terms to the City's LSDBEs. The District's Department of Banking and Financial Institutions, national bank regulators local community development banks, SBICs and SSBICs targeting Washington, DC, the local NMVCC, other privately sponsored equity funds, and Community Reinvestment Act (CRA), and Officers of major lending institutions must be engaged in dialogue to address approaches and strategies for making debt and equity capital available to small and disadvantaged business in the District. The District must be proactive in looking at ways to encourage lending institutions to begin outreach efforts to provide capital to its LSDBE constituents.

## 4.0. Recommendations

### ISSUE:  The Need to Streamline and Expedite the Certification Process

Overall, the LSDBE certification and re-certification processes received mixed reviews from interviewees. Several of the developers and agency interviewees have the impression that the process is difficult and discourages applicants. On the other hand, although many LSDBEs encountered problems and delays when they went through the process, others found the certification and re-certification processes to work smoothly and commented that OLBD staff was very helpful.

Based on SBA data, the District's LSDBE program is not finding widespread appeal among the overwhelming majority of potentially qualified businesses. This is especially troubling to the Subgroup, as a common theme among the developers, agency directors, and agency procurement officers interviewed is that there are not enough certified LSDBEs to meet their procurement needs. These stakeholders say that, while they would like to use more LSDBEs, with the exception of a few in selected industries, many of the categories that they purchase from have no certified LSDBE vendors.

The Subgroup reviewed the business certification processes of the U.S. Small Business Administration, U.S. Department of Transportation, the cities of Philadelphia, Pennsylvania and Atlanta, Georgia, and the Washington Area Regional Committee on Minority Business Enterprise Certification. We found that the certification applications used by these organizations are similar to OLBD's certification application with regard to the type and volume of information

requested. Many of the actual applications appear to be modeled after the SBA 8 (a) certification program.

**Recommendation:**

Develop Memorandums of Understanding (MOUs) with the SBA and the Maryland/DC Minority Supplier Development Council to streamline and expedite LSDBE certifications for DC-based SBA 8 (a) and NMSDC certified businesses in certain categories.

**ISSUE: The Lack of a Coordinated Technical Assistance Delivery Strategy and Implementing Program Works Against Small and Disadvantaged Businesses, Both Those Certified and Those Seeking Certification**

The Technical Support and Business Assistance Subgroup focused its attention on examining ways to enhance small businesses capacity and, thereby, create a more capable, marketable and robust pool of businesses ready to compete for government and private sector business opportunities. Based on its research, the Subgroup has determined that the District must do a better job of providing its local, small and/or disadvantaged community with the resources that will aid them in taking better advantage of the LSDBE program. Such help should assist them in succeeding and getting on an equal footing with the companies against which they compete. This assistance can be provided directly or indirectly through other public sources or in the private sector.

The Subgroup believes that many more businesses could be certified as LSDBEs and many of those that are certified would reap the benefits of contract opportunities, if needed training, business advisory services, and other technical assistance are made available to them.

**Recommendations:**

♦ Contract with an organization or a consortium of business training and advisory service providers to deliver technical support and business assistance to certified LSDBEs and LSDBE applicants. Training should include small business financing and preparing firms to attract capital.

♦ Reconsider plans to create a business resource center within OLBD and concentrate resources on expanding the Department of Employment Services' (DOES) and Howard University Small Business Development Center's (HUSBDC) program as a model One-Stop Capital Shop.

♦ Expand the existing DOES/HUSBDC business incubator program by creating an incubator pilot project in a specific growth industry, funded with public and private resources. The Subgroup recommends creating the pilot program for small construction firms.

**ISSUE:  Need to Assess Performance Quality and Build Business Capacity and Capabilities**

Quality, capacity, and capabilities are three common areas where procurement officers, agency directors, and private developers have issues with LSDBEs.  The common viewpoint is that OLBD needs to provide an updated listing of LSDBEs and provide additional information about each LSDBE's skill-base, capacity, financial health, bonding capacity and prior performance.  Also, additional effort should be applied to following-up with businesses being certified to ensure that they become viable contributors to their community's and the City's economic sustainability.  Many stakeholders interviewed said that they would like to see an effort to follow-up with LSDBEs after projects are completed to determine how they performed.  Where it is determined that they performed poorly, help to correct deficiencies should be provided.  Assistance in winning contracts should also be provided.  The provision of this assistance should help these firms to operate more effectively and grow.  The consensus is that help should be in the areas of developing skills, and in how to successfully operate a business.

The Subgroup believes that the LSDBE certification process provides an excellent opportunity, assuming adequate staff and appropriate technical know-how, for the District to assess the technical and business assistance needs of LSDBE certification applicants, and to systematically refer them to business and technical assistance service providers capable of meeting their needs.  The LSDBE certification process could be the first step to building small business capacity by getting applicants into a "pipeline" of capacity building training and advisory services.  Training and other business support assistance should be designed as opportunities for LSDBEs to continuously develop their business acumen.

**Recommendations:**

♦ Develop a capacity and capabilities assessment program within the government to determine the business readiness level of new applicants and for certified LSDBEs.  Where warranted certain LSDBE applicants should be referred to appropriate business training and counseling prior to award of full certification.

♦ Establish a vendor performance database for all vendors doing business with the District government to track and report vendor performance.

**ISSUE:  Need to Expand the Sources of Flexible Debt and Equity Capital Targeted to LSDBEs.**

Many lenders and investors perceive that there are greater risks and greater costs involved in underwriting loans to small and disadvantaged businesses.  As such, it is very difficult for these businesses to obtain appropriate financing.  Further, many small and disadvantaged business owners lack the knowledge and finance to prepare applications to obtain financing.

The Subgroup feels strongly that, in addition to improving the information flow to LSDBEs about existing business lending and financing products and programs, the District must ensure that public and private small business lending and investing sources offer flexible and competitively-priced terms to the City's LSDBE population.

**Recommendations:**

♦ The District should promote the Department of Banking and Financial Institutions' (DBFI) efforts to continue partnering with financial institutions to ensure community reinvestment, community development, and to promote more lending opportunities for DC businesses.

♦ Promote DBFI's efforts to develop a venture capital program that can also address the financing needs of LSDBE in the District.

♦ Consider depositing District cash in local banks to encourage greater lending to small and disadvantaged businesses, especially those located in under-served areas of the City.

♦ Encourage the Office of Banking and Financial Institutions' and OLBD to jointly evaluate existing small business lending programs (micro and others) and expand the pool of funds available through small business lending institutions.

*Compliance and Enforcement*
*Subgroup Report*

# TABLE OF CONTENTS

1.0     Introduction

2.0     Statutory

3.0     Issues:  Identification, Analysis, and Validation

4.0     Models for Comparison

4.0     Recommendations

# 1.0    Introduction

Pursuant to DC Law 12-268, the "Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises (LSDBE) Act of 1998," each agency of the District of Columbia government is required to allocate 50 percent of construction contracts to certified small business enterprises; allocate 50 percent of its procurement of goods and services to certified small business enterprises; and allocate 5 percent of its contracts to prime contractors that agree to sub-contract a portion of the work to certified local/disadvantaged business enterprises. This Report focuses on the current compliance and enforcement process related to this requirement and identifies opportunities to strengthen them.

# 2.0    Statutory Framework and Program Expectations

The Office of Local Business Development (OLBD) is charged with the responsibility of monitoring agency compliance with the requirements of DC Law 12-268 in a race and gender neutral way. In order to facilitate compliance monitoring, OLBD requests that District agencies submit a series of documents, including, an Annual Budget Allocation Letter, an Expendable Procurement Projection Report, an Operating Expenses Checklist, and Quarterly Reports. At the end of each fiscal quarter, the OLBD compiles the quarterly expenditure reports and files them with the Office of the Mayor and the Council of the District of Columbia.

Pursuant to DC law 13-169, the Equal Opportunity for Local, Small and Disadvantaged Business Enterprises Amendment Act of 2000, agencies that fail to meet their goal could jeopardize their contracting authority. The Office of Local Business Development is authorized under the above referenced law to reserve contracts, or parts thereof, until the agency's failings have been remedied.

OLBD also reviews and approves Affirmative Action Plans submitted by District agencies for public/private partnerships and for contractors with contracts in excess $25,000. In addition, through Memoranda of Understanding (MOU), OLBD monitors the use of LSDBEs by the District's "economic development project partners." The latter are entities participating in the District's Industrial Revenue Bond Program and the District's Tax Increment Financing (TIF) Program. They execute an MOU pledging their "best efforts" to provide LSDBEs contracting opportunities in an amount equal to 35 percent of the value of the bond proceeds or project costs. OLBD monitors MOUs through review of quarterly reports submitted by project partners.

**An Historical Perspective of the LSDBE Program**

The District of Columbia Minority Contracting Act was originally enacted by the City Council in March 1977, as DC Law 1-95, 23 DCR 953 2(b). The Act established a goal of 25 percent of the dollar value of all District construction contracts and goods and services other than construction to local minority business enterprises. In 1980 and 1983, the City Council expanded the ethnic group eligibility to participate in the program and increased the utilization goal from 25 percent to 35 percent.

In January 1989, in the case of the City of Richmond v. J.A. Croson Co., 488U.S. 469 (1989), the Supreme Court ruled that the City of Richmond's minority business enterprise set-aside program was unconstitutional. This decision forced many states to review and/or, in many cases, revise or suspend their race-based set-aside programs. In order to meet the "strict scrutiny" standards imposed under the Croson decision, many states, and the District of Columbia, conducted extensive Discrimination Studies. The District's study documented the historical under-utilization of minority-owned businesses to determine if a disparity existed between the availability of minority-owned businesses in the District's market and their utilization in the District's contracting activities.

The U.S. Court of Appeals suspended the District's sheltered-market program in June 1992, following a decision of the District of Columbia Circuit in O'Donnell v. the District of Columbia. Following the logic of the Croson decision, the Court of Appeals found that:

◆ The District's 35 percent goal operated as an inflexible requirement.

◆ The District's adoption of the Act was based on "general allegations of discrimination rather than on relevant and statistical findings of disparity.

◆ The District developed "no strong basis in evidence" for setting its minority contracting goal at 35 percent.

Following the completion of the District's Discrimination Study in 1992, DC Law 12-268 "Equal Opportunity for Local, Small, and Disadvantaged Business Enterprise Act was enacted by the City Council. Under this Law, each agency of the District, among other things, shall:

◆ Allocate its construction contracts in order to reach a goal of 50 percent of the dollar volume of all construction contracts to small businesses.

◆ Allocate its procurement of goods and services, other than construction, in order to reach a goals of 50 percent of the dollar volume to small business enterprises.

◆ Allocate 5 percent of its contracts to prime contractors who agree to subcontract a portion of the contract work with local or disadvantaged businesses.

DC Law 12-268 also provides for a bid preference mechanism; a separate set-aside program for small business enterprises; a set-aside program for local, small and disadvantaged businesses at the sub-contracting level; and a set-aside program for local, small and disadvantaged businesses for the "Blanket Order Blitz" program.

Despite the fact that 10 years have passed since the District's race-based set-aside program was found unconstitutional by the Courts, many people continue to believe that minority set-asides should remain in the District of Columbia. In fact, the District's own Discrimination Study revealed that there was disparity in certain areas of contracting with minority-owned businesses, leading many people to believe that the District would be able to meet the strict scrutiny standards imposed in the Croson decision. Other areas of marketplace contracting, however, revealed "over-utilization" based on the availability of minority business enterprises in the marketplace. Despite these findings, the District opted not to continue with a revised race-based program to replace the original Minority Contracting Act DC 1-95, but instead to develop a race neutral program to promote DC-based businesses, small businesses and businesses whose owners had or currently suffered from economic and social disadvantages.

## 3.0   Identification, Analysis And Validation

During discussions relating to the effectiveness of the District's monitoring and enforcement efforts, a number of stakeholders raised concerns about whether the District is aggressively enforcing MOU requirements. That concern is heightened when one considers the amount of potential business for LSDBEs that exists within the scope of projects covered by MOUs. While the Subgroup did not examine the extent to which this particular enforcement activity was more aggressively pursued than others, our recommendations for improved monitoring and enforcement are intended to include enforcement of MOU commitments.

As a result of the significant amount of research and data collected by the Task Force, we conclude that having a race and gender-neutral program is not seen as a major barrier. Rather the lack of compliance and enforcement of the legislation and policies set forth in DC Law 12-268, The "Equal Opportunity for Local, Small and Disadvantaged Business Enterprise Act of 1998" is considered the hurdle to the effectiveness of the LSDBE program.

## 3.1   Improved Systems are Key to Enhancing Reporting

Amongst all the areas of study by the Task Force; the issue of systems, measurement, reporting, and monitoring received significant attention. In each of the Subgroup's area of focus, each issue led back to systems problems, i.e. procurement, communications, tracking, monitoring, and reporting systems. Each Subgroup identified significant gaps in the existing systems' capabilities; inhibiting, in many cases the City's ability to effectively communicate its program successes. The three District agencies most involved in the LSDBE procurement supply chain – the Office of Local Business Development (OLBD), the Office of Contracting

and Procurement (OCP), and the Office of the Chief Financial Officer; all rely on incompatible computer systems. As such, OLBD is unable to develop credible, meaningful, verifiable compliance reports that could otherwise lead to improving public perception concerning the LSDBE program.

## 3.2  Current OLBD Compliance and Enforcement Activities

A description of the structure that is used to implement compliance and enforcement of DC Law 12-268 follows. It should be noted that a number of stakeholders have questioned the extent to which the process outlined below is rigorously followed. Thus, what is described may not mirror actual practice or stakeholder perception of actual practice. Nonetheless, the Subgroup has examined the basic structure and, absent any evidence to the contrary, has assumed that it is being followed. Our recommendations are intended to improve the effectiveness of this basic structure.

The Director of OLBD has the responsibility and authority to carry out the functions assigned to the Office. With regard to agency compliance with LSDBE regulations, the Director is responsible for the:

> review [of] the procurement plans of each agency of the District government and determine[ing] . . . which contracts, or parts thereof, shall be reserved . . . so that agency's failing may be timely remedied . . . reviewing agency plans and taking appropriate action . . . and monitoring agency compliance with LSDBE requirements.

The other officials involved in the process of ensuring agency compliance with LSDBE regulations are agency directors and the Office of Contracting and Procurement (OCP).

Because agency directors have limited contracting authority, responsibility for meeting LSDBE goals does not solely rest with them. Agency directors and OCP share this responsibility. They jointly decide the goal and the ways in which the goal is to be reached.

## 3.3  Forecasts and Report Content

To facilitate monitoring the compliance of District agencies, OLBD requires District agencies to submit quarterly reports to the OLBD detailing each agency's expenditures with LSDBEs. The reports provide information regarding how much each agency has expended with respect to LSDBEs. These expenditure reports must then be compiled and submitted to the Office of the Mayor and the Council of the District of Columbia at the end of each fiscal quarter.

A list of the compliance reports that OLBD requires the agencies to submit are presented below:

**Exhibit 13, Part 6**

◆ Annual Allocation Letter (Form OLBD/CE #1) – This document functions as both a worksheet for each agency to determine the amount of its budget that will be set aside for compliance with DC Law 12-268 and as documentation of the agency director's awareness of the agency's actual obligation under the law for the fiscal year. Specifically, the annual allocation letter provides the agency's: 1) appropriated budget for the fiscal year, 2) operating expenses, 3) expendable budget, and 4) the amount reserved for the set-aside target to be utilized with LSDBEs. The agency director is required to sign the letter.

◆ Operating Expense Checklist (Form OLBD/CE #2) – This document provides an easy way for the agencies to determine their annual operating expenses. Agencies are required to enter the amount of those non-discretionary operating expenses by object code. (The form lists the object codes so that only dollar amounts need to be entered.) The purpose of having the agencies record the amount of their non-discretionary operating expenses by object code is to reflect those operating expenses, which because of the nature of the expense, should not be part of the agency's discretionary expendable budget. The form also allows for adjustments (where object codes have to be entered as well as dollar amounts) for annual expenses not listed on the checklist and requires documentation explaining why the additional amounts are non-discretionary expenses for the agency.

◆ Expenditure Procurement Projection Report (Form OLBD/CE #3) – This document works as an outline for how an agency intends to meet its LSDBE set-aside requirement. (This is the document that is referred to in the data gathering transcripts and notes as forecasts.) Agencies are required to list:

  • The object code number
  • A description of the expenditure
  • The estimated annual expenditure for the fiscal year
  • The projected quarterly expenditure
  • The market that the agency plans to utilize (e.g. LSDBE, Small Business Set-Aside, Open Market, etc.)
  • The type of service for each item of expenditure that the agency projects to spend for the entire fiscal year

Quarterly Contract Award/Purchaser Report (Form OLBD/CE #4) – This document serves as OLBD's monitoring device for evaluating an agency's performance relative to meeting the LSDBE requirement throughout the fiscal year. Agencies are required to provide a detailed list of all purchases made by the agency in the quarter. This includes:

◆ Vendor name

◆ Contract award/purchase order (PO) number

◆ Contract award/PO amount

◆ Contract award/PO date

- Payment amount
- Payment date, description of service
- An indication of whether or not an LSDBE was the vendor

In the beginning of the fiscal year, each agency submits an estimate of its LSDBE expenditure goal for the year to OLBD. The Expenditure Procurement Projection Report serves as the documentation for forecasts. Agencies should achieve 25% of their goal each quarter. The first annual forecast is actually submitted at the end of the first quarter because of the delay in approval of the District's budget by the U.S. Congress.

Agencies submit quarterly reports to the Director of OLBD. Agency reports are prepared by the agency Chief Contracting Officer and the agency's Chief Financial Officer (CFO) or the CFO's designee. Agency directors sign off on the reports before they are submitted to the Cluster Relations Manager in OCP and the OLBD Director.

Shortfalls are addressed upon review of quarterly contract award/purchaser reports. If the Director of OLBD finds a shortfall in an agency's report, the Director first calls the agency's chief contracting officer to discuss a plan to resolve the problem and to find out if the agency has a plan for making up the shortfall in the next quarter. When the OLBD Director and the agency's Chief Contracting Officer cannot reach a consensus on how to make up the shortfall, OLBD transmits a letter to the agency requiring the agency to double its LSDBE expenditures in the next quarter in order to meet its LSDBE goal.

OCP also monitors an agency's progress toward meeting its annual LSDBE goal. Specifically, the Business Development and Contract Compliance Officer in OCP reviews each agency's goals achievement on a quarterly basis. If an agency is short of its goal, the Officer projects the possibility of reaching the goal in the future. If appropriate, OCP also transmits a letter to the agency concerning the need for the agency to double its next quarter's LSDBE expenditures to meet its annual LSDBE goal.

## 3.4  Agency Compliance

At the January 31, 2002 hearing before the Committee on Government Operations, OLBD reported that for the first time since the inception of the LSDBE program, 32 agencies met their individual LSDBE goals. While the Office was proud of this achievement, staff acknowledged that there is opportunity for improvement because 19 agencies did not meet their goals.

The Chief of Procurement, at this same hearing, advised those in attendance that during FY2001, OCP's expendable budget was $1,370,796.00 and its annual LSDBE goal was $685,398.00. The actual contract dollars spent by OCP with LSDBEs totaled $866,032.90. While the agency was able to meet its FY 2001 goal, the fact is that the LSDBE community

should be able to generate more business to obtain more of the expendable budget. It is also evident from OLBD reports of contracts awarded and comments from LSBDEs at the town meetings that contracts awarded are not spread throughout the entire LSDBE community. There is a perception that contracts tend to go to those businesses that have learned how to manipulate the system.

There is no question that the current Director and staff have made significant improvements. However, the Director and the overwhelming majority of participants in the Focus Groups stated that much more needs to be done.

The District of Columbia, in its attempt to adhere to the rulings in the Croson and O'Donnell cases, implemented rules and regulations regarding women and minority programs, and established the 1992 Equal Opportunity for Local, Small and Disadvantaged Business Enterprises Act. The creation of this law enabled large local companies to compete against small and disadvantaged companies, thus creating a significant barrier of entry for the truly small business enterprise.

Among the LSDBE program stakeholders interviewed, private developers questioned, "What does "local mean?" They know that local does not necessarily mean small; therefore, the government may not be meeting what they think is the mission of the program. Moreover, the focus group data reveals that agency directors, procurement officers, and LSDBEs have an overall lack of understanding concerning what the program is specifically trying to accomplish. These stakeholders stated that even the program's very name – Local, Small and Disadvantaged Businesses – creates differing interpretations and confusion.

It is the view of the Compliance and Enforcement Subgroup that eligibility and size standards should be revised to ensure that the local small business enterprises do not have to compete against the larger, well-established companies in their respective work classifications.

## 4.0    Models for Comparison

In examining other state and local protected class business programs in other jurisdictions, the Subgroup questions whether or not some jurisdictions continued to, despite the Court's decisions, administer race or gender-based set-aside programs. Further, the Subgroup compared various program aspects, including utilization goals and program enforcement mechanisms, used by other jurisdictions. (See Exhibit 4.1.)

# Exhibit 4.1 – Comparison of Best Practices: Compliance and Enforcement

| Baltimore, Maryland Minority/Women's Business Enterprise (Ordinance 211/Mayor's EO) | Chicago, Illinois Minority and Women-Owned Business Procurement Program (Municipal Purchasing Act. 65) | Florida State Minority Business Enterprise "One Florida Initiative" (EO 99-281/Chapter 94-322) | Philadelphia, Pennsylvania The Minority Business Enterprise Council (EO 1-93) |
|---|---|---|---|
| **Background** | | | |
| • Previous program struck down by lawsuit.<br>• 1999 Disparity Study revealed disparity among minority groups and women. | • Conducted disparity study after Croson Case.<br>• New ordinance passed in 1990 to comply with court ruling.<br>• There were a lot of challenges initially from prime contractors.<br>• In 2000, the Ordinance was amended to allow the Office to monetarily penalize contractors when underrepresented groups are not utilized. | • Conducted disparity study.<br>• Current program meets the Court's requirement to be race neutral by eliminating preference points.<br>• The Governor's EO is the mandate; no legislation governs the process. The next Governor could do away with the program. | • Results of disparity study conducted three years ago have yet to be released.<br>• Groups challenged old "Office of Minority Opportunities" program and the new one, but they continue to operate under the current Executive Order. They use EEO data for leverage and emphasize the need for inclusion in awarding contracts. |
| **Model** | **(2 Programs)** | | |
| • The current program is race and gender-based businesses.<br>• Participation Goal: 35% to all minority and women-owned businesses.<br>• Annual goals are set for each agency based on availability of businesses vs. total number of certified companies.<br>• Size standards are currently being developed. Anticipate that they will follow SBA standards. | • Participation Goal: 25% minority and 5% women for Conventional Program.<br>• Participation Goal: 16.9 %minority and 4.5% women for Target Market Program, which is designed to have proven companies compete against each other. Primes cannot compete in program. 10% of overall City budget is set-aside for this program.<br>• Currently being challenged, but has not gone to court yet. | • They do not have goals, participation ranges or points.<br>• Anyone bidding on a contract, including large minority firms must have a diversity plan.<br>• A mandatory registration system is used to capture the total extent of minority business spending across agencies.<br>• Success is measured against total dollars actually spent against available dollars.<br>• Awarding of contracts is based on past participation and performance. | • The current program is race and gender-base and includes all minority classes, the disadvantaged, women and the disabled.<br>• Participation range is used, but the range is not set or stated.<br>• The range is based on bidder's ability to perform.<br>• Bidders must already be certified at bid opening to be considered.<br>• An economically disadvantaged business is defined as personal net worth being less than $750K.<br>• The goal is to move small businesses to status of prime. |
| **Compliance and Enforcement** | | | |
| • All contracts (1500-2000) of $25K or more are reviewed by the office.<br>• An agency can ask for waiver of goal for sole source contracts, but this is kept to a minimum.<br>• There is a constant monitoring of all contracts to ensure goals are being achieved.<br>• If a contractor repeatedly fails to meet goals, the City must be reimbursed its money.<br>• Agency directors are required to report progress on an ongoing basis. If Agency misses commitment, dollars are taken out of the budget.<br>• Conducts job-site visits to ensure prime and subcontractors are in compliance.<br>• Requires all invoices, canceled checks, time records, and receipts upon completion of contract.<br>• Procurement is centralized for more control. | • Every contract is reviewed and bidders must submit a Compliance Plan.<br>• Agencies are responsible for monitoring; if not in compliance, the contract cannot be awarded.<br>• A portion of monies is held in retainage on all contracts so final payment can be penalized if commitment is missed.<br>• In conjunction with these programs, they have a residence requirement that 50% of all hours must be worked by residents of Chicago or monetarily penalized.<br>• Size standard is $27 million for all contracts averaged over a 3-year period.<br>• Conducts job-site visits to ensure prime and subcontractors are in compliance.<br>• Requires all invoices, canceled checks, time records and receipts upon completion of contract.<br>• Procurement is centralized for more control. | • Mandates all agencies to submit contracts over $75K for bid review.<br>• Bidders must adhere to diversity plan, which is reviewed by both the office and agency.<br>• Ongoing monitoring and monthly audits are performed by the Governor's Office to compare current spending against previous month and previous year spending. Actual dollars spent are tracked.<br>• All department heads are evaluated on their achievement.<br>• Roundtable meetings are held monthly to ensure that companies understand the Diversity Plan and expectations.<br>• Procurement is decentralized. | • Every contract over $50K is reviewed to determine if participation range is achievable.<br>• Each bidder must submit a binding agreement form, "Solicitation for Participation and Commitment Form."<br>• Bids are ranked according to compliance.<br>• A bid is rejected if a bidder is not responsive to participation range.<br>• Payment is withheld if it is determined that contractor is not in compliance.<br>• If a project is delayed, agency is responsible for notifying office of start-up so monitoring can begin.<br>• Conducts job site visits to ensure prime and subcontractors are in compliance.<br>• Requires all invoices, canceled checks, time records and receips upon completion of contract.<br>• Procurement is centralized for more control. |

# 5.0 Recommendations:

## Revise LSDBE Program Eligibility Standards

♦ Establish a two-tier system that distinguishes program incentives for large local businesses from small local businesses.

♦ Set aside 50% of agency discretionary procurement for small local businesses only (Tier 2).

♦ Increase revenue ceilings from current levels to $35 million for small local businesses.

♦ Increase asset totals for community financial institutions to $500 million.

♦ Increase "micro-business" revenue limit to $2 million.

## Establish Enhanced Compliance and Enforcement Standards

♦ Include a liquidated damages provision, if permitted, in all future Industrial Revenue Bond (IRB) contracts for failure to meet LSDBE participation requirements involving District procurement activity and in all MOUs executed in connection with the District bond activity. The OLBD, OCP, and contracting officers should consult with the Office of the Corporation Counsel and, where appropriate, immediately recommend to that office the enforcement of liquidated damage provisions in existing contracts where the prime contractor has failed to comply with LSDBE participation requirements.

♦ Enforcement tools of the Department of Consumer and Regulatory Affairs, such as the cancellation of construction permits, should be utilized to ensure compliance with LSDBE participation requirements.

♦ The District should contract with an organization to monitor private-sector contractor compliance with District LSDBE participation requirements. The contractor should have expertise in the construction industry in order to assist the government in identifying potential compliance issues and LSDBE contracting opportunities. The contractor should be provided with, among other things, authority for random job-site visits, review of contractor documents (including time sheets and invoices), and access to subcontractor documents and records. The entity should be given the broadest mandate and all contractors with the District should be under a contractual obligation to fully cooperate with the entity.

♦ Support the provision contained in Bill 14-548 introduced by Councilmember Harold Brazil (Bill 14-548) that both the OLBD and the OCP be subjected to periodic independent evaluations of their actions in approving agency goals and ensuring agency compliance with outstanding requirements for LSDBE participation.

*Quantitative Analysis Report*

# MAYOR'S TASK FORCE ON LOCAL, SMALL AND DISADVANTAGED BUSINESS OPPORTUNITY DEVELOPMENT

## Quantitative Analysis of Local, Small and Disadvantaged Business Enterprise Participation in District of Columbia Government and IRB/PUD Recipient Procurement

# A Synopsis

August 15, 2002

**Submitted To:**

**Steven Jumper**
**Chairman**

# INTRODUCTION

The comprehensive report for the District of Columbia's Local, Small or Disadvantaged Business Enterprise (LSDBE) program participation for Fiscal Year 2001 (FY 2001) is herewith submitted. Responsibility for both accuracy of data and completeness and fairness of the presentation rests with the District of Columbia and reporting agencies: the Office of Contracting and Procurement; the Office of the Chief Financial Officer; and the Office of Local Business Development. L. S. Caldwell & Associates, Inc. has conducted its analysis on a manner designed to present fairly the District's contractual and financial LSDBE participation but makes no assertions to the validity or accuracy to the material respects of the information submitted in conducting its analysis. This report includes all disclosures necessary to enable the reader to gain a necessary understanding of the District's contracting activities, and where appropriate how LSC reached its conclusions based on submitted inconsistent or incomplete information.

*Report Overview*

This comprehensive report has been prepared in accordance with the aforementioned objectives tasked by the Mayor's Task Force. The report is divided into an introductory section and a reference section. The introductory section includes this letter, the District's organizational chart, Glossary, the Methods of Analysis, and the Summary Analysis. The reference section includes a set of attachments that support the findings in the Summary Analysis. The last section provides LSC's discussion of conclusions, outstanding issues and recommendations based on the analysis.

*Make up of District Government*

This analysis is for the District of Columbia government agencies, independent agencies, and its component parts.

The government also comprises thirteen (13) independent agencies and other such separate organizations. The D.C. Sports and Entertainment Commission (**DCSC**), the Public Benefit Corporation (**PBC**), the University of the District of Columbia (**UDC**), the Washington Convention and Tourism Corporation (**WCTC**), and the Water and Sewer Authority (**WASA** are, for example, legally separate organizations but still considered a part of the District of Columbia. *Please note the PBC discontinued operations on April 30, 2001. Its functions were subsequently transferred to the Department of Health, although their budget and LSDBE participation are reported separate from the Department of Health.*

The Washington Metropolitan Area Transit Authority (**WMATA**) is a legally separate organization that is owned, operated, and governed in part by the District of Columbia along with the states of Maryland and Virginia. *LSDBE contracts with WMATA were not reported for this analysis.*

The District of Columbia Housing Authority (**DCHA**) is also an independent agency of the District government. It is a corporate entity with the powers of DCHA vested in a Board of Commissioners consisting of nine members. Additional independent agencies include: the Citizens Complaint Review Board; the Office of the Inspector General; Lottery and Charitable Games Control Board; the Department

of Public Schools; Office of the D.C. Auditor (who is appointed by the D.C. Council); Board of Elections and Ethics; Public Services Commission; the Taxicab Commission; and the Campaign Finance Office.

Finally, the thirteen (13) member D.C. Council, is the legislative arm of the District of Columbia. Although also considered independent of the District of Columbia, their figures were considered and included in this report as well.

*Background for Scope of Work*

District of Columbia Mayor Anthony Williams convened the Mayor's Task Force on Local, Small and Disadvantaged Business Opportunity Development to review the Local, Small or Disadvantaged Business Enterprise (LSDBE) program administered by the Office of Local Business Development (OLBD). The LSDBE program was enacted by the D.C. City Council under the "Equal Opportunity for Local, Small, and Disadvantaged Business Enterprise Act of 1998", made effective as D.C. Law 12-268.

D.C. Law 12-268 mandates that all District agencies, unless otherwise determined by the Local Business Opportunity Commission (LBOC), shall:

- Allocate construction contracts procurement of non-construction goods and services to achieve a goal of 50% LSDBE participation; and

- Submit quarterly reports to LBOC specifying a plan to reach the 50% goal, and contracts or subcontracts awarded to LSDBE firms during the quarter.

In the private sector, developers that receive assistance (e.g., financing, zoning allowances, property purchases, etc.) from the District government are required by a Memorandum of Understanding (MOU) signed with OLBD to "make a bona fide effort" to achieve 35% LSDBE participation in all phases of Project construction. The MOU is typically required of private developers who receive assistance in the form of a Community Development Block Grant (Department of Housing and Community Development), Exclusive Right Agreement (Redevelopment Land Agency/National Capital Revitalization Corporation), Industrial Revenue Bond (Office of the Deputy Mayer for Planning and Economic Development), Land Disposition Agreement (Redevelopment Land Agency/National Capital Revitalization Corporation), Planned Unit Development (Office of Zoning) and Tax Increment Financing (Office of the Deputy Mayor for Planning and Economic Development).

In the review of the LSDBE program, the Mayor's Task Force on Local, Small, and Disadvantaged Business Opportunity Development, tasked L. S. Caldwell & Associates, Inc. (LSC) with analyzing, District of Columbia government procurement and private sector purchasing by Memorandum of Understanding (MOU) signatories. LSC is noted as one of the foremost firms, expert in the field of Contractor/Employment Compliance (Affirmative Action/Equal Employment Opportunity [AAP/EEO]) Program Development in the country.

LSC has been applauded by the private and public sectors and recognized by such federal agencies as the: Office for Federal Contract Compliance, U. S. General Services Administration, and the U. S. Department of Commerce/Minority Business Development for outstanding work in contract compliance and monitoring. The firm has implemented a number of Contract and Employment analyses, Bonding Programs, Contractor Colleges, Employment and Contractor Workshops, Mentoring Programs, and varied Outreach Programs around the region for state and federal programs as well as a number of specific Compliance/AAP/EEO Programs.

As a management firm, LSC has successfully provided management and compliance oversight services for projects ranging in size from $5 million to $2 billion. Services include the total compliance management, specific analytical services, the provision of onsite personnel, contract review, requisition/ invoice approval, establishment of internal and external procedures, negotiating contract clauses, developing operating budgets and other administrative controls.

## *Project Objectives*

Based on the needs of the Task Force, as specified through our contractual obligations, LSC was responsible for analyzing and reporting on the following procurement data. Where appropriate, recommendations were to be made.

1. The Budgets, Goals, and Expenditures, of all District and Independent Agencies for at minimum fiscal year 2001, as reported by the Office of the Chief Financial Officer, Office of Contracts and Procurement and Office of Local Business Development.

2. Define and determine eligible LSDBE dollars cumulative and by agency.

3. Indication of all District and Independent Agencies which are in compliance with the 50% LSDBE goal.

4. Total Agency Expenditures to LSDBE firms.

5. LSDBE percent achieved with respect to the District's MOU partners.

# Glossary of Terms

**Acronyms**

Acronyms are groups of initials used to avoid repetitive writing of frequently used titles.  The table below lists recurring acronyms and terms in this report.

| | | | |
|---|---|---|---|
| **CDBG** | Community Development Block Grant | **MOU** | Memorandum of Understanding |
| **DCMR** | District of Columbia Municipal Regulations | **OCFO** | Office of The Chief Financial Officer |
| **DBE** | Disadvantaged Business Enterprise | **OCP** | Office of Contracts and Procurement |
| **EA** | Emergency Action Dollars | **OLBD** | Office of Local Business Development |
| **FY** | Fiscal Year | **PUD** | Planned Unit Development |
| **IRB** | Industrial Revenue Bond | **SBA** | Small Business Administration |
| **LBE** | Local Business Enterprise | **SBE** | Small Business Enterprise |
| **LSBE** | Local, Small Business Enterprise | **SDBE** | Small, Disadvantaged Business Enterprise |
| **LSC** | L. S. Caldwell & Associates, Inc. | **SS** | Sole Source Dollars |
| **LSDBE** | Local, Small, Disadvantaged Business Enterprise | **Task Force** | The Mayor's Task Force on Local, Small and Disadvantaged Business Opportunity Development |

| | |
|---|---|
| **Appropriated Budget** | The dollars funded by the District of Columbia to each agency. |
| **Appropriation** | Authority to spend funds appropriated by Congress and financed by general District revenues. |
| **Capital Budget (Capital Improvements Plan)** | A plan for initiating the development, modernization, or replacement of District-owned facilities during a six-year period.  This plan provides the basis for future year capital budget requests. |

| | |
|---|---|
| **Disadvantaged Business Enterprise** | 51 percent of those who own, operate, and control the business enterprise are socially disadvantaged because the individuals have faced chronic, *not fleeting*, instances of prejudice or bias due to their identity as members of a group, as evidenced by the following:<br>• documentation proving that the individuals seeking socially disadvantaged status as members of a group hold themselves out as members of the group;<br>• documentation proving that the individuals seeking socially disadvantaged status have been isolated from the mainstream of American society uncommon to business persons who aren't socially disadvantaged; and<br>• documentation providing that the individuals seeking socially disadvantaged status have personally suffered social disadvantage through treatment they have experienced. |
| **Economically Disadvantaged** | Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities. |
| **Eligible Dollars** | Agency dollars set aside for LSDBE participation after operating expenses have been covered. Pursuant to District Law and regulations, Eligible Dollars are generally fifty percent (50%) of the expendable budget. |
| **Expendable Budget** | Agency dollars available after operating expenses have been covered. |
| **Expenditures** | A payment for goods and services received. |
| **Federal Dollars** | Federal government allocated dollars for local agency operations. |
| **Grants** | Funds received from the federal government to support the District's capital program. |
| **Local Business Enterprise** | A business enterprise whose principal office is physically located in the District of Columbia, is licensed by the District, and is subject to District of Columbia taxes. |
| **Operating Expenses** | Appropriated dollars used to fund an agency's infrastructure, i.e.: salary, lights, fixtures, etc. |
| **Other Dollars** | Internally generated dollars by agency. |
| **Revenue Bond** | Bonds whose principal and interest are payable exclusively from earnings of an enterprise. |

| **Small Business Enterprise** | ***A local business*** or a business enterprise that has satisfied the requirements established in Section b (13) of the Equal Opportunity for Local, Small, and Disadvantaged Business Enterprises Act and is independently owned, operated, and controlled. An SBE must also meet various size standards related to annual income. |
| --- | --- |
| **Socially Disadvantaged** | Individuals who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as members of a group. Social disadvantage must stem from circumstances beyond their control. In the absence of evidence to the contrary, individuals who are members of the following designated groups are presumed to be socially disadvantaged:<br>• Black Americans<br>• Hispanic Americans<br>• Native Americans<br>• Asian Pacific Americans<br>• Members of other groups designated by the SBA. |

# METHODS OF ANALYSIS

At the request of the Mayor's Task Force on Local, Small, and Disadvantaged Business Opportunity Development, L. S. Caldwell & Associates, Inc. (LSC) was charged to conduct an analysis of the District of Columbia's FY 2001 contracting opportunities relevant to the District of Columbia's Local, Small, or Disadvantaged Business Enterprises (LSDBE). This analysis/ report covered sixty-one (61) District of Columbia Agencies and Commissions, and twenty-eight (28) MOU partners. The primary goal for LSC was to review current District LSDBE compliance and explore ways to improve participation and reporting through an examination of the District's utilization policies, programs, and practices. This analysis is done to be useful to Agency managers in structuring systems and policies that are consistent with their business needs and operations as well as their LSDBE contracting obligations and diversity objectives.

Accordingly, LSC looked at the District's business practices employed by District agencies to comply with their equal opportunity obligations and diversity objectives. LSC also set out to catalogue its findings in a way that would be useful to the Task Force and the District of Columbia overall, including agency managers unfamiliar with the District's LSDBE legislation and mandates.

Suggestions are also offered to the Mayor's Task Force with recommendations to improve the District's LSDBE program and assist in developing its best policies, programs, and practices. LSC researched the statutory, regulatory, policy or operational changes that could be made to facilitate the development of those policies and practices.

Since ***management commitment*** and ***accountability*** are necessary for the District's LSDBE policies, programs, and practices, LSC weighed these concepts very heavily in its analysis which will resonate throughout this report. In terms of commitment, LSC evaluated agency goals versus expenditures or in parlance what "management was saying versus doing". In terms of accountability, the report looked at contract dollars and MOU partnerships and other financial measures to reflect an agency's ability to set high standards and then demonstrate significant LSDBE participation.

In accordance with the requirements for this analysis, LSC requested certain financial contracting data from the District Agencies. Specifically, the following data was requested:

## From the Office of Local Business Development
I. Sample copies of a blank and a completed "Expenditure Projection Report", including a concise explanation of the process to determine LSDBE Projection expenditures.

II. Individual "Expenditure Projection Reports" submitted from all:
   a. District Agencies
   b. Independent Agencies

III. A list of certified Prime LSDBEs with contract awards by Agency
   a. A list of Prime non-LSDBE contract awardees and their lower tier LSDBE contractors.

b. Indicate the agreed upon 50% goal amount (If negotiated less than 50% of the total Agency budget, an Expenditure Projection Report must be attached).
c. Indicate Agency goal achievement

IV. The sum of contract dollars awarded to certified businesses in each year for the following categories:
a. Local businesses
b. Local small businesses
c. Local disadvantaged businesses
d. Local, Small, Disadvantaged Businesses

V. A list of LSDBE contract awardees alphabetically; including every contract awarded to each LSDBE firm as an individual contract.

VI. Included with this list, provide the total amount of contract dollars spent with LSDBEs and non-LSDBEs by NGIP code. If not available by NGIP code, use SIC or NAICS codes.

VII. The Name of each MOU Project, the Developer, the GC or CM, the total project amount and the percent of the Project completed
a. Indicate the agreed upon net project dollar amount used to calculate the 35% goal.
b. Indicate the agreed upon 35% goal dollar amount
c. Indicate the percent of project expenditures
d. Indicate the percent of the 35% goal achieved
e. List the names of all LSDBE and non-LSDBE Prime contract awardees by the total dollar amount awarded.
f. Provide the list of Primes with contracts and their certified LSDBEs with lower tier contract awards
g. Provide the total amount of LSDBE contract awards

**From the Officer of the Chief Financial Officer**

I. Provide the total BUDGET ALLOCATED for:
a. District Agencies
b. Independent Agencies

II. Provide the ACTUAL BUDGET SPENT at fiscal year end for:
a. District Agencies
b. Independent Agencies

III. Provide a breakdown of District Agency and Independent Agency Budgets by category for:
a. District appropriated dollars
b. Federal dollars
c. Capital Budget
d. Other dollars

IV.  Provide the sum of expenditures with certified businesses in each year for:
    a.  Local businesses
    b.  Local small businesses
    c.  Local disadvantaged businesses
    d.  Local, small, disadvantaged businesses


**From the Office of Contracting and Procurement**

I.  List any emergency contracts, including dollar amounts of expenditures and which contracts went to LSDBEs.

II.  List any sole source contracts, including dollar amounts of expenditures and which contracts went to LSDBEs.

As indicated in the Timeline below, two "Requests for Data" were submitted by LSC to the Office of the Chief Financial Officer, the Office of Contracts and Procurement, and the Office of Local Business Development. The first request, sent on June 19th, 2002 did not yield sufficient information to conduct the analysis.  It wasn't until the second request for the same information on July 7th, 2002 and a number of subsequent telephone calls from LSC staff, which ultimately yielded the materials and documents needed.

In the early stages of the analysis, LSC requested specific information from the Office of the Chief Financial Officer, Office of Contracts and Procurement and Office of Local Business Development.  As this chart indicates, in most cases LSC did not receive the data on time, if at all.  Further, little of the data was received electronically, also as requested.

| Information Requested | From Agency | Date Requested (First Deadline: June 26th) | Date of Second Request (If Applicable) | Was information received | | Date(s) Received | How Information was received |
|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | |
| Expenditure Projection Report for all Agencies | OLBD | June 3, 2002 | July 7, 2002 | ✓ | | July 29, 2001 | Mail |
| List of all Certified LSDBEs with District Agency contracts | OLBD OCFO | June 3, 2002 | July 7, 2002 | ✓ | | July 29, 2001 | Mail |
| Sum of LSDBE contract dollars by contractor name and certification type | OLBD | June 3, 2002 | July 7, 2002 | | ✓ | | |
| A total amount of contract dollars spent with LSDBEs and non- | OLBD OCFO | June 3, 2002 | **Not Applicable** | ✓ | | June 26, 2002 | Mail |

| LSDBEs by NIGP codes | | | | | | | |
|---|---|---|---|---|---|---|---|
| The name of each MOU Project and the percent of the Project completed | OLBD | June 3, 2002 | **Not Applicable** | ✓ | | June 3, 2002 June 8, 2002 | Email Fax |
| Total District Appropriated, Federal, Capital, & Other Dollars Allocated and Spent for all District of Columbia Agencies | OCFO | June 3, 2002 | July 7, 2002 | ✓ | | July 8, 2002 | Mail |
| The sum of Expenditures with certified businesses for LSDBE contractors | OCFO | June 3, 2002 | **Not Applicable** | ✓ | | June 26th | Mail |
| A list of Emergency Action contracts and dollar amounts to LSDBE contractors | OCP | June 3, 2002 | **Not Applicable** | ✓ | | July 5th, 2002 | Email and fax |
| A list of any Sole Source contracts and dollar amounts to LSDBE contractors | OCP | June 3, 2002 | **Not Applicable** | ✓ | | July 5th, 2002 | Email and fax |

Overall, time was the most pressing challenge. However, LSC encountered additional challenges in conducting its analysis:

- LSC began its work with an exhaustive review of the literature submitted by the District, and expended a disproportionate number of hours re-keying that data in order to derive necessary calculations.

- LSC encountered numerous discrepancies in the data, which could not be researched due to insufficient time and resources.

- LSC was not contracted to confirm any data or statistical sample submitted.

**Step I - Program Management Team**

On May 30, 2002, L. S. Caldwell & Associates, Inc. staff met to determine who would constitute the Team responsible for conducting the Task force analysis. The In-house team consisted of: Ms. Loretta Caldwell, Mr. Eugene Harvey, and Mr. Robert Williams. On June 27th Mr. Korey Gray was added to the team.

Once assembled, the team outlined the steps it would take to conduct the analysis, and prepared a Data Request letter to the District of Columbia agencies for the necessary information. It was also decided that Mr. Gray would lead the team, and assume responsibility for the collection of the data and any follow up that may be required. He conscientiously maintained communication with Mr. Steven Jumper and Ms. Vicki Johnson to keep the Task Force apprised on LSC's analysis. Further, through frequent telephone and email correspondence, the LSC Team established lines of communication with the Office of the Chief Financial Officer, and the Office of Local Business Development to obtain missing or incorrect data.

As stated in the timeline, on June 3rd, 2002, LSC submitted its first data request letter to the Task Force. It was assumed that this would be the only letter needed, so it was inclusive of all the information LSC needed to conduct its analysis. It was expressed in the letter that all data must be submitted to LSC no later than June 26, 2002. It was further requested that LSC receive all financial information electronically.

Once the deadline of the June 26, had passed, it became apparent that more vigorous efforts would have to be made in order to get the necessary information to conduct the analysis. Several emails and high level calls were made by the LSC Team to encourage the three reporting agencies to submit their data. On July 5th, 2002, a second Data Request Letter was crafted and submitted to the three Agencies and to Steven Jumper requesting his assistance to obtain the information needed. A new deadline of July 12th 2002, was set along with another request to get the information electronically.

Shortly after the 2nd request letter, LSC began receiving a wealth of material; however, only one of the financial documents, from OCP, came electronically. The LSC Team met with Steven Jumper and Vicki Johnson to discuss ways to capture this data, and how to proceed. It was decided at this point by Mr. Jumper that, due to the tardiness of the Agencies to respond and the convoluted manner in which they submitted the data, LSC would report only on the District's LSDBE participation for FY '01.

## Step II – Data Capture

In order to capture the data electronically, the following supplementary tasks were conducted by the LSC Team:
1) Developed an in-house database and electronic spreadsheet to capture data.
2) Briefly reviewed the materials submitted to determine what information needs to be keyed into the in-house systems.
3) Set a deadline of one week to key in information.
4) Assigned additional LSC staff with task hours to key in the information
5) Once data was keyed, LSC began its analysis.

As we began capturing and keying the data, the LSC Team discovered several inconsistencies:

1) LSC did not receive LSDBE Expenditure Reports for FY 2001
2) The D.C. Agency Procurement Data Spreadsheet mailed to LSC by the OCFO did not include corresponding NIGP codes, per LSC's request.
3) The D.C. Agency Procurement Data Spreadsheet did not provide congruent or discernable contract descriptions to determine appropriate NIGP, NAICS, or SIC codes. It was readily apparent that the preparer of this spreadsheet, minimized the "cells" to fit the report on one page. In doing so, several pertinent facts were lost. This could have been averted if the file were sent electronically. LSC made attempts to obtain a new set of data from the preparer, but was not successful.
4) The D.C. Agency Procurement Data Spreadsheet contract totals, did not match the accompanying Procurement Summary Page, also submitted by the OCFO.
5) Quarterly Expenditure Reports - As part of their obligations, all District of Columbia Agencies and MOU partners are required to submit Quarterly Expenditure Reports to the Office of Local, Business Development.   There are some issues with reporting in that it appears a number of agencies and MOU partners have not filed reports for all quarters, or the reports were otherwise filed incorrectly. This would partially explain some of the discrepancies in the information provided to LSC for its analysis.

LSC requested and received FY 2001 reports from the OLBD on July 29, and 30th, a full two weeks after beginning work on the report and more than two weeks after the second deadline. The LSC Team promptly assimilated the data and incorporated it into our data system.

## Step III – Analysis and Report

On July 31st, 2002, LSC completed keying in data. The team then spent the next two days, examining and comparing the data, developing statements and topics for discussion regarding the District's LSDBE participation. Several graphs and charts were developed to highlight the statements made in this report.

First, the report identifies the factors that determine an agency's appropriate LSDBE participation. This included identification and understanding of all District policies and regulations that govern its LSDBE and equal opportunity program.

Secondly, the report analyzes the agencies' goals and actual participation. This portion of the analysis is broken into a discussion of the District's MOU partnerships and the larger and more in depth evaluation of the LSDBE contracting program. Inclusive in this section is the identification of those agencies found to be particularly noteworthy, as well as which firms and trades received the most contract dollars.

Third and finally, LSC ends its analysis with a set of reccomendations and suggestions for improved LSDBE participation and reporting.

---

# EXECUTIVE SUMMARY OF FINDINGS

**Objective I:** *The Budgets, Goals, and Expenditures, of all District and Independent Agencies for fiscal year 2001, as reported by the Office of the Chief Financial Officer, Office of Contracts and Procurement and Office of Local Business Development.*

The following is a summary of findings regarding the District of Columbia's LSDBE participation for FY 2001. These findings were based solely upon the documentation provided by the Office of the Chief Financial Officer, the Office of Local Business Development, and the Office of Contracts and Procurement. LSC makes no assertions as to the validity or accuracy of the information provided.

**District of Columbia Budget** – This quantitative analysis focuses exclusively on the Local Appropriated funds for the District of Columbia. The table below (**Figure 1.1**) provides a glance of the FY 2001 District of Columbia Budget. These figures come from the OCFO's District Agency Budget and Expenditure report (**Attachment 1: FY 2001 Budget and Expenditures**).

**Figure 1.1**   **FY 2001 District Operations Budget**
**$6,113,469,000**



| Federal Budget | $1,597,625,000 |
|---|---|
| | $1,024,835,000 |
| Local Appropriated Budget | $3,491,009,000 |

As shown in **Figure 1.2** the total Local Appropriated Budget for the District of Columbia in FY 2001 was $3,491,009,000 or 57% of the total District Government's operations budget.

**Figure 1.2    FY 2001 Local Budget Summary**



| Local Appropriated Budget | $3,491,009,000 |
|---|---|
| Operation Costs | $3,087,305,798 |
| **Expendable Budget** | **$403,519,692** |
| Eligible Dollars | $201,851,601 |
| Unrestricted Dollars | $201,851,601 |

**Objective II:** *Determination of eligible LSDBE dollars cumulative and by agency.*

As shown in the **Figure 1.2** the District of Columbia's total expendable goal for FY '01 was $403,519,692.00.

Title 27, District of Columbia Municipal Regulations (DCMR) Chapter 8, Local, Small, and Disadvantaged Business Enterprises Contracting regulations, pursuant to District of Columbia Law 12-268, as amended, sets forth a Project contracting goal of 50% of its expendable budget for Local, Small, or Disadvantaged Business Enterprise participation. This is also referred to as the agency's "Eligible Dollars". The Expendable Budget is determined by the respective agencies with coordination and approval by the Office of Local Business Development. **For FY 2001, the LSDBE contracting goal was calculated as $201,851,601.00 or 5.78% of the Local Appropriated Operating Budget.**

The following chart (**Figure 2.1**) provides the Eligible Dollars per District Agency, as indicated from the Office of Local Business Development (**Attachment 2: Summary of Differences between OLBD and OCFO**).

Figure 2.1

| Agencies with LSDBE Dollars | Appropriated Budget | Eligible LSDBE Dollars |
|---|---|---|
| *Aging, Office of* | $14,188,091.00 | $1,204,929.00 |
| *Appeals and Review, Board of* | $244,000.00 | $31,000.00 |
| *Arts and Humanities, Commission on* | $1,779,565.00 | $38,156.00 |

| Agencies with LSDBE Dollars | Appropriated Budget | Eligible LSDBE Dollars |
|---|---|---|
| *Auditor, Office of* | $1,282,690.00 | $71,299.50 |
| *Banking and Financial Institutions* | $1,869,376.00 | $120,715.00 |
| *Cable Television, Office of* | $3,570,850.00 | $593,692.00 |
| *Campaign Finance, Office of* | $1,229,519.00 | $13,731.00 |
| *Chief Financial Officer* | $79,243,543.00 | $7,143,159.00 |
| *Citizen Complaint Review Board* | $1,351,754.00 | $72,201.00 |
| *City Administrator, Office of* | $4,722,252.00 | $288,867.00 |
| *City Wide Call Center* | $1,958,785.00 | $185,312.00 |
| *Commission on Mental Health* | Not Reported | Not Reported |
| *Consumer & Regulatory Affairs* | $23,293,902.00 | $652,975.00 |
| *Contracts and Procurement, Office of* | $12,458,352.00 | $685,398.00 |
| *Contracts, Grants (Department Unknown)* | Not Reported | Not Reported |
| *Corporation Counsel, Office of* | $49,810,000.00 | $1,492,366.00 |
| *Correction, Department of* | $209,234,847.00 | $5,560,067.00 |
| *Council of the District of Columbia* | $12,061,314.00 | $367,000.00 |
| *DC Sports & Entertainment Commission* | $10,968,000.00 | $390,000.00 |
| *Department of (Department Unknown)* | Not Reported | Not Reported |
| *Deputy Mayor* | $1,879,059.00 | $178,717.00 |
| *Elections and Ethics, Board of* | $3,288,443.00 | $367,587.00 |

| Agencies with LSDBE Dollars | Appropriated Budget | Eligible LSDBE Dollars |
|---|---|---|
| Emergency Management Agency | No data | $17,924.50 |
| Employment Services, Department of | $11,511,260.00 | $326,162.00 |
| Fire and Emergency Services Department | $114,511,580.00 | $1,337,246.00 |
| Health & Hospitals, DC, PBC | $149,659,999.00 | $4,000,163.50 |
| Health Department | $1,030,391,647.00 | $27,108,824.00 |
| Housing and Community Development Department | $85,812,104.00 | $780,800.00 |
| Housing Authority | | |
| Human Resource Development | $2,761,168.00 | $1,285,500.00 |
| Human Services Department | $380,545,335.00 | $8,078,513.00 |
| Inspector General, Office of | $11,292,000.00 | $446,500.00 |
| Insurance and Securities Regulation | $7,359,000.00 | $165,500.00 |
| Latino Affairs, Office of | $880,923.00 | $18,367.00 |
| Local Business Development, Office of | $785,963.00 | $109,014.50 |
| Lottery and Charitable Games Control | $226,534,000.00 | $9,445,715.00 |
| Mayor, Office of | $7,713,896.00 | $1,447,215.00 |
| Metropolitan Police | $295,790,927.00 | $5,816,578.00 |
| Motion Picture & Television Development | $403,991.00 | $28,398.00 |
| Motor Vehicles, Department | $23,533,771.00 | $109,674.00 |
| Office of (Department Unknown) | Not Reported | Not Reported |

| Agencies with LSDBE Dollars | Appropriated Budget | Eligible LSDBE Dollars |
|---|---|---|
| *Human Rights, Office of* | $1,353,714.00 | $90,479.00 |
| *Office of the Chief Medical Examiner* | $3,997,005.00 | $369,570.00 |
| *Office of the Chief Technology Officer* | $12,564,039.00 | $2,077,218.00 |
| *Personnel, Office of* | $8,648,629.00 | $2,342,878.50 |
| *Planning, Office of* | $3,929,263.00 | $259,808.00 |
| *Property Management, Office of* | Not Reported | $12,173,202.50 |
| *Public Library, DC* | $25,688,974.00 | $1,064,691.00 |
| *Public Schools, DC* | $664,880,000.00 | $13,541,754.00 |
| *Public Service Commission* | $5,471,886.00 | $227,179.00 |
| *Public Works, Department of* | $93,311,408.00 | $20,600,871.00 |
| *Recreation and Parks, Department of* | $24,603,439.00 | $1,787,034.00 |
| *Secretary, Office of* | $1,712,498.00 | $132,940.00 |
| *Sentencing, Advisory Commission* | $729,927.00 | $62,000.00 |
| *Taxicab Commission* | $672,941.00 | $49,000.00 |
| *Tuition Assistance Program* | $33,274,019.00 | $388,881.00 |
| *U. S. Army Corps of Engineers* | Not Reported | Not Reported |
| *University of District of Columbia* | $44,680,775.00 | $4,190,974.00 |
| *Washington Convention Center* | $52,726,300.00 | $3,361,855.00 |
| *Water and Sewer Administration* | $509,570,000.00 | $59,152,000.00 |

**Objective III**: *Indication of all District and Independent Agencies which are in compliance with the 50% LSDBE goal.*

> *Disclaimer: It is not possible to confirm total agency achievement, because there is a discrepancy that exists between the Office of the Chief Financial Officer and the Office of Local Business Development regarding LSDBE Contracts awarded.*

OLBD reported that $310,827,225 in contract dollars were awarded to LSDBEs **(Attachment 2)**. However this figure is substantially different from the $376,609,311 contract dollars awarded to LSDBE's according to the OCFO. Although neither statement can be independently verified, this report relies on both Agency findings but defers to the OCFO when the numbers conflict, as the set of data provided was more complete and included some supportive findings that were based on the contractor detail attachments.

> *Disclaimer: There were several agencies that submitted reports that appear inconsistent, egregious, and distort the findings on LSDBE percent achieved. These agencies which are listed and highlighted in the* **Appropriated Budgets and LSDBE Participation at a Glance** *chart reportedly awarded contract dollars to LSDBEs that exceed their Expendable Budgets, and in some cases exceed their reported Appropriated Budgets. Accordingly, we cannot accurately display their LSDBE participation versus their Eligible Dollars.*

The following chart (**Figure 3.1**) indicates each District Agency's LSDBE participation. As indicated in **Attachment 3**, of the agencies that reported numbers, twenty-three (23) agencies achieved their LSDBE participation goal. (For the purposes of this report, successful achievement of goal was determined to be ninety percent (90%) or better). The average rate of participation for these agencies is 128%. These agencies are:

Rounded to nearest percent

| | | |
|---|---|---|
| Department of Aging | District Agency | 104% participation |
| Board of Appeals and Review | District Agency | 100% participation |
| Department of Arts and Humanities | District Agency | 100% participation |
| Office of Cable Television and Telecommunications | District Agency | 116% participation |
| Citizens Complaint Review Board | Independent Agency | 127% participation |
| Office of the City Administrator | District Agency | 102% participation |
| Office of Contracting and Procurement | District Agency | 126% participation |
| Department of Corrections | District Agency | 160% participation |
| Office of the Deputy Mayor for Planning and Economic Development | District Agency | 101% participation |
| Office of Inspector General | Inspector Agency | 137% participation |
| Office of Latino Affairs | District Agency | 203% participation |
| Office of Local Business Development | District Agency | 134% participation |
| Lottery and Charitable Games Control Board | Independent Agency | 96% participation |
| Office of the Mayor | District Agency | 142% participation |
| Department of the Metropolitan Police | District Agency | 118% participation |
| Motion Picture and Television Development | District Agency | 100% |
| Department of Parks and Recreation | District Agency | 107% participation |
| Office of Property Management | District Agency | 130% participation |
| Department of Public Schools | Independent Agency | 175% participation |
| Department of Public Works | District Agency | 183% participation |
| Office of the Secretary | District Agency | 94% participation |
| Water and Sewer Authority | Independent Agency | 168% participation |

Furthermore:
- Nineteen (19) District Agencies did not meet the LSDBE 50% goal of expendable dollars.

- Eighteen (18) District Agencies submitted inconclusive reports with which to satisfactorily determine LSDBE participation.

As reported by the OLBD, the chart below (**Figure 3.2**) identifies the top five agencies with the greatest LSDBE percentage.

Figure 3.2 Top Five
Agencies



**Objective IV**: *Total Agency Expenditures to LSDBE firms.*

A total of 3,060 contracts were awarded to 296 different contractors listed by the OCFO as Local, Small, and/or Disadvantaged enterprises **(Attachment 4)**.

*Disclaimer:    LSC is not able to verify certification for several of these firms, as we were not provided a listing of FY '01 Certified firms or access to the necessary databases to access this information, per our request.*

This chart below **(Figure 4.1)**, identifies the number and cumulative value of the District's LDBE contracts by their Certification Type.  This information is based on the Annual Allocation Letters submitted by the Office of Local Business Development found in the Appendix section of the full report.

| Certification Type | Number of Contracts Awarded | Total Value of Contracts Awarded | Percent of District Contracts with Identifiable Certification Types |
|---|---|---|---|
| LSDBE | 66 | $100,143,749.29 | 38% |
| LSBE | 90 | $40,142,156.75 | 15% |
| LDBE | 0 | $0.00 | 0% |
| SDBE | 3 | $770,205.70 | Less than 1% |
| LBE | 9 | $119,502,126.44 | 46% |
| SBE | 2 | $365,970.00 | Less than 1% |
| DBE | 0 | $0.00 | 0% |
| **Totals** | **170** | **$260,924,208.18** | |

The remaining contractors could not be classified, as per the disclaimer above.

Figure 4.2 depicts OCFO's top ten LSDBE contractors (determined by dollars)



**Objective V:** *LSDBE percent achieved with respect to the District's MOU partners.*

- **Memorandum of Understanding (MOU)** – According to information submitted by the Office of Local Business Development, in FY '01, the District of Columbia executed sixteen (16) MOU's with Industrial Revenue Bonding (IRB) and twelve (12) MOU's as Capital Revitalization Corporation Approved Projects (CRCAP). In all instances the LSDBE goal was 35%. As of July 6th 2002, total bond financing for IRB MOU's was $9,672,700,000. The total bond proceeds (goal) for LSDBE participation to that same date were $156,714,617. The total actual proceeds were **$12,643,115** or **8%** of goal.

  As **Industrial Revenue Bond Monitoring Program Consolidated Report** indicates the IRB MOU partnerships are still ongoing and projected to meet the 35% LSDBE participation.

_____

Of the twelve (12) CRCAP MOU's, ten (10) were Planned Unit Development (PUD) Project's, including the Georgetown Incinerator Project. The total Adjusted Development Budget for the CRCAP MOU's was $407,425,550. The LSDBE 35% participation goal was $142,598,942.50. To date, the total LSDBE participation is **$17,485,250.00 or 12%** of goal.

**Exhibit 13, Part 7**

# RECOMMENDATIONS

Through the course of completing its analysis, LSC generated several suggestions on ways to improve LSDBE and MOU participation by District Agencies. Although all of these suggestions had merit, many of them did not appear to be germane to this quantitative analysis, or bore significant implications beyond the scope of this report, including recommendation that entailed program overhauls. Ultimately, LSC targeted its recommendations to improving the District of Columbia's LSDBE reporting component.

First, L. S. Caldwell & Associates, Inc. strongly encourages this Task Force and the District of Columbia to conduct an independent audit of each agency to confirm the veracity of the LSDBE contractual data collected, maintained, and reported by each agency.

Secondly, LSC recommends that the District of Columbia, via the Office of Local Business Development, develop a set of standard "best practices" and resolutions that reflects with current legislation and allows improved tracking and reporting of Agency LSDBE and MOU participation.

This includes, but is not limited to:

- In all cases where applicable, enforce the 50% Rule for LSDBE Participation. In cases where the 50% is not applicable, include agency justification for ineligible contracts along with new participation goals and proof of achievement.
- Establish a standardized coding system for descriptions of contracts for better tracking and evaluations. Such a system should include relevant NIGP, NAICS or SIC codes.
- Develop electronic filing system that tracks all LSDBE contractual information (i.e. excel spreadsheet or access database).
- Establish a tracking system that separates LBE, SBE, DBE, LSBE, LDBE, LSDBE, RBO, etc. companies for better comparisons and accurate data analysis.
- Develop an effective standard quarterly tracking report form to be used by all District Agencies, Public/Private Agencies, and MOU partnerships.
- Enforce rule for quarterly reporting by all District Agencies, Public/Private Agencies, and MOU partnerships.
- Develop a monthly monitoring component exclusive of the quarterly reporting.

In order to facilitate greater effectiveness and efficiency in the planning and delivery of OLBD's LSDBE programs, LSC also recommends certain coordination initiatives.

- OLDB should report quarterly on the status and accomplishments of the LSDBE contracting program and all such outreach efforts to promote greater awarness and participation. The report should include an evaluation and presentation of best practices.

- OLBD should train all Agency heads on the 50% Rule and all monitoring and reporting processes used to track participation.

* * * * * * * * * * * * * *

This report should be thought of, not as a blueprint, but more as an idea bank that can be drawn upon broadly by one and all.  LSC's findings and recommendations are not meant to require the District of Columbia to adopt certain practices or policies that are outside the scope of any applicable laws and mandates.

*Agency Comment Letter(s)*



October 10, 2002

Mr. Steve Jumper
Director, Public Relations
Washington Gas
1110 H Street, NW
Washington, DC 20009

Dear Steve:

Thank you for forwarding the confidential copy of the draft report on Local, Small and
Disadvantaged Business Opportunity Development to the Department of Banking and Financial
Institutions ("DBFI").

DBFI's comments relate specifically to Section 1.6 Recommendations, Page 8 entitled
"Utilization". The report lists nine areas of utilization. In DBFI's view, all of the services that
are articulated in Section 1.6 should appropriately be located at the Enhanced Business
Information Center ("E-BIC") located at the Martin Luther King, Jr. Library.

DBFI has taken the lead in developing and implementing the operations of the E-BIC. This is a
partnership that includes the Small Business Association (SBA), DOES, Howard University's
Small Business Development Center (HUSBDC), DCPL, OCTO, DC Marketing Center, other
district agencies and partnerships with the Universities and law firms in the Washington, DC
area. This E-BIC has been established to create a comprehensive small business resource center
that will provide an array of technical support and services to all small businesses at any stage of
development in one central location.

Accordingly, DBFI recommends that bullet number 7 of Section 1.6 be deleted and the following
language be inserted in the report, "The District should promote DBFI's efforts to continue to
partner with financial institutions to ensure community reinvestment, community development
and to promote more lending opportunities for businesses in the District of Columbia".

Thank you for this opportunity to comment on the draft report.  If you have any questions, please call me on (202) 727-1565.

Yours truly,


S. Kathryn Allen
Commissioner

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAPITOL PAVING OF D.C., INC.        :

     Plaintiff                     :

v.                               :         Civil Case No. 07cv113 (RJL)

DISTRICT OF COLUMBIA, et al.     :

     Defendants              :

## AFFIDAVIT OF FRANCISCO R. NETO

FRANCISCO R. NETO, having been duly sworn, deposes and states as follows:

1.     I am over 18 years of age and competent to testify in a court of law.

2.     I have personal knowledge of the matters set forth in this Affidavit.

3.     I am the President of Capitol Paving of D.C., Inc.

4.     Capitol Paving is a minority-owned and operated business established in the District of Columbia on November 9, 1987.  The work of Capitol Paving includes  paving and rehabilitation work.

5.     A substantial portion of Capitol Paving's present work involves contracts with the District of Columbia government for paving and rehabilitation work in the District.

6.     Since March of 2006, the District of Columbia has issued three Solicitations containing the Longtime Resident Business (LRB) preference for work that is within the realm of expertise and scope of services performed by Capitol Paving.   In connection with the FY05 First Citywide Alley Contract, Capitol Paving was the apparent low bidder by an amount of $576,068.20.

**Exhibit 14**

However, upon application of the LRB preference, Fort Myer was deemed to be the low bidder, although it would perform the work at its bid price which results in a higher price to the District for the work in the amount of $576,068.20.

7.     As a result of the application of the LRB preference, if the First Citywide Alley Contract is awarded to Fort Myer, Capitol Paving would lose a contract potentially generating $26.5 million over five years. Even if the contract were limited to one year, Capitol Paving would lose a $5.3 million dollar contract. It has been my experience in the paving industry that if a contractor satisfactorily performs the initial year of a multi-year contract, that it will generally be awarded the subsequent option years as well.

8.     In 2002, Capitol Paving was awarded the same work set forth in the Alley Contract pursuant to a different solicitation. Capitol Paving had successfully completed the base year and three of the option year periods. Capitol Paving was ready to commence the fourth option year when it was advised by DC DOT that the District did not intend to exercise option year four. No reason was provided for the cancellation. On information and belief, the 2002 Alley Contract was a unit price contract of $3,113,300.00 per year including a base year and 4 option years equal to a contract amount of $15,566,500.00. As a result of additional work added to the contract, Capitol Paving's performance of the base year and 3 option years generated a total revenue of $32,702,922.00. While Fort Myer's bid for the 2005

-2-

Alley Contract was $27,132,323.20, consistent with the additional work performed on the 2002 Alley Contract, in connection with the 2005 Alley Contract, Fort Myer has the potential of earning revenues doubling or tripling the total contract bid amount.    That additional work will be performed at a premium based on the application of the LRB preference.

9.    Based on the emergency requirement to immediately perform some of the work under the 2005 Alley Contract, Capitol Paving is ready, willing and able to perform the work required under its existing 2002 Alley Contract which has not been finalized..

10.    The second Solicitation is for FY06 City Slurry Seal and Chip Seal Contract, which also contains the LRB preference.    The contract is for a period of one year, and the one year price range is approximately over $1.5 million.

11.    The District has also issued a request for proposal,  POKA-2006-R-0087-VH (D. C. Streetcar Anacostia Initial Line Segment).  This is  roughly a $30 million contract, which also includes the LRB preference.

12.    At the very minimum, the application of the LRB preference will cause Capitol Paving to lose contracts worth potentially  millions of dollars as well as effectively preventing Capitol Paving from competitively  bidding on other Solicitations that contain the LRB preference.

13.    The District of Columbia continues to generate contracts which contain the LRB preference.  Capitol Paving will not be eligible to apply for the LRB

- 3 -

certification until November 9, 2007.  In the interim, the LRB preference has created a monopoly in bidding on contracts for work in the District of Columbia.   If Capitol Paving cannot effectively compete for  paving work in the District of Columbia, it would be required to lay off employees and vastly reduce the size of its operations and\or facilities.   Ultimately, it would be forced out of the  paving  business in the District of Columbia, threatening the very existence of the company and resulting in irreparable injury to Capitol Paving.

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT
THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE TO
THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Francisco R. Neto

Dated: _3 - 19 - 07_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAPITOL PAVING OF D.C., INC.**　　　　　:

　　　**Plaintiff**　　　　　　　　　　　　:

**v.**　　　　　　　　　　　　　　　　　:　　**Civil Case No. 07cv113 (RJL)**

**DISTRICT OF COLUMBIA, et al.**　　　　:

　　　**Defendants**　　　　　　　　　　　:

### AFFIDAVIT OF PHUONG D. TRAN

PHUONG D. TRAN, having been duly sworn, deposes and states as follows:

1.　　I am over 18 years of age and competent to testify in a court of law.

2.　　I have personal knowledge of the matters set forth in this Affidavit.

3.　　I am the  Vice President and Chief Estimator for paving work  in the District of Columbia for Capitol Paving of D.C., Inc.

4.　　Capitol Paving is a minority owned and operated business established in the District of Columbia on November 9, 1987.

5.　　A substantial portion of Capitol Paving's present work involves contracts with the District of Columbia government for  paving and rehabilitation work in the District. I am experienced and intimately familiar with the Solicitation, bidding, preference and award procedures for procurement of paving work on behalf of the District of Columbia.

6.　　A company certified as a  Longtime Resident Business (LRB) is entitled to a 10% reduction in its bid price.  However, notwithstanding the allowable 10% reduction, if the LRB certified contractor is awarded the contract, the

**Exhibit 15**

work will actually be performed at the actual or higher contract price. This is apparent in connection with the FY05 First Citywide Alley Contract, in which Capitol Paving was the apparent low bidder by an amount of $576,068.20. However, upon application of the LRB preference, Fort Myer was deemed to be the low bidder, although it would perform the work at its bid price which results in a higher price to the District for the work in the amount of $576,068.20.

7.    During my 29 years in the paving industry, and prior to the LRB preference being implemented, on information and belief, there was never a certification for a business category preference that resulted in a reduction in the bid price of 10%. The 10% reduction in bid price creates an insurmountable advantage in the bidding process.

8.    On information and belief, Fort Myer Construction Corporation is the largest paving contractor performing work for the District of Columbia. Despite the size advantage enjoyed by Fort Myer, prior to the implementation of the LRB preference, Capitol Paving has managed to competitively bid for paving work in the District of Columbia.

9.    Fort Myer's receipt of the LRB preference and the resulting 10% reduction in bid price, has the practical effect of reducing and ultimately eliminating competition in the paving industry in the District of Columbia.

10.   As paving work for the District of Columbia is a major source of revenue for Capitol Paving, the inability of Capitol Paving to competitively bid for

and be awarded such work will ultimately result in the company being forced out of the paving business for the District of Columbia and will result in irreparable injury to Capitol Paving.

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT
THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE TO
THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Phuong D. Tran

Dated: Mar. 19, 2007

- 4 -